UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
(Charleston Division)

| | |
|---|---|
| BISHOP OF CHARLESTON,<br>   a Corporation Sole, d/b/a The Roman<br>   Catholic Diocese of Charleston;<br><br>and<br><br>SOUTH CAROLINA INDEPENDENT<br>COLLEGES AND UNIVERSITIES, Inc.<br><br>   *Plaintiffs*,<br><br>v.<br><br>MARCIA ADAMS, in her official capacity as the Executive Director of the South Carolina Department of Administration; and<br><br>BRIAN GAINES, in his official capacity as budget director for the South Carolina Department of Administration; and<br><br>HENRY MCMASTER, in his official capacity as Governor of South Carolina,<br><br>   *Defendants*. | Case No.   **2:21-cv-1093-BHH** |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. In response to the COVID-19 pandemic ravaging our state and nation, the U.S. Congress and South Carolina General Assembly have appropriated substantial sums of public funds to provide relief to local governments, employers, non-profit organizations, schools, and colleges.

2. However, because the South Carolina Constitution contains a provision, a so-called Blaine Amendment, which prohibits public funds from being allocated to private or religious

schools, the schools and universities represented by Plaintiffs are legally prohibited from accessing these relief funds.

3. Because the Blaine Amendment was born in bigotry and prejudice based on race and religion, it violates the equal protection and free exercise clauses of the U.S. Constitution, and should no longer bar Plaintiffs' schools from equal access to these essential relief funds.

4. Hence, Plaintiffs bring this action under 42 U.S.C. § 1983 to challenge the constitutionality of Article XI, Section 4 of the South Carolina Constitution, which states: "No money shall be paid from public funds nor shall the credit of the State or any of its political subdivisions be used for the direct benefit of any religious or other private educational institution."

5. This case asks this court to confront the ugly history behind South Carolina's Blaine Amendment and whether that prejudice is a permissible basis for a continuing policy whereby the state bars private schools and universities from participation in neutral grant programs when the state constitutional provision prohibiting private school participation is based on longstanding and pervasive religious and racial bigotry.

## JURISDICTION AND VENUE

6. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

7. The Court may authorize Plaintiffs' request for declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 as well as Fed. R. Civ. P. 57 and 65, and the equitable powers of this Court.

8. Venue is proper in this district under 28 U.S.C. § 1391 because all or a substantial number of the events that gave rise to this action occurred in this district and because all Defendants reside here.

9. Under District of South Carolina Local Rule 3.01, the Charleston Division is the appropriate division for this action because a substantial portion of the events at issue occurred in that division.

## PARTIES

### A. Plaintiffs

10. Bishop of Charleston, a Corporation Sole, is the civil law presence of the ecclesiastical juridical body of the Roman Catholic Diocese of Charleston ("The Diocese"). The Diocese serves more than 7,000 students, grades kindergarten through 12, through its 33 schools, all of which are ministries and operations of the Corporation Sole. The corporation is headquartered in Charleston, though the Diocese and its schools serve students across the entirety of South Carolina.

11. South Carolina Independent Colleges and Universities, Inc., is the trade association for private, non-profit institutions of higher education in South Carolina. The non-profit association, chartered by the State of South Carolina and recognized in various state statutes, includes in its membership twenty colleges with a combined total of over 34,000 students. Its member colleges actively participate in the association's leadership and direction. Its mission is to support independent, private colleges in South Carolina. On this basis, it has associational standing to represent its members' interests. Its headquarters are in Columbia, although its members stretch across the state.

### B. Defendants

12. Director Marcia Adams is sued solely in her official capacity as executive director of the State of South Carolina Department of Administration. At all times relevant to Plaintiffs' allegations, Adams was acting under color of state law for purposes of 42 U.S.C. § 1983.

13. Brian Gaines is sued solely in his official capacity as budget director at the State of South Carolina Department of Administration. At all times relevant to Plaintiffs' allegations, Gaines was acting under color of state law for purposes of 42 U.S.C. § 1983.

14. Governor Henry McMaster is sued solely in his official capacity as the Governor of South Carolina. At all times relevant to Plaintiffs' allegations, McMaster was acting under color of state law for purposes of 42 U.S.C. § 1983.

## FACTUAL ALLEGATIONS

### A. South Carolina's History of Religious and Racial Bigotry

15. The South Carolina Constitution of 1895, which included the state's original Blaine Amendment, was the product of one particular giant in Palmetto politics: Benjamin "Pitchfork Ben" Tillman. Following the Civil War, the State had adopted the Constitution of 1866 under the guidance of Reconstruction Republicans. Once Reconstruction had ended and Union troops had withdrawn from the state, Tillman set out to craft a new constitution that permanently protected white power with literacy requirements for voting and other racist policies.

16. One of those racist policies was the Blaine provision, which read:

> The property or credit of the State of South Carolina, or of any County, city, town, township, school district, or other subdivision of the said State, or any public money, from whatever source derived, shall not, by gift, donation, loan, contract, appropriation, or otherwise, be used, directly or indirectly, in aid or maintenance of any college, school, hospital, orphan house, or other institution, society or organization, of whatever kind, which is wholly or in part under the direction or control of any church or of any religious or sectarian denomination, society or organization.

Art. XI, Sec. 9 (1895).

17. This provision reflected the ugly marriage of two prejudices: religious bigotry against immigrant Catholics then coming to America's shores and racial prejudice against newly freed slaves whose lives, living conditions, and educational opportunities were being improved by

4

religious missionary organizations. And it served an important Tillman goal: if the freed slaves and their descendants were cut off from private schools that might actually teach them to read, then they could never reach a critical mass of voters who could hurdle the literacy test blocking their access to the ballot box.

18.     Plaintiff SCICU includes among its membership three colleges founded by religious missionaries in the years shortly after the Civil War with the specific goal of educating freed slaves and their descendants: Allen College (founded as Payne Institute in 1870, Columbia and renamed in 1880), Benedict College (founded as Benedict Institute in Columbia, 1870), and Claflin University (Orangeburg, 1869). These religious colleges undermined Tillman's goal of suppressing African-American education to ensure their status as a permanent underclass of menial laborers.

19.     In addition to Tillman's racism, which found widespread support across the Convention delegates, another sordid wind was blowing across the country at the same time: anti-Catholic prejudice. After the Civil War, America began experiencing significant immigration from Europe's heavily Catholic nations, such as Ireland, Italy, and Poland. A deep-seated distrust of so-called "Papists" pervaded much of American society, which attitude was reinforced by a general skepticism of immigrants. The nativist reaction against the immigrants found political expression in groups like the American Party, the American Protective Association, and the National League for the Protection of American Institutions.

20.     The anti-Catholic movement found its Congressional champion in James G. Blaine, a member from Maine who sponsored the original Blaine Amendment, which would have amended the U.S. Constitution to prohibit any public aid to so-called "sectarian" institutions, when sectarian was code for Catholic.

21. After the federal Blaine Amendment failed by to pass by a razor-thin margin in 1875, so-called "baby Blaine" amendments were eventually adopted in greater than 35 states, including South Carolina.

22. The historical record indicates that the American Protective Association and the National League for the Protection of American Institutions were active in South Carolina politics in 1895, lobbying the constitutional convention for a Blaine provision in the Palmetto state's new charter.

23. The Convention adopted a Blaine provision that closely mirrored the national Blaine Amendment, permanently prohibiting any state funds from reaching the Diocese's various social service ministries or the historically black colleges that belong to SCICU.

24. The Tillman Constitution continued in force for more than fifty years, until a group of "Young Turks" led by then-state senator John West called for revisions to the 1895 Constitution. In 1966, the state empaneled the West Committee to review the 1895 Constitution.

25. Though some of its members may have later advocated progressive views on race, two of its dominant figures were avowed defenders of racial segregation: the Committee's secretary, William D. Workman, Jr., and the all-powerful speaker of the South Carolina state house, Solomon Blatt.

26. The Committee's final report was submitted to the General Assembly, which eventually placed it on the ballot for the people's approval in 1972.

27. The General Assembly and popular approval of the Committee's overall revisions to the Constitution were also a product of the predominantly white, segregationist political majority that dominated South Carolina politics during the Civil Rights era.

28. The change in the provision to permit indirect aid to students, while still barring direct aid to schools, was made to allow for state-funded scholarships for students to attend private segregation academies.

29. Thus, in 1972 the Blaine Amendment was revised to its present form, a section of the Education article which now reads: "No money shall be paid from public funds nor shall the credit of the State or any of its political subdivisions be used for the direct benefit of any religious or other private educational institution." Art. XI, Sec. 4. A separate provision of the 1972 revision retained the prohibition on the credit of the state being used for private institutions. Art. X, Sec. 11. The Attorney General of South Carolina has issued opinions referring to the 1972 provision as a Blaine Amendment.

**B. South Carolina, federal funds, and emergency relief for educational institutions.**

30. Congress passed the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) (the "CARES Act") on March 27, 2020. The CARES Act provided, among other things, money for educational institutions and related businesses that were affected by COVID-19.

31. The CARES Act created three separate funds, including the Governor's Emergency Education Relief ("GEER") Fund, which is relevant here. *See* CARES Act § 18001(b). Under the GEER, the governor of a state may direct federal funds to

> (1) provide emergency support through grants to local educational agencies that the State educational agency deems have been most significantly impacted by coronavirus to support the ability of such local educational agencies to continue to provide educational services to their students and to support the on-going functionality of the local educational agency; (2) provide emergency support through grants to institutions of higher education serving students within the State that the Governor determines have been most significantly impacted by coronavirus to support the ability of such institutions to continue to provide educational services and support

7

>the on-going functionality of the institution; and (3) provide support to any other institution of higher education, local educational agency, or education related entity within the State that the Governor deems essential for carrying out emergency educational services to students for authorized activities described in section 18003(d)(1) of this title or the Higher Education Act, the provision of child care and early childhood education, social and emotional support, and the protection of education-related jobs.

*Id.* § 18002(c).

32. GEER funds are allocated to states based on the number of people between ages 5 and 24 in the state, as well as the number of students for each state counted under Section 1124(c) of the Elementary and Secondary Education Act of 1965. Id. § 18002(b).

33. South Carolina received $48,467,924 in GEER funds from the federal Department of Education.

34. Though the funds are entrusted to the Governor's discretion, the fiscal agent for the funds is the Department of Administration.

35. The U.S. Department of Education's "Certification and Agreement for Funding under the Education Stabilization Fund Program Governor's Emergency Education Relief Fund" signed by Governor McMaster designated Defendant Gaines, an employee of the Department of Administration, as the state program representative. The application further states that the Department run by Defendant Adams "serves as the coordinating agency for federal and state COVID-19 relief appropriations and disbursements. The office is authorized to receive federal and state relief funding as directed by federal law, and to disburse funds as directed by the governor pursuant to law."

36. To distribute a portion of the GEER funds, Governor McMaster created a grant program called Safe Access to Flexible Education ("SAFE"). Under the SAFE grant program, eligible families could apply for need-based grants for up to $6,500 per student for the 2020–2021

8

academic year. Students could use the grant funds at any private or independent school that registered and met certain criteria regarding the impact of COVID-19 on its operations.

37.     After a student chooses the specific private school he wants to attend and is enrolled, the student's parent or guardian would use an online portal to direct the grant funds that had been awarded to the family to that specific private school.

38.     The Diocese planned for its 33 schools to participate in the SAFE program, including creating advertising and marketing materials for its schools to promote SAFE to families with students enrolled in parochial schools and those who might choose to move their children to the schools.

39.     The Governor's distribution of the GEER funds also included a program to help the eight historically black colleges and universities (HBCUs) in South Carolina. The program was designed to provide support for online learning at the HBCUs. Six of these HBCUs are private, and five of them are members of Plaintiff SCICU:

| Allen University    | $ 217,527 |
| Benedict University | $ 547,539 |
| Claflin University  | $ 546,023 |
| Clinton College     | $  53,493 |
| Morris College      | $ 166,048 |
| Voorhees College    | $ 141,195 |

40.     After the Governor announced the GEER program, litigation was promptly filed in Orangeburg County state trial court challenging the SAFE grants program under the Blaine Amendment. The trial court judge granted a temporary injunction against distribution of the SAFE

9

grants. Recognizing the broad reach of the South Carolina Supreme Court's order, the Governor also stopped implementation of the HBCU grants.

41. The Supreme Court of South Carolina certified the case in its original jurisdiction and struck down the SAFE program on the basis of the Blaine Amendment.

42. Because of the Court's decision, the SAFE and HBCU GEER funds remain unspent, in South Carolina's account at the U.S. Department of Education. The Governor must announce his allocations for the funds by May 11, 2021, one year from the date of the state's award letter, and all funds must be sent out from state and federal accounts by September 30, 2021.

43. The CARES Act also provided block grants that states could allocate internally in their discretion. South Carolina exercised its discretion through the General Assembly, which passed 2020 Act 154. The Act included $115 million for "State Agencies, Local Governments and Higher Education Institutions" to reimburse them for COVID-related costs.

44. The Department of Administration, run by Defendant Adams, set up the application process for these Act 154 funds. The deadline to apply for qualifying institutions was November 15, 2020. Numerous members of SCICU timely submitted applications for the funds.

45. After the Supreme Court's decision, Defendant Adams sent memoranda to South Carolina's private colleges and universities informing them that they would not qualify for funds made available to higher education institutions under the South Carolina General Assembly's Act 154. As of this filing, a substantial portion of these Act 154 funds remains in state accounts, unspent.

46. Separately, Act 154 authorized $25 million for nonprofit organizations impacted by COVID. The statutory definition was broad enough to cover private and parochial schools. Numerous other religious and nonprofit organizations received funds from this appropriation, but

the Blaine Amendment prevented the Diocese's schools and other private and religious schools from accessing these funds.

47. The United States Congress has adopted another round of COVID relief, America's Rescue Plan (Pub. L. 117-2). The $1.9 trillion bill includes substantial funds for states, such that the General Assembly could choose to adopt additional relief for nonprofits and universities. Because of the South Carolina Supreme Court's interpretation of the Blaine Amendment, the schools of the Diocese and the members of SCICU are prevented from accessing any relief from these new funds.

## CLAIM FOR RELIEF – COUNT I

## (42 U.S.C. § 1983 – Equal Protection)

48. Plaintiffs incorporate by reference all previous paragraphs as if fully set forth herein.

49. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution says: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

50. The clause prohibits laws which are facially neutral but were motivated by bigotry against and targeted toward a suspect class. *Ramos v. Louisiana,* 140 S.Ct. 1390 (2020).

51. Race and religion are both suspect classes. *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008).

52. The historical record shows quite clearly that the 1895 constitutional provision was motivated by racial and religious prejudice.

53. The historical record shows that the 1972 revision perpetuated the racial and religious prejudice, and at minimum did not confront and cleanse the prejudice of 1895.

54. Defendants cannot establish that the Blaine Amendment survives a strict scrutiny analysis.

## CLAIM FOR RELIEF – COUNT II

## (42 U.S.C. § 1983 – Free Exercise of Religion)

55. Plaintiffs incorporate by reference all previous paragraphs as if fully set forth herein.

56. The Free Exercise Clause of the First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

57. The Free Exercise Clause applies to states and their political subdivisions through the Fourteenth Amendment of the United States Constitution.

58. The Free Exercise Clause prohibits laws that have as their intended object the suppression of free exercise, even if they appear facially neutral. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993).

59. Institutionalized educational ministries such as schools and universities, and other evangelical ministries are part and parcel of a religious organization's free exercise of religion. *See generally Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020).

60. The South Carolina Blaine Amendment is a law targeted at the suppression of religious educational ministries, namely Catholic schools and schools founded by northern religious missionaries after the Civil War. *See Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2269–2273 (2020) (Alito, J., concurring) (discussing history of religious discrimination).

61. On its face and as applied to Plaintiffs, Article XI, Section 4 of the South Carolina Constitution punishes Plaintiffs for exercising their religious beliefs and free exercise rights by barring them from access to otherwise generally available funds.

62. The prohibition against appropriating public funds for the benefit of private and religious schools with public funds in Article XI, Section 4 results from years of anti-Catholic bigotry in South Carolina similar to other states in the country.

63. The prohibition against public funds being appropriated for private and religious schools in Article XI, Section 4 also stems from years of bias against religious institutions in the South that served freed slaves and their descendants.

64. The prohibition against supporting private and religious schools with public funds in Article XI, Section 4 conditions the receipt of a public benefit on the renunciation of their religious convictions and right of free exercise.

65. There is no compelling interest or narrow tailoring that the Defendants can establish that the Blaine Amendment survives strict scrutiny.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs request that this Court:

1. Declare that Article X, Sec. 4 of the South Carolina Constitution was adopted based on prejudice against two suspect classes, namely race and religion, fails strict scrutiny, and therefore is unconstitutional under the Equal Protection Clause.

2. Declare that Article X, Sec. 4 of the South Carolina Constitution was adopted with the intent to suppress religious free exercise, fails strict scrutiny, and therefore is unconstitutional under the Free Exercise Clause.

3. Enjoin Governor McMaster, Director Adams, and Mr. Gaines from using Article X, Sec. 4 of the South Carolina Constitution as a basis for denying Plaintiffs and other private and religious schools' access to the GEER funds.

4. Enjoin Director Adams and Mr. Gaines from using Article X, Sec. 4 of the South Carolina Constitution as a basis for denying Plaintiff SCICU's members' and any other private and religious schools access to the Act 154 funds.

5. Award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

6. Grant such other relief as this Court deems just and proper.

Respectfully submitted,

TURNER PADGET GRAHAM AND LANEY

*/s/ Richard S. Dukes, Jr.*
Richard S. Dukes, Jr., Federal ID No. 7340
40 Calhoun Street, Suite 200
Charleston, SC 29401
Phone: (843) 576-2810
Fax: (843) 577-1646
Email:  rdukes@turnerpadget.com


LIBERTY JUSTICE CENTER

*/s/ Daniel R. Suhr*
Daniel R. Suhr
Brian K. Kelsey
Jeff Jennings
208 S. LaSalle St. Suite 1690
Chicago, IL 60604
dsuhr@libertyjusticecenter.org
bkelsey@libertyjusticecenter.org
jjennings@libertyjusticecenter.org
*Pro hac motions forthcoming*

*Attorneys for Plaintiffs*

Dated: April 14, 2021