UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| BISHOP OF CHARLESTON, a Corporation Sole d/b/a The Roman Catholic Diocese of Charleston;<br><br>and<br><br>SOUTH CAROLINA INDEPENDENT COLLEGES AND UNIVERSITIES, INC.<br><br>                                    Plaintiffs,<br><br>        vs.<br><br>MARCIA ADAMS, in her official capacity as the Executive Director of the South Carolina Department of Administration;<br><br>and<br><br>BRIAN GAINES, in his official capacity as budget director, Department of Administration, State of South Carolina;<br><br>and<br><br>HENRY MCMASTER, in his official capacity as Governor of South Carolina,<br><br>                                    Defendants. | Civil Action No. 2:21-1093-BHH<br><br>**OPINION AND ORDER** |

This matter is before the Court on Plaintiffs Bishop of Charleston and South Carolina Independent Colleges and Universities, Inc.'s ("SCICU") (collectively "Plaintiffs") motion for a preliminary injunction (ECF No. 6). For the reasons set forth herein, the Court denies the motion.

1

## **BACKGROUND**

Plaintiffs filed a Complaint on April 14, 2021 (ECF No. 1), and subsequently an Amended Complaint on April 27, 2021 (ECF No. 26), asking this Court to declare a provision of the South Carolina Constitution unconstitutional under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and/or the Free Exercise Clause of the First Amendment to the U.S. Constitution. Specifically, Plaintiffs argue that Article XI, Section 4 of the South Carolina Constitution violates the U.S. Constitution because it unlawfully discriminates on the basis of race and/or religion. The provision at issue, hereinafter referred to as South Carolina's "no-aid" provision, states as follows: "No money shall be paid from public funds nor shall the credit of the State or any of its political subdivisions be used for the direct benefit of any religious or other private educational institution." S.C. Const. art. XI, § 4.

The Coronavirus Aid, Relief, and Economic Security (CARES) Act was passed by the U.S. Congress and signed into law on March 27, 2020, as Public Law 116-136. The massive act contained substantial funds to help states, schools, employers, and individuals deal with the crisis presented by the COVID-19 pandemic. Among its provisions, the Act included the Governor's Emergency Education Relief (GEER) Fund, a discretionary pot of federal money granted to states for governors to support students as they thought best.

Defendant Henry McMaster ("Governor") applied for and received South Carolina's full allocation from the original GEER fund. The Governor dedicated $32 million of the GEER funds to a new education initiative to provide Safe Access to Flexible Education (SAFE) Grants for South Carolina's K-12 students from low- and moderate-income

families who needed support to stay in or move to an independent school. Plaintiff the Bishop of Charleston, a Corporation Sole, doing business as The Roman Catholic Diocese of Charleston ("Bishop"), on behalf of the thirty-three Catholic schools in the state that the Diocese administers, intended to receive students using SAFE Grants. (Ryan Aff. ¶¶ 7–8, ECF No. 6-2.) When the SAFE Grants program was announced, the Diocese developed resources for its schools to promote the SAFE Grants to current and potential students. (*Id.*)

The Governor dedicated another $2.4 million in GEER funds to support online education access and upgrades at South Carolina's eight historically black colleges and universities ("HBCUs"). Six of the eight HBCUs in South Carolina are independent, religiously affiliated institutions (five are members of the SCICU) that collectively stood to receive over $1.6 million from the Governor's plan, but for South Carolina's no-aid provision.

Litigation commenced in state court, wherein the state-court plaintiffs sued to prevent use of the GEER funds for the SAFE Grants program. The South Carolina Supreme Court exercised its original jurisdiction over the case, *Adams v. McMaster*, 851 S.E.2d 703 (2020). In *Adams*, the South Carolina Supreme Court issued a declaratory judgment holding: (1) that the GEER funds are converted into "public funds" within the meaning of the no-aid provision when they are received in the State Treasury and distributed through it; (2) that that the funds would provide a "direct benefit" to independent and religious schools; (3) that the SAFE Grants program violates the constitutional prohibition against direct aid to religious or other private educational institutions; and (4) that the CARES Act does not preempt South Carolina's constitutional mandate prohibiting

the use of public funds in such a manner. *Id.* The Governor also suspended the $2.4 million for independent and religious HBCUs given the logic of the *Adams* opinion.

In addition to the federally appropriated GEER funds, the South Carolina General Assembly authorized $115 million to reimburse COVID-related expenses for state agencies, local governments, and institutions of higher education ("Act 154 funds"). The members of SCICU applied for those funds. (Perez Aff. ¶ 7, ECF No. 6-3.) Defendant Marcia Adams ("Commissioner Adams") sent a letter to SCICU informing it that, because of the *Adams* decision, the South Carolina Department of Administration would not permit Act 154 funds to flow to SCICU member institutions. (*Id.* ¶¶ 12–13; Ex. B, ECF No. 8-5.) Plaintiffs contend that although a portion of the Act 154 funds have been disbursed to nonprofit organizations, including religious institutions and entities, more than $80 million of the Act 154 funds for state agencies, local governments, and institutions of higher education remain in state accounts awaiting final review and dispersal. (Perez Aff. ¶ 10.)

Plaintiffs bring this case seeking to vindicate their claim to the GEER funds. The Governor announced his allocation of these funds to the SAFE Grants and HBCUs, but Defendants are prohibited from executing this allocation because of the no-aid provision, as interpreted by the South Carolina Supreme Court in *Adams*. Plaintiffs state that if the Governor does not reallocate these funds by May 11, 2021, then South Carolina stands to lose access to them entirely when the U.S. Department of Education redistributes them to other states.

Plaintiff SCICU is further concerned that Defendants may act soon to disburse the remaining $80 million in Act 154 funds, and that SCICU members will be denied access to those funds. According to the SCICU, Defendants are currently considering

applications for Act 154 funds that are in excess of the amount available. (Perez Aff. ¶ 9–11; Ex. A, ECF No. 6-4.) If the entire corpus of Act 154 funds is disbursed to applicants who are not subject to the no-aid provision, the SCICU asserts, then any subsequent victory in this case would ring hollow.

Accordingly, Plaintiffs seek a preliminary injunction from this Court striking down the no-aid provision of the South Carolina State Constitution as unconstitutional under the Equal Protection and/or Free Exercise Clauses of the U.S. Constitution, in order to preserve their access to the GEER funds and Act 154 funds.

## STANDARD OF REVIEW

The Supreme Court has stressed that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) ("Because preliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power, this Court should be particularly exacting in its use of the abuse of discretion standard when it reviews an order granting a preliminary injunction." (quotation marks and citation omitted)). To obtain a preliminary injunction, the moving party must establish: "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Id.* at 20. The party seeking the injunction bears the burden to establish each of these elements by a "clear showing." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *cert. granted, judgment vacated on other grounds*, 559 U.S. 1089 (2010), and *adhered to in part sub nom. The Real Truth About Obama, Inc. v. F.E.C.*, 607 F.3d 355

(4th Cir. 2010). A court's issuance of mandatory injunctive relief, as opposed to prohibitory, should be especially sparing, because "[m]andatory preliminary injunctions do not preserve the status quo . . . ." *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980). The Fourth Circuit has stated, "Mandatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994) (citations omitted); *see also Pashby*, 709 F.3d at 319 (stating that when the preliminary injunction at issue is mandatory rather than prohibitory in nature, the standard of review is "even more searching").

## DISCUSSION

Plaintiffs' motion for a preliminary injunction requests mandatory relief in the form of this Court striking down a provision of the South Carolina State Constitution. The Court cannot grant Plaintiffs' motion because they have not made a clear showing that they are likely to succeed on the merits.

With respect to the Free Exercise Clause challenge, Plaintiffs' argument against the constitutionality of South Carolina's no-aid provision relies heavily on the U.S. Supreme Court's recent decision in *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020), which struck down the following provision of the Montana Constitution:

> "**Aid prohibited to sectarian schools.** . . . The legislature, counties, cities, towns, school districts, and public corporations shall not make any direct or indirect appropriation or payment from any public fund or monies, or any grant of lands or other property for any sectarian purpose or to aid any church, school, academy, seminary, college, university, or other literary or scientific institution, controlled in whole or in part by any church, sect, or denomination." Mont. Const., Art. X, § 6(1).

140 S. Ct. at 2252. In *Espinoza*, parents of students at a private Christian school brought

6

an action against the Montana Department of Revenue challenging a Department administrative rule that excluded religiously affiliated private schools from a state scholarship program for students attending private schools. *See id.* at 2251–52. The Department asserted that the rule was necessary to reconcile the scholarship program with the "no-aid" provision of the Montana Constitution. *Id.* at 2252. The Supreme Court concluded that under *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017) strict scrutiny applied because the no-aid provision discriminated on the basis of religious status, and that the no-aid provision could not survive such scrutiny because Montana's interest in separating church and State "more fiercely" than the Federal Constitution did not qualify as compelling given the free exercise infringement created by the provision. 140 S. Ct. at 2257, 2260.

> The *Espinoza* court stated:
>
> The Department . . . suggests that the no-aid provision advances Montana's interests in public education. According to the Department, the no-aid provision safeguards the public school system by ensuring that government support is not diverted to private schools. . . . *But, under that framing, the no-aid provision is fatally underinclusive because its "proffered objectives are not pursued with respect to analogous nonreligious conduct."* [*Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993)]. *On the Department's view, an interest in public education is undermined by diverting government support to* any *private school, yet the no-aid provision bars aid only to* religious *ones. A law does not advance "an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited."* Id., *at 547, 113 S. Ct. 2217 (internal quotation marks and alterations omitted). Montana's interest in public education cannot justify a no-aid provision that requires only religious private schools to "bear [its] weight."* Ibid.
>
> *A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious.*

140 S. Ct. at 2261 (some emphasis added). This analysis makes clear that the Supreme

7

Court struck down Montana's no-aid provision precisely because it discriminated against religious schools *but not* other private schools, creating an implicit contrast with no-aid provisions like South Carolina's that encompass both religious *and* private non-religious schools. Unlike the provision at issue in *Espinoza*, South Carolina's no-aid provision prohibits the use of public funds for the direct benefit of religious and non-religious private schools alike. In other words, South Carolina's provision discriminates along the private/public divide, not the religious/non-religious divide. Suffice it to say, Plaintiffs have not made a clear showing that they are likely to succeed on their claim grounded in religious discrimination and the motion for a preliminary injunction is unavailing.

With regard to the Equal Protection Clause challenge, Plaintiffs contend that the history of the no-aid provision, both as to its initial adoption in 1895 and its amendment and readoption in 1972, is awash in racist bigotry and anti-Catholic animus. The SCICU represents twenty independent colleges and universities, five of which are HBCUs. (Perez Aff. ¶ 4.) These HBCUs were designated to receive funds related to the CARES Act prior to the decision of the South Carolina Supreme Court in *Adams*. After *Adams*, the GEER funds could no longer be disbursed to the HBCUs. Moreover, Commissioner Adams made it clear in her letter to the SCICU that, due to the *Adams* decision, the Department of Administration would not permit Act 154 funds to flow to SCICU member institutions. (ECF No. 6-5.) Plaintiffs' race discrimination theory is based on the assertion that the current version of South Carolina's no-aid provision violates the U.S. Constitution because a prior version of the provision from South Carolina's 1895 Constitution was motivated by racial prejudices common to that era, and because the revision of the provision in 1972 was done with a purpose to perpetuate the religious and racial bigotry

embedded in the provision from its beginning. (*See* ECF No. 6-1 at 10–30.)

In advancing this theory, Plaintiffs rely on a legal doctrine applied in *N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016), where the Fourth Circuit declared a "facially neutral" North Carolina voting statute unconstitutional based on the State's history of racial discrimination in voting, the sequence of events leading up to the statute's passage, the legislative history of the statute, the disproportionate impact of the statute on African Americans, and the absence of legitimate non-racial motivations to explain the passage of the law. The *McCrory* court explained the doctrine as follows:

> In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S. Ct. 555, 50 L.Ed.2d 450 (1977), the Supreme Court addressed a claim that racially discriminatory intent motivated a facially neutral governmental action. The Court recognized that a facially neutral law, like the one at issue here, can be motivated by invidious racial discrimination. *Id.* at 264–66, 97 S. Ct. 555. If discriminatorily motivated, such laws are just as abhorrent, and just as unconstitutional, as laws that expressly discriminate on the basis of race. *Id.*; *Washington v. Davis*, 426 U.S. 229, 241, 96 S. Ct. 2040, 48 L.Ed.2d 597 (1976).
>
> When considering whether discriminatory intent motivates a facially neutral law, a court must undertake a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266, 97 S. Ct. 555. Challengers need not show that discriminatory purpose was the "sole[ ]" or even a "primary" motive for the legislation, just that it was "a motivating factor." *Id.* at 265–66, 97 S. Ct. 555 (emphasis added). Discriminatory purpose "may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Davis*, 426 U.S. at 242, 96 S. Ct. 2040. But the ultimate question remains: did the legislature enact a law "because of," and not "in spite of," its discriminatory effect. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L.Ed.2d 870 (1979).
>
> In *Arlington Heights*, the Court set forth a nonexhaustive list of factors to consider in making this sensitive inquiry. These include: "[t]he historical background of the [challenged] decision"; "[t]he specific sequence of events leading up to the challenged decision"; "[d]epartures from normal procedural sequence"; the legislative history of the decision; and of course, the disproportionate "impact of the official action—whether it bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266–67,

9

97 S. Ct. 555 (internal quotation marks omitted).

*McCrory*, 831 F.3d at 220–21.

Defendants argue that Plaintiffs cannot show any likelihood of success in proving that the South Carolina Supreme Court's decision in *Adams*, and the subsequent decisions by the Governor and Commissioner Adams not to disburse CARES Act and Act 154 funds to private schools, were motivated by racial prejudice. (ECF No. 19 at 7.) The argument misses the point. Plaintiffs are not attempting to show race discrimination in the *Adams* ruling or in the decisions not to disburse funds, but rather that South Carolina's no-aid provision was constitutionally invalid in the first instance and that its subsequent revision perpetuated the discriminatory harms of the originally wrongful provision. (*See* ECF No. 6-1 at 29–30.)

Nevertheless, Plaintiffs have not made a clear showing that they are likely to succeed on the merits of their Equal Protection Clause challenge. No reasonable person with an enlightened mind would attempt to defend the racially insidious motives of Benjamin Ryan "Pitchfork Ben" Tillman, who Plaintiffs have described as, "U.S. Senator, Governor, and patriarch of post-bellum Palmetto State politics." (*Id.* at 1.) His segregationist politics and ardent efforts to disenfranchise African-Americans were as abhorrent in the late nineteenth century as they are now. Likewise, the contemporaneous anti-immigrant, anti-Catholic campaign of U.S. Congressman James G. Blaine and the American Protective Association offend all well-reasoned standards of decency, tolerance, and fairness. But Plaintiffs efforts to draw a straight line through the unconscionable discrimination of the past to the judicial and administrative decisions of the present fall well short of the proof necessary to support the mandatory injunctive relief

requested—to wit, striking down a State constitutional provision that has existed in one form or another for 125 years. In addition to the presumptive caution necessary in all instances where the Court is asked to exercise its equitable powers in such a far-reaching manner, important concerns of federalism reach their zenith where, as here, the requested relief would require the Court to invalidate a duly adopted provision of a State constitution. The Plaintiffs have only begun to scratch the surface of what will no doubt be a well-litigated challenge to the no-aid provision on the merits. For the time being, there is no evidence that the no-aid provision, as applied in *Adams* and the disbursement decisions by the Governor and Department of Administration, disproportionately affected African-American students, HBCUs, or religious schools. The fact remains that the majority of the SCICU member institutions are not HBCUs and the no-aid provision has been applied neutrally as to religious and non-religious institutions. In this context, it would be premature to apply the *Arlington Heights* analysis to invalidate South Carolina's no-aid provision on the current record.

Having found that Plaintiffs have not satisfied the first *Winter* factor, a discussion of the remaining factors would be superfluous. Therefore, the Court dispenses with further analysis of the proposed preliminary injunction and hereby denies Plaintiffs' motion.

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion for a preliminary injunction (ECF No. 6) is DENIED.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

May 11, 2021
Charleston, South Carolina