## Table of Contents

**Problem and Solution**………………………………………………………………..p. 2

**General Outline**………………………………………………………………p. 3

**Summary Discussion of General Outline**………………………………..p. 4

**Detailed Discussion of South Carolina Constitutional Evolution**…………….....p. 11
    **Part I.  South Carolina's Evolving Constitutions**…………………………p.11
        **Up To And After 1865**……………………………………………p. 11
        **Constitution of 1868**……………………………………………p. 15
        **Constitution of 1895**……………………………………………p. 18
        **Revisions of 1895 Constitution starting in 1960s**………………...p. 21
            **The Revised Article on Public Education**………………..p. 24

    **Part II. Evolution of the Tillman Era in South Carolina**…………………..p. 26
        **General Background on Blaine Amendment**……………………p. 26
        **Catholics from Abroad; African-Americans at Home**……………p. 27
        **Sketch of South Carolina: The Tillman Version**……………………p. 30

    **Part III. Sketches of Selected South Carolina Leaders Post-Tillman**……..p. 33
        **In the footsteps of Tillman:**
            **Coleman L. Blease**……………………………………p. 34
            **Ellison DuRant Smith**…………………………………...p. 35
            **Olin DeWitt Talmadge Johnston**………………………….p. 36
            **James Strom Thurmond**………………………………...p. 37
            **James F. Byrnes**……………………………………….p. 38
            **Edgar Allen Brown**……………………………………p. 44
            **Lawrence Marion Gressette**………………………….p. 45
            **Solomon Blatt**…………………………………………..p. 47
        **State Leaders with more moderate views after mid-20th Century**
            **Ernest Hollings**………………………………………p. 48
            **Robert McNair**………………………………………p. 49
            **John C. West**………………………………………p. 50

**South Carolina's Lingering Neglect of Public Education**……………………p. 51

**Conclusion**………………………………………………………………p. 53

**Appendices**………………………………………………………………p. 54

## PROBLEM AND SOLUTION

**PROBLEM:**

South Carolina incorporated the Blaine Amendment in its revised 1895 Constitution. The Blaine Amendment prohibits any state aid to schools or universities founded by independent or religious organizations. As a consequence, private schools founded by various religious denominations or independent organizations did not qualify for state funding. Many of these private schools, including Catholic-based schools, also enrolled African American youth who had limited funding and learning opportunities in the state's public education system.

Constitutional revision in the 1970s removed only part of the original Blaine Amendment. The revision removed the barrier to indirect aid to private education institutions. The revised article still retains the ban on direct aid to independent and religious schools.

Thus, the revised South Carolina Constitution's Article XI, Public Education, continues to deny direct public funding for individuals in independent and religious schools or universities. The incomplete revision maintains, even if latently, the distortions of racism and anti-Catholicism embedded in the South Carolina constitution since the inclusion of the Blaine Amendment in 1895.

**SOLUTION:**

The South Carolina 1895 Constitution, Article XI, Public Education, needs additional revision to remove the remaining section based on the Blaine Amendment. The section prohibits direct use of public funds for individuals in private schools and universities.

Direct aid to individual students offers an alternative for students marooned in South Carolina's virtually segregated public schools today. Removal of the constitutional barrier for direct aid for individuals in private schools and universities will allow the General Assembly to implement a forward looking approach to quality and social justice in the education of new generations in South Carolina.

**GENERAL OUTLINE**

**Part I.  South Carolina's Evolving Constitutions**
       **Up To and After 1865**
       **Constitution of 1868**
       **Constitution of 1895**
       **Revisions of 1895 Constitution starting in 1960s**
            **The Revised Article on Public Education**

**Part II. Evolution of the Tillman Era in South Carolina**
       **General Background on Blaine Amendment**
       **Catholics from Abroad; African-Americans at Home**
            **Catholics from Abroad**
            **African-Americans at Home**
       **South Carolina: The Tillman Legacy to the Present**
       **Sketch of South Carolina: The Tillman Version**

**Part III. Sketches of Selected South Carolina Leaders Post-Tillman**
            **In the footsteps of Tillman:**
                **Coleman L. Blease**
                **James F. Byrnes**
                **Ellison DuRant Smith**
                **Olin DeWitt Talmadge Johnston**
                **James Strom Thurmond**
                **Edgar Allen Brown**
                **Lawrence Marion Gressette**
                **Solomon Blatt**
            **State Leaders with more moderate views after mid-20[th] Century**
                **Ernest Hollings**
                **Robert McNair**
                **John C. West**

**South Carolina's Lingering Neglect of Public Education**

**Conclusion**

**Appendices**

**SUMMARY DISCUSSION OF GENERAL OUTLINE**

**Part I.  South Carolina's Evolving Constitution**

**Up To and After 1865**

Based on the 1790 state constitution and the revised 1860/65 version, the state depended on slavery for agricultural production. Politics were based on representation of white land owners.

Slavery may be said to have ended with the Emancipation Proclamation and the end of the Civil War. In an ideal response, South Carolina may have used the 1776 Declaration of Independence as a guide to pursue the self-evident truths:

"that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness"

to renew its post-war state constitution and government.

However, South Carolina responded immediately by enacting and imposing laws that extensively restricted the civil liberties of African Americans. These laws were known as "Black Codes" and later as "Jim Crow" laws. Most African Americans were consigned to an inferior second-class citizenship that effectively maintained conditions of slavery through continued white political and economic domination. There was little or no prospect that white state elected representatives would provide for public education or any other form of public spending for newly emancipated African Americans.

**Constitution of 1868**

After disappointing developments in South Carolina after 1865, the United States Congress demanded a new state constitution with universal suffrage for males.

The new state constitution was adopted in 1868. It abolished slavery, granted individual freedom to African Americans, restored political representation to all, and provided public education for all citizens—black and white. Actual realization of the new constitutional provisions for blacks through honest and sustainable change remained more a distant hope than a present fact.

After 1868, African Americans continued to face resistance and outright political opposition on many fronts. Post 1868 brought continued setbacks for African Americans accompanied by escalating racial discrimination, mounting economic inequality, along with continued harassment, terror, and violence from white rivals who were intent on maintaining white supremacy and racial segregation.

**Constitution of 1895 and the Tillman's Legacy**

After the end of Reconstruction in 1876, some former confederate state leaders led by Wade Hampton III restored traditional, aristocratic, planter leadership to govern the state. They supported limited accommodations for loyal blacks who were presumably known and loyal to them.

Despite blacks having become legally emancipated and having the right to vote, the political reaction to the recognition of black voters after 1868 was increasingly negative and sharp. To oppose Hampton, some wealthy white leaders along with rank-and-file whites--some with money and most with little at all—joined under the leadership of Benjamin Tillman in a "Farmer's Revolt." Their purpose was to discredit any remaining pre-Civil War aristocratic leadership in South Carolina and to make sure African Americans were forcefully denied opportunities for meaningful citizenship or economic life.

Tillman and his supporters convened a new constitutional convention in 1895. The result in 1895 was a "Jim Crow" constitution[1] which was tailor made for racial discrimination and white supremacy. By making the "Jim Crow" system legitimate in a more designed way constitutionally, life between blacks and whites from politics to personal relationships would become comprehensively dominated by whites through a racial caste system. It was a constitutional framework virtually unchallenged until mid-20[th] Century.

The 1895 organizing principles of white supremacy and racial segregation reversed legally the black political entitlements and economic interests which had been recognized in the 1868 Constitution. The objective for a new state constitution was not to re-write it, but simply to alter the substance of the 1868 Constitution by inserting provisions to restrict civil liberties of African Americans. The restrictive provisions undermined and distorted the ideals and principles of emancipation and social justice established in 1868.

Among new 1895 provisions were a poll tax as a pre-condition for voting; a splintered executive elected on a long ballot; and a decentralized state government dependent on county politics. The 1895 Constitution also included South Carolina's original Blaine Amendment. The Blaine Amendment reflected a national effort to prohibit allocation of state funds to Catholic institutions. In the south, the impact of the prohibition extended to African Americans in private schools and universities founded by Catholic and non-Catholic northern missionaries to educate freed slaves.

Decentralized state government made each county a local fiefdom governed by White politics. There were 35 counties represented at the 1895 Constitutional Convention. Today, there are 46 counties in South Carolina. It is plausible to suggest that each new county was created to promote newly dominant white political interests.[2] A more direct

---

[1] "Jim Crow" refers to the legitimization of racist laws and customs against blacks in the South. In South Carolina segregationist political leaders spoke emphatically and with great energy about the dangers of racial integration. Social institutions with few exceptions endorsed and engaged in the oppression of blacks. A comprehensive system of separate norms defined life between blacks and whites under "Jim Crow." An example is that a black man could not offer to shake hands with a white man since it implied equality. Whites considered themselves superior to blacks, for example, in morality, intelligence, and social behavior. White resistance, including violence, was the general remedy to any black assertion of political power or social mobility. Please see comments by David Pilgrim. 2000/2012. "What was Jim Crow" at https://www.ferris.edu/jimcrow/ Retrieved July 2, 2021. See also, Gunnar Myrdal. 1944. *An American dilemma: The Negro problem and American Democracy*. New York: Harper.

[2] In 1895, Saluda County was created from part of Edgefield. In 1897, Bamberg emerged from Barnwell; Cherokee from parts of Spartanburg, Union, and York; Dorchester from Berkeley and Colleton; and Greenwood from parts of Abbeville and Edgefield. In 1902, Lee emerged from parts of Darlington, Kershaw, and Sumter. Calhoun emerged

suggestion is that each newly formed county divided any emerging concentration of black citizens or black political interests on a county level to restrict them from any local or statewide influence. White supremacy used geography as well as politics and restrictive social norms to create a firm and longstanding base for dominance. Each county had local responsibility for public education and used that responsibility arbitrarily to limit or avoid provision of educational opportunities for blacks.

The 1895 system of representation with one county, one Senator made each Senator the "king of a local kingdom." The legislative delegation[3] also governed as a county council. In the absence of home rule or municipal powers, the annual budget (supply bill) for each county had to be passed by the state legislature. The supply bill included funding for public education through county boards of education in a racially segregated public school system.

Individual Senators controlled county spending for education through the budgeting bottleneck. The budget procedure for counties was a comprehensive logroll. At its root, a county is only an administrative arm of the state. The state legislature had to provide directly the resources for a county to operate. No Senator would dare vote against the "supply bill" of another county for fear of jeopardizing his own approval. And no House member of the county "legislative delegation" would dare challenge the Senate or its Senator for fear of political reprisal.

After 1895, South Carolina consolidated itself into a legislative state, both at state and county levels. The state was governed by white officials elected with few black votes. It fused political and economic power into a few hands, many of whom served in public office as a state senator or House member for decades. For statewide matters, individual, decade long serving senators in a committee chair emerged as a director of a "clearinghouse" through which legislation relevant to that committee had to be considered before it moved to the entire Senate.

The state Senate committee framework allowed a single senator as chair, often from a rural area and continuously re-elected, to bury, resist, or alter proposed legislation that may have benefitted blacks. It is through the committee chair mechanism that a few legislative decision makers were able continuously to deny positive changes for blacks. A few senators enabled the state to delay compliance with any nationally endorsed or mandated changes in civil rights reform until beginning in the 1960s.

---

in 1908, from parts of Orangeburg and Lexington; Dillon, in 1910, from Marion; Jasper, in 1912, from Beaufort and Hampton. McCormick emerged in 1916 from Edgefield, Abbeville, and Greenwood; and Allendale, South Carolina's last county, emerged in 1919, from Barnwell and Hampton. See http://www.archivesindex.sc.gov/guide/CountyRecords/co1693.htm Retrieved June 30, 2021.

[3] The legislative delegation at the time was the county senator and house members from the county. After Reynolds v. Sims 377 U.S. 533 (1964), the South Carolina State Senate was reapportioned into 27 districts with 50 members. In 1967, the Senate was reapportioned into 20 districts with 46 members. Districts were reduced to 16 in 1972. In 1984, single member districts were created for the 46 members. Until 1964, each county received one house member and the rest were apportioned by population. In 1975, a Home Rule Act created county councils separate and independent from the General Assembly.

Today's Senate rules allow self-selection for committee assignments with deference to time in office. After an election, Senate members are listed by years of continuous service. Members with longest continuous service select committee assignments first. The committee chair is the longest serving from the majority party.

Tillman's version of white supremacy and racial segregation continued as the dominant, exclusive, and comprehensive model of South Carolina leadership well into the 20th Century. White supremacy, in direct or more subtle forms, may well still be the central social principle around which southern political interests organize even today. [4]

Central to continuing white supremacy and racial segregation is the selective development and provision of public education for whites along with general denial of public education for blacks. From 1895 onward, South Carolina leaders made only minimally available, grudging, slow, put-off resources for the education of blacks. Rural blacks were especially ignored compared to black communities in more densely settled communities.

Views of Catholic leaders regarding racial segregation at mid-20th Century are a clear contrast to the prevailing political views and actions in South Carolina. As a letter written by Vicar General Bernardin in 1959 explains:

> South Carolina is still one of the most segregated states in the country. Every kind of law has been passed to circumvent the 1954 decision of the Supreme Court. The political and local leaders on both the state and local levels have pledged themselves to the maintenance of segregation.
>
> This situation, of course, makes it more difficult to put into practice her [the Catholic church's] principles  concerning racial justice. … With complete racial justice as our ideal, we shall prudently, but firmly, work toward the accomplishment of this ideal.
>
> Much has been done by the church already… . Admission to our churches is denied to no one, regardless of his color. …
>
> In our schools the progress has been much slower. So far there is only one school that has both whites and Negroes attending. But it will be only a matter of time before justice prevails in this sphere also.[5]

For more than seven decades following 1895, South Carolina did as little as it could to educate blacks and to promote public education for them. And even what it did accomplish was achieved only after massive resistance and institutional reluctance. Delay, postponement, and logjams along with the prevailing legislative logroll stalled racial integration until the state ran out of legal dodges in the 1960s and 1970s. Only then did South Carolina take beginning steps to acknowledge the legality of desegregation. In fact,

---

[4] Numan V. Bartley. 1982. "In Search of the New South: Southern Politics after Reconstruction." *Reviews in American History,* X (December), 151-163.

[5] Letter from Vicar General Bernardin to Don Renfrew, Jr. June 4, 1959. Original Document. Joseph Louis Bernardin was born in Columbia, South Carolina, in 1928. He served for 14 years in the Diocese of Charleston beginning in 1952. Among his titles there was Vicar General. After serving in various capacities, then as the Archbishop of Cincinnati in 1972 and then as Archbishop of Chicago in 1982, he was elevated to Cardinal in 1983.

the state acted primarily when necessary to avoid direct intervention only when prompted by the national government on behalf of its long underserved black population.

**Revisions of 1895 Constitution starting in the 1960s**

The processes for amending the South Carolina Constitution is by Constitutional Convention or referendum. Confronted in the 1960s with a rising national emphasis on individual rights, the state legislature opted to revise the 1895 constitution using an item-by-item process starting in 1970. The referendum process begins with a proposal by two-thirds of the members of the South Carolina House and Senate separately. The proposal must then be approved in a referendum by a majority in the general election and subsequently confirmed by a majority vote in each branch of the General Assembly. There is no popular initiative for constitutional amendment in South Carolina.

The 1970 revisions were based on the recommendations of a Legislative Study Committee known as the West Committee. Among these revisions were changes in Article XI, Public Education to allow public funding for private institutions for the first time, thus by revising part of the Blaine Amendment. Much of the newly available public funding for private educational institutions went to newly developing "private schools." Many of these private schools were formed for white students allegedly to improve the quality of education compared to racially integrated public schools. The silent public conversation was that public schools were becoming more and more black, thus lending credibility to a general assessment of newly forming private schools as "segregation academies."

Before partial revision of the Blaine Amendment provisions in the 1895 state constitution in the 1970s, Catholic leadership began to speculate about and to plan financing of their private schools. In an October 1963 letter, Vicar General Bernardin wrote Bishop Reh of the Charleston Diocese with suggestions about the private school problem and proposed a General Communication or Pastoral on Public Education for distribution to Catholic families in South Carolina. Vicar General Bernardin explained:

> In the Pastoral you would explain why the Church maintains schools, the sacrifices that our people have made over the years to build and maintain the schools we have in the diocese, etc. Then, within this framework, the obligation of supporting these schools could be outlined. The letter would be entirely positive in its approach. By sending it to each family, rather than reading it from the altar, we could go into more detail and it could serve as a handy reference. I think most of our people will be loyal and I am convinced that the financial difficulties that the private schools are going to face will work to our advantage (e.g. , they now say that it will cost $500 — $600 per child to set up and operate these schools, but the State will provide only a little more than $200). Nevertheless, I am of the opinion that a Pastoral on education to be published early in 1964 would bring the matter into clearer focus for our people and would help us in the overall situation.[6]

---

[6] Letter from Right Rev. Msgr. Joseph L. Bernardin, Vicar General, to Most Reverend Francis F. Reh, Bishop of Charleston. October 21, 1963. Original Document.

The revised article on Public Education was adopted in 1972. After recommendation by the West Committee, the General Assembly proposed the revision. It was approved in the General Election and subsequently approved by majority vote of the General Assembly.

Constitutional revision in the 1972s removed only part of the original Blaine Amendment in order to permit indirect aid to private education institutions. The revised article retains the ban on direct aid to independent and religious schools. Thus, the constitutional revision of the education article continues to deny direct public funding for individuals in independent and religious schools through mechanisms such as tax credits or vouchers. The incomplete revision maintains, even if latently, the racism and anti-Catholicism embedded in the South Carolina constitution since Ben Tillman. The remaining part of the Blaine Amendment limits the mobility of black students to pursue public education in private settings.

The South Carolina 1895 Constitution, Article XI, Public Education, needs additional revision to remove the remaining section based on the Blaine Amendment that prohibits direct use of public funds for individuals in private schools and universities.

## Part II. Evolution of State Constitution and the Tillman Era in South Carolina

### General Background on Blaine Amendment

Religious organizations founded private schools in South Carolina for black students after 1865 since public education, although available to all, was made available to white students almost exclusively.

### Catholics in America

Large waves of Catholic immigration from Europe inspired many American states to adopt the Blaine Amendment. The Blaine Amendment was adopted in the 1895 South Carolina Constitution as a way to avoid education of Catholic and African-American youth in private schools by prohibiting state aid for private schools. The main intent was to limit public education for blacks. Lack of education, ignorance, and poverty are primary ways to subordinate a significant part of the overall population.

### African Americans at Home

South Carolina had few Catholic immigrants. Although forced by means of slavery, blacks are practically the major immigrants into South Carolina. The anti-outsider fear was easily transferred by the South Carolina White population minority to the majority black population under the leadership of Ben Tillman.

### South Carolina: The Tillman Legacy to the Present

Tillman consolidated his interests and the interests of South Carolina's "true men" by defeating white Conservative Democrats led by Wade Hampton III, former Confederate

General and descendant of South Carolina patriots. Hampton favored limited political participation by blacks to consolidate with the aristocratic Conservatives.

For Tillman and his followers, any conciliation or accommodation with African-Americans was "an abomination." The combination of white supremacy and racial segregation purged South Carolina politics of any traditionally Conservative or Populist views. Tillman was elected governor in 1890 and United States Senator in 1894.

Tillman's organizing principles for white dominance were consolidated in the revision of the 1868 state constitution in a constitutional convention convened by Tillman and Tillmanites in 1895. The Blaine Amendment was among provisions included in the revisions in 1895.

Confronted in the 1960s with a rising national emphasis on individual rights, the state legislature revised the 1895 constitution item-by-item by referendum in general elections every two years starting in 1970 based on the recommendations of a Legislative Study Committee. The revision of the Public Education Constitution's Article XI established a statewide system of public education to replace the County-based 1895 system. In the process, part of the Blaine Amendment prohibition was lifted. State aid may now be used indirectly to support private education institutions. But, the remaining part— direct aid to individuals who attend a private institution—was left untouched.

Part III. Sketches of Selected South Carolina Leaders Post-Tillman

Notable statewide leaders following in the Tillmanite tradition are, among others, Cole L. Blease, Ellison Durant "Cotton Ed" Smith, James Strom Thurmond, Olin DeWitt Johnston, Edgar Allen Brown, Laurence Marion Gressette, and Solomon Blatt. There are many state legislators, county commissioners, and mayors with identical views of at least racial segregation if not white supremacy.

To get elected to public office in South Carolina required a candidate to validate, to some degree of vigor, public sympathy if not outright endorsement of racist views. Racist oratory was just a tool to win elections. Streaming from Tillman, the more strident the racist view as necessary, the better. Often candidates would rationalize, "it is not personal," "it just what I have to say for the people to elect me so I may serve them." More accurately, the rationalization may have been "for 'us' to elect me so I may serve 'us,'" meaning "us" means white and "them" means black. South Carolina leaders were elected on the basis of a self-defined, self-interested, inward looking, practice of racist moralism, not on the basis of a higher ethics of public service. Appeal to higher ethical standards probably would have gotten any of them defeated in the next election.

Although many were not as fierce or blustery as Tillman, Blease, and Thurmond, the outcomes are the same for many state-based leaders like Brown, Gressette, and Blatt. Brown, Gressette, and Blatt are unique as "generation straddlers" between established racism and eventual civil rights reform. Though none of the three was a civil rights

reformer, each in an individual way contributed to a stable political framework for transitioning into racial integration.

Gressette was educated as a debater in the University of South Carolina's classical philosophical tradition. His style was "crisp," formal, and dismissive. He could humble a political or trial opponent with a word or short sentence. Blatt was more the friend of the "little" man. As long term Speaker of the House, Blatt ran the "school of the gavel." Reportedly, he would pick favorites among new House members for committee assignments. The most favorite became member and chair of the House Judiciary Committee. Given the role of the state legislature in electing judges, the judiciary committee chair could informally run "statewide," for Lieutenant Governor of course before running for governor. Robert McNair from a nearby county was a favorite of Blatt's. Brown was the keeper of the state treasure as chair of the Senate Finance Committee. He kept the state's Triple-A bond rating intact and the state's budget in balance as needs for public spending grew to finance racial integration.

Along with the national civil rights reforms of the 1960s, South Carolina leaders gave way gradually and grudgingly to more democratic social norms and representative government.

A new wave of "moderately segregationist" governors, beginning with Ernest Hollings, Robert Evander McNair, and John Carl West through Richard Riley in the 1980s began to encourage more industrial development and more investment in statewide public schools. Hollings was the original "industry hunter," McNair was the advocate of a kindergarten program to include black children; West declared the state "color blind" in his inaugural address, hired James Clyburn (Member of Congress today) as an executive aide, and launched a two-year technical college system; Riley backed an education improvement act to improve the quality of public education in the state.

**DETAILED DISCUSSION OF THE EVOLUTION OF THE SOUTH CAROLINA CONSTITUTIONAL FRAMEWORK**

**Part I.  South Carolina's Evolving Constitution**

## Up To and After 1865

After several failed attempts to colonize what was to become "Carolina" by the English, French, and Spanish, the English established a lasting colony near today's city of Charleston in 1670. Slaves came with the first English settlers. Enslaved blacks were a numerical majority by 1708. The constitutional basis of the colony was the Fundamental Constitutions. The Lords Proprietors became bankrupt in 1719. "Carolina" was soon separated into independent North Carolina and South Carolina states. Attracting enough white, European settlers to populate the South Carolina colony and to hold public office continued as a problem into the 18th Century.

In South Carolina, before 1776, a Commons House of Assembly developed while the colony was run by the British Government.  The Commons House is the antecedent of generations of dominant legislators and a dominant legislature in South Carolina. Leadership gradually consolidated into an agricultural elite of Low-country rice planters and Charleston merchants during the State's "Golden Age" (1740-1800). A major concern about a violent rebellion by slaves throughout the colonial period led to constant efforts to balance the number of African-American slaves with the free, white population. Whites became a majority again by 1750, but many whites continued to migrate westward and left the population balance in constant doubt.

By 1790, the State was dominated by large-scale, slave based agriculture. There were also many new settlers in the up- or back-country. Unlike the mostly English planters and merchants who came to the Low-country, the Upcountry was populated primarily by Scot-Irish

settlers who entered by way of the Great Wagon Road from Philadelphia as they moved toward the South.

The state's 1790 Constitution linked the Low-country aristocracy with the new Upcountry small farmers.[7] As the first major statehood constitution in 1790, it extended representation to the Upcountry based on population, but kept property ownership as a voting qualification. It stripped the governor of veto power and kept the office weak and subject to legislative dominance. Enslaved African-Americans once again became a majority of the state's population by 1820 as the continuation of slavery became a national question.

Southern states, including South Carolina, generally did not provide public education before the Civil War. Landed planters and others who could afford it hired private tutors or enrolled their male children in private institutions in South Carolina and elsewhere. The educational divide extended to poor whites, who were educated informally or not at all, and to enslaved African-Americans who were prohibited by law from learning to read and write.[8]

The 1800s ushered in the gradual closing off of the state from the nation. John C. Calhoun's state-centered views led to opposition by South Carolina leaders to major national policies that did not comport with the state's agricultural interests. There were many episodes of tedious negotiation and temporary compromises with the Congress. After Calhoun's death in

---

[7] Fletcher M. Green. 1930. *Constitutional Development in the South Atlantic States 1776-1860*. Chapel Hill, NC: University of North Carolina Press, p. 18.

[8] With apprehension for collaboration among black slaves and continuing rumors of slave rebellion or conspiracies among slaves, a general perception is that whites justified denial of public education to slaves as a preventive measure. For example, see "Until the Revolutionary War the number of slaves rose consistently. Although the fears of possible revolt increased, the desire for more wealth and more slaves outweighed them. Opposition to the formal education of Negroes came early in the eighteenth century after it was noted that the slave insurrections were usually led by Negroes of some learning." in Burnet R. Maybank, Sponsor. 1941. *South Carolina: A Guide to the Palmetto State*. New York: Oxford University Press, p. 47.Retrieved June 26, 2021.
https://www.carolana.com/SC/eBooks/South_Carolina_A_Guide_to_the_Palmetto_State_1941.pdf

1850, South Carolina began to rebel more intensely against the Union and sparked its secession into Civil War.

At the end of the Civil War, South Carolina faced a series of sharp changes. (1) its major cities, Charleston and Columbia, were destroyed; (2) federal military troops occupied the state and military courts governed statewide; (3) agriculture was now based on free, not slave labor, but, without adequate money resources, the roots for "economic slavery" in the sharecropping and the crop-lien system were being laid;[9] (4) the Freedman's Bureau reallocated coastal lands and islands occupied by federal troops beginning in 1861 to blacks and federal tax policies provided other land for redistribution to freedmen, [10] and (5) prominent citizens had emigrated to Mexico, Brazil, or the western United States.

Reconciliation with the Union led to a period of Reconstruction (1865-1876).[11] The second significant state Constitution was developed in 1868. Unlike the Constitutions of 1790 and 1865 which were enacted by the Legislature, the 1868 Constitution was developed in a constitutional convention by a black majority. It was popularly ratified. It featured a more defined separation of powers with a stronger, popularly elected governor who had veto power. The 1868 Constitution provided for counties, free schools, and extended personal freedoms and liberties to blacks as well as whites. Subsequent legislative provision for state supported public education provided a potential means to realize citizenship and newly won individual freedoms through literacy and formal schooling—now for all--black and white, rich and poor. It was not to be an ideal realized anytime soon.[12]

---

[9] David D. Wallace. 1951. *South Carolina: A Short History*, Columbia, S.C.: University of South Carolina Press, p. 563.
[10] Willie Lee Rose. 1964. *Rehearsal for Reconstruction*. New York: Oxford University Press.
[11] Rod Andrew Jr. 2008. *Wade Hampton: Confederate Warrior to Southern Redeemer*. Chapel Hill: University of North Carolina Press, describes the campaign of 1876 and the election of Wade Hampton.
[12] Virginia B. Bartels, ed.1994 following. *The History of South Carolina Schools.* Retrieved June 26, 2021. https://www.carolana.com/SC/Education/History_of_South_Carolina_Schools_Virginia_B_Bartels.pdf

After the end of Reconstruction and with the withdrawal of Federal troops from South Carolina in 1876, conservative, ruling aristocrats and planters from before the Civil War restored themselves to power over a simmering layer of anti-conservative politics.[13] The simmer became a boil with the rise and election of Benjamin Tillman as governor in 1890. Tillman mobilized the politics of white supremacy into a policy of racial segregation by means of a Farmers' Revolt. The Constitution of 1895 established white dominance over a socially and racially divided state.[14] The Constitution of 1895 in many was a re-statement of the 1868 Constitution. The significant, important, and notable exceptions are insertion of restrictions on individual liberties regarding blacks in new Article I, the Bill of Rights. The changes were made by a constitutional convention with no minority representation. The 1895 Constitution continued legislative rule. It used the suffrage clause to exclude African-Americans and maintain white rule. African-Americans left the state in large numbers after 1900.

From 1890-1960s, one crop-cotton agriculture persisted in the face of grinding poverty for the majority of whites and blacks. Industrialization consisted largely of cotton-based textiles and only slowly diversified into other areas of manufacturing. It were as if South Carolina was politically and socially fossilized during this three-fourths century into a fixed pattern of white supremacy and racial segregation.

The 1960s featured a gradual, often reactionary emergence of the politics of nationally mandated racial change, state voter modernization through increased African-American voter registration, and changes in governmental form. Political views within the state became increasingly diverse. Reaction to changes in national civil rights policies led to re-identification

[13] William J. Cooper, Jr. 1968. *The Conservative Regime in South Carolina, 1877-1890.* Baltimore, MD: The Johns Hopkins University Press.
[14] George B. Tindall. 1952. *South Carolina Negroes, 1877-1900.* Columbia, SC: University of South Carolina Press.

of former South Carolina Democrats with the national Republican Party. Conservative editor/journalist, William D. Workman, challenged sitting United States Senator Olin D. Johnston as a Republican and won 44 percent of the vote.[15] The first Republican member among state representatives appeared in 1962 when state House representative Floyd Spence switched from the Democratic Party because he was unhappy with changes in the national Democratic Party's toward more liberal views under President Kennedy.[16] Democratic Senator and former Dixiecrat[17] candidate for President, Strom Thurmond, switched to the Republican Party in 1964.

Revision of the Constitution of 1895 gave rise to questions about how to modernize the 1895 Constitution. A Study Committee reported in 1968 with a series of recommendations to remove obsolete provisions, rewrite often amended parts, to rework state finance and taxation, and to expand the powers of county government.

Since the 1868 Constitution is the basis for the 1895 constitutional convention revisions and 1968 recommendations which were subsequently adopted as item-by-item revisions, following is a more detailed look at 1868 provisions and subsequent developments to the present.

---

[15] See W.D. Workman. 1960. *The Case for the South*. New York: Devin-Adair Co. in which Workman argues for continuation of segregation in the South. The 44 percent may be a proxy definition of the conservative segregationist vote in South Carolina at the time. Segregationists would need only 6+percent of the remaining 56 percent votes to win. Assuming black votes in the general election would be reduced by restrictions such as voter registration or the primary system from approximately forty percent of total voting population by at least half to twenty percent of voting population, the remaining 36 percent of voters would be white. Conservatives would need only 1/6ths of remaining votes (6 percent of 36 percent) to win. [44% Segregationist white to 6+% Conservative White = Win (50%+1) by opposing 30% Independent or Liberal Whites + 20% black Voters. Even so, South Carolina's blacks did not publicly abandon the Republican Party (the party of Lincoln) until the Goldwater presidential campaign in 1964. Conservative whites continued to dominate more and more of Republican vote in subsequent years and gradually defeated Democrats at most levels of elected government offices in South Carolina.
[16] Spence reportedly said that his preacher would not speak to him after his switch during the greeting after the next Sunday service Spence attended.
[17] "Dixiecrat" refers to the States Rights Democratic Party which campaigned to protect the rights of (Southern) states to maintain racial segregation. Strom Thurmond as a founder was unhappy on many fronts including the role of organized Labor in electing Democrat Harry Truman as President and with Democratic support for civil rights for blacks. Dixiecrats won 39 Electoral College votes in 1948 but were soon absorbed into the growing Republican Party, especially during the Goldwater Presidential Campaign in 1964.

### The Constitution of 1868

Aggravated by South Carolina's insistence on electing former Confederate heroes to the Congress and its passage of the Black Codes to regulate former slaves, the U.S. Congress directed establishment of a new state government in 1868. Under authority of the congressional Reconstruction Acts, the head of the United States military government in South Carolina ordered a state constitutional convention in Charleston on January 14, 1868. Under military supervision, African American men voted in South Carolina for the first time in the elections for the constitutional convention delegates and elected three-fifths of them. Whites did not vote in the ratification election for the proposed new constitution, despite the fact that it was, and still is, the only whole constitution to be submitted directly to the electorate for approval. It was ratified by the United States Congress April 16, 1868.

The 1868 constitution was equally revolutionary for the times for South Carolina because it embodied many principles of democratic government. For example, for the first time, the new constitution provided for population alone, rather than wealth or the combination of wealth and population, as the basis for House representation. The 1868 constitution abolished debtor's prison, provided for public education, abolished property ownership as a qualification to hold a public office, granted some new rights to women, and created counties.

A two-thirds legislative vote was also required to issue any bonded debt. The turmoil and accompanying fraud of the administrations elected in the period, not to mention the financial disaster of Confederate debt, resulted, in 1873, with an additional requirement for a two-thirds majority of the voters to confirm an increase in the general obligation debt of the state.

The 1868 Constitution continued popular election of the governor, first established in 1865, rather than election by the General Assembly. The popularly elected governor now had a

veto that required a two-thirds vote of the General Assembly to override it. The governor was empowered further to command the state militia, initiate proposals to the General Assembly, grant reprieves and pardons, and commission state officers[18]

The 1868 Constitution's Article 10 provided for a uniform system of free public schools.[19] Although not implemented, the constitution mandated that the schools should operate for at least six months each year. Further, all children had to attend school for at least four years as soon as enough facilities were available. A reform school for juvenile offenders was also mandated, but it was not built until in the early 1900s. Proper provisions for the deaf and blind were also ordered. Schools were financed by a poll tax. In 1878, an amendment added two mills on property for the schools. Maintenance of the state university was made mandatory and the creation of a normal school and an agricultural college were also required.

The status of the newly freed slaves was also confronted in the 1868 Constitution. Race was abolished as a limit on male suffrage. Disfranchisement could be only for murder, robbery, and dueling. The Black Codes that had flourished under the Constitution of 1865 were essentially forbidden by the 1868 Constitution. There was no provision against intermarriage of African Americans and whites. All the public schools were open to all races.

## The Constitution of 1895

The Civil War destroyed the social and economic structure of South Carolina. Benjamin Tillman was significant among political leaders who used the widespread hardship and anger of poor farmers for political advantage. Tillman's appeal to white farmers, a majority of the voting

---

[18] Cole Blease Graham, Jr. and Donald P. Aiesi. 1983. "The role of the governor in South Carolina." in Luther F. Carter & David S. Mann. Eds. *Government in the palmetto state.*  Columbia, S.C.: Bureau of Governmental Research and Service, University of South Carolina.
[19] Edward Sweat. 1961. Some Notes on the Role of Negroes in the Establishment of Public Schools in South Carolina. *Phylon* (1960-), 22(2), 160-166. doi:10.2307/273453. Retrieved June 29, 2021

population who were simultaneously a minority of the state's total population, led to his election as governor in 1890. Calls for a new state constitution mirrored a "white supremacist" movement to prohibit blacks from voting and to exclude them from politics.

The reason for framing a new constitution was the perceived danger of an African American majority vote and a return to the politics of Reconstruction. Post-Reconstruction, the manipulation of the large African American majority vote by an active, conservative white minority of planters, professional men, and business leaders was a threat to Tillman's all-white leadership.[20]

Tillmanites were no different from Conservatives about the need for racial hierarchy, but they disagreed on how to go about it. Conservatives were more patronizing to blacks; Tillman publicly declared that he despised blacks. Under Tillman, the state steered the narrow course of disfranchising South Carolina's African Americans without disfranchising poor, illiterate whites or stirring the national government to act on it more restrictive policies toward blacks.

The 1895 constitution was adopted by a convention with the specific aim of excluding African Americans from politics. African Americans by 1900 made up 58 percent of the state's population The 1865 Black Codes would re-emerge under the 1895 constitution as "Jim Crow" laws in forms subtle enough to avoid immediate conflict with the Fifteenth Amendment to the United States Constitution. The convention did not require popular election of presidential electors. It did not define the civil rights and citizenship of the former slaves clearly. The state's General Assembly reverted to an all-white institution during this period and remained so until the 1960s.

---

[20] Conservatives thought that higher education was best suited for an elite few—black or white.

The means for black disfranchisement was through the new suffrage clauses in the 1895 Constitution. The right to vote went to all males who were paying taxes on property assessed at $300.00 or more and who were able to read and write the state constitution. The South Carolina Constitution of 1895 made both literacy tests and poll taxes conditions for voting to constrain and limit black participation. Even if an African American male voter owned enough property, the new literacy tests could be used by local, white voting registrars to disqualify him. Literacy tests could be used to exclude uncooperative poor whites also. The poll tax was not abolished by the national government until 1951 and unregulated local voter registration continued until passage of the federal Voting Rights Act in 1965.

The South Carolina tradition of legislative control of local government, as old as colonial times, was continued in the 1895 constitution through the failure to provide for locally elected county governing bodies. The legislative delegation from each county became the county governing board. A special, "local government" session was reserved for the end of each legislative year to pass a budget, or supply bill, for each county.[21]

The 1895 Constitution made specific use of the county as a base from which to organize politics and representation. The dispersion of political power to the county as an organizing jurisdiction led to dominance by whites in the rural areas. Each county was allowed one senator regardless of population. Through a system of delegation governance, individual senators were able to influence the course of legislative and governmental affairs by control of special legislation and with the supporting customs of senatorial courtesies. Special legislation applied

---

[21] Columbus Andrews. 1938. *Administrative county government in south carolina*. Chapel Hill, NC: University of North Carolina Press.

only to one county and each senator customarily did not interfere with the special laws or local appointments proposed by another senator.[22]

The longstanding political influence of the Low-country was partially diminished through the influence of single senators in the more numerous Upcountry counties. In turn, the large number of small, rural counties across the state overshadowed developing needs in the smaller-number of large, urban counties.

Despite the preoccupation with race, many of the typical and therefore more reform-oriented features of the 1868 Constitution were retained.[23] The governor was given a budget line-item veto, rare among the Southern states. However, the practical side of the 1895 revisions was that the executive department was still split into many offices, including some elected state agency heads. The formal powers of the governor were generally restrained, especially by limits to a two-year term with potential for only one reelection. Separate schools for blacks and the prohibition on interracial marriage were reaffirmed.

The 1895 Constitution was not submitted to a popular referendum. The theory was that because the Convention delegates were chosen by the people, the Convention could put its provisions directly into operation.

As early as the 1920s, Professor D. D. Wallace questioned whether the 1895 Constitution needed replacement.[24] By the middle of the twentieth century, the criticisms of the 1895 Constitution were more extensive. For example, it was cluttered by numerous amendments

---

[22] Ralph Eisenberg. 1961. "The Logroll, South Carolina Style, " in Richard T. Frost (ed.), *Cases in State and Local Government*. Englewood Cliffs, NJ: Prentice-Hall, Inc., pp. 155-163.
[23] Cole Blease Graham, Jr. 1996. "The Evolving South Carolina Constitution," *Journal of Political Science*: Vol. 24; Nr 1, Article 2. Retrieved from: https://digitalcommons.coastal.edu/jops/vol24/iss1/2; https://digitalcommons.coastal.edu/cgi/viewcontent.cgi?article=1229&context=jops

[24] David D. Wallace. 1927. *The South Carolina Constitution of 1895*, Bulletin No. 197. Columbia, SC: University of South Carolina Press, pp. 119-125

required for local government actions. Through the 1966 election, 330 constitutional amendments had been passed. About three-fifths of these amendments dealt with bonded debt limits for local governments, especially school districts. It was not until 1968 that a constitutional amendment to change the bonded debt of a county could be voted on just within the county and not statewide. South Carolina along with Florida had the ninth longest constitution in the country in 1960 when measured by the number of words in the document.[25] The constitution was weighed down by detailed provisions more easily made and changed if made by statute.

### Revisions of 1895 Constitution starting in 1960s

Overtime, many citizens and organized groups had recommended constitutional revision. Before the 1960s, there were no practical results. A study committee was created by the General Assembly in 1966 to evaluate the need for revision. Based on its evaluations, the committee was additionally charged "to recommend provisions which may be included in a new constitution, to suggest methods to eliminate archaic provisions, and to propose methods to bring about changes."[26]  The Committee to Make a Study of the South Carolina Constitution of 1895 made its report to the General Assembly in July 1969.

In the course of its work, the study committee focused on each section of the 1895 document, painstakingly reviewed it, and made a specific evaluation to carry over or delete a section. If carried over, the report recommended needed revisions. The study committee also drafted and made the case for some new sections in the constitution. The committee proposed 17 new articles to the General Assembly to be considered through an article-by-article amendment process aligned with the original 17 articles in the 1895 Constitution.

---

[25] Council of State Governments, *Book of the States, 1960-1961*. Lexington, Kentucky.
[26] Robert H. Stoudemire. 1975. "The S.C. Constitutional Revision Report," *The University of South Carolina Governmental Review,* 12, pp. 1-4.

The General Assembly also approved the study committee's proposal for appointment of a legislative steering committee of five senators and five representatives to shepherd the individual articles through the legislature to general election referendums. The legislative steering committee was headed by Senator Marion Gressette (D-Calhoun County).  Original hopes were to complete the article-by-article revision in committee and submit all 17 articles at the same time in the 1970 general election. Each proposed article had to be authorized by a two-thirds vote of each house and be approved by a majority of general election voters. The changed article had to be ratified by the General Assembly before it was included in the constitution. The date of ratification defined the date for the new amendment went into effect.

The initial hope for complete revision in one general election was not achieved. Five revised articles were approved by voters in 1970 and ratified in 1971. They were:

**Revised Article I** deals with personal rights. The long time, formal constitutional guarantees for freedom and liberty were left intact. Many provisions similar to the 1868 Constitution, such as to vest the power in the people, to establish religious freedoms, freedom of speech, and the right of assembly and petition, were not changed. Among other fundamental freedoms and liberties carried over were guarantees of privileges and immunities, due process and equal protection of the law, and prohibitions against bills of attainder, ex post facto laws, and titles of nobility. The complete list reads much like the Bill of Rights to the United States Constitution.

**Revised Article II** treats the right of voting. The revised article essentially establishes up-to-date requirements for voting. In a 1974 amendment, the voting age was set at 18 years and the residency requirement at 30 days. The article also provides for the registration of voters.

The **new Article IX** arranges for corporations. The revisions updated this article and streamlined the constitutional procedures by which corporations are regulated. Common carriers, publicly owned utilities, and privately owned utilities are specifically mentioned.

**Article XII** distributes the functions of government. The revisions updated the older version of this article that was called "Charitable and Penal Institutions." The new article requires the General Assembly to provide appropriate agencies for "the health, welfare, and safety of the lives and property of the people of this State and the conservation of its natural resources." It provides for the building of prisons, the care and control of convicts, and the separate confinement of juvenile offenders.

**New Article XV** is the impeachment article. Very few changes were made in this article that provides conditions for the removal of judges, the governor, and other officers that the General Assembly identifies by law. In the 1972 election, voters approved seven more revised articles. One of these articles dealt with alcoholic liquors and was proposed directly by the General Assembly rather than by the study committee.

After all these articles were ratified, the comprehensive result was one article essentially carried over into the new constitution (Art. XV, Impeachment), ten articles revised, and the one new article. (Art. VIII-A, Alcoholic Liquors and Beverages).

Additional Revised Articles:

**Article IV** deals with the executive department. Executive powers are not increased, but the rules of gubernatorial succession are made clear and definitions are made regarding who governs in the absence of the governor. The most significant change

came in 1981 when this revised article was amended again to allow the incumbent governor to run for reelection to a second four-year term.

**Article V** treats the judicial department. The revised article provides for a unified court system under the supervision of the state Supreme Court. It included old Article VI from the 1895 Constitution that dealt with jurisprudence. A Court of Appeals between the state Supreme Court and the sixteen Judicial Circuit courts was added in 1984. A 1988 amendment established a statewide grand jury to give the state attorney general more flexibility in prosecuting cases, especially drug cases. Experts feel that handling evidence to win indictments is easier through the statewide grand jury than a jury limited to a single county.

**Revised Article VI** clarifies and increases the removal powers of the governor by allowing the governor to suspend any state or local official, except for legislators or judges, if they are indicted by a grand jury. This article also includes the "long ballot," whereby South Carolina elects a Secretary of State, an Attorney General, a Treasurer, a Superintendent of Education, a Comptroller General, a Commissioner of Agriculture, and, at the time, an Adjutant General to terms coterminous with the governor.

**Article VIII** on local government allows local governing bodies for counties to replace the General Assembly's tradition of special legislation for county budgets or "supply bills". The article also requires alternate forms of local government. It combined two articles from the 1895 Constitution (VII-Counties and VIII-Municipalities).

**Article VIII-A** on alcoholic liquors and beverages established South Carolina's mini-bottle policy. The state had tried to regulate liquor through a cumbersome "brown-bag" arrangement. Consensus was difficult because of "wet vs. dry" conflicts across the

state. By letting the voters decide, the legislature could define a productive source of tax revenue for public education and alcohol treatment programs and positively improve the reputation of the state for tourists and business people.

**The Revised Article on Public Education**

**Article XI, Public Education**, requires a free public school system and permits indirect state aid to students. The article creates a State Board of Education made up of one member from each of the 16 judicial circuits elected by the legislative delegation within each circuit and rotated among the counties within. The governor appoints an additional member to the board.

Today Since the early 1970s flurry of constitutional change, developments have gone more slowly. Article Ill regarding the legislative branch has not been revised, but an amendment in 1977 fixed the times and terms of the legislative session. In 1979, a general reserve fund requirement was ratified under this article. Revised Article X on finance and taxation was ratified May 4, 1977. It identifies categories and formulas for the assessment of property and defines approaches that the General Assembly may take for classifying property and setting the assessment ratios for different categories of property.

The original 1895 Article X was the constitution's most amended section. The new article restricts the right of the state, its political subdivisions, and school districts to issue bonds and gives the General Assembly power to define limits and additional procedures for incurring general obligation debt. These restrictions limit use of specific constitutional amendments as a means to incur excessive or careless debt. Provision for the militia (Article XIII) and eminent domain (Article XIV) have not been changed. The article on the militia has a section that requires pensions for Confederate veterans and their indigent widows. The last Confederate

widow survived until the early 1990s. The other articles deal with the amending and revising processes (Article XVI) and with Miscellaneous Matters (Article XVII). These articles were changed to the extent necessary to accommodate the revision process.

In 1992, legislation was introduced which proposed a constitutional referendum to restructure state government by limiting the number of state agencies to 15 and by authorizing the governor to appoint state agency heads. The General Assembly did not authorize the referendum. In the 1993 session, the assembly passed legislation that combined more than six dozen agencies into eleven agencies run directly by the governor and six agencies with some gubernatorial control in place of predominant governing commissions.

## Part II. Evolution of the Tillman Era in South Carolina

**General Background on Blaine Amendment**

In 1875, James G. Blaine (1830-1893), a Member of Congress from Maine, proposed an amendment to the Unites States Constitution on December 14, 1875, so that:

> No State shall make any law respecting an establishment of religion or prohibiting the free exercise thereof; and no money raised by taxation in any State, for the support of public schools, or derived from any public fund therefor, nor any public lands devoted thereto, shall ever be under the control of any religious sect, nor shall any money so raised, or lands so devoted be divided between religious sects or denominations.[27]

---

[27] Source: 44 Cong. Rec. __ (December 14, 1875). Amendment, Congressional Record, 44th Congress, 1st session, IV, 205, 14 December, 1875. Cited in Sister Marie Carolyn Klinkhamer. (1956). The Blaine Amendment of 1875: Private Motives for Political Action. *The Catholic Historical Review, 42*(1), 15-49. Retrieved June 7, 2021, from http://www.jstor.org/stable/25015986.

The proposed amendment, largely reflecting anti-Catholic views across America, was approved in the United States House of Representatives but failed in the United States Senate in August 1876. The Ku Klux Klan was among supporters of the amendment at the time.[28]

As a recourse, many states later adopted the Blaine amendment in their state constitutions, including by South Carolina in its 1895 Constitutional Convention, more commonly known as the Tillmanite Constitution. A convenient application in post-1895 South Carolina was the prohibition of any state aid to schools founded by religious organizations to educate Catholic or African-American youth. In today's South Carolina, the issue is whether individual students or families may directly receive public funds through vouchers or tax credits to pay for education in a religious school.

## Catholics from Abroad; African-Americans at Home

Around the 1890s, many national and some state political leaders increased their focus on the domestic status of Post-Reconstruction African-Americans and recent increases in immigration from abroad. The Blaine Amendment set the stage to exclude Catholic schools and students from any form of public financial support. It also became a tool in South Carolina during the revision of the state's 1895 Constitution to exclude religious schools founded to educate African-Americans.[29]

---

[28] See U. S. Commission on Civil Rights, *School Choice: The Blaine Amendments & Anti-Catholicism* 36 (2007), Cited in: Espinoza v. Montana Department of Revenue 591 U. S. ____ (2020) at ALITO, J., concurring, p.3. Accessed at: https://www.supremecourt.gov/opinions/19pdf/18-1195_g314.pdf, June 7, 2021. The South Carolina Klan was dispersed by Federal authorities around 1870, but continued as rifle or sabre clubs. These clubs became the basis of Wade Hampton's "Red Shirts" who menaced freed blacks during Reconstruction. Please see "Red Shirts" at https://www.scencyclopedia.org/sce/entries/red-shirts

[29] The American Missionary Association (AMA) established private academies and private black colleges in South Carolina. The Avery Normal Institute was founded in Charleston, S.C.by the AMA in 1865 as a grade and high school to educate and train elementary school teachers. Avery closed in 1954. It is now known as the Avery Museum and Research Center of African American Culture.
 "Religious denominations also founded African-American academies in the South. Notable were the efforts of the Presbyterian Church U.S.A. (after 1870, the United Presbyterian Church U.S.A.), which established over 75 private

**Catholics from Abroad.**

Nationally, political concern emerged in the 1890s about how to restrict European immigration. Legislative consensus for restrictions did not develop immediately, perhaps due to the large number of Irish Catholics who had come to America around the 1840s and were now holding office. In 1850, Catholics were five (5) percent of the nation's population. Between the 1850s and early 1900s, additional waves of Catholic immigrants arrived from newly centralized countries such as Italy, Poland, Germany, and from East European including areas known today as the Czech Republic and Slovakia. By 1906, Catholics were seventeen (17) percent or 14 million out of 82 million Americans.[30] At the start of the Twentieth Century, Catholics were the largest religious denomination in America…larger than either the Methodists or the Baptists.

Lack of legislative success to reduce new waves of European immigration led to creation of a Congressional commission in 1907 to identify the causes of immigration and the impact of steadily increasing numbers. The Commission's objective was to collect "scientific" studies to show that immigrants during recent decades were harming the United States. A host of quantitative studies beginning in the 1880s were based on eugenics.[31] The Commission Report

---

schools in the South. In South Carolina alone, the Presbyterian Church U.S.A. established 25 schools. The Baptists founded Bettis Academy in Trenton, S.C., in 1881. The Methodist Episcopal Church founded Mather Academy in Camden, S.C., in 1888. The African Methodist Episcopal Zion Church established Clinton Normal and Industrial Institute in Rock Hill S.C. in 1896. Avery Institute in Charleston, S.C., was established by the AMA in 1865. The AMA (American Missionary Association) established over 150 schools in the South" (Durham, Jan/Feb, 2000, pp. 68-69). Records of some schools are at the Amistad Research Center New Orleans, La. Please see an expanded list at: Dr. Joseph T. Durham. "America's Other Private Schools". http://www.mathernaa.org/mather_--_crisis_magazine_2000_0001.pdf Accessed June 7, 2021.

[30] Julie Byrne, *America*, Department of Religion, Duke University, National Humanities Center, November 2000 http://nationalhumanitiescenter.org/tserve/nineteen/nkeyinfo/nromcath.htm accessed June 4, 2021. Also, Maura Jane Farrelly, "Catholicism in the Early South," *Journal of Southern Religion* 14 (2012): http://jsr.fsu.edu/issues/vol14/farrelly.html. 1. Accessed June 8, 2021.

[31] "Eugenics—a term coined, in 1883, by Darwin's half-cousin Francis Galton, who declared it 'a virile creed, full of hopefulness.' Soon, the United States, along with Germany, was at the forefront of the movement to improve the human species through breeding. *Scientific American* ran articles on the subject, and the American Museum of Natural History hosted conferences. Theodore Roosevelt, Alexander Graham Bell, John D. Rockefeller, Jr., and

ran to forty-one volumes and included recommendations to limit new immigrants that ran far beyond the shaky science the Commission assembled to support them. Among recommendations was a literacy test.[32] After Congress adopted the recommendations of The Dillingham Commission's, mass immigration to America virtually stopped until the mid-1960s.[33]

But, South Carolina did not experience a large influx of Catholics. Denominational statistics for 1908 show 30 Catholic churches with 19 ministers and 9,650 members. By comparison, the same source finds 1,003 Baptist churches with 410 ministers and 118, 217 members along with 798 Methodist Episcopal churches with 357 ministers and 85,441 members.[34] From a dominant Protestant perspective, there was room for anti-Catholic sentiment among the population. Practically, Catholics were small enough in number and political influence for statewide political leaders to ignore, tolerate, or berate.[35] The dominant political split was between Black and White.

### African-Americans at Home.

In 1890, 728,934 of 1,151,149 South Carolinians were black (59.9%). The remaining 462,008 South Carolina citizens were white (40.1).[36] To an influential South Carolinian seeking

---

many other prominent citizens were outspoken supporters." From Goering, Sara, "Eugenics", *The Stanford Encyclopedia of Philosophy* (Fall 2014 Edition), Edward N. Zalta (ed.), URL = https://plato.stanford.edu/archives/fall2014/entries/eugenics/, accessed June 4, 2021. See also, *Definitions from Oxford Languages* https://www.google.com/search?client=firefox-b-1-e&q=eugenics, accessed June 4, 2021. See also Stephen Jay Gould. 1981. *The Mismeasure of Man.* New York: W.W. Norton, especially pages 73-145. For a discussion of the "Hereditarian Theory of IQ," please see pages 146-233.

[32] https://immigrationhistory.org/item/dillingham-commission-reports/ accessed June 4, 2021).

[33] Katherine Benton-Cohen, (2018). *Inventing the Immigration Problem: The Dillingham Commission and Its Legacy*. Harvard University Press, 2018, p.1.

[34] Keiley, J. (1912). South Carolina. In *The Catholic Encyclopedia*. New York: Robert Appleton Company. Retrieved June 8, 2021 from New Advent: http://www.newadvent.org/cathen/14157a.htm  accessed June 8, 2021.

[35] In his 1924 campaign for the United States Senate, James F. Byrnes was subjected to an anti-Catholic political ad in a Charleston newspaper because twenty former acolytes (altar boys) at St. Patrick's Catholic Church had endorsed him. Byrnes left St. Patrick's Catholic school as a teenager to study law. Although born as a Catholic, he later became a member of the Episcopalian Church. Please see James F. Byrnes (1958). *All in One Lifetime*. New York: Harper. Also David Robertson. 1994. *Sly and Able*. New York: Norton.

[36] United States Census Data reported in R*ogers Jr., George C. and C. James Taylor (1994). A South Carolina Chronology 1497–1992*. University of South Carolina Press. Find Page Number

statewide or national office like Benjamin Ryan Tillman (1847-1918), the 40-60 population split, presumably against him, easily linked to a harsh political calculation: (1) isolate the 60% black to take them out of civic society to prevent them from voting and (2) find enough loyalists among the 40% White to win with 50%+1 of white population, roughly 20% of total state population.

Of course, the number voters do not equal population. In 1890, women were not eligible voters. All black male voters and untrustworthy white male voters were also restricted from voting.[37] The 50%+1 of trustworthy white male voters (50% of white males among 20% of total state white population needed for Tillman to win) could easily shrink to about 10% of the state's total. White supremacy and racial segregation go hand in hand to preserve the interests of the 10% who are led by Ben Tillman to political dominance in South Carolina.

## South Carolina: The Tillman Version

Benjamin Ryan Tillman (1847–1918) was elected governor in 1890. In the process he dismantled Governor Wade Hampton III and the old guard Bourbons[38] who, as the Conservative Democratic Party, had governed the state after Reconstruction. The Conservative Democratic Party had used the "lost cause" as a way to "redeem" South Carolina from the national Republican Party—the party of Lincoln and the party of many Black South Carolinians.

---

[37] Tillman and his political supporters excluded Populist influence or potential political opposition by eliminating all but "true white men." See Stephen Kantrowitz (2000). *Ben Tillman and the Reconstruction of White Supremacy*. Chapel Hill: University of North Carolina Press, p. 113.

[38] A derisive term from the Tillmanite perspective, "Bourbon" referred to the restoration of the French Royal Family after the French Revolution as a term to describe the restoration of South Carolina planters and slave owners after the end of Reconstruction.

To curry votes, white Conservatives had marginally recognized voting and office holding by African-Americans.[39] Tillman made sure that the black majority would not find a political friend to any degree in his new constitutional and social order.

Tillman's Inaugural Address as governor was held in public "in the open air" rather than indoors before the Legislature. A historian notes that Tillman in his address:

"… made very clear his views on race. Jefferson was wrong when he said all men were created equal. Blacks are not equal. 'The whites have absolute control of the State Government… and we intend…to retain it.'"[40]

More directly in Tillman's words"

"In our own State, the triumph of Democracy and white supremacy over mongrelism and anarchy, of civilization over barbarism, has been most complete. And it is gratifying to note the fact, that this was attended by a political phenomenon which was a surprise to all of us. … They quietly pursued their avocations, and left the conduct of the election to the whites. … [T]o-day there is less race prejudice and race feeling between the white men and black men of South Carolina than has existed at any time since 1868.

The dismal experience of universal negro suffrage, … we have endured and survived."[41]

---

[39] Jarrell, Hampton M. 1949. *Wade Hampton and the Negro: The Road Not Taken*. Columbia: University of South Carolina Press.

[40] From A. V. Huff, Jr. 1991. *The History of South Carolina in the Building of the Nation.* Columbia, South Carolina: R. L. Bryan Company, p. 333 cited in Alan Wieder. (1997). Chapter 10: South Carolina School History Textbooks' Portrayals of Race An Historical Analysis. *Counterpoints, 47*, 125-154. Retrieved June 7, 2021, from http://www.jstor.org/stable/42975190.

[41] *Inaugural Address*, B.R. Tillman, Governor of South Carolina. 1890. Columbia, S.C. James H. Woodrow, State Printer, p. 4 Retrieved at https://dc.statelibrary.sc.gov/bitstream/handle/10827/639/Inaugural_Address_1890-12-4.pdf?sequence=1&isAllowed=y.

Tillman's 1890s rhetoric on race reflects a perspective which may be associated to some extent with the rising "junk science" responding to anti-Catholic immigration and white supremacy exclusion of the socially and politically unwanted, for example:

"I don't care what you believe, but I know God didn't make the nigger of as good clay as he made me. What has he done for himself, or for civilization? . . . Whatever the niggers have today they got through slavery."[42]

Maybe more directly, however, Tillman's rhetoric reflects James Henry Hammond's "mudsill"[43] theory. Hammond concluded that a slavery or a slave class is necessary for a social and economic elite that blacks are better off as slaves, and that free laborers in the North are actually in a condition of slavery and worse off than slaves in the South.

Tillman urged his followers to call a new constitutional convention to replace the Reconstruction-era constitution of 1868. He challenged other white political leaders by exploiting fear of possible African-Americans dominating the polls with their White Conservative allies. The 1895 state constitutional convention was for "the sole cause of our being here." It was to deny voting rights for African-Americans. The convention and the resulting Constitution turned the state into a "model 'Jim Crow'" white supremacy regime. Among provisions limiting blacks and untrustworthy whites were the poll tax, educational and property requirements for voting, and a subjective or "literacy" test of knowledge about the

---

[42] Quoted in Lindsey Saunders Perkins. 1945. "The Oratory of Benjamin Ryan Tillman." Ph.D. Dissertation, Northwestern University, p. 378, cited in Orville Vernon Burton, "Introduction to 'Pitchfork Ben Tillman: South Carolinian'" by Francis Butler Simkins. 2002. Reprint. University of South Carolina Press, xxv. Please see the original: Francis Butler Simkins, 1944. *Pitchfork Ben Tillman: South Carolinian*. Columbia, S.C.: University of South Carolina Press. See also Francis Butler Simkins. 1926. *The Tillman Movement in South Carolina*. Durham, N.C.: Duke University Press.

[43] Please see  James Henry Hammond. March 4, 1858. *The Mudsill Theory*. Retrieved June 8, 2021, from https://www.shmoop.com/historical-texts/house-divided-speech/mudsill-theory.html  A "mudsill" is a support sill or beam lie directly on the ground. In Hammond's rhetoric, "mudsill" means lowest social or economic level.

Constitution. Literacy tests allowed county voter registration officials decided to pass whites and fail blacks as needed to insure a white voter victory in the election result.

**Part III. Sketches of Selected South Carolina Leaders Post-Tillman**

**Background**

Following are brief sketches of major state political leaders who held office after Tillman down to the 1968-1970s revision of the State Constitution of 1895. To varying degrees, each continued the organizing principles of the Tillmanite model—use white supremacy and racial segregation to pit whites against blacks and thereby limit black political participation in order to insure white electoral supremacy.

Tillman and many of his followers were wealthy and held similar economic and business interests to white conservatives from the post-Reconstruction period. Although white business interests were distinct from white have-nots, the have-nots joined with Tillman and white wealthy business leaders against blacks. As a practical approach, white office seekers benefitted from Tillmanite principles to win elections. Some exploited Tillman's views more aggressively and graphically to promote electoral success.

The costs to the state's economy for disinvestment in public education and social services for poor blacks and whites are no doubt immense. As reported in the 1930s, living conditions for poor blacks and poor whites are often remarkably similar. Black and white tenant farmers and sharecroppers shared a lack of formal education; neither had adequate medical facilities; and did not interact socially. Conditions which keep blacks in poverty keep whites there as well. For

example observers in the late 1930s wrote that "… lower wages for Negroes bring down the wages of white laborers; poor living conditions favor the spread of disease."[44]

Ironically, white have-nots voted against the promotion of their interests in wage-based employment and beneficial governmental social programs in order to keep blacks "in their place." At the core, Tillman's successors were sensitive to business needs and eventually supported some forms of national government relief during times of economic depression, especially for farmers. The also endorsed national spending for the development of infrastructure such as highways and ports that would also advance business and manufacturing interests.

The series of leaders described below reflect the broad impact of Tillman's political and social model over time.

**Early post-Tillman Leaders**

Many leaders following soon after Tillman expressed racist views with little or no reservation or embarrassment. The rhetoric of the early post-Tillman leaders sharply heaped blame directly on African-Americans for political issues. They stoked fear among white have-nots to endorse their views and to vote for them by excluding blacks.

**Coleman Livingston Blease (Governor 1911-1915, United States Senator 1925-1931)**

**Coleman L. Blease** appealed to racial bigotry and accused opponents of attempting to reduce white mill workers to the same level as African Americans. He labeled blacks as "baboons" and "apes" and urged that there be no spending of white men's taxes on black

---

[44] In Burnet R. Maybank, Sponsor. 1941. *South Carolina: A Guide to the Palmetto State.* New York: Oxford University Press, p. 53. Retrieved June 26, 2021. https://www.carolana.com/SC/eBooks/South_Carolina_A_Guide_to_the_Palmetto_State_1941.pdf

schools. As governor, Blease promoted separation of the races on chain gangs and defended lynching, stating, "whenever the Constitution comes between me and the virtue of the white women of the South, I say to hell with the Constitution."[45]

Consistent with the Tillmanite strategy of pitting white have-nots against Blacks to preserve the political and economic interests of wealthy white "haves," as governor Blease opposed compulsory public education because it interfered with ability of parents to educate children. Popular among millworkers, an emerging political group due to new textile manufacturing plant investments, Blease opposed regulations such limits on their work hours. Known as "the wool hat boys," they often shouted "give'em hell, Coley" as Blease made one of his "stump winding" speeches. Hamstrung by fear of blacks and a growing group of white middle-class managers and professionals, they voted for Blease even though his achievements for them were modest at best. Blease was defeated by James F. Byrnes in the race for United States Senator in 1930.


**Ellison Durant Smith (United States Senator 1909-1944)**

Ellison Smith is noteworthy for:

His "shut the door" speech which supported the Immigration Act of 1924. The Act severely restricted the number of immigrants who could enter the United States each year, especially from southern and eastern Europe. Many Catholics had settled in America from these parts of Europe.

---

[45] https://www.scencyclopedia.org/sce/entries/blease-coleman-livingston  Access Date June 22, 2021. Original Published Date May 17, 2016. Date of Last Update October 14, 2016. See also Simon, Bryant. "The Appeal of Cole Blease of South Carolina: Race, Class, and Sex in the New South." *The Journal of Southern History*, vol. 62, no. 1, 1996, pp. 57–86. JSTOR, www.jstor.org/stable/2211206. Accessed 22 June 2021.

His walkout of the 1936 Democratic Party National Convention was to protest that a black minister gave an opening invocation for the day. A popular story is that he returned the next day. Since he had made his point about racial segregation, there appeared to be no need to lose any new political opportunity oppose progress for civil liberties for blacks.

He continued opposition to the 14th and 15th Amendments to the United States Constitution with statements like, "… political equity means social equity, and social equity means the mongrelization of the American race."[46]

As is so often the paradox, Smith supported agricultural and industrial interests in South Carolina while simultaneously berating blacks and advocating "states' rights" to preserve traditionally segregated South Carolina. Smith died in office in 1944.

## Olin DeWitt Talmadge Johnston (Governor of South Carolina 1935-1939, 1943-1945; United States Senator 1945-1965)

The United States Supreme Court ruled in Smith v. Allwright, 321 U.S. 649 (1944) that a Texas law which allowed a political party to set its rules internally, including an all-white primary, was unconstitutional. South Carolina's all-white primary became illegal as well. As governor, Olin Johnston validated his "white supremacist" credentials, not by overly racist speech, but by calling a special session of the General Assembly on April 14, 1944. In the special session, the General Assembly took six days to pass 147 laws. The purpose of the flurry of legislation was to by-pass the Supreme Court by designating the state Democratic Party as a private organization. As a private organization, the state did not directly control the Democratic

---

[46] Hollis, D. (1970). "Cotton Ed Smith": Showman or Statesman? *The South Carolina Historical Magazine*, 71(4), 235-256, p. 249. Retrieved June 22, 2021, from http://www.jstor.org/stable/27567009

Party. And neither did the United States Supreme Court under the authority of the existing decision.

Involved in a close campaign with incumbent "Cotton Ed" Smith for a seat in the United States Senate, Governor Johnston did not grant clemency to a fourteen year old black youth sentenced to death. George Stinney, Jr., was convicted of murder in a one-day trial and executed.[47] Seventy years later in 2014, South Carolina Circuit Judge Carmen Mullen overturned his conviction posthumously. The judge recognized a lack of credible evidence of guilt and the possibility that Stinney's confession was forced. [48]

### James Strom Thurmond (Governor of South Carolina 1947-1951; United States Senator 1954-2003)

Thurmond is perhaps the closest in view, style, and racist rhetoric to Ben Tillman, Coleman Blease, and Ellison Smith. A strident segregationist and states' rights advocate, Thurmond was prone to strident racist rhetoric, for example,

> "There is not enough troops in the army, to force the southern people to break down segregation and admit the nigger race into our theaters, into our swimming pools, into our homes, and into our churches."[49]

In something of a turning point in his political career, in the 1970s, a newspaper article reported:

---

[47] https://systemicjusticeblog.wordpress.com/2016/04/21/george-stinney-and-the-lessons-of-history-2/ Retrieved June 26, 2021.
[48] https://racism.org/index.php/articles/law-and-justice/criminal-justice-and-racism/140-death-penalty/1994-the-youngest-of-the-young-fourteen-year-olds-sentenced-to-die?showall=&start=1 Retrieved June 26, 2021.
[49] Quoted at https://wnyc studios New York. 2016. New York Public Radio. Retrieved June 27, 2021.

> "Mr. Thurmond, one of the architects of the so-called Southern strategy of the
> Nixon Administration, has been receiving unusual criticism in his home state for what is
> seen as his failure to deliver on a 1968 pledge that a Republican in the White House
> would return freedom of choice to South Carolina schools."[50]

Thurmond continued his defense of segregation and states' rights in a long public career, although with perhaps with a less divisive racist tone as he grew older.

**Some Moderate Views Emerge**

Beginning in the 1960s, some South Carolina executive and legislative leaders began to moderate or avoid racist rhetoric along with diminishing praise of racial segregation. The need for a positive "business climate" in a racially peaceful society was the emerging moderate view. Even then, hints or events of black protests or minority disagreement with prevailing state policy revealed that growing moderation may have been a masquerade behind which traditional racism prevailed. Events or demands that may have marred the ability of the state to attract business investment were confronted directly by existing state authority to preserve traditional "law and order" under the prevailing need for "order and good harmony" among all South Carolinians.

Tactically, many state leaders after mid-20th Century believed more diverse industrial development would advance the property and income tax base to support increased funding for public education programs. Public education would create a more skilled and technically competent workforce to attract even more industry and capital investment to modernize the state economically and potentially socially.

As in the past, the spoils of change went first to whites, now approaching a population majority of 60% or more due to black exodus from the state's oppressive, little changing racism.

---

[50] https://www.nytimes.com/1970/10/24/archives/racial-theme-dominates-south-carolina-campaign.html  Accessed June 27, 2021.

Nonetheless, national school desegregation policies forced recognition of the need for a more inclusive public education policy in South Carolina.

**James F. Byrnes (Governor of South Carolina 1951-1955; United States Secretary of State 1945-1947; Associate Justice of the United States Supreme Court 1941-1942; United States Senator 1931-1941; Member United States House of Representatives 1911-1925).**

Byrnes rose to power as a court stenographer which gave him access to significant state and local leaders.[51] Elected to Congress in 1911, he negotiated expansion of the highway system in South Carolina by having the United States Postal Service rent roads. Use of rental contracts avoided any federal policy to which South Carolinians would have objected. Byrnes' career included significant roles in all three branches of the United States government.

Perhaps the great native hope for white South Carolinians to avoid racial integration, Byrnes returned home after his extensive national service to be elected governor in 1950. He faced mounting challenges from the black community to change or end the Jim Crow system in the face of economic, social, and racial developments in the state after World War II.

**Byrnes and "separate, but equal."** Byrnes' response to South Carolina's Jim Crow approach was to recommend and implement a "separate, but equal" education policy. Realistically, his response was so that South Carolina could delay or deny national civils rights and desegregation policies by funding separate schools for blacks. Governor Byrnes based his

---

[51] For a biography, see David Robertson. 1980. *Sly and Able: A Political Biography of James F. Byrnes*. New York: W. W. Norton Company. For Byrnes' personal views, see James F. Byrnes. 1947. Speaking Frankly. New York and London: Harper and Brothers and Byrnes. 1958. *All in one lifetime*. New York: Harper and Brothers.

recommendations on a 1948 Peabody survey. The Peabody survey described significant differences in funding, school facilities, transportation, and teacher training for black and white schools[52] and recommended these differences be responsibly addressed.

The General Assembly increased its defense of racial segregation by adopting Byrnes' proposals. It imposed a three percent sales tax for a program to fund "equal" schools for blacks and whites.[53] It was the first use of the sales tax in South Carolina's history. It funded a 75 million dollar bond issue to address the Peabody Report recommendations.

As governor, Byrnes also used his authority to employ extra measures to continue the state's "separate but equal" system of public schools. When the NAACP sued the State of South Carolina and the Clarendon County Schools over segregation,[54] not just equal protection, Byrnes may have used his potential influence in the United States Supreme Court as a former Justice to have the suit shifted to Kansas. Nonetheless, court-ordered desegregation came in *Brown v. Board of Education of Topeka* 347 US 483 (1954). Byrnes never supported the decision. He temporarily suspended the state's equalization program after the *Brown* decision in 1954, but soon reinstated it after conferences with white and black leaders.

---

[52] *Public Schools of South Carolina : a digest of the report of the South Carolina Education Survey Committee* South Carolina Education Survey Committee; George Peabody College for Teachers, Division of Surveys and Field Services (South Carolina State Library, 1948). https://dc.statelibrary.sc.gov/bitstream/handle/10827/6731/ESC_Public_Schools_of_SC_1948.pdf?sequence=5&isAllowed=y Retrieved July 6, 2021.

[53] For a discussion of school equalization during this period, please see Rebekah Dobrasco. School Equalization. South Carolina Department of Archives and History. http://polisci.usca.edu/aasc/Equalization%20Schools.htm Retrieved June 29, 2021. See also, Rebekah Dobrasco. *Website* at https://www.sciway.net/afam/sc-equalization-schools.html or https://www.sciway.net/afam/sc-equalization-schools.html Accessed June 30, 2021.

[54] As one legal scholar observed: "… the strategy was to attack segregation in education, but the real agenda was the removal of the basic barrier to full and equal citizenship rights for blacks in this country. With segregation eliminated, blacks, it was thought, would have an unrestricted opportunity to function in America on equal terms with whites. We now know, of course, that the NAACP lawyers erred. The lawyers did not understand then how effective white power could be in preventing full implementation of the law; nor did they realize at the time that the basic barrier to full equality for blacks was not racial segregation, a symptom, but white supremacy, the disease." In Robert L. Carter, *The NAACP's Legal Strategy Against Segregated Education*, 86 MICH.L. REV.1083 (1988). Available at: https://repository.law.umich.edu/mlr/vol86/iss6/3 Accessed July 5. 2021.

Recognition of state funding for education for blacks, even if only to maintain racial segregation, was more than half a century overdue. The sales tax and school equalization were opposed by black and white citizens. The white refrain was the usual repetition that "whites don't pay taxes to support black schools." Other whites thought waiting until the final United States Supreme Court was justification not to spend the money. There would be no need to fund black schools if Byrnes could engineer a Supreme Court victory and get the suit from Clarendon County[55] dismissed. Some blacks found offense in what they saw as a calculated legislative response that would not have happened were it not for the *Briggs* case. For them, "separate, but equal" seemed forced into adoption by a reluctant legislature.

Despite the legislative effort to continue racial segregation, some advances in traditional practices were required by the legislature. County education boards had to plan new schools based on population. Counties were also required to consolidate the more than one thousand school districts to make administration more effective. Small local boards of education were generally abolished. Many counties resisted these changes and increased state control over what had been previously the 1895 constitutional emphasis on county-based government.

The General Assembly also created a State Educational Finance Commission to manage the new funds. The Commission had one black member. The common understanding was that funding for construction, transportation, and program improvements would first go to white schools and eventually to black ones. Local opposition to state oversight of the new funds forced the Commission to accommodate continuing local political influence. There was continuing local resistance, especially in black majority rural areas, to building adequate facilities for blacks or to supplement state funds with local revenue.

---

[55] *Briggs v. Elliott* 342 U.S. 350 (1952).

Even so, by 1955 when Byrnes left office, white state political and education leaders believed they could make the case that black schools were substantially equal to white schools and that blacks preferred equalization of racially different public education to racial integration. Even so, the school equalization program was only a beginning effort to remedy decades of underfunding. Simultaneously, white leaders continued to rationalize political resistance to the Supreme Court's order for broader, racial integration.

By 1963, the Educational Finance Commission had approved over $214 million in building projects since the inception of the program, with 53.9 percent of the total funds appropriated for white schools and 46.1 percent of the funds appropriated for black schools. In 1966, the state Department of Education assumed the roles and responsibilities of the Educational Finance Commission.

 Desegregation of South Carolina's public school system in South Carolina was not initiated until 1963. In January 1963, Harvey Gantt desegregated Clemson University. In September 1963, eleven African American students desegregated the Charleston County public schools. Other school districts gradually followed suit, allowing minimum racial integration with small numbers of black students in white schools. Rarely did white students desegregate black schools. A dual school system, in which there remained many large, separate school for blacks and whites based on race, was maintained until federal policy changed it in 1970. Many historically black high schools were closed about this time or re-designated as black elementary or junior high schools.

The tactical approach launched by Governor Byrnes to maintain "separate, but equal" had been nullified by the United States Supreme Court. It mutated into alternate forms to continue observable patterns of racial segregation in public education.

School desegregation led to a movement by local communities to create private schools. Private schools could maintain segregation in fact by accepting applications from white students only. The number of private schools grew dramatically by 1975. As a result, in many areas, especially in a rural area with a majority black population, a private school was able to enroll almost all the white students who would ordinarily attend a public school. Some critics named them as "segregation schools" or "segregation academies". Eventually, non-religious based private schools accepted small numbers of black applicants.

The motivation for racial justice in Catholic private schools by tradition and in the 1970s is different from and does not comport with the general private school movement for maintaining racial segregation in education in the state. As previously referenced in this report, Vicar General Bernardin observed in 1959 that:

> South Carolina is still one of the most segregated states in the country. Every kind of law has been passed to circumvent the 1954 decision of the Supreme Court. The political and local leaders on both the state and local levels have pledged themselves to the maintenance of segregation.
> This situation, of course, makes it more difficult to put into practice her [the Catholic church's] principles concerning racial justice. … With complete racial justice as our ideal, we shall prudently, but firmly, work toward the accomplishment of this ideal.[56]

**Edgar Allen Brown (South Carolina House of Representatives 1921-1926, Speaker 1925-1926; South Carolina State Senate 1929-1972, president pro tempore[57] 1942-1972).**

---

[56] Letter from Vicar General Bernardin to Don Renfrew, Jr. June 4, 1959. Original Document. Joseph Louis Bernardin was born in Columbia, South Carolina, in 1928. He served for 14 years in the Diocese of Charleston beginning in 1952. Among his titles there was Vicar General. After serving in various capacities, then as the Archbishop of Cincinnati in 1972 and then as Archbishop of Chicago in 1982, he was elevated to Cardinal in 1983.

[57] In the election of 2018, a constitutional amendment placed the Governor and Lieutenant Governor on the same ticket. As a result the Senate president pro tempore position will disappear after more than a century. The president pro tempore was an influential post that directed the Senate's agenda and controlled appointments to most state boards and commissions. Bristow Marchant. 2018. "One of the Most Powerful Jobs in SC Government is Going Away." *The State*. December 19. https://www.thestate.com/news/politics-government/article222959450.html Accessed July 8, 2021.

Edgar Brown came into public life as a court stenographer like Byrnes. As president pro tempore of the Senate and chair of the Senate Finance Committee,[58] he played an instrumental role in state financial matters for more than three decades until 1972. His fiscally conservative views held the state's AAA bond rating to be sacred and unchanging. Brown's finance committee proposed the budget after the House version. Given the logroll process in the Senate, its version was more important than what the House version. It dominated any conference committee before votes in the respective chambers of the General Assembly.

Brown depended on a central finance administrative body, the South Carolina Budget and Control Board, to keep the state on a sound fiscal basis. Brown was a strong advocate of the public school system, although the public school system was segregated during most of his time in office. He was instrumental in passing legislation for the state's educational television system. The system was envisioned as a way to improve the quality of materials in rural as well as urban school districts. Brown had a special affinity for rural issues.  He was a strong proponent of a good road system, financed on a "pay as you go" basis with the gasoline tax.

More than anything, Brown was among state leaders who advocated all "deliberate speed" as a way to comply with new national civil rights policies. "Speed" really meant delay through a variety of court based proceedings. Only after exhausting all relevant legal remedies would the state comply voluntarily. Brown expressed "law and order" in this way:

> In South Carolina … we have faced radical changes affecting every facet
> of our lives. Despite mounting pressures from all sides, we in South Carolina

---

[58] Workman, William D. 1963. *The Bishop from Barnwell: The Political Life and Times of Senator Edgar A. Brown.* Columbia, S.C.: R. L. Bryan. Workman's title reflects the commonly held description of Brown's influence as that of a "bishop" in an organized church. See also https://guides.law.sc.edu/MemoryHoldTheDoor-VolumeII/BrownEdgarAllen. Retrieved June 26, 2021; and https://www.scencyclopedia.org/sce/entries/brown-edgar-allan/ Access date June 26, 2021.

have maintained respect for law and order and have preserved good race relations. We have conducted our fights in the courts and have complied in good faith with their decisions, no matter how wrong we might personally felt them to be. By respecting the law ourselves and demanding that respect from others, we in South Carolina have been spared much of the racial strife so evident elsewhere.[59]

Senator Edgar A. Brown and Speaker of the House Solomon Blatt were leaders of the Barnwell Ring which controlled the S.C Legislature for most of the 20th century.

**Laurence Marion Gressette (South Carolina State House of Representatives 1925-1928, 1931-1932; State Senator from Calhoun County 1937-1984, president pro tempore 1972-1984)**

**Gressette Committee (1951-1966)**. In 1951, state senator Marion Gressette from Calhoun County initiated a movement in the South Carolina General Assembly to create the South Carolina School Committee, more commonly known as the Gressette Committe. With the onset of legal action in federal courts to challenge the "separate but equal" policy in South Carolina's public schools, the General Assembly created the committee to prepare for, delay, and even stop implementation of federally mandated desegregation.

---

[59] Statement by State Senator Edgar A. Brown. 1969. Amendments to the Voting Rights Acts of 1965: Hearings, Ninety-first Congress, By United States. Congress. Senate. Committee on the Judiciary. Subcommittee on Constitutional Rights. P. 658. Retrieved June 26, 2021.
https://www.google.com/search?q=edgar+brown+south+carolina+quotes&safe=active&client=firefox-b-1-e&ei=rc7XYMOgD8nl5NoP3Mi_2Ac&oq=edgar+brown+south+carolina+quotes&gs_lcp=Cgdnd3Mtd2l6EANKBAhBGAFQwawCWJDPAmDV1wJoAXAAeACAAW6IAYQPkgEEMjQuMZgBAKABAaoBB2d3cy13aXrAAQE&sclient=gws-wiz&ved=0ahUKEwiDq4yrz7bxAhXJMlkFHVzkD3sQ4dUDCA0&uact=5

Guided by its chair, Senator Gressette, the Committee slowed the rate of compliance with federal demands. Simultaneously, it maintained the "law and order" stance of Senator Brown and business leaders. Ironically, the Committee was able to prevent many, radically reactionary segregation laws from even being debated by the legislature. In 1966, on the realization that continued legal opposition would be fruitless, the legislature dissolved the Gressette Committee with the concurrence of its chair. By 1970–1971 South Carolina schools were fully desegregated.

Gressette also became chair of the Senate Judiciary Committee in 1953. Under his guidance as "caretaker," the Senate Judiciary Committee would be known as "Gressette's Graveyard." with Gressette being known as "the caretaker." A reasonable estimate is that 75 to 80 percent of the bills introduced in the House and the Senate passed through his committee. When a bill came up, Senators reportedly looked for the nod of his head as to how to vote. He was popularly known as "the Silver Fox" due to his management of what died in his committee or passed the Senate as well as his swept back gray hair.

Throughout his career, Senator Gressette maintained his perspective was not "personal." Rather he declared he represented the people who elected him.


**Solomon Blatt (South Carolina House of Representatives 1932-1986; Speaker of the House of Representatives 1937-1947, 1951-1973)**

Speaker of the House Solomon Blatt and State Senator Edgar A. Brown were leaders of the Barnwell Ring[60] which controlled the South Carolina government from the 1940s through the late 1960s. The Barnwell Ring was a network of rural county representatives which witnessed

---

[60] "[The Barnwell Ring] …was also a system in which most public policy was made in private, with few brakes on the conduct of those at the top." See https://www.nytimes.com/1991/05/12/us/scandals-casting-shadows-over-public-life-in-south-carolina.html.  Retrieved June 27, 2021.

growing interest in public education and the need for a peaceful business climate. Nonetheless, it generally opposed urban interests, promoted racial segregation as long as it could, and opposed national civil rights policy changes along with spending on social development issues that may have benefitted the poor—both black and white.

Blatt used the House Judiciary Committee to steer "acceptable" candidates for election to judgeships by the General Assembly. Through Blatt's "school of the gavel," a Chair of the House Judiciary Committee (for example, Robert McNair) was effectively given state sponsored, statewide exposure to campaign for a leadership role through a network of the state's Judiciary.

In tune with South Carolina's resistance to public school integration:

"It was before an all-white legislature in 1966 that Mr. Blatt, in one of his rare speeches on the floor, shed tears in an attack on a bill to restore the state's compulsory school attendance law. The original law had been repealed almost a decade earlier as part of "massive resistance" legislation aimed at thwarting school integration.

"You may want a 16-year-old so-and-so to sit by your granddaughter," Mr. Blatt had shouted, "but Sol Blatt will fight and die to prevent it from happening to his granddaughter."

When he was asked whether he would prefer 16-year-old illiterates to walk the streets rather than to go to school, Mr. Blatt had answered, "I'd rather have them in the streets. They can be avoided there."

Consistent with the personal-public ambivalence among South Carolina political leaders about changes in racial segregation policies, the article continues:

"Senator Brown once confided that the reason Mr. Blatt had made such an
issue on the bill was because "folks back home think he's too much for the
Negroes."[61]

Personally, white leaders often had black political friends who could be trusted to support
them as well as black servants in their homes. But publicly, there had to be rigorous opposition
to any changes in segregated black-white politics to get elected. The winning votes in an election
came from poor whites and other whites who opposed blacks ideologically as well as from
Whites who opposed spending programs that may benefit blacks and require them to pay more
taxes.

### Ernest Frederick Hollings (Governor of South Carolina 1959-1963; United States Senator 1966-2005)

Perhaps the first thaw in the frozen racist model of Ben Tillman, Governor Ernest
Hollings announced to the General Assembly that the state had exhausted its routes of judicial
appeal. He exhorted lawmakers, policymakers, and citizens to stick to the dignified pursuit of
government by law and order and not to give-in to the appeal of anger or emotion that could only
result in racial conflict and scare away business investors.[62]  Although Hollings' career was
primarily at the national level,[63] the beginnings of peaceful integration of public education
institutions was a hallmark of his service to the state.

---

[61]See  https://www.nytimes.com/1973/06/12/archives/a-venerable-dixie-legislator-retires-tears-and-full-heart.html.
Retrieved June 27, 2021.
[62] John G. Sproat, "'Firm Flexibility': Perspectives on Desegregation in South Carolina," in Robert H. Abzug and
Stephen E. Maizlish, eds. *Race and Slavery in America: Essays in Honor of Kenneth M. Stampp* (Lexington, Kentucky:
University Presses of Kentucky, 1986), 164-184.
[63] See Ernest F. Hollings, Kirk Victor. 2008.  *Making Government Work.* Columbia: University of South Carolina
Press for an autobiography. Primary emphasis is on Hollings' service as United States Senator 1966-2005.

**Robert McNair (Member of House of Representatives, 1951-1963; Governor of South Carolina, 1965-1971)**

With the early departure of the sitting governor to the United States Senate, Robert McNair went on to serve as governor for six years—two years remaining in the existing term and then four more years after his election in 1966. He was a supporter of statewide kindergartens and persuaded legislative approval of an additional penny on the existing sales tax to support the program. He was widely known as a political moderate who was considered among others as a possible vice presidential running mate for Senator Hubert H. Humphrey's presidential campaign.

His moderating image was challenged on a national stage by events surrounding student unrest at South Carolina State University in 1968. Three black students were killed by law enforcement in what seemed like a reversal of the state's positive racial climate to the negative tones and actions of pre-civil rights days. Nonetheless, Governor McNair continued to promote the need for improved and responsive public education. He also continued to expand the vision of state economic development through industry hunting trips to places like California and Europe.

**John C. West (State Senator 1955-1967; Governor of South Carolina 1971-1975)**

John C. West is closely identified with the moderating stance claimed by Governor Robert E. McNair's administration. West was the first to declare the state racially neutral,[64] when he described South Carolina as "color blind" in his inaugural address.

---

[64] Race neutral actions aim to help racial minorities without reducing benefits or status of the racial majority. Race neutral implies that remedies for unfair differences between races may be developed without having exclusive or defined targets to benefit the racial minority. Critics see racial neutrality as a political safe haven that does not address racial equality through direct action. See James M. Glaser and Timothy J. Ryan. 2013. *Changing minds, if*

His 1970 campaign for Governor may be noted as the last statewide campaign in which West's opponent used racist rhetoric and tactics.  A newspaper account observed:

> "Mr. West is a baldish man of 47 years who appears retiring when compared with the state's most familiar politicians, Senator Strom Thurmond and Representative L. Mendel Rivers. He has taken the position that he will not attempt to polarize the races during the campaign and has asked Mr. Watson to direct his rhetoric to the crucial issues of education and economic needs."[65]

Unlike Olin D. Johnston, West as governor said there would be no executions during his term. More broadly, he was an advocate of a technical education system to provide trained workers for new industry and a second medical school to expand physician and health services throughout the state.

**South Carolina's Lingering Neglect of Public Education**

Since the 1970s South Carolina has been impacted by national debates over public education policy and made some noteworthy policy responses. The Education Finance Act of 1977 identified a "defined minimum program" for South Carolina schools and raised questions about inequities in school funding. The Basic Skills Assessment Act (1978) and the Educator Improvement Act (1979) addressed the importance of basics in education program design and content along with improved qualifications of teachers.

---

*not hearts: Political remedies for racial conflicts.* Philadelphia: University of Pennsylvania Press. Also please see discussion in James M. Glaser and Timothy J. Ryan. 2013. "How 'race neutrality' can save affirmative action." *Washington Monthly*. Nov/Dec. https://washingtonmonthly.com/magazine/novdec-2013/how-race-neutrality-can-save-affirmative-action/  Retrieved July 2, 2021.
[65] https://www.nytimes.com/1970/10/24/archives/racial-theme-dominates-south-carolina-campaign.html

In 2014, after a twenty-one year legal battle, the State Supreme Court ordered the Legislature to redo its approach for minimally adequate public education.[66] Since then, nothing has happened. Perhaps imitating the tactics of the ostrich, the General Assembly has not identified a time line or a plan to make changes in the funding process for poor schools. In 2017 the *Abbeville* decision was vacated given accommodating developments in the specific school districts involved in the legal action.

In the aftermath, long established racial and economic divisions in public education and social integration continue statewide.[67] A recent article by the *Post and Courier* notes:

> "The Legislature has largely sat idle while gaps in achievement and resources have widened across the state, leaving daunting divides between rural and urban districts, poor and affluent schools, and white and black students.
>
> Lawmakers have ignored their own mandates for funding education as generations of students languish … . Lawmakers can't even agree on what the most significant problems are, let alone raise the 'minimally adequate' benchmark the state has prescribed for public education."[68]

---

[66] Please see Abbeville County School District et al. v. The State Of South Carolina et al. https://www.sccourts.org/opinions/displayOpinion.cfm?caseNo=24939 Retrieved June 29, 2021. In the case, responsibility for free public education and a broad definition of a minimally adequate education are:
> "The plain language of [the educational clause] places the responsibility for free public education with the General Assembly. . . . . p. 6. We define this minimally adequate education required by our Constitution to include providing students adequate and safe facilities in which they have the opportunity to acquire:
> > 1) the ability to read, write, and speak the English language, and knowledge of mathematics and physical science; 2) a fundamental knowledge of economic, social, and political systems, and of history and governmental processes; and 3) academic and vocational skills. Pp.7-8.

[67] Today, nearly half of Greenville's 87 traditional schools are made up of more than 50% minority students — demographics that are consistently reflected across South Carolina. In a state with about 64% white residents, 27% black residents and 6% Hispanic/Latino residents, only half of the students attending public schools are white. Ariel Gilreath. 2020. "It's not policy anymore, but 1 in 7 South Carolina schools remain segregated". The Greenville News, February 17. https://www.greenvilleonline.com/story/news/2020/02/17desegregation-1-out-of-7-south-carolina-schools-highly-segregated/2843394001/ Retrieved July 1, 2021.
[68] Paul Bowers, Glenn Smith, Seanna Adcox, Jennifer Berry Hawes, and Thad Moore, "Minimally Adequate: How South Carolina's 'minimally adequate' education system fails too many students." *Post and Courier.* November 14, 2018. https://data.postandcourier.com Retrieved July 2, 2021

The political malaise over funding a" minimally adequate education" suggests an increasing burden on the General Assembly to take some meaningful action to expand individual educational opportunities and achievement. The alternative of individual, direct funds for students to attend private schools and universities offers a feasible way for minority students to enroll in private schools with a mission of social justice to serve and educate them.

**CONCLUSION**

**PROBLEM:**

South Carolina incorporated the Blaine Amendment in its revised 1895 Constitution. The Blaine Amendment prohibits any state aid to schools or universities founded by independent or religious organizations. As a consequence, private schools founded by various religious denominations or independent organizations did not qualify for state funding. Many of these private schools, including Catholic-based schools, also enrolled African American youth who had limited funding and learning opportunities in the state's public education system.

Constitutional revision in the 1970s removed only part of the original Blaine Amendment. The revision removed the barrier to indirect aid to private education institutions. The revised article still retains the ban on direct aid to independent and religious schools.

Thus, the revised South Carolina Constitution's Article XI, Public Education, continues to deny direct public funding for individuals in independent and religious schools or universities. The incomplete revision maintains, even if latently, the distortions of racism and anti-Catholicism embedded in the South Carolina constitution since the inclusion of the Blaine Amendment in 1895.

**SOLUTION:**

The South Carolina 1895 Constitution, Article XI, Public Education, needs additional revision to remove the remaining section based on the Blaine Amendment. The section prohibits direct use of public funds for individuals in private schools and universities.

Direct aid to individual students offers an alternative for students marooned in South Carolina's virtually segregated public schools today. Removal of the constitutional barrier for direct aid for individuals in private schools and universities will allow the General Assembly to implement a forward looking approach to quality and social justice in the education of new generations in South Carolina.

**APPENDIX:**

APPENDIX

In the course of preparing this report, I have reviewed the following items which are include as an electronic appendix to this report, identified by their corresponding number.

1. Nic Butler, Ph.D., "The Myth of the Holy City," Charleston County Public Library (Jan. 24, 2020), available at https://www.ccpl.org/charleston-time-machine/myth-holy-city#_ednref2.
2. Thomas Cooper, ed., The Statutes at Large of South Carolina, volume 2 (Columbia, S.C.: A. S. Johnston, 1837)
3. The South Carolina Constitution of 1776 (Yale Law School Law Library Avalon Project).
4. The South Carolina Constitution of 1778 (Yale Law School Law Library Avalon Project).
5. Joe Regan, *Irish Frontier Catholicism in the Antebellum US South*, 2 Irish Studies South 24 (2016).
6. James Underwood, *The Constitution of South Carolina, Vol. 3: Church and State, Morality and Free Expression* (1992).
7. Colin Gunstream, *Thesis: Home Rule or Rome Rule? The Fight in Congress to Prohibit Funding for Indian Sectarian Schools and Its Effects on Montan*a (2015).
8. 4 Cong. Rec. 5453 (1876).
9. Joseph P. Viteritti, *Blaine's Wake: School Choice, the First Amendment, and State Constitutional Law*, 21 Harv. J.L. & Pub. Pol'y 657 (1998).
10. Laurie F. Maffly-Kipp, *An Introduction to the Church in the Southern Black Community*, Univ. of North Carolina (May 2001).
11. Troy Lee Kickler, *Black Children and Northern Missionaries, Freedmen's Bureau Agents, and Southern Whites in Reconstruction Tennessee, 1865 -1869* (2005) (Ph.D. diss., Univ. of Tenn.).
12. Laurie Maffly-Kipp, *African American Christianity, Pt. II: From the Civil War to the Great Migration,1865-1920*,Nat.HumanitiesCenter, http://nationalhumanitiescenter.org/tserve/nineteen/nkeyinfo/aarcwgm.htm.
13. Penn Center, http://www.penncenter.com/explore-penn-centers-history.
14. Avery Institute, http://www.averyinstitute.us/history.html.
15. Otis Westbrook Pickett, Neither Slave Nor Free... : *Interracial Ecclesiastical Interaction In Presbyterian Mission Churches From South Carolina To Mississippi, 1818-1877*, 23-38 (2013).
16. Kevin Krause, *A Different State of Mind: Ben Tillman and the Transformation of State Government in South Carolina, 1885-1895* (2014).
17. Lewis K. McMillan, *Negro Higher Education in South Carolina* (1952).
18. S.C. Dep't of History & Archives, United States Department of Interior National Register of Historic Places Inventory—Nomination Form, http://www.nationalregister.sc.gov/MPS/MPS044.pdf

19. Claflin University, *Panther STEPS: Students in Transition Engaged and Preparing for Success*, March 2011, *available at* www.claflin.edu/docs/default-source/planning-assessment/claflin-panther-steps-plan.pdf

20. Colyer Meriwether, *History of Higher Education in South Carolina* (1888).

21. The Constitution of South Carolina of 1895.

22. Note: *Segregation academies and state action*, 82 Yale L.J. 1436 (1973)

23. Gretchen Keiser, *Photo inspires look back at era when Catholic schools desegregated*, Georgia Bulletin (Jan. 9, 2014).

24. Leonard Roghoff, *Review Essay: Fight Against Fear: Southern Jews and Black Civil Rights* (Athens: University Press of Georgia, 2001), J. of Southern Religion (2003), http://jsr.fsu.edu/2003/Rogoff.htm.

25. S.C. Dep't of Archives & History, National Historical Register nomination form, Columbia Township Auditorium, https://npgallery.nps.gov/GetAsset/3f1f8b6d-fb96-4dd8-9beb-a0c7e8b3c682.

26. "Franciscan Sisters Colleen Waterman, Maigread Conway, and Joachim protest during the Charleston Hospital Workers' Strike (1969)," Diocese of Charleston Archives, https://dioceseofcharleston.omeka.net/exhibits/show/historyofthediocese/item/207.

27. Cole Bease Graham, Jr., "The Evolving South Carolina Constitution," 24 J. of Political Science 23 (1996).

28. William D. Workman, Jr., *The Case for the South* (1960).

29. *Constitutional Convention of 1895, Journal of the Constitutional Convention of the State of South Carolina* (1895).

30. Final report of the Committee to Make a Study of the South Carolina Constitution of 1895, to His Excellency the Governor and the General Assembly of the State of South Carolina ("West Committee Report") (1969).

31. *A Denominational View*, Yorkville Enquirer, May 9, 1888.

32. H.R. DOC. NO. 54-5 (1895).

33. *Immigration*, The Newberry Herald and News, May 31, 1888.

34. *Religion and Politics*, The Darlington News, November 14, 1895.

35. *Romish Schools*, The Abbeville Press and Banner, September 19, 1888.

36. *That Catholic Scheme*, The Aiken Recorder, August 14, 1888.

37. The Aiken Recorder, Nov. 5, 1895.

38. *The Immigration Convention*, The Fairfield News and Herald, May 30, 1888.

39. William C. Hine, "South Carolina State College: A Legacy of Education and Public Service," 65 Agricultural History 149 (1991).

40. Race Prejudice and Discrimination: Readings in Intergroup Relations in the United States (Arnold M. Rose, ed.) (1951).

41. Ari L. Goldman, "Visit to South Carolina Reflects Rise of Catholics in Bible Belt," N.Y. Times (Sept. 11, 1987).

42. "Bishops' Support Of Civil Rights March Commended," The Catholic Northwest Progress (Seattle, WA) (Aug. 23, 1963).

43. Amasa M. Eaton, The Late Constitutional Convention and Constitution of South Carolina, 31 AM. L. REV. 198 (1897).

44. "Clearing the Decks," The Constitutional Convention, The State (September 22, 1895).

I have additionally reviewed the following volumes which are not available electronically but are available at academic and public libraries in South Carolina:

1. Philip Hamburger, *Separation of Church and State* (2002).
2. Dr. Courtney Tollison, *Moral Imperative and Financial Practicality: Desegregation of South Carolina's Denominationally-affiliated Colleges and Universities* (University of South Carolina, 2003).
3. Statutes at Large of South Carolina, General and Permanent Laws, 1963, p. 498-500

X *Cole Blease Graham, Jr.*
_____
Cole Blease Graham, Jr.
Executive Professor
_____

July 27, 2021