IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON  DIVISION

BISHOP OF CHARLESTON, etc., et al )     Civil Action No. : 2:21-cv-1093-BHH
                                   )
                    Plaintiffs,    )
                                   )
              v.                   )     **MEMORANDUM IN SUPPORT OF**
                                   )     **MOTION FOR SUMMARY JUDGMENT**
MARCIA ADAMS, etc., et al.         )     **STATE OF SOUTH CAROLINA**
                                   )     **AND IN OPPOSITION TO**
                    Defendants,    )     **PLAINTIFFS'MOTION FOR**
                                   )     **SUMMARY JUDGMENT**
              and,                 )
                                   )
THE STATE OF SOUTH CAROLINA,       )
                                   )
              Intervenor-Defendant )
                                   )
_____   )

## INTRODUCTION

In an unprecedented legal claim, one sorely lacking in foundation, Plaintiffs seek to strike down as violative of the federal Constitution present day Article XI, § 4 of the South Carolina Constitution.  This provision, which has undergone considerable change over the years – from its original version in the 1868 Constitution, to its strengthened form in the 1895 Constitution, to its liberalization in 1972 – now prohibits only direct aid to private schools.  Yet, Art. XI, § 4 now allows tuition grants and other aid to students to attend the school of their choice.  Plaintiffs contend that the 1972 Amendment adopting Art. XI, § 4, "embodied and retained racial and religious animus," thereby requiring strict scrutiny, which they say cannot be met in order to sustain the provision's constitutionality.  Plaintiffs' Memorandum In Support of Summary Judgment (ECF No. 73-1) at 2.  Plaintiffs base their claims to erase Art. XI, § 4 upon incredibly generalized, and many factually incorrect, allegations of racial and religious bigotry in South

Carolina, led by "Pitchfork" Ben Tillman, as well as an alleged advocacy of the Blaine Amendment, all leading up to the work of the "West Committee" in the 1960's. Their contention is that "the West Committee's actions were rooted in the racial and religious bigotry of the past, and thus the Committee took a 'revise and tweak' approach to the 1895 Constitution rather than a 'start from scratch approach' such that the current version must bear the full weight of the original's animus." *Id.* at 2. In any case, Plaintiffs maintain, "racial and religious animus were substantial motivating factors for the West Committee in the 1960's, such that the 1972 provision fails judicial scrutiny on its own." *Id.*

We strongly disagree. Such fanciful arguments should be dismissed out of hand because they are not true. Plaintiffs' reliance upon conjecture about the times and certain individuals fails to provide a factual basis for granting them summary judgment. Instead, the State shows below that effectuating individual prejudices was not the intention behind the Constitutional provisions.

Moreover, as noted by this Court in its Order denying a Preliminary Injunction:

> For the time being, there is no evidence that the no-aid provision, as applied in Adams and the disbursement decisions by the Governor and Department of Administration, disproportionately affected African-American students, HBCUs, or religious schools. The fact remains that the majority of the SCICU member institutions are not HBCUs and the no-aid provision has been applied neutrally as to religious and non-religious institutions. In this context, it would be premature to apply the Arlington Heights analysis to invalidate South Carolina's no aid provision on the current record.

ECF No. 34 at p. 11. In fact, current programs for aid to college students, such as the Tuition Grants program for students attending private colleges, and the Hope and Palmetto Fellowship Scholarship programs for students attending either public or private colleges, includes historically black institutions and religiously affiliated colleges as well as schools that do not have that history or affiliation. *See* Exhibit 1.

2

That the Plaintiffs and the State have differing views of the history behind the Constitutional provision does not create a "genuine dispute as to any material fact" (Rule 56, FRCP) for purposes of the cross Motions for Summary Judgment. The Plaintiffs rely on conjecture rather than material fact and do not show their entitlement to judgment. The State relies on the material facts about the participants and their work on the 1895 Constitutional provision and the amendment resulting from the West Committee's work. Accordingly, the State has shown that no genuine dispute of material fact exists as to its arguments and that the State is entitled to judgment as a matter of law.

## ARGUMENT

### THE HISTORY AND FACTS ASSOCIATED WITH ART. XI, §4 AND ITS PREDECESSORS DEMONSTRATE THAT IT IS NOT ROOTED IN RACIAL OR RELIGIOUS ANIMUS, AND THAT IT TREATS ALL SCHOOLS EQUALLY WITHOUT REGARD TO WHETHER THEY ARE HISTORICALLY BLACK OR RELIGOUSLY AFFILIATED

In short, it was not the presence of racial or religious discrimination which produced these "no aid" provisions in the South Carolina Constitution. While such discrimination no doubt existed, these provisions were adopted for valid, non-discriminatory reasons.

Plaintiffs' expert, Dr. Graham, admitted in his Deposition that the Blaine Amendment focused more on a national movement than one affecting South Carolina directly because, he noted, Catholics in this State were small in number at the time of the 1895 Constitutional Convention. In South Carolina, the focus was on Tillman and White Supremacy, not anti-Catholicism. Exhibit 2, Graham Dep. At 18-20. Of course, we do not deny, nor in any way condone Tillman's overt racism or advocacy of White Supremacy.

But such White Supremacist views, which Tillman and others frequently espoused, cannot and do not condemn Art. XI, § 4 or its predecessors. We categorically reject the idea that

3

the West Committee recommended its revision to the "no aid" provision (Art. XI, § 9) as a result of racial or religious bigotry. The Committee heard and considered all points of view and decided on a moderate course, assisting students attending the college of their choice, but not going too far to aid private institutions directly. It is this choice by the West Committee and the framers of Art. XI, § 4 that Plaintiffs dislike and seek to find a legal theory to undo it.

Plaintiffs' experts offer little of substance as to how Tillman's or other White Supremacists' viewpoints invalidate Art. XI, § 4 or its predecessor provisions. They simply decry these racist sentiments, with which no one disagrees, certainly. But they fail to demonstrate how such bigotry generally relates to the "no aid" provisions specifically. The bottom line here is that Art. XI, § 4 and its predecessors were adopted for legitimate, non-discriminatory reasons, including support for the fledgling public schools in the State, as well as a strong tradition of fiscal conservatism that public funds not be spent for private purposes. Such legitimate reasons cannot be deemed to violate the federal Constitution.

Not coincidentally, the 1868 Constitution marked the first time that support for the public schools was mandated by our State Constitution. As a leading authority on the Blaine Amendment has concluded, "[t]he no-funding [of private and sectarian schools] arose . . . [f]oremost [as] public school officials sought to prevent the division of school funds in order to secure the financial stability of the nascent common schools." Green, "The Insignificance of the Blaine Amendment," 2008 B.Y.U. L.Rev. 295, 310 (2008). Notwithstanding Tillman's zealous advocacy for White Supremacy at the 1895 Convention, accompanied by his push to disenfranchise African-Americans, considerable support for the State's public schools was displayed there as well. Tillman himself pushed hard for public education at the 1895 Convention, including his insisting upon a three mill tax in the Constitution. This support for

common schools, as Professor Green explains, went hand in hand with a no aid to sectarian schools provision.  Thus, despite Plaintiffs' and their experts' attempts to condemn Art. XI, § 4 through "guilt by association," their efforts here must surely fail.

Moreover, Professor Underwood, in his seminal work on the South Carolina Constitution, has characterized the 1868 version of South Carolina's "no aid" requirement as a "strong provision," but one containing a loophole which needed to be remedied by the 1895 Constitution. Underwood, The Constitution of South Carolina, Vol. III, at 167.  That 1868 loophole required public education funds to be under the "exclusive" control of a religious sect in order to be violated.  *Id.*  According to Professor Underwood, the loophole was plugged by "a far more detailed provision, adopted as Article XI, Section 9, of the original Constitution of 1895." *Id.*

In the end, however, closure of this loophole in 1895 led to many pleas and suggestions in subsequent years for loosening the 1895 Constitution's no aid provision.  The desired change was to allow students to receive financial aid such as tuition grants, scholarships and benefits in order to attend any school they saw fit, including private schools.  Ultimately, this occurred with the recommendation of the West Committee in 1969, and the amending of the State Constitution in 1972.  While Plaintiffs and their expert, Dr. Graham, seek to link this effort with some form of "latent" racism, see Graham Report at 2, neither racism nor religious bigotry played any role, as will be shown below.  Indeed, in his Deposition, Dr. Graham admits that the West Committee was not dominated by racial animus of religious bigotry.  Graham Dep. At 63.  He acknowledges there was no "straight line" from Tillman to the work of the West Committee.  *Id.* at 64.

Dr. Graham further acknowledges that the West Committee had, as part of its membership, figures such as Brantley Harvey, who he characterizes as "reform minded," and not a "traditionalist" (Graham Dep. At 41) and Dick Riley, who he views as "very open, reform-

minded kind of person who I think would be very tolerant of Catholics." (Dep. At 39).  Of course, with respect to John West, he described him as not "a racist in his heart" (Dep. At 54), having "no religious animus" (56) and "not racially motivated" in seeking to make changes to Art. XI, § 4.  He recalled that in his inaugural address, Governor West "declared the State color blind." (Dep. At 46).  In short, some of the most progressive leaders the State has ever produced served on the West Committee.  To think they would continue the tradition of Tillman's racism is a denigration of these leaders.

Labelling the 1972 constitutional change to remove any prohibition of "indirect" aid, but leaving in place the prohibition of "direct aid," as "incomplete," as Plaintiffs do, is a policy argument, not a legal one.  Even under the Establishment Clause, if the State provides financial aid directly to a sectarian organization, it must be used for a secular purpose.  *Trinity Luth. Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012 (2017).  At the time the West Committee made its Report, the Establishment Clause was even more strictly construed than even today.  As the Supreme Court stated in *Espinoza v. Mont. Dept. of Rev.*, 140 S.Ct. 2246, 2261 (2020) "[a] state need not subsidize private education," but must remain neutral.  Here, in its tuition grants program, which emerged from the work of the West Committee, the State treats religious schools equally with respect to private schools.

Former Attorney General Dan McLeod also elaborated on the adoption of the "no aid" provisions, contained in both the 1868 and 1895 Constitutions, as well as their underlying purpose.  His view is in accord with that of scholars who document that the public school movement was ongoing in the Nineteenth Century, and that this played a major role in the "no aid" provisions in South Carolina:

> [a]pparently, free public schools did not exist in recognizable form until the adoption of the Constitution of 1868.  Article 10, Section 4 of the Constitution

6

of 1868, provided for the compulsory attendance at school of children of certain ages and Section 5 provided for the establishment of a tax for the support of public schools, with the following concluding sentence:

> 'No religious sect or sects shall have exclusive right or control of any part of the school funds of the State, nor shall sectarian principles be taught in the public schools.' . . .

The Constitution of 1868 was adopted by a Reconstruction Era Convention, but its restriction with respect to the non-sectarian use of public funds for educational purposes has been carried forward into the Constitution of 1895 in strengthened form. This was apparently due to the experience obtained during the first, real public school era in South Carolina in the years 1868-1895.

S.C. Op. Att'y Gen., 1969 WL 15557 (April 24, 1969).

In addition, South Carolina's illustrious historian, David Duncan Wallace, concluded that the 1895 Constitutional Convention "accepted the principle that common schools are the true basis of the State's educational system and that the State owes its aid to the great masses of the people who desire to obtain primary education rather than to those desiring college education, who are presumably better able to help themselves." Wallace, "The South Carolina Constitutional Convention of 1895," The Sewanee Review 348, 356 (May 1896). To illustrate that support for the public schools was prevalent at the Constitutional Convention of 1895, the remarks of Delegate E.J. Kennedy are instructive. There, Delegate Kennedy of Chesterfield vowed:

> I shall vote for Section 8 [supporting States colleges and universities] on its second reading for the following reason: Because I believe that common school education and higher education should co-exist together and that the one is necessary to the other, and that the State should provide liberally for the support of both, but if the State shall fail to make a liberal provision for the support of her common schools I shall refuse to vote for the Section on its third reading.

7

Convention Journal at 577 (emphasis added). Likewise, Delegate Derham proposed an Amendment to Section 8 of the Education Article (relating to colleges and universities) stating that:

> [t]he General Assembly in appropriating money for the institutions of higher education in this State shall at no time make an annual appropriation to exceed one-tenth of the money actually paid to teachers annually in the free common schools of this State from the funds provided for in this Article.

Convention Journal at 577-78. Delegate McWhite proposed a Resolution that ". . . no portion of any fund or tax now existing, or that may hereafter be raised or levied for educational purposes, shall be appropriated to, or used by or in aid of any church, sectarian or denominational schools. Convention Journal at 220. The concern of delegates was undoubtedly to protect funds for public schools and see that such funds not be diverted. See Green, *supra* at 310.

Even in these few references, it can, therefore, be easily seen that there is considerable support for the fact that Plaintiffs' claims are entirely wrong. While many of the framers – Tillman most certainly, were extreme White Supremacists, the no-aid provision was not the product of racism and religious bigotry, but instead reflected substantial support for the public schools. We will provide more documentation for the Court to that effect below.

The truism that Tillman was a racist is thus completely beside the point: that cannot be used to taint the positive accomplishments of the 1895 Convention. There is no better example than the continuing support for public schools at the 1895 Convention. In addition, the various versions of the "no aid" provision in South Carolina's Constitutions have been enforced repeatedly over the decades by the South Carolina Supreme Court. There has never been any suggestion or hint that these provisions violated the federal Constitution or were in any way racially or religiously discriminatory. The reason is simple: they were not.

8

Indeed, much to Plaintiffs' dissatisfaction, only a year ago, the Supreme Court applied Art. XI, § 4's constitutional command, prohibiting no "direct" aid to private or religious schools in *Adams v. McMaster*, 435 S.C. 225, 244, 851 S.E.2d 703, 713 (2020). There, South Carolina's highest Court held that:

> . . . the Governor's allocation of $32 million in GEER funds to support the SAFE Grants Program constitutes the use of public funds for the direct benefit of private educational institutions within the meaning of, and prohibited by, Article XI, Section 4 of the South Carolina Constitution.

The Court's opinion in *Adams* was a straightforward analysis with no suggestion that Art. XI, § 4 was in any way tainted by racism or religious prejudice. In *Adams*, the Supreme Court noted that the "West Committee" proposed the removal of "indirect" aid from the prohibitions of Art. XI, § 9. Moreover, the Court voiced support for its earlier decision in *Durham v. McLeod*, 259 S.C. 409, 192 S.E.2d 202 (1972), distinguishing *Adams* from *Durham*, by noting that "[t]he program does not provide students with the independent choice we found acceptable in *Durham*." 432 S.C. at 242, 851 S.E.2d at 711-12.

Yet, even though this constitutional prohibition against aid to private institutions has been on the books in various forms for over a century and a half, Plaintiffs now claim it violates the First Amendment's Free Exercise Clause, as well as the Fourteenth Amendment's guarantee of Equal Protection. Why? The argument is that the 1895 Constitution was adopted by those acting under the spell of the vehement and violent racist, "Pitchfork" Ben Tillman. Employing a "guilt by association" line of thinking, Plaintiffs condemn the predecessor to present day Art. XI, § 4 (Art. XI, § 9) as nothing more than South Carolina's version of the failed Blaine Amendment to the United States Constitution, authored and advocated by "'anti-immigrant, anti-Catholic campaign of U.S. Congressman James G. Blaine and the American Protective Association.'" Plaintiffs' Memorandum In Support of the Motion for Summary Judgment, Entry No. 73-1 at 1.

9

According to the Plaintiffs, racism and anti-Catholic animus reigned supreme in the framing of the 1895 Constitution such that the "no-aid" provision is equally tainted by that bigotry, and should therefore fall by the wayside. Yet, they offer little or no evidence that these biases led to the adoption of the "no-aid" provisions. Dr. Graham, in fact, notes that the Blaine Amendment was not a significant factor in South Carolina. Graham <u>Dep.</u> At 18-20. Even more importantly, Plaintiffs do not search for alternate explanations as to why the "no aid" provisions became a part of South Carolina's Constitution. Indeed, as already noted, several legitimate reasons led to the adoption of these prohibitions.

Moreover, Plaintiffs do not stop there. They also target John West, who chaired the Committee to Make a Study of the South Carolina Constitution of 1895 – a committee comprised of the most able and eminent South Carolinians – and which sought in the 1960's to overhaul the State Constitution as archaic, duplicative and cumbersome. Among the many recommendations made by the "West Committee" was the liberalization of the "no aid provision" to allow students to obtain tuition grants from the State, and to use such assistance to attend private or denominational schools, such as Erskine or Furman, if they so chose. Underwood, *supra* at 171 [West Committee loosened the restrictions of Art. XI, § 9 "to permit tuition grants to students attending religiously sponsored colleges."].

The tuition grants program, enacted in 1970, still remains a viable force today, helping to educate African-American as well as white students. Contrary to Plaintiffs misguided efforts to link the West Committee with an earlier tuition grant program, used as an attempt to circumvent *Brown v. Board of Education*, the 1970 tuition grants program was supported by blacks and whites alike. See, Exhibit 3, *The State*, April 28, 1970 ("Tuition grants act has black, white blessing."). Yet, Plaintiffs argue the West Committee did not go nearly far enough to allow

10

direct aid to sectarian institutions because its members were largely racial and religious bigots. Such a claim is outlandish and should be rejected.

This Court's Order denying Plaintiffs' Motion for Preliminary Injunction is highly instructive here. The Court rejected Plaintiffs' Free Exercise arguments, properly concluding that South Carolina's "no aid" provision does not discriminate against religious schools, but includes within its mandate no aid to "private non-religious schools." *Bishop of Chas. v. Adams*, 2021 WL 1890612 (D.S.C. 2021) at * 4. Thus, according to the Court, "Plaintiffs have not made a clear showing they are likely to succeed on their claim grounded in religious discrimination. . . ." *Id.*

With respect to Plaintiffs' Equal Protection challenge, this Court likewise rejected such argument for purposes of the Preliminary Injunction. The Court noted that Plaintiffs rely upon *N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016). This is a case in which "the Fourth Circuit declared a 'facially neutral' North Carolina voting statute unconstitutional based on the State's history of racial discrimination in voting, the sequence of events leading up to the statute's passage, the legislative history of the statute, the disproportionate impact of the statute on African Americans, and the absence of legitimate non-racial motivations to explain the passage of the law." *Id*. Quoting *McCrory*, this Court referenced, as part of Plaintiffs' contentions, *Village of Arlington Heights v. Met. Housing Devel. Corp.*, 429 U.S. 252 (1977) as follows:

> [w]hen considering whether discriminatory intent motivates a facially neutral law, a court must undertake a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266, 97 S.Ct. 555. Challengers need not show that discriminatory purpose was the "sole[ ]" or even a "primary" motive for the legislation, just that it was "a motivating factor." *Id*. at 265-66, 97 S.Ct. 555 (emphasis added). Discriminatory purpose "may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily

11

on one race than another." *Davis [Washington v. Davis]*, 426 U.S. at 242, 96 S.Ct. 2040. But the ultimate question remains: did the legislature enact a law "because of," and not "in spite of," its discriminatory effect. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L. Ed.2d 870 (1979).

*Id*. (quoting *McCrory*, 831 F.3d at 220-21). Accordingly, applying these principles, the Court correctly concluded:

> [n]evertheless, Plaintiffs have not made a clear showing that they are likely to succeed on the merits of their Equal Protection Clause challenge. No reasonable person with an enlightened mind would attempt to defend the racially insidious motives of Benjamin Ryan "Pitchfork Ben" Tillman, who Plaintiffs have described as "U.S. Senator, Governor, and patriarch of post-bellum Palmetto State Politics." (*Id*. at 1). His segregationist politics and ardent efforts to disenfranchise African-Americans were as abhorrent in the last nineteenth century as they are now. Likewise, the contemporaneous anti-immigrant, anti-Catholic campaign of U.S. Congressman James G. Blaine and the American Protective Association offend all well-reasoned standards of decency, tolerance, and fairness. But Plaintiffs efforts to draw a straight line through the unconscionable discrimination of the past to the judicial and administrative decisions of the present fall well short of the proof necessary to support the mandatory injunctive relief requested – to wit, striking down a constitutional provision that has existed in one form or another for 125 years. . . . The Plaintiffs have only begun to scratch the surface of what will no doubt be a well-litigated challenge to the no-aid provision on the merits. For the time being, there is no evidence that the no-aid provision, as applied in *Adams* and the disbursement decisions by the Governor and Department of Administration, disproportionate affected African-American students, HBCU''s or religious schools. The fact remains that the majority of the SCICU member institutions are not HBCU's and the no-aid provision has been applied neutrally as to religious and non-religious institutions. In this context, it would be premature to apply the *Arlington Heights* analysis to invalidate South Carolina's no-aid provision on the current record.

*Id*. at * 5 (emphasis added).

In our view, this Court analyzed Plaintiffs' arguments correctly. Plaintiffs' case is founded on nothing more than an effort "to draw a straight line through the unconscionable discrimination of the past to the judicial and administrative decisions of the present. . . ." *Id.* Yet, Dr. Graham, Plaintiffs' expert, says there is no such "straight line" leading from Tillman to the West Committee. Graham Dep. At 64. Nor is there any indication whatsoever that the West

12

Committee acted out of anything other than a sense of civic duty in making its recommendations. As Dr. Graham concluded in his Deposition, the West Committee worked hard "to change obsolete and troubling provisions of the 1895 Constitution." Graham <u>Dep.</u> At 59. Indeed, the West Committee recommended restoration of support for the public schools to the Constitution, which had been removed after *Brown*, as well as the taking out of the provision requiring separate schools for the races. See West Committee Report at 101, 103. This is hardly the work of a racist Committee.

As Justice Potter Stewart once wrote, "[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980). And, as the Eleventh Circuit has noted, past discriminatory practices do not "by itself, compel us to find a discriminatory purpose behind every statute passed during regrettable periods of Georgia's past." *Hall v. Holder*, 117 F.3d 1222, 1226-27 (11th Cir. 1997). If such were the case, virtually all laws from the past would be subject to being erased. The same cautionary admonition from *Holder* is applicable here. If Art. XI, § 4 is examined on its own merits – which, certainly, it should be, rather than to approach it as "guilt by association," based upon the views of such racist figures as Ben Tillman or "Cotton Ed" Smith or past racist and religious animus – Art. XI, § 4 is perfectly valid. As the United States Supreme Court recognized in *Zelman v. Simmons-Harris*, 536 U.S. 639, 649 (2002), ". . . our decisions have drawn a consistent distinction between government programs that provide aid directly to religious schools, . . . and programs of true private choice, in which government aid reaches religious schools <u>only as a result of the genuine and independent choices of private individuals.</u>" (emphasis added). That is precisely what Art. XI, § 4 does. Moreover, as was said in *Opinion of the Justices to the Senate*, 514 N.E.2d 353, 358 (Mass. 1987), the framers were "'concerned

about aid to sectarian institutions and, more generally, <u>with halting the politically divisive and financially wasteful practice of direct aid to private schools and institutions.</u>'" (emphasis added).

And, in characterizing a provision providing that "[n]o tax shall be laid or appropriation of any public money made in aid of any church, or private or sectarian school, or any public service corporation," the *en banc* Arizona Supreme Court explained that such provision "applies to all private schools, <u>whether sectarian or not</u>." *Kotterman v. Killian*, 972 P.2d 606, 621 (Ariz. 1999) *en banc*. (emphasis added). Thus, as the Court concluded in *Adams v. McMaster* with respect to Art. XI, § 4, "[t]he direct payment of . . . funds . . . to private schools is contrary to the framers' intention not to grant public funds 'outrightly' to such institutions."

There is also no doubt that one of the principal purposes of Art. XI, § 4, as amended, is to ensure that state or local tax dollars are expended for a public purpose, not a private one. As was stated in <u>Op. S.C. Att'y Gen.</u>, 2003 WL 2104391 (April 29, 2003), ". . . at least three opinions of this Office have concluded that a particular statute or expenditure of public funds does not violate Article XI, § 4 of the South Carolina Constitution where there is established <u>a primary independent public purpose</u> as opposed to a 'direct benefit' provided to a private educational institution." (emphasis added). On the other hand, the financial assistance to students to attend the college or university of their choice is indeed a public purpose. See *Hunt v. McNair*, 255 S.C. 71, 78, 177 S.E.2d 362 (1970), ["It is too late to question whether or not the promotion of secular education is a public purpose as it is universally acceptable as a proper public purpose."].

Plaintiffs seek to raise the specter of the Blaine Amendment as a means for condemning Art. XI, § 4 and its predecessor provision, Art. XI, § 9. However, Plaintiffs present little or no evidence that the Blaine Amendment served as any kind of driving force in the adoption of either of these provisions. Our research indicates it was not. As noted, Dr. Graham seems to agree.

14

Indeed, scholars are dubious that the Blaine Amendment had much at all to do with adoption of state constitutional "no aid" provisions. As one scholar, who has written extensively on the subject of the Blaine Amendment, has stated, "[n]o sectarian education arose out of a general movement to establish a system of publicly-operated schools universally accessible to all children." Green, *supra* at 300-301. However, Professor Green further explains,

> [t]he interpretation and even constitutionality of these state provisions have been inextricably tied to the Blaine Amendment. . . . But the Blaine Amendment is insignificant as a constitutional event. While the Blaine Amendment is historically and politically significant, it matters little for constitutional purposes the legal principles the Amendment embraced. Nonsectarian public education and a prohibition on state funding of religious education – both predated the Amendment and were not significantly altered by it. . . . Contemporary understandings of nonsectarian education and the no-funding principle emerged from the debates over the Blaine Amendment relatively unaffected.

> In addition, the legal connection between the Blaine Amendment and a majority of the state no-funding provisions . . . is uncertain at best. To be sure, twenty-two states adopted no-funding provisions in their constitutions during the fifty years following the defeat of the Blaine Amendment. . . . Several of those provisions contain language that appeared in one of the many versions of Mr. Blaine's proposed amendment. . . . But the majority do not. . . . Rather, most of the post-1876 no-funding provisions mimic language that can be found in earlier constitutions of other states. . . . Despite their claims to the contrary, opponents of the no-funding principle have generally failed to demonstrate a connection between the Blaine Amendment and the various state provisions from legislative histories, convention records, or other historical sources. . . . <u>Instead, they have sought to taint the various state provisions with the stain of anti-Catholicism through guilt by association with the Blaine Amendment. But it is an argument based on innuendo and assumption, not historical fact.</u> . . .

Green, *Id.* at 297-98 (emphasis added). Thus, Professor Green, one of the foremost experts in the country concludes:

> [t]he Blaine Amendment was a significant historical event from a social and political standpoint. It is worthy of study and critique for what it tells us about nineteenth-century attitudes toward religious pluralism, cultural assimilation, and education as the engine of democratic self-governance. But as a constitutional event, the Blaine Amendment is insignificant. The inordinate

> attention it has received by justices and advocates with their focus on its attendant anti-Catholicism <u>obscures the complex issues that were at stake in the nineteenth century controversy over the role and content of public education.  The Blaine Amendment, it seems, has become its own "bloody shirt," used to discredit a constitutional principle that stands on its own merit. The more it is used as a legal football, the harder it is to appreciate its true significance.  And the more we focus on the anti-Catholicism of the period, the less we are able to understand the host of other issues that informed the nineteenth-century School Question and what that history means for current funding controversies.</u>  To paraphrase Justice Thomas, we should "bury" the Blaine Amendment and give it a rest.

*Id.* at 332 (emphasis added).  We think Professor Green's analysis explains well South Carolina's early attempts to establish a public school system as part of its 1868 and 1895 Constitutions.

Thus, we categorically reject Plaintiffs' arguments.  Their contentions represent a misuse of history in an effort to overturn a longstanding and valid constitutional provision.  Indeed, as stated, such arguments were rejected by this Court in denying Plaintiffs' Request for a Preliminary Injunction.  Plaintiffs have presented no evidence of a violation of the Free Exercise Clause or the Equal Protection Clause.  This Court correctly distinguished *Espinoza v. Montana Dep. of Revenue*, ___ U.S. ___, 140 S.Ct. 2246, 207 L. Ed.2d 679 (2020), explaining that:

> [t]his analysis makes clear that the Supreme Court struck down Montana's no-aid provisions precisely because it discriminated against religious schools, creating an implicit contrast with no-aid provisions like South Carolina's that encompass both religious <u>and</u> private non-religious schools.  Unlike the provision at issue in *Espinoza*, South Carolina's no-aid provision prohibits the use of public funds for the direct benefit of religious and non-religious private schools alike.  In other words, South Carolina's provision discriminates along the private/public divide, not the religious/non-religious divide.  Suffice it to say, Plaintiffs have not made a clear showing that they are likely to prevail on their claim grounded in religious discrimination and the motion for preliminary injunction is unavailing.

*Bishop of Chas. v. Adams*, 2021 WL 18906012 (D.S.C. 2021) at * 4.  The Court quoted *Espinoza*, saying that "[a] state need not subsidize private education.  But once a state decides to do so, it cannot disqualify private schools solely because they are religious."  *Id.* at * 3.

This Court's analysis above squares completely with that found in 19 S.C. Jur. Constitutional Law, § 45 where it is stated the following:

> [i]n 1973, Article XI was revised and Section 9 was replaced by what is currently Section 4, which provides that "no money shall be paid from public funds nor shall the credit of the State or any of its political subdivisions be used for the direct benefit of any religious or other private educational institution."… The Supreme Court of South Carolina has considered Section 4 on only one occasion. . . . [written before *Adams*]. Despite this absence of guidance, Section 4 changes Section 9 in at least two significant ways. First, Section 4 prohibits state aid to all private educational institutions; therefore, Section 4 is neutral regarding religion and is actually a prohibition against state support of private education rather than state sponsorship of religion. Second, Section 4 prohibits only direct aid to educational institutions; therefore, a court could approve any indirect aid to sectarian schools to the limits of the establishment clause. . . . This was also prohibited under Section 9. . . .

Even under old Art. XI, § 9 – prior to amendment – the South Carolina Supreme Court, in *Durham v. McLeod*, *supra,* held that aid to a student to attend the college or university of his or her choice was valid both under the Establishment Clause as well as pursuant to the State Constitution, concluding that ". . . it would require a strained construction to hold that participation by students [in a loan program] attending Wofford, Furman, and like institutions, as well as those attending the University of South Carolina, Clemson University and the like, offends this constitutional restriction." See also Op. S.C. Att'y Gen., 2011 WL 1444725 (March 21, 2011) ["Our courts would analyze the constitutionality of any such scholarship or tax credit program – whether use of the scholarships or tax credits involve public or private, sectarian or secular schools – as the United States Supreme Court did in upholding the Ohio Pilot Scholarship Program in the *Zelman* case [*Zelman v. Simmons-Harris*, 536 U.S. 639 (2002)]. Similarly, the South Carolina case of *Durham v. McLeod*, which validated the student loan program at issue there, would serve as a guiding precedent for concluding that S. 414 would, on its face, pass constitutional muster under Article XI, § 4 of the State Constitution."].

17

To reiterate, Professor Green concludes that "[n]onsectarian education arose out of a general movement to establish a system of publicly-operated schools universally accessible." *Id.* at 300-301. He further finds that, by the time of the Civil War, or shortly thereafter, this public school movement had evolved toward secularization such that many advocates sought even to eliminate Bible reading in the public schools:

> [t]his third generation of reformers sought to make public education not simply nondenominationally religious but truly nonsectarian, in that only universally acknowledged moral principles would be taught and religious devotion eliminated. . . . The movement received a boost from an 1872 decision by the Ohio Supreme Court that banned all Bible reading and religious instruction in the Cincinnati public schools. . . . But the movement toward secularization had its own momentum brought about by a desire to make public schooling more professional, academically rigorous, and religiously inclusive. . . . In a December 1869 opinion piece in the New York Tribune, Henry Ward Beecher, one of the nation's leading preachers wrote that "compulsory Bible in schools is not in accordance with American doctrine of the liberty of conscience" and should be abolished. The state, Beecher insisted, "had no business to teach religion, or to show partiality to one or another sect in religion."

*Id.* at 307-8. The Ohio Supreme Court decision to which Professor Green refers is *Bd. Ed. of City of Cincinnati v. Minor*, 23 Ohio St. 211 (1872). In that case, the Ohio Supreme Court concluded that Ohio's constitutional provision forbidding sectarian teaching in the public schools was dispositive with respect to the fact that teachings from the Bible were not permitted in the public schools. The Ohio provision was virtually identical to that adopted in the South Carolina Constitution of 1868.[1]

As former Attorney General McLeod noted, the public education movement occurred virtually simultaneously with the approval of the 1868 Constitution in South Carolina. As seen, "the Constitutional Convention of 1868 adopted South Carolina's first constitutional education

---

[1] During Reconstruction, many persons from the North flocked to South Carolina, including from Ohio, and were actively involved in state politics, including the framing of the 1868 Constitution.

article" and Section 3 provided for "a liberal and uniform system of free public schools throughout the State." *Fogle, Abbeville County School Dist. v. State: The Right to a Minimally Adequate Education in South Carolina,* 51 S.C. L. Rev. 781, 786-89 (2000). The Convention's Committee on Education reported that education is "the surest guarantee of republican liberty" and that, as a consequence, it is the "duty of the General Assemblies in all future periods," to "establish, provide for, and perpetuate a liberal system of free public education." 1868 Convention Journal at 264-66. Moreover, as one scholar has written, while the execution of a system of free public schools in South Carolina was flawed, "[e]xperts agree that the Republicans planned an intelligent, progressive common school system in South Carolina. Among those who designed the new system were men who brought to their task substantial experience as teachers and educational administrators both in South Carolina and the North." Williamson, After Slavery at 223-24.

Once the 1868 Constitution had mandated support for free public schools in South Carolina, and forbidden "exclusive control" by sectarian schools over school funds, the private schools complained mightily. Attorney General McLeod cited a Report from Superintendent of Education Hugh S. Thompson in 1879 regarding these complaints. Superintendent Thompson, known as the father of South Carolina's modern school system, reported the following:

> [Another] form in which the charge against our (free) public schools is generally made is that they have seriously injured the good private schools heretofore existing in this State and that they afford no proper substitute for the schools whose usefulness have been thus impaired – the truth of this charge is admitted but (if) submitted to a proper vote (free public schools) would be sustained. 1879 Reports and Resolutions, p. 377.

Op. S.C. Att'y Gen., 1969 WL 15557 (Apr. 24, 1969).

Thus, consistent with the 1868 Constitutional Convention's efforts to support public education, by making that support part of the Constitution, as well as the ongoing national

19

movement for secularization in the public schools, South Carolina began to create what would ultimately become Art. XI, § 4 regarding the prohibition of aid to private schools.  Such a decision to foster public schools was not based upon religious or racial bigotry, but upon the constitutional support for the public schools, virtually non-existent in South Carolina theretofore. As shown above, this support began to demonstrate results.  With very limited public monies at their disposal, the framers of the 1868 Constitution thus eschewed public aid to religious schools. As noted, in the very last sentence of Section 5 of the Education Article of the Constitution, the Convention inserted the sentence "[n]o religious sect or sects shall have exclusive right or control of any part of the school funds of the State, nor shall sectarian principles be taught in the public schools."

As Professor Underwood and former Attorney General McLeod have pointed out, however, by the time of the 1895 Convention, it was felt that the 1868 "no-aid" provision, while strong, needed further tightening.  Even though the members of the 1895 Convention were, due to racial bigotry, determined to disenfranchise African-Americans, and opposition to racial integration of the public schools continued, support for public education remained strong even among those at the 1895 Convention.[2]  According to historian D.D. Wallace, the Convention "accepted the principle that common schools are the true basis of the State's educational system and the State owes <u>its aid</u> to the great masses of the people who desire to obtain primary education, rather than those desiring college education who are presumably better able to help themselves."  *Wallace, supra* (emphasis added).  And, as Plaintiffs' expert, Dr. Blease Graham has written, "[d]espite the [1895 Constitution's] preoccupation with race, many of the typical and

---

[2] As one eminent historian has noted, ". . . even in Mississippi and South Carolina, where blacks came to control many local boards of education, segregated facilities remained the rule."  Foner, Reconstruction: America's Unfinished Revolution, 1863-1877 at 367.

therefore more reform-oriented features of the 1868 Constitution were retained.  Among them were the governor's veto, legal rights for women, <u>and the provisions for public education.</u>" Graham, "The Evolving South Carolina Constitution," 24 Journal of Political Science at 22 (1996) (emphasis added).

This support for public education was amply demonstrated by the 1895 Convention delegates – Ben Tillman, most certainly, and numerous others as well.  At the opening of the Convention, Governor John Gary Evans, installed as President of the Convention, made a speech strongly supporting public education.  The Governor recognized that:

> [t]he question of education is of vital importance and the most serious to deal with.  It is a principle of government that the best educated people are the happiest and easiest governed.  It is of more importance than the question of suffrage because it should be the first requisite to the enjoyment of citizenship.  The beginning of a citizen is at home, but his maturity is in the school and college.   The schoolmaster thus becomes the most important personage under the government.  <u>It is the duty of the State to furnish for the masses that education which fits them for citizenship, and to this end our common schools should be liberally supported by taxation.</u>

(emphasis added).  Governor Evans proceeded to note that there should be "separate education of the races," an idea prevalent throughout the nation at the time [*Plessy v. Ferguson*, 163 U.S. 537 (1896) was decided shortly thereafter].  As already seen, segregated schools were the rule in South Carolina, even during Reconstruction.  Governor Evans then continued:

> [a] common school education creates a demand for a higher or collegiate one, and it is your duty [the delegates] to support the higher institutions of learning in the State.  See that no lights are put out – rather let more be established. The great mass of the people never complain of taxation for education when they know they derive the direct benefit.

Convention <u>Journal</u> at 12.

Shortly thereafter, Delegate Henry J. Haynsworth of Greenville, a graduate of Furman, and a prominent member of the Bar, was requested to introduce an Ordinance, virtually identical

to what became Section 9 of Article XI (Education Article).  This was the "strengthened" version of the 1868 provision (Art. X, § 5) which Professor Underwood and Attorney General McLeod discussed.  The proposal was then referred to the Committee on Education.  It read as follows:

> That neither the property nor credit of the State of South Carolina, or of any County, City, Town, Township, School District, or other subdivision of the said State, nor any public money from whatever source derived, shall be gift, donation, loan, contract, appropriation or otherwise, be used directly or indirectly in aid or maintenance of any college, school, hospital, orphan house, or other institution, society or organization under the direction or control of any church, or of any religious or sectarian society or organization.

Convention Journal at 88.  This provision is certainly much broader and far more sweeping than that of the 1868 provision.  There can be little doubt that its aim was the protection of public school or state college funds or monies so that these funds could not be diverted to sectarian schools or organizations therefrom.  Haynsworth's proposal, like its predecessor in the 1868 Constitution, became part of the Education Article (Art. XI).

We are certainly not arguing herein that White Supremacy was not the dominant theme at the 1895 Constitutional Convention.  Indeed, as Professor Graham documents, it was.  Graham, Report, *supra.*  Nevertheless, that fact cannot blur or denigrate the accompanying purpose of the Convention – to ensure support for the public schools.  It cannot ascribe a racist motive to the 1895 Convention's protection of public school funds from being diverted to private or sectarian institutions.  Green, *supra* at 310.  The State, of course was incredibly poor, and its public resources incredibly limited.  Certainly, racial motives played a major role, even in support for the public schools.  But regardless, that support was there.  The eminent historian, George Brown Tindall, has written that:

> [t]he Constitution of 1895, like that of 1868, was an important milestone in the progress of public education.  Although the increase in public school funds had been brought about largely by arguments for white supremacy, it brought some benefits to the Negro schools by a process of trickling down. . . .

22

> Whatever the motives of the dominant whites, the Negro schools by the end of the century were beginning to emerge from the financial slough.  The decrease of Negro illiteracy from 78.5 percent in 1880 to 52.8 percent in 1900 . . . indicated that progress had been made despite the deficiencies, but that the road ahead was still long and difficult.

Tindall, *South Carolina Negroes*, 1877-1900, at 222-223.  Professor Tindall pointed out that "Tillman strongly urged the adoption of the program [raising the property tax to further support public education], reminding the delegates that by enacting the three mill tax they could secure education against a future legislature fearful of the wealthy and ignorant, both of whom might be in an unholy alliance against public education."  *Id.* at 222.  It should be noted that Tillman's support was pivotal because Governor Evans opposed a constitutional tax for schools, leaving the funding decision to the discretion of the General Assembly.

Notably, even the African-American delegates (there were six at the Convention) were concerned that education funds, particularly funds that would be used to support institutions of higher education, would be diverted to aid sectarian or private schools.  Delegate Thomas E. Miller of Beaufort introduced a Resolution "Prohibiting the Passage of Any Law Taxing the People to Support Sectarian Institutions" as follows:

> It is admitted herein that it is the right and duty of the State to support institutions of higher education; therefore
>
> Be it resolved by this Convention:
>
> 1st.  That the Legislature shall never pass any law for the purpose of founding, maintaining or aiding institutions of learning that are denominational or sectarian.
>
> 2nd.  That the Legislature shall never use the credit of the State or appropriate any money for the payment or support of other expenses of any school or institution of higher education which is wholly or in part under sectarian or ecclesiastical control.

Convention Journal, at 220.

To this same end, the Convention witnessed a remarkable act of unity between white and African-American Convention members, regarding Claflin University. Ben Tillman played a pivotal role in this compromise. This episode brought to a full crescendo the "no aid" to sectarian institutions provision, ultimately approved as Art. XI, § 9 of the 1895 Constitution.

Up until 1895, the State had been supporting Claflin University which was primarily under Methodist Episcopal religious control. Claflin College "retained so close a relationship with Claflin University, as to be indistinguishable from it. . . ." Tindall, *supra* at 228. In short, "[t]he unique situation at Claflin College, . . . remained a joint venture between the State and the Methodist Episcopal Church. . . ." Krause, A Different State of Mind: Ben Tillman and the Transformation of State Government in South Carolina," at 93. As Professor Tindall further described it,

> [a]ll did not go well with this peculiar collaboration of church and state, however. Among whites there was always a suspicion of the supposed radical tendencies of the Methodist Episcopal Church and among Negro Baptists a considerable agitation against "giving to one school of distinctive denominational creed, what should either be given to a state school free from all denominational control, or . . . should be divided among the several denominational schools in the State on the basis of their numerical strength."….

> The six Negro delegates to the Constitutional Convention of 1895 skillfully exploited this feeling to secure a separate state college for Negroes. R.B. Anderson complained that a great part of the control of the University rested with the Methodist Church, but he declared that the Negroes of the State wanted a school entirely free of sectarian control. . . . Thomas E. Miller proposed that the State establish a school entirely separate from the Methodist controlled university and provide that only "Southern men or women of the Negro race be on the faculty. . . .

> This agitation led Ben Tillman to move for the establishment of a separate school in Orangeburg to be given the unfortunate name of Colored Normal, Industrial, Agricultural and Mechanical College of South Carolina [now S.C. State University]. Because of the desire of Negroes for additional jobs and the interest of both races in eliminating Northern denominational influences, the Motion was quickly accepted.

24

Tindall, *supra* at 229-230.

Immediately thereafter, Art. XI, § 9, the forerunner of Art. XI, § 4, was approved by the Convention. Convention Journal at 581-82. Thus, there should be little doubt that the 1895 Convention did not adopt Art. XI, § 4 because of racial and anti-Catholic animus, but for a combination of other reasons, already discussed: the strengthening of a similar 1868 Constitution provision (Art. X, § 5); the blossoming support for the public schools, begun at the 1868 Convention and mandated by the 1868 Constitution; the support for fiscal integrity; and the resolution of the Claflin situation. While it may be too much to conclude that Claflin pushed adoption of Art. XI, § 9 across the finish line, the resolution of the Claflin situation, with Tillman's support, certainly played an integral part.

Moreover, as to Claflin, the role of Thomas E. Miller was also key. It has been written that ". . . during the Convention's deliberations Miller succeeded in enlisting Tillman's support for a provision in the new Constitution authorizing the creation of a separate land-grant college for African-Americans. Since 1872 the State's land grant funds had been allocated to the State A&M College which was under the control of Claflin University...." As noted, Claflin was controlled by the Methodist Episcopal Church. Subsequently,

> [i]n 1896 Miller guided legislation through the General Assembly creating the Colored Normal, Industrial, Agricultural and Mechanical College of South Carolina (now South Carolina State University). Shortly thereafter Miller resigned from the House and was named the President of the new institution in Orangeburg. Miller skillfully administered the college – during the first fifteen years. Its primary mission was to train black youngsters in agriculture and the trades. In 1897 he explained, "The work of our college is along the industrial line. We are making educated and worthy school teachers, educated and reliable mechanics, educated reliable and frugal farmers."

Edgar, ed., S.C. Encyclopedia, "Thomas Ezekial Miller," at 635-36.

Thus, in summary, the 1895 Constitutional Convention adopted an extensive Education Article as Article XI.  Section 3 provided for a system of free public schools; § 6 increased taxes to support the public schools; and § 7 required segregated schools.  Section 8 left to the discretion of the General Assembly ("may provide") as to the level of support for Clemson, the University of South Carolina; Winthrop and the South Carolina School for the Deaf and Blind.  However, with respect to Claflin, the Constitution's Article 8 read as follows:

> Provided, That the General Assembly <u>shall</u>, as soon as practicable, wholly separate Claflin College from Claflin University, and provide for a separate corps of professors and instructors therein, representation to be given to men and women of the negro race; and it shall be the Colored Normal, Industrial, Agricultural and Mechanical College of this State.

(emphasis added).  In short, Claflin was the only state-sponsored school which was mandated to be funded by the State.  The other State schools were left to be funded at the discretion of the General Assembly.  Therefore, regardless of the racist that Tillman surely was, he played a significant role in the 1895 Constitution's Education article and its support for public schools and for what ultimately became S.C. State University.  The strengthened "no aid" provision of Art. XI, § 9 was an important part of that process and was contained in the very same Education Article.

Following adoption of Art. XI, § 9, the provision was construed on various occasions.  For example, in 1902, the Attorney General concluded that Art. XI, § 9 did not preclude a free school being operated at or near Epworth Orphanage "open to the inmates (children) of that institution as well as all eligible scholars, the orphanage being under the control of a sectarian denomination."  Exhibit 4.  The Attorney General found that Art. XI, § 9 "offers no barrier to the establishment of the school, although it may be patronized partially or solely by children from the orphanage."  In the view of the Attorney General, "[t]he test as to whether an institution falls

26

within the constitutional inhibition cited is to determine its origin, control and direction." The

school, its trustees, teachers, text-books, etc., the Attorney General concluded, "are all provided

by and under the control of the State authorities." Furthermore,

> [t]he school is necessarily open to all and the mere fact that the school is located at an orphanage and patronized by orphans cannot divest the school of its governmental origin or control. <u>Nor can it be said that such a school is a direct or indirect aid to the orphanage, for the constitutional provision has reference to public aid to an orphanage as an institution; but does not deny to a child in an orphanage, or in a private house, the same privileges enjoyed by other children under a beneficent law.</u>

(emphasis added). Thus, the opinion of the Attorney General anticipated seventy years later the

decision of *Durham v. McLeod*, *supra*, wherein the Court concluded that ". . . the emphasis is on

aid to the student rather than to any institution or class of institutions." 259 S.C. at 413, 192

S.E.2d at 203.

Furthermore, in 1923, there were calls for using Art. XI, § 9 as a means for supporting

scholarships to students to attend any school they chose, including denominational schools. In a

letter to the editor, D.M. Douglas, President of Presbyterian College (and later President of the

University of South Carolina), urged that South Carolina follow what New York had done, that

state possessing a similar constitutional provision to that of South Carolina. Douglas noted that

> I have advocated the New York plan of scholarships for South Carolina for some years. Briefly this plan is as follows. The State of New York gives 3000 scholarships. They are worth $100 each. The money is paid direct to the student. The department of education has upon its list all the approved colleges of the State, most of them church and independent colleges. The student has the privilege of attending any college in the State on this approved list. He makes his own choice. The money is not given by the State for the benefit of the institution, but for the benefit of the student receiving the education and the money is paid direct to him.

This was exactly the analysis of the Supreme Court decades later in *Durham*. Douglas observed that "[t]his plan has found opposition from some grounds," based upon Art. XI, § 9. However, he argued that the Constitution of New York had a virtually identical provision. Therefore,

> [i]t will be seen that Art. 11, Section 9 in the South Carolina Constitution and Article 9, Section 4 in the New York Constitution are practically the same. If the New York plan of scholarships does not violate their constitution, it is hardly possible that a similar scholarship plan would violate our Constitution.

Exhibit 5, *The State*, January 16, 1923 at 3. Compare *Parker v. Bates*, 216 S.C. 52, 62, 63, 56 S.E.2d 723, 727, 728 (1949) [Art. XI, § 9"is quite broad" and "the plain meaning of our Constitution is that no public funds may be allocated in any manner to any hospital or health center which is, quoting, 'wholly or in part under the direction or control of any church or of any religious or sectarian denomination, society or organization.'"].

We now turn to the work of the "West Committee," which made its final <u>Report</u> in 1969, after three years of intensive debate regarding the creation of a more streamlined and workable State Constitution. Professor Underwood's detailed study of the South Carolina Constitution discusses in considerable detail the West Committee's recommendations with respect to Art. XI, § 9. In the entirety of Professor Underwood's discussion, he presents no suggestion that the Committee was guilty of religious or racial bigotry in the performance of their duties. See Underwood, <u>The Constitution of South Carolina</u>, III, Chapter VII. Moreover, as noted above, Dr. Graham, in his deposition, did not believe the West Committee was guided by racial bigotry or religious animus.

First, Professor Underwood notes that "[i]n a sense Article XI, Section 9, of the original 1895 Constitution, and its current counterpart Article XI, Section 4, <u>are an extension of the traditional South Carolina fiscal conservatism to the educational and social services area</u> with specific emphasis upon prohibiting grants to religious organizations as those most likely to be

operating in those fields.  Let private organizations look to private services."  *Id.* III, at 171. (emphasis added).  We wholeheartedly agree with his assessment.  His is another way of saying what we have already discussed: that the State's limited tax dollars for education should not be sent directly to private organizations.  Green, *supra* at 310 [and to "prevent the division of school funds."].

On the other hand, as Professor Underwood states, and as we have already documented, in the post-1895 period, "[a]s the competition for private funds increased, and expenses mounted, many private educational institutions were under enormous pressure to seek governmental assistance from State and federal agencies."  *Id.* at 171.  A good example was the proposal of Dr. Douglas, as far back as 1923, to follow New York's scholarship program.  Exhibit 5.  As mentioned, Douglas indicated that his proposals had been made for years.  Such pleas were a reflection of what was to reach a crescendo in South Carolina decades later.

Professor Underwood documents how the West Committee walked the line between loosening Art. XI, § 9 restrictions to serve the private choice of students wishing to attend college including so-called religious schools or private schools on one hand, and "taking one person's tax money to support another's religion or creating the appearance that the State endorsed the ideological message of the religious institutions it aided" on the other.  *Id.*  Dr. Graham admits that the West Committee was concerned about too much control over religion, as well as the fiscal implications of direct aid to religious schools.  Graham Dep. At 73.  This was not the result of racial and religious bigotry, but a reasonable political compromise.

With intense testimony on both sides of this issue, including that from Dr. Paul Hardin, III, President of Wofford, the Committee decided to recommend what ultimately became Art. XI, § 4 which states:

> No money shall be paid from public funds nor shall the credit to the State or
> any of its political subdivisions be used for the <u>direct benefit</u> of any religious
> or other private educational institution.

Underwood, *supra* at 172.  This is the version today and the one reviewed by the Court in *Adams*

*v. McMaster*.  The Committee removed "the prohibition that only <u>indirectly</u> benefits private

educational institutions."  Professor Underwood explains that:

> [t]he remaining prohibition of direct aid applies not only to grants going to
> church-operated private institutions but also to ". . . other private educational
> institution[s]."  This removes the taint of singling out religious institutions for
> hostile treatment, which could be just as much of a deviation from the ideal of
> state neutrality toward religion as would be a provision singling out religious
> institutions for favorable treatment.

*Id.* at 172-73.

In the view of Professor Underwood, the change recommended by the West Committee

was "the more modest position of recommending the deletion of the ban on indirect aid but

retained the prohibition on direct grants."  Yet, in our humble opinion, it was much more

important than that.  The change, significantly, loosened the restrictions on "indirect aid" so as

"to permit tuition grants to students attending religiously sponsored [or private] colleges."  *Id.* at

171.  Such a change was almost revolutionary with respect to support of higher education in

South Carolina.  Yet, at the same time, the West Committee's recommendations did not allow

undue State influence over religious schools.  The Committee's Report summarized its approach

as follows:

> The Committee fully recognized the tremendous number of South Carolinians
> being educated at private and religious schools in this State and that the
> educational costs to the State would sharply increase if these programs ceased.
> <u>From the standpoint of the State and the independence of the private</u>
> <u>institutions, the Committee feels that public funds should not be granted</u>
> <u>outrightly to such institutions.</u>  Yet, the Committee sees that in the future there
> may be substantial reasons to aid students in such institutions as well as in
> state colleges.  Therefore, the Committee proposes a prohibition on direct
> grants only and the deletion of the word "indirectly" currently listed in Section

> 9 [of Article XI]. By removing the word "indirectly" the General Assembly could establish a program to aid students and perhaps contract with religious and private institutions for certain types of training and programs. The prohibition against using public money and credit for private hospitals, orphanages etc. presently listed in Section 9 is continued, but is included in [the article on finance and taxation]. . . .

*Id.* at 173-74 (emphasis added). In short, the Committee struck a reasonable balance between direct and indirect aid. The federal Constitution does not mandate otherwise.

Professor Underwood also discusses the close relationship between Art. XI, § 4 and Art. X, § 11 regarding pledging the State's credit in aid of a private corporation or entity, as having been reflected by the intent of the West Committee. He notes it was "the apparent intent of the West Committee as seen from the interaction of its recommendation on the education article with its proposals for the tax and finance article" to subsume orphanages or hospitals "under the broader terms forbidding governmental assistance to all forms of private entities." *Id.* at 174. Thus, concluded Professor Underwood,

> [t]he repetition in both the education and tax articles of the limitations on the use of government credit and funds for religious educational institutions, and the inclusion of limitations on government assistance to private secular educational institutions as well as other types of private secular organizations, reinforces the conclusion that the policy [of the West recommendations] is as much an expression of the fiscal conservatism of the State as it is a reflection of separation of church and state doctrines. Promiscuous State fiscal aid to all forms of private endeavor, whether religious or not, was to be viewed with deep skepticism.

*Id.* (emphasis added).

Following the West Committee Report in 1969, the very next year the General Assembly enacted the Tuition Grants Act. Despite Plaintiffs accusation that the West Committee had opened the door for funding the creation of segregation academies through its recommendation to remove the word "indirectly" – an allegation that is ridiculous – the 1970 Tuition Grants Act

was widely supported by African-Americans, as well as whites.  An article in <u>The State</u> in April

of 1970, entitled "Tuition Grants Act has black, white blessing," the following was reported:

> South Carolina's new tuition grants act passed by the General Assembly in its rush to adjournment last week, has the blessing of both blacks and whites interested in improving the State's institutions of higher learning.

> This is a far cry from a 1963 tuition grants law which was branded by Negroes as a scheme to perpetuate school segregation and was eventually ruled unconstitutional on those grounds.

> Like the 1963 act, the new piece of legislation appears headed for a court test. But this time legal action will probably be what lawyers call a "friendly suit." This means suit was brought to clarify constitutionality of a new law and expedite its implementation should it prove valid.

The article goes on to say the following:

> Lincoln C. Jenkins, an NAACP attorney who participated in the fight against the 1963 act, said he couldn't be happier over passage of the 1970 tuition grants act.

The State, April 28, 1970 [53].

That test case was *Hartness v. Patterson*, 255 S.C. 503, 179 S.E.2d 907 (1971).  While

the lower court upheld the Tuition Grants Act, the Supreme Court struck it down under a strict

reading of Art. XI, § 9.  The Supreme Court noted that most of the schools eligible for the tuition

grants program were "under the direction or control of religious groups or denominations."

Moreover, the *Hartness* Court stated that the Constitution forbade direct aid to such schools but

also aid "is prohibited if it indirectly benefits the religious schools."  255 S.C. at 506, 179 S.E.2d

at 908.  The Court also explained that "[i]t is conceded that the tuition grant is not made directly

to the school, but is made to the student who is required to pay it to the school selected by him."

255 S.C. at 507, 179 S.E.2d at 908.  Thus, according to the Court,

> [w]e reject the argument that the tuition grants provided under the Act do not constitute aid to the participating schools.  Students must pay tuition fees to attend institution of higher learning and the institutions depend upon the

> payment of such fees in financing their operations.  While it is true that the tuition grant aids the student, it is also of material aid to the institution to which it is paid.  The fact that only a portion of the tuition costs are covered by the grants from the State affects the matter only in degree.

255 S.C. at 909, 179 S.E.2d at 507-8.

Editorial writers were, at the time, sharply critical of *Hartness*.  In an editorial entitled "Court's Tuition Decree Sets Law on its Head," The State's editors (led by W.D. Workman, Jr., chief editor, who plaintiffs attack as a racist) wrote:

> [t]he simple command of Article XI of the South Carolina Constitution is this: that the State may not use public money to aid directly or indirectly, church-supported institutions.  This is what the article prohibits and all that it prohibits.  What the Supreme Court prohibits, however, is State aid once removed.  Such aid, it reasons, [was] what the framers of Article XI intended to deny when they stipulated that no state money be parceled out to church schools "indirectly."

> It is not in the least clear that this was the intent of the framers at all.  Barring evidence to the contrary (none of which is cited in the Court's decision), it seems reasonable to suppose that the framers meant what they said: that the State, finding the front door shut, might not deliver subsidies to religious schools through the rear entrance.

> In the case of tuition grants, it is necessary to examine not only the intent of the framers, but also the intent of the grants.  Are they designed to save financially shaky schools from insolvency?  Or are they intended to assist impecunious students?  It is clear that students are the intended recipients of this aid.  It is State aid to church-run schools only in the sense that fire protection and police protection are State aid; that is to say because the schools also derive some benefit thereby.

The State, March 15, 1971, at 12 [Exhibit 6].  This editorial was written, knowing full well that the purpose of the 1970 tuition grants program was to aid African-American students, as well as whites.  In other words, this is another example where Plaintiffs' allegations of racism by members of the West Committee must fail.

Article XI, § 4, as recommended by the West Committee, finally assumed its present form by constitutional amendment, approved by the voters in November 1972, and ratified by the

33

General Assembly in 1973.  This cleared the way for the present tuition grants program created in 1970.  The Amendment now reads as follows:

> [n]o money shall be paid from public funds nor shall the credit of the State or any of its political subdivisions be used for the <u>direct</u> benefit of any religious or other private educational institution.

This is the exact language which the West Committee proposed, and it has remained unchanged since 1973.  As seen, rather than a provision created by racist and religious bigotry, the West Committee recommendation was a reasonable compromise striking a reasonable balance, resulting from considerable deliberation.  But its results were profound.  As Dr. Graham indicates, present day Art. XI, § 4 benefits all races and applies to all private schools.  Graham <u>Dep.</u> At 77-78.  That is an understatement.  Therefore, the State is entitled to judgment as a matter of law.

## CONCLUSION

Plaintiffs' arguments must surely fail.  Neither *Arlington Heights*, nor the federal Constitution is violated by either the work of the 1895 Constitutional Convention in adopting Art. XI, § 9 or that of the West Committee in proposing Art. XI, § 4.  To contend that the West Committee was "stacked with ardent racists" is simply not true, and even if it was, such a generalization cannot be used to strike down Art. XI, § 4.  See Plaintiffs' Memorandum at 23.  As former Attorney General McLeod opined in 1974, "[a] comparison of the amended version (Art. XI, § 4) and the original provision, contained in Article XI, Section 9, reveals that the amended version <u>is much less restrictive in proscribed connections between the State and private and religious educational institutions.</u> . . ."  <u>Op. S.C. Att'y Gen.</u>, 1974 WL 27574 (January 4, 1974). (emphasis added).  General McLeod noted that "[t]he expressed intent of the framers of the revised constitutional provision which was approved by the people and ratified by the

General Assembly was to prohibit aid to religious and other private educational institutions only if it directly benefitted such an institution." *Id.*

Such an approach was entirely reasonable. The work of the West Committee and the subsequent amendment of the Constitution was a progressive reform, with lasting results – to allow students of all races and nationalities to attend the college or university of their choice – public or private, religious or non-religious. The tuition grants program could now go forward with certainty. To cast aspersions on the Committee's work with the allegation that the Committee was "stacked with ardent racists" is unworthy of serious debate. Moreover, Dr. Graham acknowledges in his Deposition, that in making its recommendations regarding Art. XI, § 4, there were "concerns if too much state control over money that could affect the way things were taught." Graham Dep. At 73. Further, Dr. Graham also acknowledged that the Committee considered "the standpoint of both the state and private institutions in maintaining independence in coming up with a revision to this approach." He answered not only was the Committee "deliberative in its nature," but also "independent." *Id.*

In short, the West Committee's work with respect to Art. XI, § 4 was both deliberative and reasonable, not racist. The Committee sought a real tuition grants program that benefited all races. This was not Tillman's racist legacy, but one of substantial progress for the State.

The State respectfully requests that this Court grant it summary judgment and deny the Plaintiffs' Motion for Summary Judgment (ECF 73).

Respectfully submitted,

ALAN WILSON
Attorney General
Federal ID No.10457

[Signature block continues next page]

ROBERT D. COOK
Solicitor General
Federal ID No. 285
Email: rcook@scag.gov

/s/ J. Emory Smith, Jr.
J. EMORY SMITH, JR.
Deputy Solicitor General
Federal ID No. 3908
Email: esmith@scag.gov

Office of the Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
Phone: (803) 734-3680
Fax: (803) 734-3677

September 29, 2021                    Counsel for the State of South Carolina