```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF SOUTH CAROLINA

 3                    CHARLESTON DIVISION

 4

 5   Bishop of Charleston, a      ) C/A No. 2:21-cv-1093-BHH

 6   Corporation Sole, d/b/a The  )

 7   Roman Catholic Diocese of    )

 8   Charleston, and South Carolina )

 9   Independent Colleges and     )

10   Universities, Inc.,          )

11               Plaintiffs,      )

12               vs.              )      DEPOSITION OF

13   Marcia Adams, in her official )     CHARLES GLENN

14   capacity as the Executive    )      AUGUST 31, 2021

15   Director of the South Carolina )

16   Department of Administration; )

17   Brian Gaines, in his official )

18   capacity as budget director  )

19   for the South Carolina       )

20   Department of Administration; )

21   and Henry McMaster, in his   )

22   official capacity as Governor )

23   of the State of South Carolina,)

24               Defendants.      )

25   _____ )
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

Page 2

1          Deposition on oral examination of CHARLES GLENN,

2    reported by Barbara S. Ham, Court Reporter and Notary

3    Public in and for the State of South Carolina; pursuant to

4    Rule 30 of the South Carolina Rules of Civil Procedure;

5    said deposition was taken via Zoom Videoconference, on

6    Tuesday, the 31st day of August, 2021, commencing at the

7    hour of 10:03 p.m.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

Page 3

```
 1                    APPEARANCES:

 2

 3   REPRESENTING THE PLAINTIFFS:

 4        RICHARD S. DUKES, JR., ESQUIRE

 5        Turner Padget Graham & Laney, P.A.

 6        40 Calhoun Street, Suite 200

 7        Charleston, South Carolina 29401

 8        (RDukes@turnerpadget.com)

 9

10   REPRESENTING DEFENDANT, HENRY MCMASTER:

11        VORDMAN CARLISLE TRAYWICK, III, ESQUIRE

12        Robinson Gray Stepp & Laffitte, LLC

13        1310 Gadsden Street

14        Columbia, South Carolina 29211

15        (LTraywick@robinsongray.com)

16

17   REPRESENTING DEFENDANTS, MARCIA ADAMS AND BRIAN GAINES:

18        EUGENE H. MATTHEWS, ESQUIRE

19        Richardson Plowden & Robinson, P.A.

20        1900 Barnwell Street

21        Columbia, South Carolina 29201

22        (Gmatthews@richardsonplowden.com)

23

24

25
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
 1   ALSO:
 2        WILLIAM GRAYSON LAMBERT, ESQUIRE
 3        Burr & Forman, LLC
 4        South Carolina State House
 5        1100 Gervais Street
 6        Columbia, South Carolina 29201
 7        (Glambert@governor.sc.gov)
 8
 9        LEON DAVID LEGGETT, III, ESQUIRE
10        Post Office Box 11549
11        Columbia, South Carolina 29211
12        (Davidleggett@scag.gov)
13
14        Andy Wilson, Esquire
15        Christopher Mills
16
17
18
19
20
21
22
23
24
25
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

Page 5

1                              CONTENTS:

2                                                    PAGE:

3    Exhibit Index.......................................  6

4    Stipulations.......................................  7

5    Direct Examination by Mr. Traywick....................  7

6    Cross-Examination by Mr. Matthews..................... 61

7    Cross-Examination by Mr. Dukes........................ 66

8    Re-Direct Examination by Mr. Traywick................. 68

9    Certification of Reporter............................ 72

10   Verification......................................... 73

11   Errata............................................... 74

12   Word Index

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

1                        * * * * *

2

3    EXHIBIT INDEX:                              PAGE:

4    (Copies of exhibits attached to transcript.)

5    Defendants' Exhibit No. 1 (9 pages)................... 10

6     - Notice of Taking Video-Conference Deposition of Charles

7    Glenn deposition and Subpoena

8    Defendants' Exhibit No. 2 (42 pages)................... 14

9     - Charles L. Glenn, EdD, PhD - Curriculum Vitae

10   Defendants' Exhibit No. 3 (21 pages)................... 22

11    - Expert Report of Charles L. Glenn

12   Defendants' Exhibit No. 4 (2 pages)................... 23

13    - Plaintiffs' Supplemental Rule 26(F) Disclosure - Expert

14   Witnesses

15   Defendants' Exhibit No. 5 (26 pages)................... 29

16    - References for books written by Charles Glenn

17

18

19

20

21

22

23

24

25

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
1                              *  *  *  *  *

2

3    Court Reporter's Legend:

4    dashes [--]    Intentional or purposeful interruption

5    ...            Indicates trailing off

6    [ph]           Denotes phonetically written

7    [sic]          Written as said

8

9            This deposition is taken in accordance with the

10   South Carolina Rules of Civil Procedure.

11           It is agreed and stipulated by the deponent and

12   respective counsel that the reading and signing of the

13   deposition by the deponent is NOT expressly waived.

14           WHEREUPON:

15   DIRECT EXAMINATION BY MR. TRAYWICK:

16       Q.   Good morning, Dr. Glenn.  My name is Lisle

17            Traywick, and I represent Governor McMaster in

18            this litigation he filed by the Plaintiffs in the

19            Charleston Division of the District of South

20            Carolina.  Have you ever had your deposition

21            taken before?

22       A.   Yes, I have.

23   MR. MATTHEWS:  Lisle, the witness hasn't been sworn.

24   MADAM COURT REPORTER:  Yeah, I need to swear him in.

25   MR. TRAYWICK:  Yes, swear him in.
```

Garber Reporting
info@garberreporting.com

CHARLES GLENN

```
1        MADAM COURT REPORTER:  Yes.
2             CHARLES GLENN, being duly sworn and cautioned to
3   speak the truth, the whole truth and nothing but the truth,
4   testifies as follows:
5   DIRECT EXAMINATION BY MR. TRAYWICK:
6        Q.   Sorry about that.  Do you mind if I call you Dr.
7             Glenn?
8        A.   Yes, if you feel you have to, but I'm not the
9             kind of doctor who does anyone any good, so.
10       Q.   All right.  Well, I appreciate that.  And sorry
11            for jumping the gun a second ago but will you
12            state your full name for the record?
13       A.   Charles Leslie, L-E-S-L-I-E, Glenn.
14       Q.   Okay.  Thanks, Dr. Glenn.  As I introduced myself
15            off the record before you got sworn in, my name
16            is Lisle Traywick, and I represent Governor
17            McMaster in this litigation filed by the
18            Plaintiffs.  Have you ever had your deposition
19            taken before?
20       A.   Yes, I have.
21       Q.   Okay.  Well, that's good.  I am, however, going
22            to go over the rules just to make sure we're
23            reading from the same sheet of music today.  If
24            you have any questions about my questions, I'd
25            ask that you please direct those toward me.  If
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
 1        you need to take a break at any time throughout
 2        the day, please just let me know.  It's certainly
 3        not an endurance contest, and I may need to get
 4        up and take restroom breaks as well.  So, please,
 5        just let me know, but I'd ask that you answer the
 6        question pending before we do take a break.  If
 7        you -- please don't speak with any of the
 8        attorneys during the breaks.  If you do, we'll be
 9        able to ask about any conversations that you had,
10        but beyond that, if I ask a bad question, which
11        is bound to happen, please just ask me to
12        rephrase.  I'm certainly not trying to confuse
13        you or create a bad record.  You're doing a great
14        job of it now, but, please, just make sure you
15        let me finish my question before you answer it so
16        that we don't make the court reporter's life more
17        difficult here with the two of us talking over
18        each other.  So, with that, we'll get started.
19        Madam Court Reporter, if you could please put up
20        on the screen what's been pre-marked as
21        Defendant's Exhibit Number 1.
22   MADAM COURT REPORTER:  Okay.  It's going to take me a
23        minute.  I didn't download those to this
24        computer, but if you'll give me a second, I can.
25   MR. TRAYWICK: Okay.
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
1       MADAM COURT REPORTER:  I apologize.  I put them on my
2           other computer.  I didn't know that you were
3           going to want me to share them.
4    MR. TRAYWICK:  That's fine.  Would you rather me do
5           it?
6    MADAM COURT REPORTER:  Either way is fine.  Whichever
7           way you prefer.  I apologize for that.
8    MR. TRAYWICK:  I'll pull them up.
9    MADAM COURT REPORTER:  Okay.
10   (DEFENDANTS' EXHIBIT 1 MARKED FOR IDENTIFICATION
11   PURPOSES (9 pages) - Notice of Taking Video-Conference
12       Deposition of Charles Glenn and Subpoena)
13   Q.   All right, Dr. Glenn, have you seen this document
14        that's been marked as Exhibit Number 1 to your
15        deposition?
16   A.   I've only seen one document.  Let me just check
17        against what I have seen.
18   Q.   Okay.
19   A.   I've seen Plaintiff's Memorandum --
20   Q.   Okay.
21   A.   -- and Plaintiff Motion, but that's all I've
22        seen.
23   Q.   Okay.  So, you haven't seen a copy of the Notice
24        of Your Deposition or the Subpoena?
25   A.   No.
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
 1   Q.    Okay.  Do you see --
 2   A.    I've seen Appendix A, yes.
 3   Q.    What's that?
 4   A.    I have seen Appendix A.
 5   Q.    Okay.  So, you have seen Attachment A that's up
 6         on the screen right now?
 7   A.    Right.
 8   Q.    Okay.  And did you bring any responsive materials
 9         with you today to your deposition?
10   A.    I sent to Richard Dukes the -- my complete
11         references behind my expert report, and also my
12         curriculum vitae which includes the cases in
13         which I've previously been a witness.  None of
14         those, I should say, were within the last five
15         years.  The other items on the list I really
16         wasn't able to see how to answer.
17   Q.    Okay.  All right.  We'll go through them in due
18         course then.  What did you do to prepare for your
19         deposition today, Dr. Glenn?
20   A.    Well, let me first make a personal remark that I
21         would have said before being sworn in just to let
22         you all know, I was doing some yard work this
23         morning, took a hard fall on the pavement on my
24         rear end.  So, if I'm wiggling around, don't
25         think it's because I'm nervous.  It's because I'm
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

| | | |
|---|---|---|
| 1 | | author of the Boston Desegregation Plan that was |
| 2 | | implemented in 1974 and worked with about 15 |
| 3 | | other Massachusetts cities to, in a much more |
| 4 | | peaceful way, to adopt plans to achieve racial |
| 5 | | integration of their schools. |
| 6 | Q. | Okay.  And then at some point, you decided to |
| 7 | | make a move into academia? |
| 8 | A. | At one point, I found myself opposing the then |
| 9 | | governor, Ed King, on a policy that I felt was |
| 10 | | inequitable.  I testified against it several |
| 11 | | times and seeing the handwriting on the wall, I |
| 12 | | made a voluntary move before being fired and, as |
| 13 | | I say, Boston University offered me a full |
| 14 | | professorship with no strings attached, so I |
| 15 | | moved over to that position at that point. |
| 16 | Q. | Thank you for that background, Dr. Glenn.  Have |
| 17 | | you ever been to South Carolina before? |
| 18 | A. | Never. |
| 19 | Q. | Okay.  Have you ever taken any courses in the |
| 20 | | course of your extensive education on South |
| 21 | | Carolina history? |
| 22 | A. | No, I don't think any have been offered at the |
| 23 | | institutions where I studied.  I have, of course, |
| 24 | | read a number of books about South Carolina |
| 25 | | history because, as you may know, I published a |

CHARLES GLENN

| | | |
|---|---|---|
| 1 | | book on the education of African Americans since |
| 2 | | colonial times and this, of course, included a |
| 3 | | good deal of discussion of what occurred in South |
| 4 | | Carolina. |
| 5 | Q. | Okay.  And what time period does that book cover? |
| 6 | A. | Well, from colonial times, from the 17th century |
| 7 | | into, I would say, I pretty much brought the |
| 8 | | story to a close in the 1960s.  I didn't try to |
| 9 | | bring it into the latest time. |
| 10 | Q. | And when was that book published? |
| 11 | A. | Oh, gosh.  I couldn't tell you.  I've published |
| 12 | | about 15 books and you do get confused.  Here we |
| 13 | | go, first published 2011. |
| 14 | Q. | Okay.  Thank you for that.  Dr. Glenn, have you |
| 15 | | ever attended any round table discussions, |
| 16 | | symposia or any conferences on South Carolina |
| 17 | | history? |
| 18 | A. | No. |
| 19 | Q. | Okay.  Ever taught South Carolina history? |
| 20 | A. | No. |
| 21 | Q. | Have you written any articles, books, chapters or |
| 22 | | any other publication about South Carolina |
| 23 | | history? |
| 24 | A. | Well, as I mentioned, it's covered fairly |
| 25 | | extensively in this book that I just mentioned |

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
 1        and my expert testimony and my report is taken
 2        largely from that book and from another book.  I
 3        might just mention it while I'm at it which looks
 4        at the issue of the state and schools in American
 5        History and so you have all the references, at
 6        least Mr. Dukes can give you all the references
 7        behind those books and you will see there are
 8        many references that draw upon South Carolina.
 9        But I should say right away to avoid any
10        confusion, I claim no particular knowledge of
11        South Carolina history beyond what is in my
12        report, and the reason I numbered the paragraphs
13        of the report was so you could ask me about any
14        particular -- I think I mentioned South Carolina
15        in about 14 of the paragraphs.  You can ask me
16        about any of those, and I will explain what I'm
17        saying there, but beyond what's in the report, I
18        really can't answer anything.
19   Q.   Okay.  And when was that second book that you
20        just held up published?
21   A.   Well, I'll have to look again at this one.
22   Q.   That's fine.  Take your time.
23   A.   2012.  I might mention a third book which I also
24        drew upon although I don't cite it so
25        specifically.  This book "The Myth of the Common
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

| | | |
|---|---|---|
| 1 | | Madam Court Reporter, if you could please mark |
| 2 | | the Expert Disclosure as Exhibit 4 to this |
| 3 | | deposition? |
| 4 | | MADAM COURT REPORTER:  I got it. |
| 5 | | (DEFENDANTS' EXHIBIT 4 MARKED FOR IDENTIFICATION |
| 6 | | PURPOSES (2 pages) - Plaintiffs' Supplemental Rule 26(F) |
| 7 | | Disclosures - Expert Witnesses) |
| 8 | Q. | And I will share that now.  Okay.  Dr. Glenn, |
| 9 | | have you seen this document? |
| 10 | A. | No. |
| 11 | Q. | Okay.  Is that your contact information there in |
| 12 | | number two? |
| 13 | A. | Let me put my glasses on. |
| 14 | Q. | Okay. |
| 15 | A. | You're dealing with an old geezer here.  Well, |
| 16 | | yes, it is except that -- no, not the telephone |
| 17 | | number.  That was my number at Boston University, |
| 18 | | but I no longer have that number. |
| 19 | Q. | Okay.  All right.  And then between that and your |
| 20 | | report, I'm wondering in what field you're being |
| 21 | | offered to purportedly testify as an expert?  You |
| 22 | | mentioned earlier you're getting historical |
| 23 | | background but what -- between your report and |
| 24 | | this, I can't tell what your claiming subject |
| 25 | | matter expertise is to be offered as an expert in |

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
 1         this case.  Can you please help me with that?
 2    MR. DUKES:  Object to the form.
 3    A.    Yes.  Let me say something about my position as a
 4          historian.  There are basically two kinds of
 5          historians.  There are academic historians who
 6          largely study some small issue based upon a close
 7          use of the sources and so forth, and that's the
 8          basis on which they obtain tenure and promotion
 9          and so forth.  And then there are historians who
10          are drawn to the field because they have
11          questions about some major policy issue.  The
12          example I always use is Winston Churchill who had
13          no degree in history and yet wrote very
14          significant historical books because of his deep
15          engagement with policy issues and issues of war
16          and peace.  I have been an expert around the
17          world really in dealing with questions of
18          educational policy and in doing so, I've written
19          a lot of history drawing upon the work of
20          academic historians.  I haven't claimed to do the
21          field work in the Netherlands or in Germany or
22          Italy or in other places which I've written and
23          published books about.  But my books have been
24          well received, because I have drawn together the
25          kinds of source materials which academic
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
 1   historians produce.  Academic historians commonly
 2   don't deal -- don't concern themselves with
 3   fundamental questions of policy, and I'm regarded
 4   as a policy expert.  I'm one of the founders, for
 5   example, of the European association for
 6   education, law and policy and it's in that
 7   context that I have written history and published
 8   now half a dozen books of history which have been
 9   well received.  But I don't claim to be the kind
10   of historian who does the nitty-gritty field work
11   of going through the records and so forth.  So,
12   what I wrote about, for example, reconstruction
13   in South Carolina, is drawn upon in books that
14   other people have written, that other historians
15   have written, and I've drawn upon those books and
16   if you care to go to my book about that, you'll
17   find that I cite them very extensively to show
18   the sources of my research.  I don't know if that
19   answers your question.  I want to be concerned
20   and make clear that I don't claim to be an
21   academic historian.  I claim to be a policy
22   expert who uses history and also comparative
23   study to deal with questions of educational
24   policy.  I might just, in that context, mention
25   that, for example, one of my recent books is a
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
 1          four volume, a collection of chapters on about 60
 2          countries around the world spelling out in detail
 3          how they relate government with schools, what the
 4          constraints are, what the freedoms are, what the
 5          context of those decisions is and to some extent,
 6          what the historical background is.  By the way,
 7          that's all available for free from Johns Hopkins
 8          University online now and if you're interested,
 9          I'd be happy to send you the link.  That may be a
10          long answer, but I was concerned not to claim
11          anything that I'm not, and I'm certainly not the
12          kind of person who works his or her way up from
13          instructor to assistant professor in the History
14          Department.  That isn't my trajectory of life.
15   Q.     Thank you for that.  All right.  So, I want to
16          kind of narrow my question a little bit.  So, I
17          believe you said you're a policy expert.  Did I
18          hear that correctly?
19   A.     Yes.
20   Q.     Okay.  So, are you being offered as a policy
21          expert in this matter, Dr. Glenn?
22   MR. DUKES:  Object to the form.
23   A.     Well, I'm offered as an historian.  Somebody who
24          has published a number of books and has been
25          recognized by a number of courts as, for example,
```

CHARLES GLENN

```
 1            one of the chapters in this book was accepted by
 2            the trial judge in the Colorado case as expert
 3            testimony.  In other words, I list the work I've
 4            done, and I mentioned that Justice Alito thinks
 5            enough of me as a historian to cite this book
 6            several times in his recent Supreme Court
 7            supporting opinions.  So, I think I can call
 8            myself a historian for the purposes of this kind
 9            of litigation.
10    Q.     Okay.  And how would you characterize this kind
11           of litigation?
12    A.     Litigation that deals with questions of whether
13           provisions of a State Constitution or State law
14           violate fundamental rights protected in American
15           law and whether they arrived at that situation as
16           a result of decisions made on the basis of a
17           discriminatory considerations, whether racial or
18           religious.
19    Q.     All right.  Thank you for that.  Dr. Glenn, about
20           how long did it take you to prepare your expert
21           report in this matter?
22    A.     I would say it took me about maybe a dozen to 15
23           hours, because I did not write much of it
24           originally.  What I did was to go through two of
25           my books, the ones I mentioned, and excerpt
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
1        sections of those books which were relevant to
2        the particular case.  And as I mentioned in the
3        report, on the references, you can go to any
4        section of my report and if you go to the book
5        from which I took it, you can find all of the --
6        all of the references, all of the sources from
7        which I drew.
8   Q.   Okay.  Do you have any itemized bills supporting
9        the time you spent?
10  A.   No.
11  Q.   No.  Okay.  And what's your hourly rate?
12  A.   I have not asked anything.
13  Q.   Okay.  So you're doing this pro bono?
14  A.   Well, if you or anyone else wants to offer to
15       subsidize me, I won't say no, but I haven't made
16       any demands.
17  Q.   Okay.  If you would please turn to your report
18       which we've marked as Exhibit 3 to your
19       deposition, and flip with me to the second page,
20       paragraph seven.
21  A.   Okay.
22  Q.   Can you please read that into the record?
23  A.   In the report which follows, I would draw
24       primarily from my books, African American/Afro
25       Canadian Schooling: From the Colonial Period to
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

1          the Present, and The American Model of State and

2          School: An Historical Inquiry.  All references

3          for all the sources cited are found in one or the

4          other of those volumes and will not be provided

5          here.

6     Q.   All right.  And I'm going to show what I've pre-

7          marked as Exhibit Number 5 to your deposition.

8     (DEFENDANTS' EXHIBIT 5 MARKED FOR IDENTIFICATION

9     PURPOSES (26 pages) - References for books written by

10          Charles Glenn)

11    Q.   Does that look familiar, Dr. Glenn?

12    A.   Yes, it does.  I prepared that yesterday.

13    Q.   Okay.  And so I'll represent to you that we were

14         -- that was produced to us yesterday as well.

15         Does that sound fair?

16    A.   Yes, it does.

17    Q.   Okay.  In your initial report though you said

18         that you were not going to provide those sources.

19    A.   I'm sorry.  I don't understand.

20    Q.   Well, you just read paragraph seven of your

21         report into the record.  Do you recall that?

22    A.   Well, I did not include in the text footnotes

23         referring to all of these sources as I would have

24         done, say, in an academic paper.  I would have

25         made the document much longer and taken me much

CHARLES GLENN

| | | |
|---|---|---|
| 1 | | longer.  So, I did not do so, but obviously one |
| 2 | | could go through and find in each case the |
| 3 | | sources. |
| 4 | Q. | **Got you.  So, you created this after you compiled** |
| 5 | | **your expert report in this matter?** |
| 6 | A. | No, I took this from the back, the references, of |
| 7 | | the two books.  If you scroll down, about halfway |
| 8 | | down, you'll find that the second half of this |
| 9 | | document is things from the other book; that is, |
| 10 | | the American Model of State and School.  So, all |
| 11 | | of the sources for my expert report are in the |
| 12 | | document in the that you have up on the screen |
| 13 | | now. |
| 14 | Q. | **So, you said you prepared this yesterday?  Did I** |
| 15 | | **hear that correctly?** |
| 16 | A. | Well, I cut and paste it out of the two existing |
| 17 | | books, yes. |
| 18 | Q. | **Okay.  Any reason you didn't included with your** |
| 19 | | **expert report a month ago?** |
| 20 | A. | No, I just -- it did not appear to be necessary, |
| 21 | | but, as I said it would have made the report |
| 22 | | much longer and more academic seeming.  I don't |
| 23 | | know if that's, you know, your goal in this |
| 24 | | instance. |
| 25 | Q. | **All right.  Do you think it would have been** |

CHARLES GLENN

```
 1         helpful for the Defendants to have this ahead of
 2         time?
 3   A.    I don't know.  I can assure you the Defendants
 4         could easily have obtained my two books.  I wish
 5         they would and find I've written, you know, the
 6         references for every single statement in the
 7         reports are there.
 8   Q.    Okay.  But in paragraph seven, you just generally
 9         reference those two books; right?
10   A.    That's right.
11   Q.    Okay.  Do you think it's fair to send a 26-page
12         list of sources 24 hours before a deposition?
13   MR. DUKES:  Object to the form.
14   A.    I was responding to your attachment which
15         requested specifically that.
16   Q.    Okay.  So, you didn't think this was necessary
17         for your expert report?
18   A.    Point E in Attachment A, a list of all books,
19         treatises, articles, publications, newspaper's or
20         materials upon which you rely to formulate your
21         opinions in this case.  That's what you wrote,
22         and that's what I provided yesterday.
23   Q.    Okay.  I appreciate that, but in your report you
24         just said that you weren't going to provide it.
25         Isn't that right?
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
1   A.   No, I didn't say I wasn't going to report it.  I
2        said that I didn't include it in that report.  I
3        did not say I would not, if asked.  Your question
4        implies a plural, a future tense, and that I
5        would say is an unfair way of characterizing what
6        I wrote.
7   Q.   Okay.  Doesn't it say will not be provided here?
8   A.   Will not in this immediate document, yes.
9   Q.   All right.  Dr. Glenn, have you read the Amended
10       Complaint in this case?
11  A.   I've only read the one document that I mentioned
12       to you --
13  Q.   Okay.
14  A.   -- and I'm not going to comment, by the way, on
15       the immediate issues in the case, because I'm not
16       competent to do so.  The only document that I've
17       read is the one that was filed on April 1st.  The
18       33 page document, Plaintiffs Memorandum.
19  Q.   Okay.  So, you haven't read Judge Hendrix order
20       denying Motion for Preliminary Injunction?
21  A.   No.
22  Q.   Okay.  All right.  And I'm just trying to get an
23       understanding of what all you've seen in this
24       case.  So thanks for your patience with that.
25       Okay.  I want to go through some of the
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

| | | |
|---|---|---|
| 1 | | paragraphs in your report.  Do you still have |
| 2 | | that in front of you? |
| 3 | A. | Sure. |
| 4 | Q. | Okay.  Great.  Paragraphs 8 through 11.  Are |
| 5 | | those primarily concerned with the 1850s and |
| 6 | | 1860s?  Is that fair to say? |
| 7 | A. | Yes. |
| 8 | Q. | Okay.  And do any of those paragraphs deal with |
| 9 | | South Carolina? |
| 10 | A. | Yes.  Paragraph eight mentions the Black Code, |
| 11 | | and paragraph nine mentions that in Charleston, |
| 12 | | an Anglican Missionary Society had purchased two |
| 13 | | slaves and trained them to teach about a |
| 14 | | schoolhouse in the 18th Century.  So, those both |
| 15 | | refer to South Carolina. |
| 16 | Q. | Okay.  How about 10 or 11? |
| 17 | A. | They do not refer specifically to South Carolina. |
| 18 | | They refer to the general -- the general point of |
| 19 | | response to emancipation which, of course, |
| 20 | | included South Carolina. |
| 21 | Q. | Okay.  Just not specifically mentioned in here? |
| 22 | A. | No. |
| 23 | Q. | Okay.  All right.  Would you agree that |
| 24 | | paragraphs 12 through 20, and I'll give you time |
| 25 | | to read them.  I'm not trying to do a memory test |

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

1      here.  I just want to make sure I have an

2      understanding of your report.  Would you agree

3      that paragraphs 12 through 20 deal primarily with

4      the reconstruction period?

5  A.  Yes, they do.

6  Q.  Okay.  And which paragraphs mention South

7      Carolina?

8  A.  Well, it seems to me that paragraph 14 does.  I

9      mention a gathering in South Carolina that

10     adopted an address to the white people of the

11     state, asking that schools be established with

12     the education of colored citizens as well as

13     white and if the advantages of both colors shall,

14     in this respect, be equal.

15  Q.  And what year was that?

16  A.  Let me put my glasses back on.  1865.

17  Q.  Okay.  All right.  So we've gotten through

18     paragraph 14.  How about 15 through 20?  Any of

19     those deal with South Carolina?

20  A.  The next paragraph that deals with South

21     Carolina, specifically, that I mention is 27.

22     But, again, all of these chapters deal with South

23     Carolina in the sense that in the situation South

24     Carolina was quite similar to that elsewhere in

25     the south.

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
1    Q.   Okay.  Just no specific examples cited.  Is that
2         fair to say?
3    A.   Exactly.
4    Q.   Okay.
5    A.   So, what those chapters established -- what those
6         paragraphs established is that, along with the
7         efforts by black citizens of the south, there
8         were efforts by northern explicitly religious
9         organizations to provide schooling for freed
10        slaves and their children.  Enslaved persons,
11        formerly enslaved persons and their children.
12   Q.   In that strain reconstruction.  Is that correct?
13   A.   Exactly.
14   Q.   Okay.  All right.  Thank you for that.  All
15        right.  I'd like to move, if you don't mind, to
16        paragraphs 21 through 25.  Is it fair to say that
17        the period you focus on there is the 1860s and
18        the 1870s?
19   A.   Yes.
20   Q.   All right.  And which paragraphs, if any, mention
21        South Carolina?
22   A.   Well, I mentioned in 27.  I don't think we've
23        gotten there yet.
24   Q.   No, we're not quite there yet.
25   A.   Okay.
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
1    Q.    So, none of those do?
2    A.    No.
3    Q.    In paragraph 26, those are two quotes from W.E.
4          Du Bois?  Is that correct?
5    A.    Right.
6    Q.    Okay.  One in 1910 and one in 1941?  Is that
7          correct?
8    A.    Yes.
9    Q.    All right.  Paragraph 27, you mentioned does
10         concern South Carolina.  Is that right?
11   A.    Yes.
12   Q.    Okay.  And what are you discussing in that
13         paragraph, please?
14   A.    The first of post-war Constitutional Convention
15         of 1868 in which there were 13 black teachers who
16         worked hard to insure that South Carolina had a
17         plan for the education of black citizens as well
18         as white citizens.  And so they developed an
19         education plan that made it the duty of the
20         legislature to insure that.
21   Q.    Okay.  And that was in the convention of 1868?
22   A.    That's right.
23   Q.    Is that correct?
24   A.    That's right.
25   Q.    And we've had several revisions of the State
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

Page 37

```
 1        Constitution since then.
 2   A.   Right.
 3   Q.   Would you agree with that?
 4   A.   Yes.  I mention there, by the way, that at this
 5        point, South Carolina was arguably ahead of a
 6        number of northern states which did not yet have
 7        compulsory schooling.  So, South Carolina is
 8        seeking to move toward making schooling universal
 9        in a very progressive way for which it deserves
10        credit.
11   Q.   All right.  Thank you for that.
12   A.   I'm sorry.  I will say the very next paragraph
13        goes on to talk about the very significant
14        progress that South Carolina made as a result of
15        those efforts.
16   Q.   Okay.  And those statistics primarily focus on
17        the period of 1870 to 1884.  Is that fair to say?
18   A.   Right.  Yes.
19   Q.   Okay.  All right.  How about paragraph 29?  Does
20        that mention South Carolina?
21   A.   Yes, it does.
22   Q.   Okay.
23   A.   Do you want me to read what it says?
24   Q.   My question more is the time frame?  Is that
25        dealing with the 1860s through the 1880s?  Would
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
 1        that be fair to say?
 2   A.   Yes, it is.
 3   Q.   Okay.  There's a quote from the Charleston Daily
 4        Courier in there.
 5   A.   Right.
 6   Q.   Okay.
 7   A.   The goal should be to educate every white child.
 8        You can see already the resistance that would
 9        develop much more strongly later.
10   Q.   Okay.  Paragraph 30, Dr. Glenn, you mention
11        schooling was a major casualty of Democratic
12        rule.  Was that in the south or was that meant to
13        be the entire country?
14   A.   Let's again, make clear, Democratic with a
15        capital D.
16   Q.   Right, right.  I'm sorry.
17   A.   Hearing you and not looking at my own text, I
18        took that to mean that -- that participation by
19        voters would inevitably be against schooling and,
20        of course, that wasn't --
21   Q.   No, your report had a capital D?
22   A.   Yeah.  Once the Republicans began to lose their
23        very short range in politics in a number of
24        southern states, schooling became much less
25        significant as a goal and I mention in that
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
 1        paragraph that some states all but dismantled the
 2        education systems that had been established
 3        through reconstruction.  Let me just interject at
 4        this point to save you from perhaps having to
 5        return to it, this made all the more important
 6        the efforts that were being funded and organized
 7        by religious based groups.  In other words, as
 8        the state efforts fell apart the voluntary
 9        religious efforts became even more significant,
10        because they filled the gap -- the resulting gap.
11   Q.   All right.  Thank you for that.  And the last
12        sort of cluster of paragraphs in this section of
13        your report, Dr. Glenn, paragraphs 31 through 37.
14        Those pretty much discuss the reconstruction
15        period in general; correct?
16   A.   Yes.  I mention South Carolina in 31, of course.
17   Q.   31.  Right.  Okay.  Any others?
18   A.   The next time I mentioned South Carolina was in
19        35.
20   Q.   Okay.
21   A.   When a black congressman from South Carolina
22        warned Congress that -- that unless it was
23        vigilant that all the progress that had been made
24        since abolition slavery was in danger of being
25        reversed.
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
 1   Q.   Thank you, Dr. Glenn.  So, that is -- we've gone
 2        through now some of the paragraphs and the
 3        provisions of schooling that freed them section
 4        of your report.  Any other opinions you intend to
 5        offer about that period that, based on my
 6        calculation, runs through reconstruction or
 7        shortly thereafter?
 8   A.   Well, I think it's worth mentioning in paragraph
 9        36 that at the South Carolina convention, that is
10        the one in 1868, not the later one which I'm sure
11        we'll be discussing, that the black delegates had
12        argued for integrated schools.  But that if
13        schools were integrated, a white delegate warned
14        that no white children would attend those schools
15        at all.  So, it's clear that the lines are being
16        very strongly drawn at that point already even
17        though this was still in -- in the exact middle
18        of the reconstruction time.
19   Q.   Right.  And then that paragraph in particular I
20        believe the time frame says 1867 to 1868.  Is
21        that correct?
22   A.   Yes.
23   Q.   Okay.  That ends the section of your report on
24        the Education to Freedmen; right?
25   A.   Right.
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

1  Q.    Okay.  Now I'd like to move on to the next
2        section about Opposition to Funding of Catholic
3        Schools, if you don't mind.  Paragraphs 38
4        through 48.  Those don't mention South Carolina
5        or any of its leaders.  Do you see that?
6  A.    That's true.
7  Q.    All right.  Paragraph 49.  Would you agree it was
8        normal for states who might have initially
9        established religion in the early colonial days
10       to provide for the separation of church and state
11       consistent with the establishment clause?
12 A.    I'm sorry, would you ask that again, please?
13 Q.    Sure, I'll be glad to repeat it.  Would you agree
14       it was normal for states who had initially
15       established religions in their colonial days to
16       provide for the separation of church and state
17       consistent with the establishment clause?
18 A.    Well, I love answering that, but I can't answer
19       it briefly.  Indeed I deal with that at great
20       length and I believe that's something...
21 Q.    Sorry.  Can you say that again.  I couldn't hear
22       that last statement.  Would you repeat it?
23 A.    Yeah.  Most states were working hard at -- well,
24       to distinguish among the three regions of the
25       country in the early national period.  In New

CHARLES GLENN

```
 1   England, almost all schools were locally
 2   supported.  They had a religious character, and
 3   the state had only a marginal oversight lull.  In
 4   the middle Atlantic states, New York,
 5   Pennsylvania, New Jersey, almost all schooling
 6   was denominational.  That is, schools were
 7   started by religious groups for their own
 8   members.  Only occasionally did the state provide
 9   funding for those schools, but when it did no
10   questions were raised about the First Amendment.
11   Indeed, I -- I don't find any use of the First
12   Amendment to oppose religious schooling right
13   through there, since the 19th century ruling.  If
14   there had been such an opposition based on the
15   First Amendment, it seems difficult to understand
16   why Blaine would have attempted to have a new
17   amendment added to the Constitution.  In the
18   south, it was very mixed and very patchy
19   provision of schooling by the state.  North
20   Carolina did a little bit better than most other
21   parts of the south, but it was very patchy mostly
22   again by whoever local groups chose to organize
23   such schooling.  In all cases though, you can
24   cite examples of schools with an explicitly
25   religious character.  It did receive state
```

CHARLES GLENN

| | | |
|---|---|---|
| 1 | | funding and then nobody objected to that state |
| 2 | | funding on the basis of the First Amendment. |
| 3 | Q. | **You mentioned how various regions reacted** |
| 4 | | **differently particularly with respect to** |
| 5 | | **education.  Would you agree that even within the** |
| 6 | | **south, there were a lot of differences of** |
| 7 | | **opinions even among the states themselves?** |
| 8 | A. | Well, opinion or differences in practice?  Are we |
| 9 | | talking about the period of the early 19th |
| 10 | | Century or -- |
| 11 | Q. | **Earlier you mentioned how New England may have** |
| 12 | | **reacted differently than maybe the south or** |
| 13 | | **various other regions.  Did I hear that** |
| 14 | | **correctly?** |
| 15 | A. | Yes. |
| 16 | Q. | **Okay.** |
| 17 | A. | So, are we talking about, let's say, 1800? |
| 18 | Q. | **Sure.** |
| 19 | A. | Sure.  Okay.  Well, in 1800 what little schooling |
| 20 | | was available in the south was mostly provided by |
| 21 | | tutors on the plantations of the wealthy |
| 22 | | plantation owners for their own children and some |
| 23 | | of their neighbors.  In Charleston and other |
| 24 | | places by churches and charitable groups.  I've |
| 25 | | already mentioned in Charleston the Anglican |

CHARLES GLENN

```
 1          Church actually purchased slaves and established
 2          a school having those slaves teach other black
 3          individuals -- freed individuals.  So, there's a
 4          whole patch work but very little that you could
 5          call new policy.
 6     Q.   And that was even within the south, would you
 7          agree?
 8     A.   I'm saying that was the case in the south.  You
 9          can cite much more policy in the New England area
10          or in the mid-Atlantic area.
11     Q.   Okay.  Would you agree that even within South
12          Carolina, different attitudes and policies and
13          opinions were prevalent at the time?
14     A.   I assume so, but I'm not a historian of South
15          Carolina, so --
16     Q.   Okay.
17     A.   -- you'll have to ask that question elsewhere.
18     Q.   Okay.  Thank you.  Paragraphs 50 through 63 in
19          your report.  If you need a second to read them,
20          I'm happy to accommodate you, but those are all
21          part of a national discussion and don't
22          specifically mention South Carolina, do they?
23     A.   Right.  What is striking -- I mean, what should I
24          say?  The implication for South Carolina or the
25          influence of South Carolina, you can say, and I
```

CHARLES GLENN

Page 45

1    argue this in length in my book which I quote
2    from here is that the Republican party in the
3    mid-1870s recognized that it no longer had a
4    winning political issue in supporting the rights
5    and interests of formerly enslaved persons in the
6    south.   In other words, as the Republican party
7    began to back out of its support for
8    reconstruction, it was casting around for another
9    issue that could get the voters stirred up and
10   that issue as President Grant specifically showed
11   and others did was anxiety about the growing
12   Catholic presence particularly in northern urban
13   areas.   Now, ironically, the Ku Klux Klan was
14   also part of that anti-Catholic movement even
15   though there were few -- few Catholics outside of
16   Louisiana.   But, in general, the sense of anti-
17   Catholic anxiety was in effect the new issue and
18   replaced the issue of doing justice for black
19   southerners or the black northerners who were
20   also being treated unjustly with the issue of
21   opposing the claims of the Catholic church.   And
22   the point in which those claims became most
23   volatile were around schooling as I show in some
24   detail in these paragraphs.
25  Q.   **Are you're suggesting that President Grant and**

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

1    South Carolinians shared political views at that

2    time?

3    A.    No.  I'm suggesting that as General Grant --

4         President Grant, realized he could no longer gain

5         political mileage by opposing the efforts of the

6         white leadership in South Carolina to roll back

7         the effects of the various post-emancipation

8         reforms that he looked for another issue and it

9         was the vacancy or the falling away of the issue

10        of a racial justice which pointed the way to

11        using religious concerns as the organizing

12        motivation for the Republican voters across the

13        north.

14   Q.   But you're not trying to attribute what leaders

15        from other states thought to South Carolina, are

16        you, as evidence of what was going on in South

17        Carolina at the time?

18   A.   No.  What I'm referring to is the rollback of the

19        reforms opposed to emancipation of forms, and I

20        think I've already showed that that occurred.

21        Now, I'm not -- I'm not making any statements

22        about how South Carolina leaders felt about

23        Catholics, if that's what you're asking.

24   Q.   I'm sorry.  You broke up there at the end.

25        You're not making any statements about South

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
1          Carolina what?

2    A.    How they felt about Catholics.

3    Q.    Okay.  Okay.

4    A.    I do point out that the Klan was very much anti-

5          Catholic and would be a key role, by the way, for

6          example, in the Oregon -- the famous case in

7          Oregon was because the Klan in Oregon was

8          organizing against Catholic so, you know, those

9          linkages exist but I have not attempted to trace

10         them.

11   Q.    Okay.  Because, I mean, you would agree that

12         Oregon and South Carolina are different regions,

13         different attitudes, very different politically?

14   A.    Correct.

15   Q.    Okay.  All right.  If you wouldn't mind looking

16         at paragraph 64, please.  Can you please explain

17         your opinion that, quote, one can in fact trace a

18         line of decent of anti-immigrant, anti-Catholic

19         agitation from the 1850s to the present?

20   A.    That's just -- so, I'm not clear what it is

21         you're asking.

22   Q.    Yeah.  Can you explain that opinion?  That's a

23         pretty broad statement.

24   A.    Well, let's go the beginning of that paragraph.

25         So, state level campaigns against support for
```

CHARLES GLENN

```
 1        Catholic schools were promoted by organizations
 2        like the APA which was a secret society reviving
 3        the know-nothing party which had been a pre-
 4        Civil War movement which faded.  Again this sort
 5        of alternate.  I mentioned already how the
 6        switching from race to religion as a focus in
 7        the 1870s one might mention that in the 1850s
 8        there's a switch from religion to race.  In
 9        other words, the anti-Catholic movement faded
10        because abolition became a bigger deal in the
11        north, and the APA opposed funding of Catholic
12        schools.  It's influence was greatest at the
13        state level as would be the case in the 1920s of
14        the revived Ku Klux Klan which agitated the
15        state laws and the Catholic schools most notably
16        in Oregon, and I mentioned that a minute ago.
17        One can in fact trace a descent of anti-
18        immigrant, anti-Catholic education in the 1850s
19        to the present, and I ask why that is serious.
20        We've had anti-Catholic, at least in my
21        lifetime, around the election of President
22        Kennedy and so forth.
23   Q.   Sure.  Well, and on that note, are you aware
24        that the former Chief Justice in South Carolina,
25        a female, served in that role for over 14 years
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

Page 49

```
 1        starting in 2000?
 2   A.   No.
 3   MR. DUKES:  Object to the form.
 4   Q.   Okay.  And were you aware that the General
 5        Assembly elects judges in South Carolina?
 6   A.   No.
 7   Q.   Okay.  Are you aware that the current Lieutenant
 8        Governor who was popularly elected by the people
 9        in South Carolina is Catholic?
10   A.   No.
11   Q.   Okay.  And are you aware that South Carolina's
12        last governor, the daughter of immigrants, was
13        popularly elected twice to that office?
14   A.   I am aware of that.
15   Q.   Okay.  Are you aware that the current Chief
16        Justice in South Carolina is African-American?
17   A.   I was aware of that, yes.
18   Q.   Okay.  And are you aware that South Carolina has
19        one of only three African Americans in the
20        United States Senate?
21   A.   Yes.
22   Q.   Representing our state?
23   A.   Yes.
24   Q.   Okay.  So, how does that square with your
25        opinion that anti-immigrant, anti-Catholic is
```

CHARLES GLENN

| | | |
|---|---|---|
| 1 | | **traced to the present?  Upon what evidence do** |
| 2 | | **you rely to make that assertion?** |
| 3 | A. | Well, I'm not really talking here and perhaps I |
| 4 | | ought to have made that clear about the 2020s, |
| 5 | | but I was in jail in North Carolina in '63 as |
| 6 | | part of the Freedom Movement.  I was at Selma in |
| 7 | | 1965.  It is not so long ago that I crossed the |
| 8 | | south and I hasten to say I crossed the north |
| 9 | | that anti-black prejudice existed and had a |
| 10 | | powerful effect.  After all my job with the |
| 11 | | state involved was actually dealing with such |
| 12 | | issues.  And you will not be unaware that even |
| 13 | | in our own days there are powerful concerns |
| 14 | | about racial attitudes in American life.  So, I |
| 15 | | don't think I'm going too far out of bounds to |
| 16 | | say that one always has to be concerned about |
| 17 | | whether there may be racial considerations |
| 18 | | involved no matter how many African Americans or |
| 19 | | immigrants may be in significant roles.  Now, if |
| 20 | | I'm wrong about that, I'm in good company with |
| 21 | | many other thoughtful Americans. |
| 22 | Q. | **Well, just for purposes of your deposition, Dr.** |
| 23 | | **Glenn, you know, we have to have the evidence** |
| 24 | | **upon which you rely to make your opinions, and I** |
| 25 | | **heard you give some anecdotals about North** |

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

| | | |
|---|---|---|
| 1 | | Carolina, but what evidence do have to support |
| 2 | | other than anecdotal that anti-immigrant, anti- |
| 3 | | Catholic agitation can be traced to the present? |
| 4 | A. | Well, what I wrote about is the decisions made |
| 5 | | in South Carolina in the late 19th Century, and |
| 6 | | you're trying to bring it into 50 years later. |
| 7 | Q. | Well, it says to the present. |
| 8 | A. | Well, okay, they were cast -- |
| 9 | Q. | Do you want to walk that back? |
| 10 | A. | Let me take out those words and say, I mean I |
| 11 | | don't actually disagree with the statement, but |
| 12 | | I'm not going to attempt to prove it because my |
| 13 | | purpose in writing that was not to argue about |
| 14 | | what may be occurring right now in South |
| 15 | | Carolina or in any other state for that matter. |
| 16 | Q. | Okay.  So, your focus was primarily on the 19th |
| 17 | | Century there? |
| 18 | A. | And the motivations behind the amendment of the |
| 19 | | South Carolina Constitution which in 1895 which |
| 20 | | I regard as being a significant indicator of the |
| 21 | | sorts of motivations that were part of the |
| 22 | | provision, but not allowing funding of faith- |
| 23 | | based schools. |
| 24 | Q. | As that was in 1895; right? |
| 25 | A. | Yes. |

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
1   Q.   Okay.  All right.  Let's move on.  Does
2        paragraph 65 mention South Carolina?
3   A.   No, it does not.
4   Q.   Okay.  So, next we're going to move to, I would
5        say, the third portion of your report titled
6        Reversing Gains Made Under Reconstruction.  Dr.
7        Glenn, are you good?  Do you need a break or
8        anything?
9   A.   No, I'm fine.
10  Q.   Okay.  I just want to be respectful of your
11       time, okay?  All right.  Paragraph 66, is that
12       just sort of general commentary about the post-
13       reconstruction era from 1977 through 19 -- or
14       1877 through 1954?
15  A.   Right.
16  Q.   Okay.  Is South Carolina specifically not
17       mentioned?
18  A.   It is specifically mentioned in the next
19       paragraph.
20  Q.   Okay.  So, let's go to that.  So, paragraph 67
21       you included some national statistics there;
22       right?
23  A.   Right.
24  Q.   Okay.  And then mention the provisions of the
25       1895 version of South Carolina's Constitution?
```

CHARLES GLENN

```
 1   A.   Right.

 2   Q.   Is that right?

 3   A.   Yes.

 4   Q.   Okay.  And you're aware that's no longer in

 5        place with respect to the provision at issue

 6        here?

 7   A.   Yes.

 8   Q.   Okay.  Paragraph 68 does not involve South

 9        Carolina, does it?

10   A.   No.

11   Q.   Okay.  Paragraph 69.  Discusses the two prior

12        versions of our State Constitution; correct?

13   A.   Yes.

14   Q.   Okay.

15   A.   I think you have skipped rather hastily over

16        paragraph 67 which arguably is a key element.

17   Q.   Okay.  What opinions do you have to offer about

18        paragraph 67?

19   A.   Well, not opinions.  Simply facts that it is not

20        accidental in my view, in my judgment, that the

21        provision to prevent funding of faith-based

22        schools was occurring at a time when a large

23        share of the schooling available to black South

24        Carolinians was provided by faith-based schools.

25        Not necessarily Catholic schools; mostly non-
```

CHARLES GLENN

| | | |
|---|---|---|
| 1 | | Catholic schools.  But that the provision |
| 2 | | against -- the provision of firing a literacy |
| 3 | | test for voting is not unrelated to the |
| 4 | | provision against funding faith-based schools |
| 5 | | because -- |
| 6 | Q. | In 1895? |
| 7 | A. | -- in 1895. |
| 8 | Q. | All right. |
| 9 | A. | Because faith-based schools were a major source |
| 10 | | of literacy for African Americans in South |
| 11 | | Carolina.  That's all I wanted to emphasize. |
| 12 | Q. | All right.  Thank you, Dr. Glenn.  I appreciate |
| 13 | | that.  All right.  If we can flip to the next |
| 14 | | page.  Paragraph 70, that doesn't deal with |
| 15 | | South Carolina? |
| 16 | A. | That's correct. |
| 17 | Q. | Okay.  And I'll clarify for the record that says |
| 18 | | Bardiman [ph] not Boardman.  Paragraph 71 |
| 19 | | through 72, those don't deal with South Carolina |
| 20 | | either, do they? |
| 21 | A. | No. |
| 22 | Q. | Okay.  73, you're discussing the Constitution of |
| 23 | | 1895? |
| 24 | A. | Right. |
| 25 | Q. | Paragraph 74 through 79, are those primarily a |

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
 1              commentary of late 1800s and the first couple
 2              decades of the 20th Century?
 3    A.   Yes, they are.
 4    Q.   Anything specific about South Carolina in there?
 5    A.   1775, of course, is specifically talking about a
 6         South Carolina Governor and Senator Tillman.
 7    Q.   All right.  And what was the year of that quote?
 8    A.   I don't remember now.
 9    Q.   Okay.  That's fine.
10    A.   It was when he was Senator rather than when he
11         was Governor.
12    Q.   Okay.  Paragraph 80, does that concern South
13         Carolina?
14    A.   Paragraph 80 is about racism in the north, but
15         also about famous film, Birth of a Nation, and
16         how that shows in the early 20th Century the
17         power of white racism continued, extremely
18         powerful, north and south.
19    Q.   Okay.  All right.  And next paragraphs 81 and
20         82, those aren't specifically about South
21         Carolina, are they?
22    A.   Not specifically.
23    Q.   Okay.
24    A.   They're about the south in general which, of
25         course, includes South Carolina.
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
 1   Q.    Okay.  But we've discussed earlier certainly
 2         among the south different states reacted
 3         differently to education policy; correct?
 4   A.    Yes.
 5   Q.    Okay.  Thanks.  Dr. Glenn, if you don't mind,
 6         I'm going to take a quick restroom break.  We've
 7         been going about an hour and 18 minutes.  So,
 8         let's come back at 11 -- it's 11:18.  Let's come
 9         back at 11:23 if that suits the group.  If y'all
10         need more time, that's fine, but five minutes,
11         that'll work.
12   MR. DUKES: Yeah.  That's fine with me.
13   Q.    We'll go off the record.
14   MADAM COURT REPORTER:  All right.  We're off the
15         record.  Thank you.
16                    (Off the Record)
17   MADAM COURT REPORTER:  All right.  We're back on the
18         record.
19   Q.    All right.  Thank you, Dr. Glenn, I appreciate
20         your patience.  All right.  Next, I want to go
21         down to paragraph 83.  That's the sentence about
22         serves Senators Fulbright, Russell, Erwin,
23         Thurmond and Byrd.  Do you see that?
24   A.    Yes.
25   Q.    Okay.  Fulbright, Russell, Erwin and Byrd were
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
 1            not from South Carolina, were they?
 2   A.    No.
 3   Q.    Okay.  And do you think that that one sentence
 4         fully encapsulates those mens' views over the
 5         course of their lifetime?
 6   MR. DUKES:  Object to the form.
 7   A.    No, I don't.
 8   Q.    No?  Okay.  In fact, some have entire books
 9         written about them; correct?
10   MR. DUKES:  Object to the form.
11   A.    Yes, they do.  I dated Senator Fulbright's
12         daughter in the old days, so I got to know him a
13         little bit and quite a nice gentleman, but it
14         doesn't mean I agreed with his position about
15         race.
16   Q.    And certainly you're not trying to tag the
17         entire south with the views of five people, are
18         you, at that time?
19   A.    Of course not, no.
20   Q.    Okay.  And your report ends at paragraph 83.  Is
21         that correct?
22   A.    That's correct.
23   Q.    Okay.  So you're not offering any opinions in
24         this case that post-date 1956.  Is that correct?
25   MR. DUKES:  Object to the form.
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
 1   A.   That's correct.

 2   Q.   Okay.  All right.  Do you know how many times

 3        the 1895 South Carolina Constitution was

 4        amended?

 5   A.   No, I don't.

 6   Q.   Okay.  Do you know what the West Committee is?

 7   A.   I'm not going to comment on anything beyond

 8        what's in my text.  I've already said I'm not

 9        any kind of an expert on South Carolina --

10   Q.   Okay.

11   A.   -- and so if you want to find out about those

12        things, you'll have to inquire elsewhere.

13   Q.   All right.  Fair enough.  So, you don't have any

14        opinions, criticisms or anything to offer about

15        the West Committee?

16   A.   I have no opinions.

17   Q.   Okay.  All right.  And if you'll bear with me

18        for one second, please.  Have you read the

19        provision at issue in this case, Dr. Glenn?

20   A.   I've read nothing except the document that I

21        already mentioned.  Do you want me to give you

22        the reference again?

23   Q.   Sure.

24   A.   The one filed with the court on April 1st?

25   Q.   Uh-huh (affirmative response).
```

CHARLES GLENN

| | | |
|---|---|---|
| 1 | A. | Entitled Plaintiff Memorandum in Support of |
| 2 | | Plaintiff's Motion or Preliminary Injunction.  I |
| 3 | | have not been provided with any other documents |
| 4 | | in the case. |
| 5 | Q. | Okay. |
| 6 | A. | I would be very interested to read other ones, |
| 7 | | but I haven't been provided any. |
| 8 | Q. | All right.  I think this is it.  Okay.  Would |
| 9 | | you look at Section 4 down there and read that |
| 10 | | to yourself, please. |
| 11 | A. | Of what's on the screen, you mean? |
| 12 | Q. | Yes.  I'm sorry.  Yeah, what I've shared, and |
| 13 | | I'll represent to you that's Article 11 Section |
| 14 | | 4 of the South Carolina Constitution in its |
| 15 | | current form. |
| 16 | A. | Do you want me to read it aloud? |
| 17 | Q. | Sure. |
| 18 | A. | Okay.  Direct pay to religious or other private |
| 19 | | educational institutions prohibited.  No money |
| 20 | | shall be paid from public funds nor shall the |
| 21 | | credit of the state or any of its political |
| 22 | | subdivisions be used for the direct benefit of |
| 23 | | any religious or other private educational |
| 24 | | institution. |
| 25 | Q. | Okay.  Dr. Glenn, would you agree with me that |

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

Page 60

```
 1        that applies to every private school in South
 2        Carolina?
 3   A.   I'm not the one to interpret South Carolina law.
 4        You have several South Carolina lawyers here and
 5        I'm sure you can agree among yourselves how to
 6        interpret, but it's not my job to interpret your
 7        laws.  I had a challenging enough time
 8        interpreting Massachusetts laws when I was a
 9        State Government official.
10   Q.   Did you see race mentioned anywhere in that
11        provision?
12   A.   No.
13   Q.   Okay.  All right.  Dr. Glenn, do you intend to
14        offer any other opinions in this matter other
15        than that which appears in your report and
16        what's been discussed during your deposition
17        this morning?
18   A.   No, I have no opinions about the present
19        situation in South Carolina, because I'm not
20        sufficiently knowledgeable to have such
21        opinions.
22   Q.   Okay.  All right.  Well, I believe that's all I
23        have.  Thank you so much for your time.  I
24        really do appreciate it.  And I hope you're not
25        too sore from your tumble earlier this morning,
```

CHARLES GLENN

```
 1              but thank you for being with us.  I'll pass it
 2              along to whomever else might want to ask you
 3              some questions.
 4      A.    Okay.  Thanks a lot.
 5      Q.    All right.  Let me unshare this.
 6      MR. MATTHEWS:  Lyle or the other Defendants -- are
 7              there other Defendants rather than me?
 8      MR. TRAYWICK:  I believe David Leggett is here
 9              representing the intervener, the Attorney
10              General on behalf of the State of South
11              Carolina.  I don't know if he has any questions,
12              but y'all will be the only two left.
13      MR. MATTHEWS:  All right.  Mr. Leggett, do you mind
14              if I proceed?
15      MR. LEGGETT:  Go right ahead.  I don't have any
16              questions on behalf of the State.
17      MR. MATTHEWS:  All right.
18  MR. GLENN - CROSS-EXAMINATION BY MR. MATTHEWS:
19      Q.    Dr. Glenn, my name is Gene Matthews.  I
20              represent two of the gentlemen or officials who
21              are being sued in this lawsuit, Ms. Adams and
22              Mr. Gaines.  If I understand and we can probably
23              bring this to a pretty quick conclusion.  My
24              understanding is you have no knowledge as to the
25              activities of the West Committee who amended the
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
1        provision of the South Carolina Constitution
2        that is an issue in this case; correct?
3   A.   That's correct.
4   Q.   Okay.  So, you would have, I think I know the
5        answers to these questions, but I do need to go
6        through them for the record.  You have no
7        knowledge about what motivated their activities
8        and when I say they, I mean the West Committee?
9   A.   I have neither knowledge nor opinion about their
10       motivations.
11  Q.   Okay.  You have no knowledge of the sequence of
12       events that led to the amendments that was
13       proposed by the West Committee and made a part
14       of the South Carolina Constitution; correct?
15  A.   No, I do not.
16  Q.   Okay.  You have no knowledge about whether or
17       not the activities of the West Committee or the
18       amendment to the Constitution departed in any
19       normal way from the procedural sequence that
20       usually leads to such amendments; correct?
21  A.   No, I do not.
22  Q.   Okay.  You have no knowledge about whether the
23       amendment as currently stated has a
24       disproportional impact of one race or religion
25       of another?
```

CHARLES GLENN

Page 63

```
1    A.    I'm sorry?
2    Q.    I'll repeat the question.  Is it true, this will
3          make it easier, is it true that you have no
4          knowledge or opinion as to whether the amendment
5          in question or the provision in question has a
6          disproportionate impact more heavily on one race
7          or religion than another?  Is that correct?
8    A.    I have no knowledge of that.  The way you asked
9          it leads me to not know whether to answer yes or
10         no.  I'm sorry.
11   Q.    Well, let me try again.
12   A.    Okay.
13   Q.    Doctor, I'm going to try again.  Do you
14         understand?  I'm going to ask another question.
15   A.    Okay.
16   Q.    All right.  Do you have any knowledge about
17         whether or not the Constitutional provision in
18         question as currently formulated has a
19         disproportionate impact on one religion or one
20         race more so than another?
21   A.    I have no knowledge about that.
22   Q.    All right.  Have you ever dealt or opined on the
23         Constitutional provision of any other state that
24         forbade public support of private education?
25   A.    Yes.
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

Page 64

```
 1   Q.    Okay.  Tell me about that.
 2   A.    As a Massachusetts state official, I was called
 3         upon to express my opinions on the Massachusetts
 4         Constitution which forbids funding with public
 5         funds any schooling not provided by government -
 6         -
 7   Q.    Okay.
 8   A.    -- even though -- even though Massachusetts, in
 9         fact, was funding the attendance of children
10         with extreme special needs in private and non-
11         governmental schools.
12   Q.    All right.
13   A.    My opinion and I expressed this as the State
14         official responsible in those areas was that
15         Massachusetts was in fact violating its own
16         Constitution in doing so.
17   Q.    What was the result of that opinion?
18   A.    It was completely ignored because Massachusetts
19         had too great an interest frankly in continuing
20         to place children with extreme special needs in
21         such schools -- in such highly specialized
22         schools.
23   Q.    Thank you, sir.  Did you believe that that
24         provision of the Massachusetts Constitution
25         violated in any way the Federal Constitution?
```

Garber Reporting
info@garberreporting.com

CHARLES GLENN

Page 65

```
1        A.    I expressed no opinion about that.
2        Q.    Do you have such an opinion?
3        A.    I really have not attempted to get my mind
4              around that.
5        Q.    So, you have no such opinion.  Is that correct?
6        A.    That's correct.
7        Q.    All right.  And do you have just a -- this will
8              be my final question, I believe, you have no
9              knowledge as to whether or not the -- whether
10             it's the South Carolina General Assembly, the
11             West Commission or the West Committee or any
12             other body that would have had a role to play in
13             the amendment of the provision in 1972?  You
14             have no knowledge about it's motivations;
15             correct?
16       A.    That's correct.
17       Q.    Okay.  Thank you, Doctor.  I have no further
18             questions.
19    MR. DUKES:  I just have a couple, as long as David
20             doesn't have any questions.
21    MR. LEGGETT:  None for me.
22    THE WITNESS:  I admire that bow tie, David.  That's
23             very damper.
24    MR. LEGGETT:  Thank you.
25 MR. GLENN - CROSS-EXAMINATION BY MR. DUKES:
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
1   Q.   Dr. Glenn, your expertise -- part of your
2        expertise is in, what we refer to as, Blaine
3        Amendments; right?
4   A.   Yes.
5   Q.   And Blaine Amendments are amendments to
6        originally the Federal Constitution but later
7        rejected on the Federal level in State
8        Constitutions that forbid public funding for
9        private and religious schools.  Is that correct?
10  A.   Yes.
11  Q.   And is it your opinion that Blaine -- Blaine
12       Amendments generally were adopted by the states
13       based on motivations of racial and religious
14       animus?
15  MR. TRAYWICK:  Object to the form of the question.
16  A.   Well, let me make a distinction.  I said a
17       minute ago that I don't have an opinion about
18       conflict with the U.S. Constitution.  Because,
19       in my view, it's up to the U.S. Supreme Court to
20       decide that.  But as a historian, I am convinced
21       that the motivation behind the adoption of those
22       provisions was overwhelmingly, across the
23       country, hostility toward the Catholic
24       population and concern about its education and
25       in a number of southern states with racial
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

Page 67

```
 1         elements in addition because of the significant

 2         role of faith-based schooling in providing

 3         literacy for formerly enslaved persons.  So, I'm

 4         clear about what I think motivations were.

 5         Whether that amounts to fundamental conflict

 6         with the U.S. Constitution is up to the Supreme

 7         Court to determine and not me.

 8   Q.    And it's your opinion that South Carolina, in

 9         adopting a Blaine Amendment, had the same

10         motivations as other states that adopted Blaine

11         Amendments; correct?

12   MR. TRAYWICK:  Object to the form of the question.

13   A.    Well, as I mentioned a few minutes ago, I think

14         the true provisions in the 1895 Constitutional

15         Amendment in South Carolina were intended to

16         work together to forbid faith-based schooling

17         being supported by any public funds in part as a

18         way to make it more difficult for 4,000,000

19         slave persons and their children to obtain the

20         literacy that would be required to vote.  So, I

21         think those -- my judgment, I'm not sure opinion

22         is the word I would use, my judgment as a

23         historian who has looked at the record is in

24         fact those two aspects of the 1895 Constitution

25         are related.
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

Page 68

```
1       Q.    And Mr. Traywick showed you the current Article
2             11 Section 4 of the South Carolina Constitution
3             that forbids state funding going to religious
4             and private schools; right?  Do you remember
5             looking at that on the screen?
6       A.    Yes, I do.
7       Q.    And is it your opinion that that is a
8             quintessential Blaine amendment?
9    MR. TRAYWICK:  Object to the form of the question.
10      A.    Yes, it is.  You're not asking me whether I
11            think it's unconstitutional.
12      Q.    No.  I'm just asking you if the language of that
13            provision --
14      A.    Right.
15      Q.    -- falls squarely within --
16      A.    Absolutely.
17      Q.    -- what is referred to as a Blaine Amendment.
18   MR. TRAYWICK:  Object to the form of the question.
19      A.    Absolutely.  And like the similar provisions in
20            a number of other states.
21      Q.    That's all I have for you, Dr. Glenn.  Thank you
22            very much.
23   MR. GLENN - RE-EXAMINATION BY MR. TRAYWICK:
24      Q.    Dr. Glenn, just a few follow-ups in reply.
25            Earlier you agreed with me that you were not
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
1          offering any opinions that post-dated 1956 in
2          this case; right?
3    A.    Right.  I'm not sure.
4    Q.    Is that correct?
5    A.    Well, if you're referring to my judgment about
6          the provision that you showed me on the screen,
7          that, of course, is post-1895 and post-1965.
8    Q.    Okay.  That's not anywhere in your expert
9          report, is it?
10   A.    No, not at all.  You asked me, and I made a
11         judgment about it.
12   Q.    Okay.  Well, actually, you wouldn't answer my
13         question, so I'm getting confused between
14         judgment versus opinion.  How do you distinguish
15         those words?
16   A.    Well, an opinion is what we feel based upon all
17         kinds of things.  A judgment is based upon solid
18         evidence.  I've looked at a lot of Blaine
19         Amendments and so I'm very familiar with what
20         form they take and therefore looking at that
21         particular provision that you showed me on the
22         screen, I can form a judgment which is not just
23         an opinion, that in fact, is similar to the
24         other Blaine Amendments.  I'm not -- I could
25         offer an opinion about its Constitutionality but
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

Page 70

```
 1        I'm not offering such an opinion, because I'm
 2        not qualified to do so.
 3   Q.   Okay.  And in your judgment then, does it apply
 4        to every single private school in South
 5        Carolina?
 6   MR. DUKES:  Object to the form.
 7   A.   It appears to do so.
 8   Q.   Okay.  In your judgment, does it mention race at
 9        all?
10   A.   No.
11   Q.   Okay.  But you don't have anywhere in your
12        report, any expert opinions, for this matter
13        about the Constitutional provision at issue in
14        this case, do you?
15   A.   I missed the word you said there, the
16        Constitutional provision --
17   Q.   At issue in this case.
18   A.   At issue.  I have some judgments about the
19        historical background for the adoption of the
20        1895 Constitutional provision.
21   Q.   Right.  1895; correct?
22   A.   That I have a judgment about.  I have no
23        judgment about the motivations behind the
24        adoption of the provision that you showed me on
25        the screen.  I made that clear.
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

```
1      Q.    Okay.  Well, I wanted to make that clear,
2            because I don't think that was clear upon cross.
3            So, you've got no opinions or judgments about
4            any of the work of the West Committee that
5            revised what you characterized as a Blaine
6            Amendment for the 1895 Constitution, do you?
7      A.    No.
8      Q.    Okay.  Thank you.  That's all the questions I
9            have.
10     MR. MATTHEWS:  Nothing more from me.
11     MR. DUKES:  I'm fine.  I'm good to go.
12     MADAM COURT REPORTER:  All right.  We're off the
13            record.
14     (There being no further questions, the deposition
15  concluded at 11:43 a.m.)
16
17
18
19
20
21
22
23
24
25
```

Exhibit A to Def. McMaster's Motion in Limine

CHARLES GLENN

Page 72

```
1              CERTIFICATE OF REPORTER

2       I, BARBARA S. HAM, COURT REPORTER AND NOTARY PUBLIC

3   IN AND FOR THE STATE OF SOUTH CAROLINA AT LARGE, HEREBY

4   CERTIFY THAT I REPORTED THE DEPOSITION OF CHARLES GLENN,

5   ON TUESDAY, THE 31ST DAY OF AUGUST, 2021, THAT THE WITNESS

6   WAS FIRST DULY SWORN BY ME AND THAT THE FOREGOING 71 PAGES

7   CONSTITUTE A TRUE AND CORRECT TRANSCRIPTION OF SAID

8   DEPOSITION.

9       I FURTHER CERTIFY THAT I AM NEITHER ATTORNEY NOR

10  COUNSEL FOR, NOR RELATED TO OR EMPLOYED BY ANY OF THE

11  PARTIES CONNECTED WITH THIS ACTION, NOR AM I FINANCIALLY

12  INTERESTED IN SAID CAUSE.

13      I FURTHER CERTIFY THAT THE ORIGINAL OF SAID

14  TRANSCRIPT WAS THEREAFTER SEALED BY ME AND DELIVERED TO

15  VORDMAN CARLISLE TRAYWICK, III, ESQUIRE, ROBINSON GRAY

16  STEPP & LAFFITTE, LLC, 1310 GADSDEN STREET, COLUMBIA,

17  SOUTH CAROLINA, WHO WILL RETAIN THIS SEALED ORIGINAL

18  TRANSCRIPT AND SHALL BE RESPONSIBLE FOR FILING SAME WITH

19  THE COURT PRIOR TO TRIAL OR ANY HEARING WHICH MIGHT RESULT

20  IN A FINAL ORDER ON ANY ISSUE.

21      IN WITNESS WHEREOF, I HAVE SET MY HAND AND SEAL THIS

22  10TH DAY OF SEPTEMBER, 2021.

23

24              BARBARA S. HAM, COURT REPORTER

25              MY COMMISSION EXPIRES APRIL 13, 2026
```

Garber Reporting
info@garberreporting.com

Exhibit A to Def. McMaster's Motion in Limine