**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| BISHOP OF CHARLESTON, a Corporation Sole, d/b/a The Roman Catholic Diocese of Charleston, and SOUTH CAROLINA INDEPENDENT COLLEGES AND UNIVERSITIES, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> MARCIA ADAMS, in her official capacity as the Executive Director of the South Carolina Department of Administration; BRIAN GAINES, in his official capacity as budget director for the South Carolina Department of Administration; and HENRY MCMASTER, in his official capacity as Governor of the State of South Carolina, <br><br> *Defendants*, <br><br> *and* <br><br> THE STATE OF SOUTH CAROLINA, <br><br> *Intervenor–Defendant*. | Civil Action No.: 2:21-cv-1093-BHH <br><br><br><br><br><br> **GOVERNOR MCMASTER'S CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

Henry McMaster, in his official capacity as Governor of the State of South Carolina ("Governor McMaster" or "Governor"), submits this Consolidated Cross-Motion for Summary Judgment and Response to Plaintiffs' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1]  For the reasons that follow, the Court should grant summary

---

[1] A supporting memorandum is not submitted because this filing contains a full explanation of the Governor's motion and response, and a separate memorandum would serve no useful purpose. *See* Local Civil Rule 7.04 (D.S.C.).

judgment in favor of Governor McMaster and deny Plaintiffs' Motion for Summary Judgment (ECF No. 73) as to those claims asserted against the Governor.

## INTRODUCTION

In July 2020, Governor McMaster announced that a portion of the Governor's Emergency Education Relief ("GEER") funds provided through the federal CARES Act would go toward the Safe Access to Flexible Education ("SAFE") Grants Program. This program would have provided need-based grants of up to $6,500 per student to cover the cost of tuition for eligible students to attend participating private or independent schools in South Carolina for the 2020–2021 academic year.

But on October 7, 2020, the South Carolina Supreme Court issued a declaratory judgment holding that "the Governor's allocation of $32 million in GEER funds to support the SAFE Grants Program constitutes the use of public funds for the direct benefit of private educational institutions within the meaning of, and prohibited by, Article XI, Section 4 of the South Carolina Constitution." *Adams v. McMaster*, 432 S.C. 225, 244, 851 S.E.2d 703, 713 (2020). The Court found "the issuance of an injunction unnecessary, as we are assured Governor McMaster, as a duly elected constitutional officer of this State, will adhere to this Court's decision" because "the Governor is a 'strong proponent of the rule of law.'" *Id.* Two months later, after the Governor filed a petition for rehearing, the Court reiterated its earlier holding. *Id.* at 230, 851 S.E.2d at 705.

More than four months later, on the eve of the federal deadline for Governor McMaster to allocate the first round of GEER funds ("GEER I"), Plaintiffs Bishop of Charleston, A Corporation Sole, d/b/a The Roman Catholic Diocese of Charleston, and the South Carolina Independent Colleges and Universities, Inc. filed suit to challenge article XI, section 4 of the South Carolina

Constitution. With respect to Governor McMaster, Plaintiffs seek damages and an injunction regarding GEER funds. However, Plaintiffs' claims against the Governor fail as a matter of law.

First, Plaintiffs' claims are at least partly barred by sovereign immunity. To the extent Plaintiffs seek an order requiring any award of funds, that effort is barred by sovereign immunity, for such allocations are in the Governor's sole discretion. And Plaintiffs' request for damages is squarely barred by sovereign immunity. Plaintiffs sued the Governor and other State officials only in their official capacities, and "state officials sued in their official capacity" are immune from "damages claims." *Fauconier v. Clarke*, 966 F.3d 265, 279 (4th Cir. 2020).

Second, Plaintiffs' challenge to Governor McMaster's allocation of the first round of GEER funds is moot. As all agree, the federal deadline for allocation of GEER I funds has now passed, and Governor McMaster has fully allocated those funds in accord with federal law.

Third, Plaintiffs lack standing to challenge Governor McMaster's discretionary allocation of any GEER funds. Plaintiffs cannot show a cognizable injury-in-fact, causation, or redressability as to those funds. Though the Governor obviously intended to allocate GEER I funds for the SAFE Grants Program, the South Carolina Supreme Court derailed those plans in declaring that they violated article XI, section 4 of the South Carolina Constitution. Nevertheless, Plaintiffs are not legally *entitled* to any GEER funds, and because funding allocations are committed the Governor's discretion, the Court could not order Governor McMaster to award—or not to award—the GEER funds to a particular entity or to use them in a particular manner. Courts in similar circumstances require a plaintiff to show more than speculation that it would receive a concrete benefit, but Plaintiffs here have pointed to nothing that moves their likelihood of redressability beyond pure speculation, particularly since the Governor has already allocated the relevant funds. This deficiency is especially glaring for the only funds left in play as to the Governor—the GEER II

funds—given that federal law prohibits those funds from being used for student-specific scholarships. Accordingly, Plaintiffs have not pled—much less proved (as is their burden at this stage)—that they would likely be awarded any GEER II monies if they prevail here.

Finally, while the Governor will defer to the Attorney General's defense of the challenged constitutional provision, Plaintiffs have not met their burden of proof on the merits. Courts are rightly reluctant to invalidate laws based not on what they say but on what those who drafted them thought. If Plaintiffs' limited assertions of proof—focusing on a handful of individuals' views on other issues predating the provision—were sufficient to invalidate a constitutional provision voted on and ratified by the people of an entire State, innumerable state and federal laws would be in imminent danger.

As explained earlier in this case, Governor McMaster agrees that Plaintiffs' schools perform a vital service for South Carolina students and families, and the Governor strongly advocated before the South Carolina Supreme Court in support of the SAFE Grants Program he proposed and in defense of the program's constitutionality. The Governor also strongly supports the core First Amendment right of individuals and organizations to exercise their religion and to be treated equally by the government. Plaintiffs' claims against the Governor, however, implicate a different core principle—that ours is "a government of laws, and not of men." *Marbury v. Madison*, 5 U.S. 137, 163 (1803). As much as the Governor may disagree with any decision of the South Carolina Supreme Court or its interpretation of provisions of the South Carolina Constitution—both of which remain true with respect to *Adams*—he has taken a solemn oath to follow and enforce the law. *See* S.C. Const. art. IV, § 15 ("The Governor shall take care that the laws be faithfully executed."). At bottom, the Governor cannot simply accept Plaintiffs' invitation to set aside that commitment and constitutional duty.

## STATEMENT OF THE CASE

For most of the past two years, the States faced unprecedented challenges as a result of the spread of the 2019 Novel Coronavirus ("COVID-19"). Congress has therefore passed several fiscal relief measures. First, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), and the President signed it into law. *See* Pub. L. No. 116–136, 134 Stat. 281 (Mar. 27, 2020). Later, Congress passed the Coronavirus Response and Relief Supplemental Appropriations ("CRRSA") Act of 2021. *See* Pub. L. 116–260, 134 Stat. 1182 (Dec. 27, 2020). Each of these acts established funds relevant here.

### A.    GEER Funds

First, the CARES Act established the GEER Fund to be administered by the U.S. Department of Education. *See* CARES Act §§ 18002–18008. These monies are usually called GEER I funds. Under the CARES Act, through GEER I, the Secretary of Education was authorized to award emergency education relief grants to governors with an approved application. *Id.* § 18002. A governor, however, was not required to apply for—or actually award—any of the grant funds. *Id.* Rather, Congress merely provided the Secretary of Education the authority and funding mechanism to make grants if a governor deemed them necessary in his or her State. *Id.*

Congress gave governors discretion to use GEER I monies to "provide emergency support through grants" to (1) "local educational agencies"[2] that were "impacted by coronavirus to support the ability of such local educational agencies to continue to provide educational services to their

---

[2] Federal law defines a "local education agency" or "LEA" as "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for a combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools." 20 U.S.C. § 1401(19); 34 C.F.R. § 302.23(a); 20 U.S.C. § 7801(30). This term also includes charter schools. 34 C.F.R. § 302.23(b).

students and to support the on-going functionality of the local educational agency"; (2) "institutions of higher education serving students within the State" "impacted by the coronavirus"; and (3) any "education related entity" a governor "deemed essential" to carry out educational services set forth in the GEER Fund, other federal law, or when the entity provided "the provision of child care and early childhood education" or "social and emotional support" or when such a grant would "protect[] education-related jobs." *Id.* § 18002(b)(1)–(3).

The CARES Act also imposed a use-it-or-lose-it deadline on States to access and utilize the GEER I funds. *See id.* § 18002(d). In so doing, Congress ensured these one-time emergency grants would be available for use for a limited time—requiring that they be obligated within one year of an approved application—or the funds would remain in the custody of, or be returned to, the federal government. *Id.* And the CARES Act, through GEER I, vested governors with wide discretionary authority to provide grants to all types of education-related institutions. *See* GEER Fund Guidance & FAQs A-5, p. 2, https://bit.ly/39WVMDX ("A Governor has wide discretion in determining the entities in the State that will receive GEER funds. A Governor can choose to fund only LEAs, only IHEs, only education-related entities, or any combination of eligible entities."); *see also* CARES Act § 18002(d) (providing for the return of funds if unused by a governor).

Governor McMaster applied for, and was approved to receive, a GEER I grant of $48,467,924 to distribute at his discretion for the benefit of South Carolina students. As noted, he initially sought to allocate around $32 million for the SAFE Grants Program, as well as $2.4 million for the State's public and independent historically black colleges and universities. *See* Press Release, Gov. Henry McMaster Invests $2.4 Million in Historically Black Colleges and Universities (July 9, 2020), https://bit.ly/3kIRYfC. But the South Carolina Supreme Court's decision in *Adams* prevented him from doing so. The Governor then allocated the balance of the

GEER I monies he received on behalf of the State before the May 11, 2021 federal deadline. *See, e.g.*, Press Release, Gov. McMaster Awards Over $12 million in GEER Funds to S.C. Department of Juvenile Justice (April 21, 2021), https://bit.ly/3EX6ete ("Today's announcement completes the awarding of original GEER Fund monies that totaled $48,467,924."); Governor's Office, Governor's Emergency Education Relief (GEER) Fund Expenses (Aug. 1, 2021), https://bit.ly/3E4oLmR; First Am. Compl. ("Compl.") ¶ 43, ECF No. 26.

When Congress later enacted the CRRSA, the Governor was awarded supplemental GEER funds totaling $21,089,129 ("GEER II").  This second round of GEER funds must be allocated by January 2022, and they are still being allocated.  *See* GEER Fund Expenses, *supra*, https://bit.ly/3E4oLmR.  The key difference between the first and second rounds of GEER funds is that Section 312(e)(1) of the CRRSA prevents the second round of funds from being used:

> (A) to provide direct or indirect financial assistance to scholarship granting organizations or related entities for elementary or secondary education; or
>
> (B) to provide or support vouchers, tuition tax credit programs, education savings accounts, scholarships, scholarship programs, or tuition-assistance programs for elementary or secondary education.

### B.    Act 154 Funds

In close proximity to the *Adams* decision, the South Carolina General Assembly passed legislation to coordinate and authorize, appropriate, or otherwise direct the expenditure of other CARES Act funds.  *See* 2020 S.C. Act No. 154.  Act 154 authorized "[s]tate agencies and higher education institutions" in several categories "to expend federal funds in the Coronavirus Relief Fund if the expenditure is in compliance with the CARES Act."  *Id.* § 3.  For instance, Act 154 authorized the Department of Administration to oversee the distribution of $25 million for a nonprofit relief program.  *Id.* § 3(E).  Act 154 also authorized the South Carolina Department of Administration to oversee the distribution of $115 million for state and local governments and

independent college and university expenditures. *Id.* § 3(G). The Act explained that "[i]ndependent colleges and universities that are member institutions of the South Carolina Independent Colleges and Universities nonprofit corporation are authorized to apply for reimbursement of expenditures that were necessary for the response to the COVID-19 public health emergency" during most of 2020. *Id.* § 10(A)(2).

After the South Carolina Supreme Court's decision in *Adams*, however, the Executive Director of the Department of Administration "refrain[ed] from disbursing money to independent colleges and universities under the Act without further judicial direction." ECF No. 6-5, at 2. Governor McMaster does not allocate Act 154 funds, and Plaintiffs here make no claim against him as to these funds. *See* Compl., Request for Relief ¶ 4; *cf. Doyle v. Hogan*, 1 F.4th 249, 257 (4th Cir. 2021) (noting that courts lack jurisdiction over a state defendant with "no control" over the relevant action).

### C.    Other Funds Not at Issue

The CRRSA also allocated a portion of funds for the Emergency Assistance to Non-Public Schools ("EANS") Program. After the requisite consultation with the South Carolina Department of Education regarding the EANS Program, the Governor promptly applied for these funds. *See* Press Release, U.S. Department of Education Awards South Carolina Nearly $40 Million for Emergency Education Funding (Feb. 19, 2021), https://bit.ly/39M8MvV. On February 10, 2021, the South Carolina Department of Education was awarded $39,981,327 in federal funds for the EANS Program. *Id.* Federal law directs that these funds are to be given "to non-public schools" "to address [specified] educational disruptions resulting from" the pandemic, such as "supplies to sanitize, disinfect, and clean school facilities" and "personal protective equipment." CRRSA § 312(d). The funds must be obligated within six months of the State's receipt. And South Carolina has recently been awarded additional EANS funds, which are subject to more statutory

constraints. None of these funds are at issue, though Plaintiffs' primary and secondary schools have been awarded substantial funds through the EANS Program.

### D.    Procedural History

On April 14, 2021, Plaintiffs filed a Complaint—and later an Amended Complaint—asking the Court to hold that article XI, section 4 of the South Carolina Constitution violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and the Free Exercise Clause of the First Amendment to the U.S. Constitution. *See* ECF Nos. 1 & 26. According to Plaintiffs, the State is barring "private schools and universities from participation in neutral grant programs" under a state constitutional provision that "is based on longstanding and pervasive religious and racial bigotry." Compl. ¶ 5.

As to Governor McMaster, Plaintiffs ask the Court to prevent him or the other State defendants "from using Article X, Sec. 4 of the South Carolina Constitution as a basis for denying Plaintiffs and other private and religious schools' access to the GEER funds." *Id.* Request for Relief ¶ 3. Plaintiffs do not seek relief against Governor McMaster regarding the Act 154 funds. *Id.* ¶ 4. Plaintiffs, however, ask the Court to award "nominal and compensatory damages," apparently against all Defendants. *Id.* ¶ 5.

On April 16, 2021, Plaintiffs filed a Motion for a Preliminary Injunction, *see* ECF No. 6, which this Court denied for lack of likelihood of success on the merits, *see* ECF No. 34. The Court stated that "Plaintiffs have only begun to scratch the surface of what will no doubt be a well-litigated challenge to the no-aid provision on the merits." *Id.* at 11. "For the time being," the Court found "there is no evidence that the no-aid provision, as applied in *Adams* and the disbursement decisions by the Governor and Department of Administration, disproportionately affected African-American students, HBCUs, or religious schools." *Id.*

Months later, the Orangeburg County School District and South Carolina State Conference of NAACP moved to intervene, and the Court denied that motion. *See* ECF No. 60. That denial has been appealed to the Fourth Circuit. *See* ECF No. 67. The Court granted the State of South Carolina's unopposed motion to intervene based on the Attorney General's invitation "into this case by the Governor" and "special standing under state and federal law to intervene when the constitutionality of a state statute is challenged." ECF No. 62.

Following discovery, Plaintiffs filed a Motion for Summary Judgment. ECF No. 73. Governor McMaster files this Consolidated Cross-Motion for Summary Judgment and Response to Plaintiffs' Motion for Summary Judgment.

## LEGAL STANDARD

"Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Seastrunk v. United States*, 25 F. Supp. 3d 812, 814 (D.S.C. 2014). "A material fact is one that might affect the outcome of the suit under the governing law," and a dispute is "genuine" "if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party." *Id.* (cleaned up).

## ARGUMENT

**I.    Plaintiffs' claims against the Governor are barred by sovereign immunity.**

Both the Eleventh Amendment and "the structure and background principles of the Constitution" bar "a citizen from suing his own state without consent." *S.C. State Ports Auth. v. Fed. Mar. Comm'n*, 243 F.3d 165, 168 (4th Cir. 2001), *aff'd*, 535 U.S. 743 (2002). "[S]overeign immunity applies" to claims for both injunctive relief and damages. *Id.* at 169. Though various exceptions apply to sovereign immunity, only one has any potential relevance here. Under *Ex parte Young*, "private suits against state officers" may be permissible "if the suit seeks only

injunctive or declaratory relief to remedy an ongoing violation of law." *Id.* at 170. But that exception does not apply to the extent that Plaintiffs seek an order compelling an award of funds, because Governor McMaster's allocation of GEER funds is purely discretionary. And no matter if any injunctive relief is possible here, sovereign immunity does not permit the damages claims asserted by Plaintiffs against these official-capacity defendants.

### A.    Any demand for an award of funds is barred by sovereign immunity.

Under *Ex parte Young*, private citizens may sue state officials in their official capacities in federal court to obtain prospective relief from *ongoing* violations of federal law. *See Franks v. Ross*, 313 F.3d 184, 197 (4th Cir. 2002). "This exception to Eleventh Amendment immunity 'is designed to preserve the constitutional structure established by the Supremacy Clause' and rests on the notion, often referred to as 'a fiction,' that a state officer who acts unconstitutionally is 'stripped of his official or representative character and [thus] subjected in his person to the consequences of his individual conduct.'" *Allen v. Cooper*, 895 F.3d 337, 354 (4th Cir. 2018), *aff'd*, 140 S. Ct. 994 (2020) (cleaned up). In other words, official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)).

But "[j]ust because a private citizen's federal suit seeks declaratory injunctive relief against State officials does not mean that it must automatically be allowed to proceed under an exception to the Eleventh Amendment protection." *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 293 (4th Cir. 2001) (cleaned up). "[T]he Supreme Court has strictly limited the application of the *Ex parte Young* doctrine to circumstances in which injunctive relief is necessary to give life to the Supremacy Clause." *Id.* at 292 (cleaned up). "Thus, a federal court cannot order a State official to remedy past violations of federal law by paying funds out of the State treasury, given that such

relief is in practical effect indistinguishable from an award of damages against the State." *Id.* at 293. Moreover, "[t]here is no doubt that the court cannot control the exercise of the discretion of an officer." *Ex parte Young*, 209 U.S. 123, 158 (1908). "It can only direct affirmative action where the officer having some duty to perform not involving discretion, but merely ministerial in its nature, refuses or neglects to take such action." *Id.*

What is more, when a plaintiff sues "to enjoin the enforcement of an act alleged to be unconstitutional," the *Ex parte Young* exception applies "only where a party defendant in [the] suit" "has 'some connection with the enforcement of the Act.'" *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 550 (4th Cir. 2014) (quoting *Ex parte Young*, 209 U.S. at 157). As the Fourth Circuit explained in *Hutto*, the "requirement that there be a relationship between the state officials sought to be enjoined and the enforcement of the state statute prevents parties from circumventing a State's Eleventh Amendment immunity." *Id.* Accordingly, "a governor cannot be enjoined by virtue of his general duty to enforce the laws." *Id.*

Thus, to the extent that Plaintiffs seek an order requiring any award of funds, that effort is barred by sovereign immunity because GEER fund allocations are in the Governor's discretion. Likewise, the Governor has taken no action to enforce article XI, section 4 of the South Carolina Constitution. Rather, the South Carolina Supreme Court prevented him from implementing a program under its interpretation of that state constitutional provision. The Governor continues to disagree with the court's decision in *Adams*, as well as its interpretation of the relevant provision of the South Carolina Constitution, but that does not change the fact that the Governor still has discretion to award the GEER II funds in a manner consistent with the relevant federal statutory provisions. Therefore, sovereign immunity bars any relief requested by Plaintiffs that would require an award of funds.

### B.     Plaintiffs cannot state damages claims against official capacity defendants.

Even if the *Ex parte Young* exception permits any injunctive relief here, States and "state officials sued in their official capacity" are immune from "damages claims." *Fauconier*, 966 F.3d at 279; *see also, e.g.*, *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 609 n.10 (2001); *Hutto*, 773 F.3d at 549.  "This is so because such suits against state officers generally represent only another way of pleading an action against an entity of which an officer is an agent."  *Adams v. Ferguson*, 884 F.3d 219, 225 (4th Cir. 2018) (cleaned up).  Here, "Governor Henry McMaster is sued solely in his official capacity as the Governor of South Carolina."  Compl. ¶ 14.  Thus, any claim against him for damages is barred.  And because the only other two defendants are likewise sued "solely" in their official capacities, *id.* ¶¶ 12–13, Plaintiffs' request for damages is barred by sovereign immunity.[3]

## II.     Plaintiffs' challenge to the discretionary allocation of GEER I funds is moot.

Plaintiffs' claim as to the GEER I funds is moot because those funds have already been fully allocated.  To ensure "that the Federal Judiciary confines itself to its constitutionally limited role of adjudicating actual and concrete disputes, the resolutions of which have direct consequences on the parties involved," "an actual controversy must be extant at all stages of review."  *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) (internal quotation marks omitted).  "If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot."  *Id.* at 72 (internal quotation marks omitted); *see also S.C. Coastal*

---

[3] Even if Plaintiffs *had* asserted personal capacity claims for damages, such claims would fail.  To get around qualified immunity, Plaintiffs would have to show that "existing precedent . . . placed the statutory or constitutional question beyond debate."  *Adams*, 884 F.3d at 226.  But they have agreed that the Supreme Court's prior holdings, specifically *Espinoza v. Montana*, "do not control this case."  ECF No. 24, at 4; *see* ECF No. 73-1, at 9 n.6.

*Conservation League v. U.S. Army Corps of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015) ("When a case or controversy ceases to exist, the litigation is moot, and the court's subject matter jurisdiction ceases to exist also.").

Here, as Plaintiffs acknowledge, the deadline to allocate GEER I funds passed months ago, and all such funds have already been fully allocated. *See* Compl. ¶ 43; Press Release (Apr. 21, 2021), *supra*. With no GEER I monies left, Plaintiffs' request for relief as to those funds is moot. Though Plaintiffs' Amended Complaint notes that not all GEER I monies have been "sent out" (Compl. ¶¶ 42–43), Plaintiffs do not identify any authority that would allow the Governor to reallocate these funds after the federal statutory deadline. Nor do Plaintiffs identify any statutory authority for the Governor to somehow "combin[e] GEER I and GEER II funding." Compl. ¶ 51. Indeed, the U.S. Department of Education has said that "GEER [I] funds must be tracked separately from GEER II and EANS funds." Fact Sheet, Governor's Emergency Education Relief Fund II, https://bit.ly/3EXLT71. Thus, Plaintiffs' commingling proposal would seemingly violate federal restrictions regarding the GEER Fund. Because the GEER I funds have been fully allocated, any challenge as to those funds is moot.

## III.    Plaintiffs lack standing to challenge the Governor's discretionary GEER funds decisions.

The Court lacks subject-matter jurisdiction for another reason: Plaintiffs also lack standing to challenge the purely discretionary allocation of all GEER funds, including the GEER I and GEER II monies. Plaintiffs have no legal right to receive these funds, so they cannot show a concrete and particularized injury-in-fact, much less causation and redressability. This Court could not order Governor McMaster to award—or not award—the GEER funds to a particular entity or to use them in a particular manner.

To carry their burden of proving standing, Plaintiffs must make three showings. First, they "must have suffered an 'injury in fact'—an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). Second, "there must be a causal connection between the injury and the conduct complained of" such that the injury cannot be traced to some "independent action" of the defendant. *Id.* (cleaned up). Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560–61 (cleaned up).

Here, all three elements face the same problem: the GEER funds are left to Governor McMaster's discretion. Thus, Plaintiffs have no particularized, legally protected interest because they have no right to these funds in the first place. Plaintiffs' own counsel ably explained this point in the *Adams* case, arguing that those who challenged the SAFE Grants Program lacked standing: "If you are not legally entitled to the funds, you are not injured if they are allocated elsewhere." Return Brief of the Palmetto Promise Institute 6, *Adams v. McMaster* (S.C. Sup. Ct. Aug. 31, 2020), https://bit.ly/3zO8leW.[4] Along the same lines, this Court observed that those entities who unsuccessfully sought to intervene "do not have a legal right to the discretionary GEER funds and Act 154 funds." ECF No. 60, at 7. Indeed, most organizations and agencies in the State will not receive GEER funds. And "[t]he injury in fact requirement precludes those with merely generalized grievances from bringing suit to vindicate an interest common to the entire public." *Meyer v. McMaster*, 394 F. Supp. 3d 550, 559 (D.S.C. 2019) (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156 (4th Cir. 2000)).

---

[4] The state court there found that the challengers had standing only under the state law "public importance exception" to normal standing requirements. *Adams*, 432 S.C. at 236, 851 S.E.2d at 708. No similar exception exists to Article III.

Nor could Plaintiffs' putative injury—a speculative denial of funds—be fairly traced to the purportedly unconstitutional provision, given the Governor's discretion. "A party does not satisfy the traceability requirement when they can only speculate about whether a party will pursue a certain action in a specific way." *Id.* at 561 (cleaned up). As shown next, Plaintiffs have offered no more than speculation about whether they might be awarded any GEER II funds even if they were to prevail on the merits.

Perhaps most seriously for Plaintiffs, a decision in their favor is not "likely" to redress their injury, for the funding decision remains in the Governor's sole discretion. Plaintiffs must show that they "personally would benefit in a tangible way from the court's intervention." *Id.* at 562 (cleaned up). Likewise, "[w]hen a declaratory judgment is involved for purposes of standing, litigants must identify some further concrete relief that will likely result from the declaratory judgment." *Id.* at 562–63. Importantly, where "the existence of one or more of the essential elements of standing depends on the unfettered choices" of actors "whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," standing does not exist. *Frank Krasner Enters., Ltd. v. Montgomery Cnty.*, 401 F.3d 230, 235 (4th Cir. 2005) (cleaned up). That principle governs this case.

At the preliminary injunction stage, Plaintiffs defended their standing to challenge GEER I funds on the ground that their suit asks the Court to take the provision's "handcuffs off the Governor so he may proceed with the allocations he already announced." ECF No. 24, at 12. Whatever force this argument had regarding GEER I funds—which are now gone, rendering any challenge to them moot—it is unavailing as to GEER II funds. As Plaintiffs recognize, by federal statute, the GEER II funds "cannot be used for student-specific scholarships." Compl. ¶ 48. This limitation, together with the lack of any announced effort that would otherwise benefit Plaintiffs,

makes the GEER II discretionary funding allocation "sufficiently uncertain to break [any] chain of causation between the plaintiffs' injury and the challenged Government action." *Allen v. Wright*, 468 U.S. 737, 759 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). That is because "unadorned speculation will not suffice to invoke the federal judicial power." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 44 (1976). And Plaintiffs have offered nothing more than speculation—no allegations, and certainly no summary judgment *evidence*—that Governor McMaster's discretionary GEER II funding decisions would otherwise benefit them in any way.[5]

"Courts have been loath to find standing when redress depends largely on policy decisions yet to be made by government officials." *US Ecology, Inc. v. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000). For instance, in denying standing to challenge a forest preservation plan, the Tenth Circuit explained that the plaintiff had not "shown that a timber lease would 'likely' become available" if the plaintiff prevailed, because "the federal agency has complete discretion as to whether to offer the opportunity sought by the plaintiff." *Wyo. Sawmills Inc. v. U.S. Forest Serv.*, 383 F.3d 1241, 1249 (10th Cir. 2004). This unbridled discretion, combined with the lack of evidence that the discretion would be exercised in plaintiff's favor, meant that the courts did "not have the power to grant the only relief that would rectify the alleged injury." *Id.* Other jurisdictions are in accord. *See, e.g.*, *Kaplan v. Cnty. of Sullivan*, 74 F.3d 398, 400 (2d Cir. 1996) (holding that the "possibility" that a county would adopt a different redistricting plan if the plaintiff prevailed was "too speculative to give [him] standing" where "no such plan has even been proposed"); *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1228 (9th Cir. 2008)

---

[5] The existence of the separate EANS Program providing relief for private schools only underscores the speculative nature of any suggestion that GEER II funds would otherwise be allocated to Plaintiffs.

("[D]iscretionary efforts by the agencies are too uncertain to establish redressibility."); *DH2, Inc. v. SEC*, 422 F.3d 591, 597 (7th Cir. 2005) ("[T]o a significant degree, the injury DH2 complains of hinges on the decisions of independent actors whose discretion—though subject to securities laws and regulation by the SEC—is nonetheless quite broad.").

The District of South Carolina has recognized this principle as well.  In *Meyer*, the plaintiff challenged a statute that, in his view, discouraged Tesla from opening a dealership in the State. The court found that the plaintiff lacked Article III standing for multiple reasons.  On redressability, the court said that the plaintiff's "implicit belief that Tesla would move to South Carolina if the statute is invalidated is 'merely speculative,' as opposed to being 'likely,' because there is no allegation within the Complaint that Tesla would take the step that [he] desires it to take." *Meyer*, 394 F. Supp. 3d at 563.  Likewise here, Plaintiffs have not pled—much less proved (as is their burden now)—that they would likely be allocated any GEER II monies if they prevail.

Absent proof that a court order forbidding Governor McMaster from considering the state constitutional provision is "likely" to redress their injury, Plaintiffs cannot establish Article III standing.  Governor McMaster is therefore entitled to judgment as a matter of law.

## IV.    Plaintiffs are not entitled to summary judgment on the merits.

At Governor McMaster's request, the Attorney General intervened in this action on behalf of the State of South Carolina to defend the challenged constitutional provision on the merits.  *See* S.C. Const. art. IV, § 15; S.C. Code Ann. § 1-7-40.  Accordingly, the Governor will defer to the Attorney General's arguments with respect to the remainder of Plaintiffs' claims.  However, because of the threat that Plaintiffs' loose theory of discriminatory intent would pose to many laws of this State and of the United States if adopted, Governor McMaster writes separately to emphasize the inconsistency between our representative form of government and Plaintiffs' broader theory of, and demand for, relief.

Asking a federal court "to void a statute that is" neutral "on its face, on the basis of what fewer than a handful of [legislators] said about it" is an extraordinary request. *Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (cleaned up). The "long standing" rule, after all, is that courts "'will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.'" *D.G. Rest. Corp. v. City of Myrtle Beach*, 953 F.2d 140, 146 (4th Cir. 1991) (quoting *United States v. O'Brien*, 391 U.S. 367, 383 (1968)). Even more extraordinary is to demand such relief based on whether a few legislators involved only with drafting the provision had unacceptable views on other issues.[6]  Sanctioning such a claim without solid proof of discriminatory intent as to the challenged provision would "represent[] a serious intrusion" on both the States and on other levels and branches of government. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (cleaned up). That is especially true in a case like this one, where the People voted on and approved the relevant constitutional provision, which *expanded* private-school funding as far as those who enacted the provision thought that the federal judiciary itself would permit. In these circumstances, the traditional presumption of good faith is all the more important. *See id.*

"Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Id.*  Neither this burden nor the presumption of good faith are "changed by a finding of past discrimination." *Id.*  "Past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself

---

[6] It is worth noting that Plaintiffs' newfound attack on only five selected members of the West Committee, ECF No. 73, at 23–26, is at odds with their own expert's testimony on the subject. During Dr. Blease Graham's deposition, defense counsel went through every member of the West Committee and asked if they were racists or religious bigots. *See* Ex. A, Graham Dep. Tr. at pp. 39–56. Dr. Graham, Plaintiffs' proffered expert in South Carolina history, identified far fewer than Plaintiffs' counsel. According to Dr. Graham, the West Committee was not driven by racial animus or religious bigotry in proposing revisions to the South Carolina Constitution. *Id.* at pp. 65:25–66:4; *see also id.* at p. 118:15–21 (same).

unlawful." *Id.* (cleaned up). "The ultimate question remains whether a discriminatory intent has been proved in a given case." *Id.* at 2324–25 (cleaned up). Here, given the 80-year passage of time and reworking of the entire State Constitution between 1895 and 1972, "there can be no doubt about what matters: It is the intent of" those who enacted and ratified the 1972 provision. *Id.* at 2325. In fact, Dr. Graham—Plaintiffs' expert—testified "that after the West Committee, the revised Constitution may be a new Constitution," not merely an amendment of the 1895 Constitution. Ex. A, Graham Dep. Tr. at p. 59:10–12. In other words, this is an entirely different constitution with no identified "straight line" between the two. ECF No. 34, at 10.

To satisfy their "burden of showing that racial discrimination was a substantial or motivating factor behind enactment of the law," Plaintiffs must present evidence regarding "(1) historical background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's legislative history; and (4) whether the law bears more heavily on one race than another." *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020) (cleaned up); *see Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021).

Yet nearly all of Plaintiffs' evidence focuses on generalized historical background years before 1972, mostly about individual legislators' views on segregation or other matters. But even putting aside the lack of any discriminatory statement about *this* provision, a handful of legislators did not make this provision law. *Cf. N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017) ("This is a good example of why floor statements by individual legislators rank among the least illuminating forms of legislative history."). The People did. And Plaintiffs provide no evidence that the People writ large intended this provision to have discriminatory effects.

Nor do Plaintiffs point to any departures from the usual legislative process or applicable procedure. If anything, this provision had more process than the norm, given its constitutional ratification. "At the very least," that the voters of South Carolina "constitutionally mandated" the provision "undermine[s] [Plaintiffs'] inappropriate linking of the" 1895 and 1972 provisions. *Raymond*, 981 F.3d at 306.

As for legislative history, Plaintiffs note that the West Committee stated that it was expanding private school funding "in conjunction with interpretations being given by the federal judiciary to the 'establishment of religion' clause in the federal constitution." ECF No. 73-1, at 31. Plaintiffs do not suggest that this concern was unreasonable. After all, in the preceding years, the U.S. Supreme Court had said that "the clause against establishment of religion by law was intended to erect a wall of separation between Church and State" that "must be kept high and impregnable." *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 16, 18 (1947). It had invalidated voluntary school-sponsored Bible reading, prayer, and even a released-time program for voluntary instruction. *See Abington Sch. Dist. v. Schempp*, 374 U.S. 203 (1963); *Engel v. Vitale*, 370 U.S. 421 (1962); *Ill. ex rel. McCollum v. Bd. of Educ.*, 333 U.S. 203, 209–10 (1948). Though Plaintiffs note that "some Justices were [themselves] influenced by residual anti-Catholicism," ECF No. 73-1, at 32, the relevant point here is that the 1972 provision's drafters could not be said to have acted with discriminatory intent if they were simply seeking to follow what the federal courts mandated. Plaintiffs' suggestion that the 1972 provision was "redundant" of these constitutional limitations (*id.* at 33) makes little sense, as the provision *expanded* funding available to private schools up to what the drafters considered to be the limit sanctioned by the federal judiciary. Trying to satisfy the federal judiciary is not discrimination.

Finally, as to discriminatory impact, Plaintiffs say almost nothing, merely noting that 34% of private schools were Catholic in 1969. *Id.* at 30. It is unclear that this figure standing alone supports Plaintiffs' claim of "a disproportionate impact," *id.*, but regardless, discriminatory intent "implies more than intent as volition or intent as awareness of consequences." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (cleaned up). And this Court already identified the lack of proven discriminatory impact as a problem with Plaintiffs' case. ECF No. 34, at 11. Indeed, Plaintiffs' failure of proof about discriminatory impact is especially problematic, as courts in this context have required plaintiffs to prove "both intentional discrimination against an identifiable" group "*and* an actual discriminatory effect on that group." *Davis v. Bandemer*, 478 U.S. 109, 127 (1986) (plurality opinion) (emphasis added), *abrogated on other grounds by Rucho v. Common Cause*, 139 S. Ct. 2484 (2019).

Invalidating a provision with no proven discriminatory impact would be a dubious application of equal protection. *See, e.g.*, *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 489 (1997) ("The important starting point for assessing discriminatory intent under *Arlington Heights* is" whether "the impact of the official action" "bears more heavily on one race than another." (cleaned up)). As Plaintiffs' own expert conceded, the provision disadvantages black and white low-income students alike. Ex. A, Graham Dep. Tr. at p. 117:14–16; *see also id.* at p. 77:22–24 (agreeing the provision applied to all races). Further, he agreed the provision applies equally to all private schools, irrespective of religious affiliation. *Id.* at p. 78:8–11.

Again, Plaintiffs bear the burden of proving discriminatory intent and impact as to the specific legal provision at issue. They have not met this burden. Their reliance on the general views and extraneous "comments of a few individual legislators" "go[es] against inferring 'good faith' on the part of the legislature"—or here, the People. *Raymond*, 981 F.3d at 307. In all events,

because "assessing a jurisdiction's motivation" "is an inherently complex endeavor," "summary judgment is rarely granted in a plaintiff's favor in cases where the issue is" discriminatory "motivation." *Hunt v. Cromartie*, 526 U.S. 541, 546, 553 & n.9 (1999).  Thus, even if the Court reaches the merits, Plaintiffs are not entitled to summary judgment.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Governor McMaster's Cross-Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment as to those claims asserted against the Governor.

Respectfully submitted,

s/Thomas A. Limehouse, Jr.

Thomas A. Limehouse, Jr. (Fed. Bar No. 12148)
*Chief Legal Counsel*
Wm. Grayson Lambert (Fed. Bar. No. 11761)
*Senior Legal Counsel*
OFFICE OF THE GOVERNOR
South Carolina State House
1100 Gervais Street
Columbia, South Carolina  29201
(803) 734-2100
Email: tlimehouse@governor.sc.gov
Email: glambert@governor.sc.gov

Christopher E. Mills (Fed. Bar No. 13432)
SPERO LAW LLC
557 East Bay Street #22251
Charleston, South Carolina  29413
(843) 606-0640
Email: cmills@spero.law

Vordman Carlisle Traywick, III
(Fed. Bar No. 12483)
ROBINSON GRAY STEPP & LAFFITTE, LLC
1310 Gadsden Street
Post Office Box 11449
Columbia, South Carolina  29211
(803) 231-7810
Email: ltraywick@robinsongray.com

*Counsel for Defendant Henry McMaster,*
*in his official capacity as Governor of the State of South Carolina*

September 29, 2021
Columbia, South Carolina