**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| **BISHOP OF CHARLESTON, a Corporation Sole, d/b/a The Roman Catholic Diocese of Charleston, and SOUTH CAROLINA INDEPENDENT COLLEGES AND UNIVERSITIES, INC.,** | |
| *Plaintiffs,* | |
| **v.** | |
| **MARCIA ADAMS, in her official capacity as the Executive Director of the South Carolina Department of Administration; BRIAN GAINES, in his official capacity as budget director for the South Carolina Department of Administration; and HENRY McMASTER, in his official capacity as Governor of the State of South Carolina,** | Case No. 2:21-cv-1093-BHH |
| *Defendants,* | |
| **and** | |
| **THE STATE OF SOUTH CAROLINA,** | |
| *Intervenor-Defendant.* | |

**BRIEF, IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT,
OF *AMICI CURIAE* AMERICANS UNITED FOR SEPARATION OF
CHURCH AND STATE, GLOBAL JUSTICE INSTITUTE, AND
NATIONAL COUNCIL OF JEWISH WOMEN**

Richard B. Katskee*
Alex J. Luchenitser*
Sarah R. Goetz*
Americans United for Separation of
  Church and State
  1310 L Street NW, Suite 200
  Washington, DC 20005
Tel: (202) 466-3234
Fax: (202) 466-3353
*katskee@au.org*
*luchenitser@au.org*
*goetz@au.org*

Aaron J. Kozloski (D.S.C. Bar No. 9510)
CAPITOL COUNSEL, LLC
  P.O. Box 1996
  Lexington, SC 29071-1996
Tel: (803) 465-1400
Fax: (888) 513-6021
*aaron@capitolcounsel.us*

*Counsel for* Amici Curiae

* Motions for admission *pro hac vice* to follow.

# TABLE OF CONTENTS

Page(s)

Table of Authorities ........................................................................................................ ii

Identity and Interests of *Amici Curiae* ............................................................................1

Introduction and Summary of Argument ..........................................................................1

Argument ...........................................................................................................................3

I.   National History Shows That It Is Improper To Assume, As Plaintiffs Ask This Court To Do, That All Nineteenth-Century No-Aid Clauses Were Motivated By Anti-Catholic Animus. ....................................................................................................3

    A.   The no-aid principle emanated from the founders. ........................................................4

    B.   State no-aid clauses enacted in the nineteenth century were not predominantly motivated by anti-Catholic prejudice or religious animus. .................8

        1.   Many state no-aid clauses predate the federal Blaine Amendment. ...................8

        2.   States had a variety of valid, secular motivations for enacting no-aid provisions. ...........................................................................................................11

        3.   Not even the federal Blaine Amendment itself was predominantly motivated by anti-Catholic animus. ....................................................................15

II.  South Carolina's 1895 No-Aid Clause Was Not Motivated By Anti-Catholic Animus. .......................................................................................................................15

    A.   South Carolina's no-aid clause was motivated by legitimate, secular purposes. ...........................................................................................................17

    B.   Plaintiffs fail to demonstrate that the 1895 no-aid provision was tied to anti-Catholic sentiment. ...........................................................................................21

III. Even if South Carolina's 1895 No-Aid Clause *Had* Been Motivated By Anti-Catholic Animus, The 1972 Amendment Would Have Erased Any Taint. ..........................26

Conclusion .......................................................................................................................31

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abbott v. Perez*,
138 S. Ct. 2305 (2018) ......................................................................................21, 28, 29

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) .....................................................................................................28

*Bush v. Holmes*,
886 So. 2d 340 (Fla. Dist. Ct. App. 2004) ................................................................14

*City of Mobile v. Bolden*,
446 U.S. 55 (1980) .......................................................................................................29

*Flast v. Cohen*,
392 U.S. 83 (1968) ......................................................................................................5, 6

*Lemon v. Kurtzman*,
403 U.S. 602 (1971) ....................................................................................................14

*Locke v. Davey*,
540 U.S. 712 (2004) .........................................................................................3, 4, 6, 14

*Sch. Dist. of Abington Twp. v. Schempp*,
374 U.S. 203 (1963) ....................................................................................................11

*United States v. O'Brien*,
391 U.S. 367 (1968) ...............................................................................................24, 30

*Univ. of Cumberlands v. Pennybacker*,
308 S.W.3d 668 (Ky. 2010) ........................................................................................14

*Wallace v. Jaffree*,
472 U.S. 38 (1985) .......................................................................................................11

**Constitutions**

Conn. Const. of 1818, art. VIII, § 2, https://bit.ly/3uKyQRO ......................................9

Del. Const. of 1792, art. I, § 1, https://bit.ly/2IU8tlz.....................................................7

Ky. Const. of 1792, art. XII, § 3, https://bit.ly/33zLqEM .............................................7

Mich. Const. of 1835, art. I, § 5, https://bit.ly/3DjhT44................................................9

Mo. Const. of 1865, art. IX, § 10 (1870) .....................................................................12

N.J. Const. of 1776, art. XVIII, https://bit.ly/2VIjN9G................................................7

**TABLE OF AUTHORITIES—continued**

**Page(s)**

Pa. Const. of 1776, art. II, https://bit.ly/2Bd5fW9....................................................7

S.C. Const. art. XI, § 4..............................................................................................16, 26

S.C. Const. of 1868, art. I .........................................................................................19

S.C. Const. of 1868, art. X ........................................................................................16, 18

S.C. Const. of 1895, art. XI, § 9 ...............................................................................16, 20

Tenn. Const. of 1796, art. XI, § 3, https://bit.ly/2qc1b6c .........................................7

Vt. Const. ch. I, art. 3, https://bit.ly/3lf0DGF .........................................................7

**Other Authorities**

William Oland Bourne, *History of the Public School
    Society of the City of New York* (1870)....................................................................13

James N.G. Cauthen, *Referenda, Initiatives, and State
    Constitutional No-Aid Clauses*, 76 Alb. L. Rev. 2141 (2013)...............................26

Circular from John Jay, National League President, and
    James M. King, National League General Secretary
    (May 21, 1890), https://bit.ly/3uF30pk...............................................................24, 25

Francis D. Cogliano, *No King, No Popery: Anti-Catholicism
    in Revolutionary New England* (1995) .....................................................................9

Thomas M. Cooley, *Michigan: A History of Governments* (1897) .............................9

Thomas M. Cooley, *A Treatise on the Constitutional Limitations
    Which Rest upon the Legislative Power of the States
    of the American Union* (1868), https://bit.ly/2OW1Djf...........................................7

*Debates and Proceedings of the Constitutional Convention
    of the State of Illinois* (1870) .................................................................................14

Carl H. Esbeck, *Dissent and Disestablishment: The Church-State
    Settlement in the Early American Republic*,
    2004 BYU L. Rev. 1385 (2004)...............................................................................6

Carl H. Esbeck, *Protestant Dissent and the Virginia Disestablishment,
    1776–1786*, 7 Geo. J.L. & Pub. Pol'y 51 (2009) .....................................................4

## TABLE OF AUTHORITIES—continued

**Page(s)**

Noah Feldman, *The Intellectual Origins of the
   Establishment Clause*, 77 N.Y.U. L. Rev. 346 (2002)............................................................6

*Final Report of the Committee to Make a Study of the
   S.C. Const. of 1895* (1969), bit.ly/ 3BevdG4 ................................................26, 27

Jill Goldenziel, *Blaine's Name in Vain: State Constitutions,
   School Choice, and Charitable Choice*,
   83 Denver U. L. Rev. 57 (2005) .......................................................8, 9, 10, 15

Cole Blease Graham, Jr., *The South Carolina State
   Constitution: A Reference Guide* (2007).............................................................21

Steven K. Green, *Blaming Blaine: Understanding the
   Blaine Amendment and the No-Funding Principle*,
   2 First. Amend. L. Rev. 107 (2003).............................................9, 10, 11, 12, 15

Steven K. Green, *The Insignificance of the Blaine Amendment*,
   2008 BYU L. Rev. 295 (2008)........................................................ *passim*

Patrick Henry, *A Bill Establishing A Provision for Teachers
   of the Christian Religion* (1784), *reprinted in Everson v.
   Bd. of Educ.*, 330 U.S. 1 (1947) (appendix to dissent of Rutledge, J.) .....................................4

Donald W. Hensel, *Religion and the Writing of the
   Colorado Constitution*, 30 Church Hist. 349 (1961) ............................................11

J. Michael Hoey, *Missouri Education at the Crossroads:
   The Phelan Miscalculation & the Education Amendment of 1870*,
   95 Mo. Hist. Rev. 372 (2001) ...........................................................12

Thomas Jefferson, *The Virginia Statute for Religious Freedom* (1786),
   *reprinted in Founding the Republic: A Documentary History*
   (John J. Patrick ed., 1995)...........................................................4, 5

*Journal of the Constitutional Convention of the
   State of South Carolina* (1895), https://bit.ly/2XZY2r6 .............................................21, 24, 25

Letter from Benjamin Franklin to Richard Price (Oct. 9, 1780),
   http://bit.ly/2jMsrVO ...........................................................5

## TABLE OF AUTHORITIES—continued

**Page(s)**

Letter from N.H.R. Dawson, Comm'r of Educ., U.S. Bureau of Educ.,
    to Sec'y of the Interior, Dep't of the Interior (June 12, 1888),
    *reprinted in* Colyer Meriwether, History of Higher Education in
    South Carolina (Bureau of Education Circular of Information No. 3
    (Herbert B. Adams ed., 1888))........................................................................17, 25

John Leland, *Van Tromp Lowering His Peak with a Broadside* (1806).........................................6

John Locke, *A Letter Concerning Toleration*
    (James H. Tully ed., Hackett Publ'g Co. 1983) (1689) ...........................................6

John Locke, *Second Treatise of Government*
    (C.B. Macpherson ed., Hackett Publ'g Co. 1980) (1690).......................................6

James Madison, *Memorial and Remonstrance Against Religious
    Assessments* (1785), *reprinted in Everson v. Bd. of Educ.*,
    330 U.S. 1 (1947) (appendix to dissent of Rutledge, J.).....................................4, 5

Colyer Meriwether, History of Higher Education in South Carolina
    (Bureau of Education Circular of Information No. 3
    (Herbert B. Adams ed., 1888)........................................................................17, 20

Randall M. Miller, *Catholics*, South Carolina Encyclopedia
    (2016), https://bit.ly/3yZVGFu..................................................................22, 23

*Not Modeled After A.P.A.: National League to Protect American Interests*,
    N.Y. Times (June 2, 1894), https://nyti.ms/3F3LQXt .........................................24

Dale A. Oesterle & Richard B. Collins, *The Colorado State Constitution:
    A Reference Guide* (2011).........................................................................11, 12

Opinion of the South Carolina Attorney General,
    1974 WL 27574 (Jan. 4, 1974), https://bit.ly/3AhKVPq.....................................28

*The Oregon Constitution and Proceedings and Debates of the
    Constitutional Convention of 1857* (Charles Henry Carey ed., 1926)....................13

*Proceedings of the Constitutional Convention Held in Denver,
    December 20, 1875 to Frame a Constitution for the
    State of Colorado* (1907), https://bit.ly/39OnNgO ..............................................11

*Proceedings of the Constitutional Convention of
    South Carolina* (1868), https://bit.ly/3FgkjCn..............................................18, 19

## TABLE OF AUTHORITIES—continued

**Page(s)**

Tom I. Romero, II, *"Of Greater Value Than the Gold of
Our Mountains": The Right to Education in Colorado's
Nineteenth Century Constitution*, 83 U. Colo. L. Rev. 781 (2012) ........................................14

Dennis C. Rousey, *Catholics in the Old South: Their Population,
Institutional Development, and Relations with Protestants*,
24 U.S. Catholic Historian 1 (2006) .................................................................................22, 23

*Sectarian,* Oxford English Dictionary (2d ed. 1989) ....................................................................12

Francis Newton Thorpe, *The Federal and State Constitutions,
Colonial Charters and Other Organic Laws of the States* (1909) ..........................................10

James Lowell Underwood, *The Constitution of South Carolina,
Volume III: Church and State, Morality and Free Expression* (1992) ........................... *passim*

James L. Underwood, *The Dawn of Religious Freedom in
South Carolina: The Journey from Limited Tolerance to
Constitutional Right*, 54 S.C. L. Rev. 111 (2002)..................................................16, 23, 25, 26

Robert F. Utter & Hugh D. Spitzer, *The Washington State Constitution:
A Reference Guide* (2002)..................................................................................................10, 11

*Work of the American League*, Sacramento Daily Record-Union
(Sept. 22, 1892), https://bit.ly/2YkgY3O..................................................................................25

## IDENTITY AND INTERESTS OF *AMICI CURIAE*

*Amici* are religious and civil-rights organizations that share a commitment to religious freedom and the separation of religion and government. *Amici* believe that religious freedom flourishes best when religion is funded privately and that governmental funding of religious activities does a disservice both to government and to religion. *Amici* therefore oppose Plaintiffs' efforts to overturn a state constitutional provision that bars all direct funding of private education so that they can force South Carolina to fund religious education.

The amici are:

- Americans United for Separation of Church and State.

- Global Justice Institute.

- National Council of Jewish Women.

## INTRODUCTION AND SUMMARY OF ARGUMENT

South Carolina's constitution forbids direct aid from the state to support private schools, whether those schools are Christian, Jewish, Muslim, secular, or other. Dating back to the state's 1868 constitution, this no-aid principle reflects South Carolina's commitments to safeguarding its public-school system, respecting the separation of religion and government, and protecting the public fisc. Yet Plaintiffs contend that the no-aid provision as it exists today must be invalidated because it allegedly is irredeemably tainted with anti-Catholic prejudice stemming from the constitutional convention of 1895, when the provision was readopted. Plaintiffs' arguments concerning national history in general and South Carolina's history in particular are neither factually accurate nor legally relevant.

First, the national history surrounding states' adoption of no-aid clauses—state constitutional or legislative provisions that expressly prohibit the funding of religious

education—shows the fallacy of attempting to tar all the clauses adopted in the nineteenth century with anti-Catholic bigotry. For many states' no-aid clauses predated the waves of Catholic immigration to the United States, any accompanying anti-Catholic sentiment, and the federal Blaine Amendment itself. In fact, the evidence shows that states had legitimate secular reasons, stemming from the views of the founders of the nation, for adopting the provisions. Thus, even if it were appropriate to rely on national historical trends to evaluate whether South Carolina's no-aid provision was motivated by religious animus, as Plaintiffs urge this Court to do, the evidence does not support Plaintiffs' position.

Second, the particular history of South Carolina's no-aid provision demonstrates that the 1895 clause was not motivated by anti-Catholic animus. For one thing, Plaintiffs altogether ignore the fact that South Carolina already had a no-aid clause at that time. Adopted in South Carolina's 1868 constitution, the clause predated the federal Blaine Amendment and the events that Plaintiffs contend show anti-Catholic animus in South Carolina later in the nineteenth century. Moreover, the available evidence suggests that, like many other states, South Carolina adopted its no-aid clauses to safeguard funding for its burgeoning public-education system. And Plaintiffs fail to identify any direct evidence that anti-Catholic animus motivated the no-aid provisions.

Finally, even if the 1895 no-aid clause had been motivated by some form of antireligious animus, which it wasn't, any taint was removed when the clause was substantially revised in 1972. Far from evincing religious animus, the 1972 revisions actually *benefitted* religious education by ensuring that it would be treated exactly the same as nonreligious private education, and by removing the 1895 clause's prohibition against indirect aid.

Plaintiffs' motion for summary judgment should be denied, and Defendants' motions for summary judgment should be granted.

## ARGUMENT

**I.    NATIONAL HISTORY SHOWS THAT IT IS IMPROPER TO ASSUME, AS PLAINTIFFS ASK THIS COURT TO DO, THAT ALL NINETEENTH-CENTURY NO-AID CLAUSES WERE MOTIVATED BY ANTI-CATHOLIC ANIMUS.**

Plaintiffs draw on the national history of the supposedly anti-Catholic proposed federal Blaine Amendment (which would have barred public-school funds from being controlled by any religious denomination), and the supposedly anti-Catholic state no-aid clauses adopted in the Blaine Amendment's wake, to argue that South Carolina's no-aid clause reflects anti-Catholic animus. For the reasons explained in more detail below, Plaintiffs' attempts to rely on national historical trends to explain the motivations behind South Carolina's no-aid clause are unavailing. But even if there were a greater connection, Plaintiffs present an incomplete and inaccurate picture of the national history concerning no-aid clauses. For one, the no-aid principle that states enshrined as a constitutional requirement has deep roots in the thinking of the founders of our nation. And in many states, including South Carolina, the evidence shows that legitimate, secular reasons—not anti-Catholic religious animus—motivated the adoption of no-aid provisions in the states' constitutions. Moreover, there isn't even historical consensus that the federal Blaine Amendment itself was predominantly motivated by anti-Catholic animus. This Court should therefore reject Plaintiffs' monolithic rendering of a nonexistent national history of no-aid clauses and rebuff Plaintiffs' attempts to color South Carolina's own no-aid clause with that inaccurate history. *Cf., e.g.*, *Locke v. Davey*, 540 U.S. 712, 723 n.7 (2004) (rejecting the plaintiff's argument that a Washington state no-aid provision was linked to the supposed anti-Catholicism of the federal Blaine Amendment where the plaintiff had failed to "establish[] a

credible connection" between the two, and thus concluding that "the Blaine Amendment's history is simply not before us").

### A.    The no-aid principle emanated from the founders.

State no-aid clauses have their deepest origins in the thinking of our nation's founders, who believed that preventing government funding of religious education was vitally important both to protect individuals' freedom of conscience against coerced support for a religion different from one's own and to shield religion and religious institutions from the deleterious effects of governmental support and interference.

For example, in response to a proposal in 1784 that Virginia use property taxes to fund religious education by paying "learned teachers" of "Christian knowledge" "to correct the morals of men, restrain their vices, and preserve the peace of society" (*see* Patrick Henry, *A Bill Establishing A Provision for Teachers of the Christian Religion* (1784), *reprinted in Everson v. Bd. of Educ.*, 330 U.S. 1, 72–74 (1947) (appendix to dissent of Rutledge, J.)), James Madison objected that the bill would infringe "the equal right of every citizen to the free exercise of his Religion according to the dictates of conscience" (*see* James Madison, *Memorial and Remonstrance Against Religious Assessments* ¶ 15 (1785), *reprinted in Everson*, 330 U.S. at 63–72 (appendix to dissent of Rutledge, J.)). Madison successfully advocated for the passage instead of a Virginia bill previously drafted by Thomas Jefferson, another leading opponent of coerced funding of religion, that provided that "no man shall be compelled to frequent or support any religious worship, place or ministry whatsoever." Thomas Jefferson, *The Virginia Statute for Religious Freedom* (1786), *reprinted in Founding the Republic: A Documentary History* 95 (John J. Patrick ed., 1995); *see also* Carl H. Esbeck, *Protestant Dissent and the Virginia Disestablishment, 1776–1786*, 7 Geo. J.L. & Pub. Pol'y 51, 88 (2009). Jefferson explained that public funding of religious activities, including religious education, violates the freedom of

conscience of taxpayers, for "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical." Jefferson, *Virginia Statute for Religious Freedom*, *supra*. And "even the forcing [of a taxpayer] to support this or that teacher of his own religious persuasion, is depriving him of the comfortable liberty of giving his contributions to the particular pastor, whose morals he would make his pattern." *Id.*

The founders' opposition to tax support for religious instruction was also rooted in a deep concern about protecting religion and religious institutions from the pernicious effects of governmental support for, and involvement in, the affairs of religious groups. Madison warned that governmental aid would "weaken in those who profess this Religion a pious confidence in its innate excellence" and "foster in those who still reject it, a suspicion that its friends are too conscious of its fallacies, to trust it to its own merits." Madison, *Memorial and Remonstrance*, *supra*, ¶ 6. Jefferson agreed, noting that public funding "tends only to corrupt the principles of that religion it is meant to encourage, by bribing with a monopoly of worldly honours and emoluments, those who will externally profess and conform to it." Jefferson, *Virginia Statute for Religious Freedom*, *supra*. Likewise, Benjamin Franklin counseled: "When a Religion is good, I conceive that it will support itself; and when it cannot support itself, . . . so that its Professors are oblig'd to call for the help of the Civil Power, 'tis a Sign, I apprehend, of its being a bad one." Letter from Benjamin Franklin to Richard Price (Oct. 9, 1780), http://bit.ly/2jMsrVO.

The founders thus viewed governmental aid for the support of religious activity—and especially religious instruction and education—as something that should not be tolerated, much less required. *See Flast v. Cohen*, 392 U.S. 83, 103–04 (1968) ("The concern of Madison and his supporters was quite clearly that religious liberty ultimately would be the victim if government

5

could employ its taxing and spending powers to aid one religion over another or to aid religion in general.").[1]

Similar concerns about religious assessments and disestablishment animated debates in the states. For example, John Leland, a Baptist minister and leading critic of religious establishments in the colonies, wrote that "[s]ecular force, in religious concerns, to make christianity appear honorable, is like lacker upon gold or paint upon a diamond. The religion of Jesus disdains such aid." Carl H. Esbeck, *Dissent and Disestablishment: The Church-State Settlement in the Early American Republic*, 2004 BYU L. Rev. 1385, 1511 n.441 (2004) (quoting John Leland, *Van Tromp Lowering His Peak with a Broadside* 30 (1806)).

To further these expansive antiestablishment interests, a number of states enacted constitutional clauses in the late eighteenth century that broadly barred the use of tax dollars to support religion. *See Locke*, 540 U.S. at 723. "The plain text of these constitutional provisions prohibited *any* tax dollars from supporting the clergy" or "the ministry." *Id.* As explained in a

---

[1] In fact, the founders' thinking had deep roots in theology and political philosophy surrounding faith and freedom of conscience that long predated the founding of our republic. The notion of freedom of conscience as a moral virtue traces back to the thirteenth-century teachings of Thomas Aquinas, who wrote that conscience must be a moral guide and that acting against one's conscience constitutes sin. *See* Noah Feldman, *The Intellectual Origins of the Establishment Clause*, 77 N.Y.U. L. Rev. 346, 356–57 (2002). Martin Luther built on this idea, teaching that the Church lacks authority to bind believers' consciences on spiritual questions. *Id.* at 358–359. John Calvin preached that individual conscience absolutely deprives civil government of authority to dictate in matters of faith. *See id.* at 359–61. And John Locke incorporated this theology into his argument for religious toleration, reasoning that "civil government" should not "interfere with matters of religion except to the extent necessary to preserve civil interests." *Id.* at 368; *see also* John Locke, *A Letter Concerning Toleration* 38 (James H. Tully ed., Hackett Publ'g Co. 1983) (1689) (writing that "[i]n vain . . . do Princes compel their Subjects to come into their Church-communion"); John Locke, *Second Treatise of Government* §§ 209-210 (C.B. Macpherson ed., Hackett Publ'g Co. 1980) (1690) (observing that if the people are "persuaded in their consciences" that the civil authorities threaten their religion, or "if they see several experiments made of arbitrary power, and that religion underhand favoured . . . which is readiest to introduce it," they will seek to "save [themselves]" by rebelling against this "illegal force").

leading early treatise, among "[t]hose things which [were] not lawful under any of the American constitutions" was "[c]ompulsory support, by taxation or otherwise, of religious instruction." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 469 (1868), https://bit.ly/2OW1Djf.

Pennsylvania's 1776 constitution, for example, provided that "no man ought or of right can be compelled to . . . support any place of worship, or maintain any ministry, contrary to, or against, his own free will and consent." Pa. Const. of 1776, art. II, https://bit.ly/2Bd5fW9. New Jersey's 1776 constitution stated, "nor shall any Person within this Colony ever be obliged to pay Tithes, Taxes, or any other Rates, for the Purpose of building or repairing any Church or Churches, Place or Places of Worship, or for the Maintenance of any Minister or Ministry, contrary to what he believes to be right, or has deliberately or voluntarily engaged himself to perform." N.J. Const. of 1776, art. XVIII, https://bit.ly/2VIjN9G. Delaware's 1792 constitution read, "no man shall or ought to be compelled to . . . contribute to the erection or support of any place of worship, or to the maintenance of any ministry, against his own free will and consent." Del. Const. of 1792, art. I, § 1, https://bit.ly/2IU8tlz. And in 1793 Vermont ratified a constitutional clause providing that "no man ought to, or of right can be compelled to . . . erect or support any place of worship, or maintain any minister, contrary to the dictates of his conscience." Vt. Const. ch. I, art. 3, https://bit.ly/3lf0DGF; *accord, e.g.*, Ky. Const. of 1792, art. XII, § 3, https://bit.ly/33zLqEM ("no man can of right be compelled to attend, erect, or support any place of worship, or to maintain any ministry against his consent"); Tenn. Const. of 1796, art. XI, § 3, https://bit.ly/2qc1b6c (identical to Kentucky's clause).

**B.    State no-aid clauses enacted in the nineteenth century were not predominantly motivated by anti-Catholic prejudice or religious animus.**

*Amici* do not deny that anti-Catholic sentiment was present in the United States in the mid-to-late nineteenth century, or that it, like all religious prejudice, was shameful. But that does not show that the no-aid clauses enacted in the nineteenth century were products of it, and Plaintiffs provide scant evidence of any such linkage anywhere, much less in South Carolina. Contemporaneous historical records delineating the reasons for states' adoptions of no-aid clauses are hard to come by. *See, e.g.*, Jill Goldenziel, *Blaine's Name in Vain: State Constitutions, School Choice, and Charitable Choice*, 83 Denver U. L. Rev. 57, 62 (2005) ("Only scant historical records and incomplete constitutional convention journals document the enactment of these amendments in the states."). But what records do exist "reveal little evidence of bigotry," and many state no-aid clauses that are pejoratively characterized as "Blaine Amendments" "cannot justifiably be associated with James G. Blaine and Reconstruction-era anti-Catholic bigotry." *Id.* at 62, 66. Indeed, many no-aid clauses long predate the waves of Catholic immigration to the United States and the introduction of the federal Blaine Amendment. Many more were patterned on no-aid provisions of other states that predated those events. And historical evidence suggests that even those no-aid clauses that were adopted in the latter half of the nineteenth century were generally motivated by legitimate reasons and cannot be dismissed as categorically anti-Catholic. *See, e.g.*, *id.* at 66 ("A variety of circumstances spanning the nineteenth and twentieth centuries surrounded the adoption of state constitutional provisions restricting public funding of religious institutions.").

1.    *Many state no-aid clauses predate the federal Blaine Amendment.*

A good number of state no-aid provisions preceded Senator Blaine's proposal and, indeed, the waves of Catholic immigration to the United States in the mid-nineteenth century—

8

some, substantially so. *See, e.g.*, *id.*; Steven K. Green, *The Insignificance of the Blaine Amendment*, 2008 BYU L. Rev. 295, 327–28 (2008). These provisions obviously could not have been motivated by either a failed federal proposal or reactions to demographic shifts that they predated.

In 1818, for example, and more than fifty years before Senator Blaine introduced the federal Blaine Amendment, Connecticut approved a constitutional provision that prohibited the diversion of school funds "to any other use than the encouragement and support of public or common schools." *See* Conn. Const. of 1818, art. VIII, § 2, https://bit.ly/3uKyQRO. At that time, anti-Catholic politics had no traction in New England. *See* Francis D. Cogliano, *No King, No Popery: Anti-Catholicism in Revolutionary New England* 155 (1995) (concluding that after the American Revolution, anti-papal sentiment "would never again be at the center of New England culture"). Indeed, as explained below, the timing of the Connecticut provisions, and others like it, dovetailed not with the fallout from the federal Blaine Amendment or an influx of Catholic immigrants (or the development of Catholic school systems), but rather with the advent of public education in America.

Michigan likewise adopted a no-aid clause in its 1835 constitution, before any wave of Catholic immigration and before there was a substantial number of Catholic schools in the state. *See* Steven K. Green, *Blaming Blaine: Understanding the Blaine Amendment and the No-Funding Principle*, 2 First. Amend. L. Rev. 107, 126 (2003); Mich. Const. of 1835, art. I, § 5, https://bit.ly/3DjhT44. In fact, Catholic clergy were active in the push to establish a public-school system in Michigan, and that is what the constitutional provision protected and advanced. Green, *Blaming Blaine*, *supra*, at 126 n.77 (citing Thomas M. Cooley, *Michigan: A History of Governments* 306–29 (1897)).

9

Similar provisions were passed in other states where there was minimal Catholic immigration or before anti-Catholicism became an issue in politics or culture. No-aid clauses were enacted in Wisconsin in 1848, Indiana in 1851, Ohio in 1851, Minnesota in 1857, and Oregon in 1857—again, without contemporaneous conflicts over the funding of religious schools. *Id.* at 127; Green, *The Insignificance of the Blaine Amendment*, *supra*, at 313–14 (citing Francis Newton Thorpe, *The Federal and State Constitutions, Colonial Charters and Other Organic Laws of the States* (1909)). Wisconsin, for example, adopted its no-aid clause before there was any system of parochial schools in the state. Green, *Blaming Blaine*, *supra*, at 127 & n.80. Indiana did so despite Catholics' comprising less than six percent of the total state population. *Id.* at 127 & n.84. And when Ohio adopted its no-aid clause, relations among public-school officials and Catholic-school officials in Cincinnati, home to the state's largest immigrant population, were "amicable." Green, *The Insignificance of the Blaine Amendment*, *supra*, at 314.

Moreover, because states frequently relied on the language in other states' constitutions to craft their own (*see* Goldenziel, *supra*, at 67 (explaining that a state often "borrowed from the constitution of [the state] admitted to the Union just before it, in hopes of expediting its own admission")), many no-aid clauses were drawn from earlier provisions elsewhere. *See id.* (noting that Wisconsin's provisions may have been drawn from Massachusetts's and Pennsylvania's and that its "constitutional convention record, though incomplete, supports the idea that it borrowed heavily from elsewhere"); Green, *Blaming Blaine*, *supra*, at 127 (noting that Michigan's constitution served as the model for the constitutions of Wisconsin, Indiana, and Minnesota); Green, *The Insignificance of the Blaine Amendment*, *supra*, at 314 (Indiana's 1851 constitution was the model for Oregon's 1857 constitution, and Ohio's 1851 no-aid clause was the model for Kansas's similar clause, adopted in 1858); Robert F. Utter & Hugh D. Spitzer, *The Washington*

*State Constitution: A Reference Guide* 9 (2002) (Oregon's 1857 constitution was the model for many provisions in Washington's 1899 constitution); Dale A. Oesterle & Richard B. Collins, *The Colorado State Constitution: A Reference Guide* 222 n.987 (2011) (explaining that the Colorado no-aid clause of 1876 was modeled on one in the Illinois constitution of 1870).

2. *States had a variety of valid, secular motivations for enacting no-aid provisions.*

Historical evidence shows that states enacted no-aid clauses to safeguard their emerging and vulnerable public-school systems. The development of public education (i.e., "common schools") began to take root in the early nineteenth century. *See, e.g.*, Green, *Blaming Blaine*, *supra*, at 116; *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 238 n.7 (1963) (Brennan, J., concurring); *cf. Wallace v. Jaffree*, 472 U.S. 38, 80 (1985) (O'Connor, J., concurring) ("[F]ree public education was virtually nonexistent in the late 18th century."). Proponents of public education feared that their public-school systems would be starved of resources if funding were extended to or divided with private schools, and so they enacted no-aid clauses to ensure that school funds were not diverted from the public fisc. *See* Green, *The Insignificance of the Blaine Amendment*, *supra*, at 317 (observing that concern about "the financial security of a nascent public education system," and a desire to standardize education, were common reasons for opposing funding of religious schools).

Hence, for example, one delegate to Colorado's constitutional convention asserted that the no-funding provision "was basic to maintaining a system of popular education." Donald W. Hensel, *Religion and the Writing of the Colorado Constitution*, 30 Church Hist. 349, 355 (1961). Convention petitions expressed similar sentiments. *See, e.g.*, *Proceedings of the Constitutional Convention Held in Denver, December 20, 1875 to Frame a Constitution for the State of Colorado* 113 (1907), https://bit.ly/39OnNgO ("We believe that . . . funds raised for [the support

11

of public schools] should not be diverted to other uses . . . ."); *id.* at 277 (stressing the importance of "mak[ing] ample provision for the support of free common schools . . . [and] guard[ing] well the public school land . . . against hasty sales [so] that greater results may be obtained for the school fund"). Likewise, in Missouri, concern that diversion of money to parochial schools would "destroy the public schools" led public-education advocates to propose a "constitutional amendment to ensure the public school funds remained solely for public education"—i.e., a no-aid clause that would prohibit payment "from any public fund whatever . . . to help support or sustain any school, academy, seminary, college, university, or other institution of learning controlled by any creed, church, or sectarian purpose whatever." J. Michael Hoey, *Missouri Education at the Crossroads: The Phelan Miscalculation & the Education Amendment of 1870*, 95 Mo. Hist. Rev. 372, 373, 384–86 (2001); Mo. Const. of 1865, art. IX, § 10 (1870).[2]

The historical evidence further suggests that, in addition to being motivated by a desire to protect burgeoning public-education systems, lawmakers enacted no-aid clauses to enshrine in law legitimate principles regarding the separation of religion and government that date back to the founders. *See, e.g.*, Green, *The Insignificance of the Blaine Amendment*, *supra*, at 310 (noting that "educational leaders and public officials increasingly came to identify the no-funding principle with principles of religious nonestablishment").

In an early example out of New York, the Common Council of New York City, which disbursed the city's school funds, twice denied requests in the 1820s for public support for

---

[2] Though Plaintiffs attempt to tar the term "sectarian" itself as anti-Catholic, its origin was to denote differences among Protestant denominations. *See, e.g.*, *Sectarian,* Oxford English Dictionary (2d ed. 1989) (term first used in the seventeenth century "by the Presbyterians with reference to the Independents [and] subsequently by Anglicans with reference to Nonconformists"). And its use into the nineteenth century continued that understanding. *See, e.g.*, *id.*; Green, *Blaming Blaine*, *supra*, at 122 (by popular understanding in the early nineteenth century, "a sectarian school was any religious school in which particular doctrines were taught").

Protestant-affiliated private schools. *See, e.g.*, *id.* at 310–11. For as the council explained, "the leading principle of all our legislation has ever been, to let religion support itself . . . and any law that should impose a direct tax on our citizens for the support of religion, would assuredly meet the disapprobation of the whole community." *Id.* (quoting William Oland Bourne, *History of the Public School Society of the City of New York* 88 (1870)). Further, if "all sectarian schools" were entitled to funding on the same grounds as the common schools, it would "give rise to a religious and anti-religious party," and "[a] fierce and uncompromising hostility will ensue, which will pave the way for the predominance of religion in political contests. The unnatural union of Church and State will then be easily accomplished—a union destructive of human happiness and subversive of civil liberty." *Id.* (quoting Bourne, *supra*, at 140). New York City's refusals to fund religious education quite obviously do not reflect anti-Catholic animus, for the private schools that sought funding were not Catholic but Protestant. And the refusals underscore the ways in which the founders' conception of church-state separation motivated states' adoptions of no-aid principles.[3]

By way of further example, a delegate to the Oregon constitutional convention of 1857 expressed that "[a] man in this country had a right to be a Methodist, Baptist, Roman Catholic, or what else he chose, but no government had the moral right to tax all of these creeds and classes to inculcate directly or indirectly the tenets of any one of them." *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857* 305 (Charles Henry Carey ed., 1926). Delegates at Illinois's 1870 constitutional convention likewise were motivated not by anti-Catholic animus but by goals that included ensuring that taxpayers would not be forced to

---

[3] Ultimately, in 1842, the New York legislature enacted a law forbidding public funds to go to any school in which "religious sectarian doctrine or tenet shall be taught, inculcated, or practiced." Bourne, *supra*, at 521, 524.

fund religious beliefs to which they did not subscribe, and preventing governmental entanglement with religion. *See* 1 *Debates and Proceedings of the Constitutional Convention of the State of Illinois* 618–26 (1870). The delegates noted that they wanted to prevent public funding of the schools of any religion, specifically mentioning Presbyterians, Methodists, Baptists, and Congregationalists. *See id.* And the framers of the Colorado Constitution "almost all seemed to be in agreement" that a "rigid separation of church and state" should exist. Tom I. Romero, II, *"Of Greater Value Than the Gold of Our Mountains": The Right to Education in Colorado's Nineteenth Century Constitution*, 83 U. Colo. L. Rev. 781, 830 (2012).

Historical evidence thus shows that states expressed a variety of legitimate, secular reasons for adopting no-aid provisions. As stated by Justice Brennan, who was himself a devout Catholic, the "widespread demands throughout the States for secular public education" were a product of powerful social forces that included "[t]he Nation's rapidly developing religious heterogeneity, the tide of Jacksonian democracy, and growing urbanization." *E.g.*, *Lemon v. Kurtzman*, 403 U.S. 602, 646–47 (1971) (Brennan, J., concurring) (citations and footnote omitted). Anti-Catholic sentiment cannot and should not be imputed by mere association or implication, and this Court should reject Plaintiffs' arguments that amount to little else. *Cf., e.g.*, *Locke*, 540 U.S. at 723 n.7 ("Neither [the plaintiff] nor amici have established a credible connection between the Blaine Amendment and . . . the relevant [state] constitutional provision," and hence "the provision in question is not a Blaine Amendment."); *Univ. of Cumberlands v. Pennybacker*, 308 S.W.3d 668, 681–82 (Ky. 2010) (concluding that there was no evidence that the Kentucky Constitution's no-aid clause was motivated by anti-Catholic animus); *Bush v. Holmes*, 886 So. 2d 340, 351 n.9 (Fla. Dist. Ct. App. 2004) ("[T]here is no evidence of religious bigotry relating to Florida's no-aid provision."), *aff'd in part*, 919 So. 2d 392 (Fla. 2006).

3.    *Not even the federal Blaine Amendment itself was predominantly motivated by anti-Catholic animus.*

Finally, even if the run of states' no-aid clauses were tethered to the federal Blaine Amendment, which they aren't, there is no consensus that the Blaine Amendment itself was motivated predominantly by anti-Catholic animus.

Although some of Senator Blaine's supporters expressed anti-Catholic sentiments, there is no evidence that he was motivated by anti-Catholic fervor. *See* Green, *Blaming Blaine*, *supra*, at 114 ("Those who characterize the Blaine Amendment as a singular exercise in Catholic bigotry thus give short shrift to the historical record and the dynamics of the times."). Quite the opposite—Blaine's mother, whom he adored, was Catholic; and his daughters attended Catholic schools. *Id.* at 142. Blaine disavowed any anti-Catholic intent, and he repeatedly made clear that he was not anti-Catholic but instead intended only to prevent controversy by resolving the school issue once and for all. *Id.*; *see also* Goldenziel, *supra*, at 66 (writing that no-aid opponents "seem to apply the Blaine name and taint indiscriminately to rhetorically reinforce their argument that all of these provisions have prejudicial origins").

## II.    SOUTH CAROLINA'S 1895 NO-AID CLAUSE WAS NOT MOTIVATED BY ANTI-CATHOLIC ANIMUS.

Drawing on the newly enacted U.S. Constitution, delegates to South Carolina's 1790 constitutional convention made great strides toward enshrining religious freedom in the state, exhibiting a deep commitment to protecting people of all faiths. For the first time in the state's history, there was no established church, for the 1790 constitution (by "eloquent omission" rather than adoption of a discrete establishment clause) severed the state's earlier establishments of the Church of England and Protestant Christianity. *See* James Lowell Underwood, *The Constitution of South Carolina, Volume III: Church and State, Morality and Free Expression* 78–79 (1992). The 1790 constitution also did away with earlier constitutional provisions that conditioned the

15

right to vote on belief in God and imposed religious tests for officeholders. *See id.* at 77–78. And

the delegates adopted a new provision guaranteeing "[t]he free exercise and enjoyment of

religious profession and worship, without discrimination or preference . . . to all mankind." *Id.* at

78; *see also* James L. Underwood, *The Dawn of Religious Freedom in South Carolina: The

Journey from Limited Tolerance to Constitutional Right*, 54 S.C. L. Rev. 111, 168–80 (2002).

South Carolina's no-aid provision—adopted for the first time in the state's 1868

constitution (at Article X, Section 5), adopted again in the state's 1895 constitution (at Article

XI, Section 9), and substantially revised in 1972 (at Article XI, Section 4)—is the natural

extension of that deep, enduring commitment to safeguarding the religious freedom of South

Carolinians by ensuring that no taxpayer would ever be forced to subsidize religion or religious

exercise. It is also, crucially, a reflection of the state's desire to safeguard the integrity of and

financial support for free public schools. And it is further partly a product of South Carolina's

fiscal conservatism.

Plaintiffs nevertheless argue that the South Carolina no-aid clause that exists today must

be struck down as unconstitutionally discriminatory because the 1895 no-aid clause was

allegedly the product of anti-Catholic animus. But Plaintiffs altogether ignore the 1895 clause's

predecessor—the closely related no-aid clause in the 1868 constitution, which predated the

federal Blaine Amendment and any purported evidence of anti-Catholic animus in South

Carolina in the nineteenth century. Plaintiffs further ignore the historical evidence that both the

1868 and 1895 no-aid provisions were driven by the state's desire to safeguard funding for its

burgeoning system of public education. And while it is true that anti-Catholic sentiment was

prominent in some portions of the country during parts of the nineteenth century, including in

South Carolina, Plaintiffs fail to present any convincing link between anti-Catholic animus and

the no-aid provisions or the constitutional conventions that voted to adopt them. In the main, Plaintiffs rely on isolated remarks of a few commentators and a guilt-by-association argument that any anti-Catholic sentiment in the United States during the era should be imputed to South Carolina and to the authors and proponents of its no-aid clauses. Plaintiffs, in short, fail to show that either South Carolina's no-aid clause today or its historical forebearers were motivated by anti-Catholic animus.

### A.    South Carolina's no-aid clause was motivated by legitimate, secular purposes.

As explained above, many states' no-aid clauses were borne of a desire "to secure the financial stability of the nascent common schools." Green, *The Insignificance of the Blaine Amendment*, *supra*, at 310. South Carolina is no exception.

From its earliest days, South Carolina "was especially alive to the necessity of mental development." Letter from N.H.R. Dawson, Comm'r of Educ., U.S. Bureau of Educ., to Sec'y of the Interior, Dep't of the Interior (June 12, 1888), *reprinted in* Colyer Meriwether, History of Higher Education in South Carolina 3 (Bureau of Education Circular of Information No. 3 (Herbert B. Adams ed., 1888)). Attempts to establish a system of free, public education began in 1811 with the passage of a much-debated act that provided for the free instruction of all children, with "preference to poor children." *Id.* at 4. But that law failed to create an administrative or supervisory body to oversee public education in the state—an "insuperable bar to success." *Id.* And the schools were substantially underfunded. *Id.* In the aftermath of the Civil War, the shortages of funding and other resources only became worse. *See* Meriwether, *supra*, at 76–77.

Against this backdrop, Article X of the 1868 constitution required the creation of a public school system—a "keystone" of a constitution that "contemplated the extensive use of public funds to make educational and health benefits widely available . . . ." Underwood, *The*

*Constitution of South Carolina*, *supra*, at 166. Article X provided that "[t]he General Assembly shall, as soon as practicable after the adoption of this Constitution, provide for a liberal and uniform system of free public schools throughout the State . . . ." S.C. Const. of 1868, art. X, § 3. Among other things, the new article provided for the creation of a state board of education composed of school commissioners from each county and an elected superintendent of education to preside over the board. Art. X, §§ 1–2. It also made attendance at a public or private school compulsory for all children between six and sixteen years old. *Id.* § 4. And it required the General Assembly to fund the public-school system through the creation of a property tax and a poll tax. *Id.* § 5.

Included in the provision regarding the collection and allocation of taxpayer dollars to support the state's public-education system was the State's inaugural no-aid clause: "No religious sect or sects shall have exclusive right to, or control of, any part of the school funds of the State, nor shall sectarian principles be taught in the public schools." *Id.* The 1868 no-aid clause was part and parcel of South Carolina's establishment of a formal system of constitutionally mandated public education. To build the functional public-school system that the new constitution mandated, the state could ill afford to let limited public funds flow to private institutions.[4]

What is more, as South Carolina historian James Underwood has noted, the no-aid provision was necessary to forestall the ills—of which Madison and Jefferson warned—that would result from public funding of religious education, regardless of the faith or denomination.

---

[4]  Underscoring the seriousness with which the delegates regarded the funding of public education, and the relative scarcity of taxpayer resources, which therefore had to be jealously guarded, robust debate took place during the convention concerning how best to impose a tax to support education funding. *See* 1 *Proceedings of the Constitutional Convention of South Carolina* 709–14 (1868), https://bit.ly/3FgkjCn.

"[O]pening the schools to a diverse student body and burdening all property taxpayers with the support of this system made more concrete guarantees of fiscal and ideological neutrality toward religion in the schools desirable," leading to enactment of the no-aid clause. Underwood, *The Constitution of South Carolina, supra*, at 167. Otherwise, "[t]he greater infusion of public funds into the educational system and the opening of that system to a diverse group of students would prompt maneuvering for control of those funds as well as attempts to control the curriculum." *Id.* at 166. To maintain a "harmonious environment, the government could not afford to let funds raised for education from all property taxpayers . . . be used to spread the ideological message of any particular religion." *Id.*

Plaintiffs offer no evidence that *any* anti-Catholic animus motivated the adoption of this provision—a provision that predates the federal Blaine Amendment by several years. Nor could they. The journal of proceedings is devoid of even the slightest hint of animus toward Catholics. *See generally* 1 *Proceedings of the Constitutional Convention of South Carolina* (1868), https://bit.ly/3FgkjCn. The provision was motivated not by religious animus, but by the state's justifiable desires to fund its developing public-education program, protect taxpayers from being required to support religious instruction, and prevent religious denominations from competing with one another or currying favor with the government to win public funding.[5]

---

[5] In fact, far from showing animus toward any denomination, the 1868 constitution evinced South Carolina's ongoing dedication to religious freedom for all its citizens, regardless of their religious affiliation: for the first time in its constitutional history, the state adopted a provision that affirmatively prohibited the establishment of religion. *See* S.C. Const. of 1868, art. I, § 10 ("No form of religion shall be established by law; but it shall be the duty of the General Assembly to pass suitable laws to protect every religious denomination in the peaceable enjoyment of its own mode of worship."). If that can be thought to have had a negative effect on any denomination, the views of our nation's founders and the theology and philosophy that led to those views notwithstanding, it would have been the formerly established Anglican Church, not the Catholic Church, that was so affected.

The concerns that animated the 1868 no-aid clause continued to be salient when the constitutional convention of 1895 convened twenty-six years later. The public-education system at that time remained precarious and vastly underfunded. *See, e.g.*, Meriwether, *supra*, at 76–77. One contemporaneous record described the "emergency" in Charleston in 1887, in the wake of the Civil War, where twice as many children needed to be educated with half the funding (because property values had plummeted, meaning that the amount of property taxes that could be collected had likewise shrunk). *Id.* at 77. The woefully inadequate funding and lack of critical infrastructure left the city's public-education system severely strained. *Id.* This "perilous situation" was "more or less common to the whole State and to the South." *Id.* And South Carolina was not less religiously diverse than it had been two decades earlier.

Hence, the 1895 delegation readopted a no-aid clause. While that 1895 no-aid clause expanded the scope of the bar on public funding of religion that had existed since the 1868 constitution, it was hardly starting from scratch. As Underwood put it, the 1868 provision had been "strong" but could still be interpreted to allow religious organizations to exert substantial influence over public funding for education, as long as the organizations did not have "exclusive" control over the funds. Underwood, *The Constitution of South Carolina*, *supra,* at 167. "This loophole was plugged" by the more detailed and expansive 1895 provision (*id.*), which forbade public funds to "be used, directly or indirectly, in aid or maintenance of any college, school, hospital, orphan house, or other institution, society or organization, of whatever kind, which is wholly or in part under the direction or control of any church or of any religious or sectarian denomination, society or organization" (S.C. Const. of 1895, art. XI, § 9).

Like its predecessor, the 1895 no-aid clause thus both safeguarded public funds for public education and staved off the harms that would result from allowing religious institutions to

20

compete for public dollars. *See* Underwood, *The Constitution of South Carolina*, *supra*, at 170 ("Society was more diverse now, and the government representing it had to be more neutral or else fractious quarrels would be set off as the various denominations would vie for the biggest share of public funds."). According to Underwood, it also reflected fiscal restraint: the no-aid clause is "[i]n a sense . . . an extension of the traditional South Carolina fiscal conservatism to the educational and social services area with specific emphasis upon prohibiting grants to religious organizations as those most likely to be operating in those fields. Let private organizations look to private sources." *Id.* at 171.

**B.      Plaintiffs fail to demonstrate that the 1895 no-aid provision was tied to anti-Catholic sentiment.**

The record of the 1895 constitutional convention contains very little debate regarding the no-aid clause, and, like the previous convention's record, contains no trace of anti-Catholic animus. *See Journal of the Constitutional Convention of the State of South Carolina* (1895), https://bit.ly/2XZY2r6. *See generally* Underwood*, The Constitution of South Carolina*, *supra* (examining South Carolina's constitutions through the lens of church-state issues without identifying any anti-Catholic motives behind relevant provisions); Cole Blease Graham, Jr., *The South Carolina State Constitution: A Reference Guide* 24 (2007) (noting that the 1895 revisions retained some of the "reform-oriented features of the 1868 constitution," including the provisions for public education, without suggestion of any anti-Catholic motive). Rather, the framers of the 1895 constitution had legitimate, secular reasons for readopting a no-aid clause, just as the framers of the 1868 constitution did. Plaintiffs bear the burden of proving that the provision was enacted with discriminatory intent (*see, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)), but their evidence is unavailing.

Plaintiffs point to the national history surrounding late-nineteenth-century Catholic immigration to the United States and the anti-Catholic political opposition that followed, including the introduction of the federal Blaine Amendment and the emergence of nativist parties like the American Protective Association. *See* Mot. 13–14. But as already described above, the history surrounding the Blaine Amendment suggests that Senator Blaine's proposal was *not* a "singular exercise in Catholic bigotry," and Blaine himself denied any anti-Catholic motivation. *See* Section I.B., *supra*. And many states, drawing on principles dating back to the founders, had no-aid clauses on the books well before the Blaine Amendment was introduced or the American Protective Association was even founded. *See* Sections I.A–I.B, *supra*. Hence, it is improper to draw a line in a vacuum between the language of the Blaine Amendment or the American Protective Association's platform and South Carolina's no-aid clause.

What is more, supposed national historical trends do not map onto the demographics and history of South Carolina. For one thing, the demographics of the state did not mirror other regions or the nation at large. *See, e.g.*, Dennis C. Rousey, *Catholics in the Old South: Their Population, Institutional Development, and Relations with Protestants*, 24 U.S. Catholic Historian 1, 21 (2006) ("[T]he flow of foreign Catholics into the South slowed to a trickle from the 1860s onward. . . .  Between 1860 and 1890, the Catholic share of the South's population barely rose, from about 5% to slightly over 6% . . . ."); Randall M. Miller, *Catholics*, South Carolina Encyclopedia (2016), https://bit.ly/3yZVGFu ("From 1850 to 1960, of all the southern states, South Carolina had the lowest or second-lowest density of Catholics in its total population."). Even Plaintiffs' own expert acknowledges that "South Carolina did not experience a large influx of Catholics." Graham Report, Dkt. No. 73-3, at 30. Moreover, anti-Catholic sentiment was not as strong in South Carolina as it was elsewhere. *See, e.g.*, Rousey, *supra*, at 16

("Although the southern American Party had many anti-Catholic members, anti-Catholicism was never as strong an ideological element of the party in the South as it was in the North . . . ."); *Miller*, *supra* ("Spasms of nativism and anti-Catholicism occurred, as in the 1880s when Catholic bishops sought state aid for parochial schools, but South Carolina evinced little of the anti-Catholicism that marked southern populism . . . ."). And even where nativist groups gained some foothold, that rarely translated into political gains. *See, e.g.*, Green, *The Insignificance of the Blaine Amendment, supra*, at 315 ("[T]he Know-Nothings were relatively ineffective in enacting anti-Catholic legislation even in those states where they briefly held clear majorities.").

The South Carolina-specific evidence that Plaintiffs put forth fares no better. Plaintiffs suggest, for example, that anti-Catholic animus is evident in provisions in South Carolina's legislative and constitutional enactments of the seventeenth and eighteenth centuries that established Protestantism as the state's religion and excluded Catholics from certain religious-exercise protections. *See* Mot. 11. But those provisions were short-lived: The 1790 constitution eliminated the Protestant establishment and expressly forbade preferring any denomination over another. *See* Underwood, *The Dawn of Religious Freedom, supra*, at 170–71. The provisions that Plaintiffs cite had been gone for more than a century by the time of the 1895 convention. They are hardly evidence of anti-Catholic animus when the 1895 no-aid clause was adopted.

To be sure, Plaintiffs do cite to some contemporaneous, and undeniably repugnant, anti-Catholic language. *E.g.*, Mot. 14–16. But many of the statements that Plaintiffs cite have nothing to do with the no-aid provision at issue; and at least one source actually *post-dates* the 1895 no-aid clause and hence could not have been an impetus for enacting that version (much less, of course, the earlier one or the current one). *See* Mot. 15–16. While isolated newspaper columns, editorials, and even statements of elected officials may reflect anti-Catholic biases harbored by

23

some in South Carolina in the late nineteenth century, they by no means prove that the 1895 no-aid clause itself was infected by any such bias. *Cf., e.g.*, *United States v. O'Brien*, 391 U.S. 367, 383–84 (1968) ("Inquiries into congressional motives or purposes are a hazardous matter. . . . What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it . . . .").

The *sole* piece of direct evidence connected to the 1895 constitutional convention that Plaintiffs cite (Mot. 12–13) is a line-item in the convention journal indicating that "a communication from 'The National League for the Protection of American Institutions'" was "received as information." *Journal of the Constitutional Convention*, *supra*, at 205. Plaintiffs say that this organization was "anti-Catholic and an extension of the American Protective Association" (Mot. 13), and thus that its letter demonstrates the influence of anti-Catholic rhetoric on the delegation. But the National League was not an extension of the American Protective Association. In fact, it explicitly disavowed that group's anti-Catholic platform. *See, e.g.*, *Not Modeled After A.P.A.: National League to Protect American Interests*, N.Y. Times (June 2, 1894), https://nyti.ms/3F3LQXt (contrasting the American Protective Association with the National League, whose spokesperson expressly rejected the Protective Association's rhetoric, and whose literature advocating passage of no-aid clauses stated that the National League "attacks no church, like the A.P.A., that it opposes no one because he is a Roman Catholic any more than because he is a Jew or a Methodist or a Baptist or anything else," and that it "is absolutely unsectarian and non-partisan in character"); Circular from John Jay, National League President, and James M. King, National League General Secretary (May 21, 1890), https://bit.ly/3uF30pk (soliciting support for no-aid provisions and identifying the League as "non-partisan and unsectarian" and "welcom[ing of] the co-operation of all citizens, whether

24

native or foreign born, who cherish and maintain American Institutions"); *Work of the American League*, Sacramento Daily Record-Union (Sept. 22, 1892), https://bit.ly/2YkgY3O (describing broad coalition, among whom "no party, no religion was known," supporting National League's no-aid proposal before Congress).[6]

Regardless, no further reference to the organization or its letter is made in the journal of proceedings. And hence, there's no evidence that the delegates even considered, much less were persuaded by, the contents of the communication—all we know is that a letter was received. And in fact, by the time that the communication was documented at the convention, readoption of the no-aid clause had *already* been proposed. *See, e.g.*, *Journal of the Constitutional Convention, supra*, at 88.

Finally, Plaintiffs try to gloss over their lack of evidence of anti-Catholic animus by arguing that "sectarian" is code for "Catholic" (Mot. 13). But that is not consistent with the original meaning of the term, as described above. *See* p. 12 n.2, *supra*. And that is not how lawmakers understood the term. Plaintiffs' view is unsupported by contemporaneous usage of the term leading up to and following South Carolina's adoption of its no-aid clause (in both 1868 and in 1895). *See, e.g.*, Dawson Letter, *supra*, at 4 (using the term "strictly sectarian" in 1888 letter in reference to religious colleges of various denominations—the schools in question "cannot be called strictly sectarian colleges since no religious tests are required of any of the students"); Underwood, *The Dawn of Religious Freedom, supra*, at 171 (1791 petition from Charleston synagogue to South Carolina legislature requesting incorporation on par with that

---

[6] Plaintiffs' sole source for its proposition to the contrary is an undergraduate thesis by a college student, who himself cites one doctoral student's thesis for the supposed scholarly consensus on the matter. *See* Mot. 13 n.16.

enjoyed by Protestant churches, requesting the "privileges and powers similar to those, which have been heretofore granted by the legislature, to other religious *Sects*" (emphasis added)).

## III.    EVEN IF SOUTH CAROLINA'S 1895 NO-AID CLAUSE *HAD* BEEN MOTIVATED BY ANTI-CATHOLIC ANIMUS, THE 1972 AMENDMENT WOULD HAVE ERASED ANY TAINT.

For all the reasons explained above, the 1895 no-aid clause was motivated by legitimate, secular aims, and there's no evidence that anti-Catholic animus steered its passage. But even if anti-Catholic animus *had* played some role in the adoption of South Carolina's 1895 no-aid clause, the substantial revision of the clause and the adoption of the modern clause in 1972—seventy-seven years later—would have eliminated any vestige of religious discrimination.

a. In 1966, the South Carolina General Assembly created a committee—known as the West Committee—to study and propose changes to the state constitution. Among other changes to Article IX, the West Committee recommended two changes to the no-aid clause: First, it recommended extending the existing bar on direct aid to cover not just private religious education but also private *secular* education. Second, it recommended removing the restriction on *indirect* aid to support private religious education. In other words, it would become permissible for the state to provide aid (for example, in the form of tuition grants) to *students* attending private religious institutions (as well as ones enrolled in secular private institutions) but not to the institutions themselves, be they religious or secular. *See Final Report of the Committee to Make a Study of the S.C. Const. of 1895* 99–101 (1969), bit.ly/ 3BevdG4; *see also* James N.G. Cauthen, *Referenda, Initiatives, and State Constitutional No-Aid Clauses*, 76 Alb. L. Rev. 2141, 2166–67 (2013). The proposed amendment was ratified and became law in 1972. As amended, the no-aid clause reads: "No money shall be paid from public funds nor shall the credit of the State or any of its political subdivisions be used for the direct benefit of any religious or other private educational institution." S.C. Const. art. XI, § 4.

The West Committee sought to respect long-standing principles of separation of religion and government while addressing other considerations. On the one hand, the Committee was concerned that a "tremendous number of South Carolinians [were] being educated at private and religious schools in this State and that the educational costs to the State would sharply increase if these programs ceased." *Final Report*, *supra*, at 99–101. And in its view, "[t]he benefits of preserving a variety of higher education providers in the form of private institutions, both secular and religious, as well as state-operated schools would be many." Underwood*, The Constitution of South Carolina*, *supra*, at 171; *see also Final Report* at 99–101. Permitting indirect aid in the form of student scholarships would, for example, "make it more feasible for low- and middle-income students" to attend religiously affiliated colleges and bring greater diversity of thought and perspectives to South Carolina's student bodies. Underwood, *The Constitution of South Carolina*, *supra*, at 171. On the other hand, "[f]rom the standpoint of the State and the independence of the private institutions, . . . public funds should not be granted outrightly to such institutions." *Final Report, supra*, at 101. For "government support of private, religiously-operated educational institutions[] could lure such institutions away from the purity of their religious perspective and make them cater to the whims of government as a means of attracting more funds." Underwood*, The Constitution of South Carolina*, *supra*, at 171.[7]

---

[7] This central tension was reflected in the debates around the proposed amendment. For example, the South Carolina Baptist Committee on Religious Liberty opposed the proposal, arguing that even indirect financial support of religious institutions was impermissible, as even if public funds did not go directly to the institutions' proselytizing, religious instruction, or other religious activities, they may nevertheless free up funds for exactly those purposes. *See* Underwood, *The Constitution of South Carolina*, *supra*, at 172. The South Carolina Association of Independent Colleges, by contrast, contended that indirect funding would not go far enough to support private education. *Id.* at 173.

Removing the barrier on indirect aid while retaining the barrier on direct funding was a compromise that satisfied the Committee, which thought that the changes would benefit South Carolina's children and education system. In the view of South Carolina's Attorney General at the time, the amended no-aid provision would not "impede religion but rather . . . further the general educational development of students who attend private as well as public schools." *See* Opinion of the South Carolina Attorney General, 1974 WL 27574 (Jan. 4, 1974), https://bit.ly/3AhKVPq.

And Underwood has suggested that the Committee's decision to bar the direct funding of *secular* institutions in addition to religious ones was not only a reflection of religious neutrality and church-state separation but also "an expression of the fiscal conservatism of the state." Underwood, *The Constitution of South Carolina*, *supra*, at 174 (noting that both the education article and the tax article included language restricting the disbursement of public funds to private institutions). "Promiscuous state fiscal aid to all forms of private endeavor, whether religious or not, was to be viewed with deep skepticism." *Id.*

b. Given these changes, even if anti-Catholic animus had played some role in the adoption of South Carolina's 1895 no-aid clause (or its 1868 predecessor), the lack of evidence of that notwithstanding, the 1972 revisions would have eliminated any trace of religious discrimination.

"Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Abbott*, 138 S. Ct. at 2324. And while the background of a given legislative enactment may be "one evidentiary source" relevant to determining intent (*id.* at 2325 (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)), the "allocation of the burden of proof and the presumption of legislative good

faith *are not changed* by a finding of past discrimination" (*id.* at 2324 (emphasis added)). For "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Id.* (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion)). Hence, in *Abbott*, the Supreme Court held that a lower court had erred when it required the government to show that the legislature had "cured any taint" emanating from an earlier version of the challenged legislation that had been enacted just two years before. *See id.* at 2325–26.

Plaintiffs have failed to show that the 1972 revisions were marked by any anti-Catholic animus. Nor could they. The revisions put religious education on precisely the same footing as secular education—in text and in practice—explicitly barring both religious and secular schools from receiving direct aid. The revisions actually *benefited* Catholic (and other religious) institutions by permitting them to receive support through indirect governmental funding. And the changes did away with the use of "sect" and "sectarian," words that Plaintiffs (incorrectly) contend are code for anti-Catholic.

Plaintiffs' strained arguments to the contrary miss the mark. Plaintiffs suggest, for example, that the 1972 no-aid clause was somehow anti-Catholic because the funding restrictions would disproportionately affect Catholic schools. *See* Mot. 30. But Plaintiffs' own statistics don't support this argument. By Plaintiffs' own count, only a third of private schools in South Carolina in 1969–1970 were Catholic, and about one-quarter of private schools were Protestant. *See id.* If anything, these numbers show that restricting aid to private schools would *not* affect Catholic schools much more than Protestant schools, and certainly not more than the majority of private schools.

Likewise, Plaintiffs' reliance on the apparent views of a single member of the West Committee (*see* Mot. 24) do not prove that such views infected the Committee or had any bearing whatever on the revisions to the no-aid clause itself. *See O'Brien*, 391 U.S. at 383–84.

Plaintiffs also suggest that concern for the separation of religion and government itself evinces anti-Catholic animus. *See* Mot. 33–34. But again, Plaintiffs provide not one whit of evidence, much less evidence specific to South Carolina, to support this contention. Indeed, as described above, the principles of church-state separation that Plaintiffs attack as anti-Catholic date back to the founders of our nation. They predate any wave of Catholic immigration to the United States and any accompanying anti-Catholic sentiment. And these principles were designed to protect all faiths equally. Moreover, Plaintiffs' logic has no bounds: If advocating for church-state separation were inherently anti-Catholic, it would seemingly call into question *any* legislative action or court decision that protects the separation of religion and government.

Finally, while Plaintiffs rely on the conclusions contained in Dr. Graham's expert report, the report itself cites no evidence tying the West Committee or the 1972 revisions to anti-Catholic animus. *See* Graham Report, Dkt. No. 73-3. Nor, for that matter, does Plaintiffs' other expert, Dr. Glenn, offer any evidence of anti-Catholic motivation for South Carolina's no-aid clause. *See* Glenn Report, Dkt. No. 73-2.

Plaintiffs insist that anti-Catholic sentiment persisted into the 1970s and that the retention of the no-aid principle in the 1972 constitution reflected such anti-Catholicism. But Plaintiffs offer no specific evidence tying South Carolina's 1972 no-aid clause to anti-Catholic animus in the state. On the contrary, the available evidence shows that the revisions were motivated by the state's legitimate interests in safeguarding its educational system, respecting principles of

church-state separation, and exercising fiscal restraint. The no-aid clause does not serve any anti-Catholic function today, if it ever did.

## CONCLUSION

Plaintiffs' motion for summary judgment should be denied and Defendants' motions for summary judgment should be granted.

Respectfully submitted this 6th day of October, 2021.

<table>
<tr><td></td><td><u>/s/ <em>Aaron J. Kozloski</em></u></td></tr>
<tr><td>Richard B. Katskee*</td><td>Aaron J. Kozloski (D.S.C. Bar No. 9510)</td></tr>
<tr><td>Alex J. Luchenitser*</td><td>CAPITOL COUNSEL, LLC</td></tr>
<tr><td>Sarah R. Goetz*</td><td>P.O. Box 1996</td></tr>
<tr><td>AMERICANS UNITED FOR SEPARATION OF</td><td>Lexington, SC 29071-1996</td></tr>
<tr><td>CHURCH AND STATE</td><td>Tel: (803) 465-1400</td></tr>
<tr><td>1310 L Street NW, Suite 200</td><td>Fax: (888) 513-6021</td></tr>
<tr><td>Washington, DC 20005</td><td><em>aaron@capitolcounsel.us</em></td></tr>
<tr><td>Tel: (202) 466-3234</td><td></td></tr>
<tr><td>Fax: (202) 466-3353</td><td></td></tr>
<tr><td><em>katskee@au.org</em></td><td></td></tr>
<tr><td><em>luchenitser@au.org</em></td><td></td></tr>
<tr><td><em>goetz@au.org</em></td><td></td></tr>
</table>

*Counsel for* Amici Curiae

* Motions for admission *pro hac vice* to follow.