**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

BISHOP OF CHARLESTON, a
Corporation Sole, d/b/a The Roman
Catholic Diocese of Charleston, and
SOUTH CAROLINA INDEPENDENT
COLLEGES AND UNIVERSITIES, INC.,

                Plaintiffs,

    v.

MARCIA ADAMS, in her official capacity
as the Executive Director of the South
Carolina Department of Administration;
BRIAN GAINES, in his official capacity as
budget director for the South Carolina
Department of Administration; and HENRY
MCMASTER, in his official capacity as
Governor of the State of South Carolina,

                Defendants,

   *and*

THE STATE OF SOUTH CAROLINA,

                Intervenor–Defendant.

Civil Action No. 2:21-cv-1093-BHH

**ORDER AND OPINION**

## INTRODUCTION

This case arises out of a dispute over Article XI, Section 4 of the South Carolina Constitution, which provides, "No money shall be paid from public funds nor shall the credit of the State or any of its political subdivisions be used for the direct benefit of any religious or other private educational institution." S.C. Const. art. XI, § 4. In July 2020, Governor Henry McMaster announced that he planned to allocate certain federal coronavirus relief funds to assist the State's public and independent historically black

colleges and universities ("HBCUs") and to establish the Safe Access to Flexible Education ("SAFE") Grants Program, which sought to provide need-based grants for eligible students to attend participating private and independent schools. After private plaintiffs, a public school district, and an education association challenged the SAFE Grants Program, the South Carolina Supreme Court held that this program violated Article XI, Section 4 of the state constitution because it would have utilized public funds to provide a direct benefit to private schools.

As a result of the State Supreme Court's decision, the Governor was unable to proceed with his plans to establish the SAFE Grants Program and to allocate federal funds to the State's HBCUs, and he reallocated the available funds to other programs. Similarly, the South Carolina Department of Administration, which the state legislature had charged with administering relief programs for nonprofits and independent colleges and universities, was forced to refrain from disbursing funds to these organizations due to the court's ruling and interpretation of Article XI, Section 4.

Several months later, Plaintiffs—a religious organization that operates several K–12 private schools and an association of private institutions of higher education—filed this suit alleging that Section 4 violates the U.S. Constitution's guarantees of free exercise of religion and equal protection of the laws. Plaintiffs claim that although Section 4 is facially neutral, it was motivated by both racial and religious discriminatory intent.

Pending before this Court are Plaintiffs' Motion for Summary Judgment, Cross-Motions for Summary Judgment from all Defendants (including the Intervenor–Defendant), Defendants' Joint Motion in Limine to exclude one of Plaintiffs' proffered experts, and Plaintiffs' Motion to Strike the State's memorandum and an exhibit. For the

reasons set forth below, the Court denies Defendants' Joint Motion in Limine as moot, denies Plaintiffs' Motion to Strike, denies Plaintiffs' Motion for Summary Judgment, and grants Defendants' Cross-Motions for Summary Judgment.

## BACKGROUND

### A.     Article XI, Section 4

The origins of Section 4 can be traced to South Carolina's Reconstruction Constitution of 1868, which included a provision stating, "No religious sect or sects shall have exclusive right to, or control of any part of the school funds of the State." S.C. Const. art. X, § 5 (1868). This provision was altered by the South Carolina Constitution adopted in 1895, which provided that:

> The property or credit of the State of South Carolina, or of any [subdivision], or any public money, from whatever source derived, shall not . . . be used, directly or indirectly, in aid or maintenance of any college, school, hospital, orphan house, or other institution, society, or organization, of whatever kind, which is wholly or in part under the direction or control of any church or religious or sectarian denomination, society or organization.

S.C. Const. art. XI, § 9 (1895). Thus, the 1895 Constitution prohibited both direct and indirect aid to religious private schools, among other religious entities.

In 1966, the General Assembly passed a resolution establishing a Committee to Make a Study of the Constitution of South Carolina of 1895. West Committee, *Final Report of the Committee to Make a Study of the South Carolina Constitution of 1895* ("West Committee Report"), at 3 (1969). This committee would be chaired by future Governor John West, who in his inaugural address as Governor would declare the State "color blind." (ECF No. 73-3 at 11, 50.) In creating what is now called the "West Committee," the General Assembly cited "major deficiencies in the present constitutional

system" and sought recommendations for amendments. West Committee Report, at 3. After a three-year study, the West Committee offered recommendations in its 1969 Final Report, including what is now Section 4. *Adams v. McMaster*, 851 S.E.2d 703, 710–11 (S.C. 2020).

The West Committee proposed two substantive changes to the provision governing public funding of private educational institutions. First, the Committee proposed to limit its prohibition to *direct* aid. *See id.* at 711. Second, the Committee eliminated any reference to "sectarian" institutions and applied the prohibition on direct aid to *all* private schools in South Carolina, regardless of religious status, affiliation, or identification. *See* 3 James Lowell Underwood, *The Constitution of South Carolina* 172 (1992) (noting that Section 4 removed any "taint of singling out religious institutions for hostile treatment").

In explaining these recommendations, the Committee stated:

> The Committee evaluated this section in conjunction with interpretations being given by the federal judiciary to the "establishment of religion" clause in the federal constitution. The Committee fully recognized the tremendous number of South Carolinians being educated at private and religious schools in this State and that the educational costs to the State would sharply increase if these programs ceased. From the standpoint of the State and the independence of the private institutions, the Committee feels that public funds should not be granted outrightly to such institutions. Yet, the Committee sees that in the future there may be substantial reasons to aid the students in such institutions as well as in state colleges. Therefore, the Committee proposes prohibition on direct grants only and the deletion of the word "indirectly" currently listed in Section 9. By removing the word "indirectly" the General Assembly could establish a program to aid students and perhaps contract with religious and private institutions for certain types of training and programs. . . .

West Committee Report, *supra*, at 99–101.

Two-thirds of the South Carolina House and Senate agreed to propose Section 4

as recommended by the West Committee to the voters of South Carolina, who adopted the provision in November 1972. *See* S.C. Const. art. XVI, § 1 (1895); Act No. 42, 100th Gen. Assemb., 1st Sess. (S.C. 1973). The General Assembly then ratified Section 4 in 1973. *Id.* Again, Section 4 now states: "No money shall be paid from public funds nor shall the credit of the State or any of its political subdivisions be used for the direct benefit of any religious or other private educational institution." S.C. Const. art. XI, § 4.[1]

### B. Coronavirus Relief Funds

Since the 2019 Novel Coronavirus first emerged, the U.S. Congress has responded by passing several fiscal relief measures. In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). *See* Pub. L. No. 116–136, 134 Stat. 281 (Mar. 27, 2020). Later that year, Congress passed the Coronavirus Response and Relief Supplemental Appropriations ("CRRSA") Act of 2021. *See* Pub. L. 116–260, 134 Stat. 1182 (Dec. 27, 2020). These acts established funds relevant here.

### 1. Governor's Emergency Education Relief ("GEER") Funds

First, the CARES Act established the GEER Fund to be administered by the U.S. Department of Education. *See* CARES Act §§ 18002–18008. These monies are usually called GEER I funds. Under the CARES Act, through GEER I, the Secretary of Education was authorized to award emergency education relief grants to governors with an approved application. *Id.* § 18002. Congress gave governors discretion to use GEER I

---

[1] This provision has been called a "no-aid" provision, including by the Court in its May 11, 2021 Order, but it differs from other state no-aid provisions in two crucial respects: (1) it does not prohibit indirect aid, and (2) it applies to all schools. *Compare Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2252 (2020) (considering Montana's "'no-aid' provision," which barred "direct or indirect" "government aid to sectarian schools"), *with* West Committee Report, *supra*, at 101.

monies to support various education entities. *See id.* § 18002(b)(1)–(3). The CARES Act also imposed a use-it-or-lose-it deadline on States to access and use the GEER I funds. *See id.* § 18002(d).

Governor McMaster applied for, and was approved to receive, a GEER I grant of $48,467,924 to distribute at his discretion for the benefit of South Carolina students. He at first sought to allocate about $32 million for the Safe Access to Flexible Education ("SAFE") Grants Program. This program would have provided need-based grants of up to $6,500 per student to cover the cost of tuition for eligible students to attend participating private or independent schools in South Carolina for the 2020–2021 academic year. He also sought to allocate $2.4 million for the State's public and independent HBCUs. *See* Press Release, Gov. Henry McMaster Invests $2.4 Million in Historically Black Colleges and Universities (July 9, 2020), https://bit.ly/3kIRYfC.

But the South Carolina Supreme Court held that "the Governor's allocation of $32 million in GEER funds to support the SAFE Grants Program constitutes the use of public funds for the direct benefit of private educational institutions within the meaning of, and prohibited by, Article XI, Section 4 of the South Carolina Constitution." *Adams*, 851 S.E.2d at 713. Forced to abandon his plans to assist HBCUs and to establish the SAFE Grants Program, the Governor then allocated the balance of the GEER I monies he received on behalf of the State before the State's May 11, 2021 federal one-year deadline. *See* Press Release, Gov. McMaster Awards Over $12 million in GEER Funds to S.C. Department of Juvenile Justice (April 21, 2021), https://bit.ly/3EX6ete ("Today's announcement completes the awarding of original GEER Fund monies that totaled $48,467,924."); Governor's Office, Governor's Emergency Education Relief (GEER) Fund Expenses

(Aug. 1, 2021), https://bit.ly/3E4oLmR; (*see also* Am. Compl. ¶¶ 42–43, ECF No. 26).

When Congress later enacted the CRRSA, the State was awarded supplemental GEER funds totaling $21,089,129 ("GEER II"). Governor McMaster was required to allocate the GEER II funds by January 2022. (Am. Compl. ¶ 49.) The key difference between the first and second rounds of GEER funds is that Section 312(e)(1) of the CRRSA prevents the second round of funds from being used:

> (A) to provide direct or indirect financial assistance to scholarship granting organizations or related entities for elementary or secondary education; or
>
> (B) to provide or support vouchers, tuition tax credit programs, education savings accounts, scholarships, scholarship programs, or tuition-assistance programs for elementary or secondary education.

It is undisputed that Governor McMaster has announced awards for the full amount of South Carolina's GEER II funds. (Gov.'s Reply in Supp. of Cross-Mot. for Summ. J., ECF No. 104 at 3.)

## 2. Act 154 Funds

In close proximity to the *Adams* decision, the South Carolina General Assembly passed legislation to coordinate and authorize, appropriate, or otherwise direct the expenditure of other CARES Act funds. *See* 2020 S.C. Act No. 154 ("Act 154"). Among other things, Act 154 authorized the South Carolina Department of Administration to oversee the distribution of $25 million for a nonprofit relief program. *Id.* § 3(E). Act 154 also authorized the Department of Administration to oversee the distribution of $115 million for state and local governments and independent college and university expenditures. *Id.* § 3(G). The Act explained that "[i]ndependent colleges and universities that are member institutions of the South Carolina Independent Colleges and Universities

nonprofit corporation are authorized to apply for reimbursement of expenditures that were necessary for the response to the COVID-19 public health emergency" during most of 2020. *Id.* § 10(A)(2).

After the South Carolina Supreme Court's decision in *Adams*, however, the Executive Director of the Department of Administration "refrain[ed] from disbursing money to independent colleges and universities under the Act without further judicial direction." (Ex. B, Perez Decl., ECF No. 6-5 at 2.)

### C.    Procedural History

On April 14, 2021, Plaintiffs filed a Complaint—and later an Amended Complaint—asking the Court to hold that Section 4 violates the Equal Protection Clause of the Fourteenth Amendment and the Free Exercise Clause of the First Amendment. (*See* ECF Nos. 1 & 26.) According to Plaintiffs, the State is barring "private schools and universities from participation in neutral grant programs" under a state constitutional provision that "is based on longstanding and pervasive religious and racial bigotry." (Am. Compl. ¶ 5.) Although Plaintiffs agree that the provision does not facially discriminate based on religion or race, they claim that the provision was motivated by religious and racial prejudice and intended to suppress religious exercise.

For relief, Plaintiffs ask the Court to prevent Defendants McMaster, Adams, and Gaines from using the constitutional provision "as a basis for denying Plaintiffs and other private and religious schools' access to the GEER funds." (Am. Compl., Request for Relief ¶ 3.) They ask that Defendants Adams and Gaines be enjoined in a similar respect as to the Act 154 funds. (*Id.* ¶ 4.) Plaintiffs also seek nominal and compensatory damages. (*Id.* ¶ 5.)

On April 16, 2021, Plaintiffs moved for a preliminary injunction (*see* ECF No. 6),

which this Court denied for lack of likelihood of success on the merits (*see* ECF No. 34). Regarding the Free Exercise Clause theory, the Court explained that unlike the provision at issue in *Espinoza*, "South Carolina's no-aid provision prohibits the use of public funds for the direct benefit of religious and non-religious private schools alike." (*Id.* at 8.) With respect to the Equal Protection Clause theory, the Court held that Plaintiffs had presented "no evidence that the no-aid provision, as applied in *Adams* and the disbursement decisions by the Governor and Department of Administration, disproportionately affected African-American students, HBCUs, or religious schools." (*Id.* at 11.)

Because Plaintiffs' Amended Complaint not only challenged the constitutional provision but also sought compensatory damages, included claims not directed specifically at the Governor, and contained new allegations regarding anticipated federal funds, the Governor invited the Attorney General to intervene in this action. (*See* ECF No. 51 at 15.) The Court later granted a motion by the State of South Carolina to intervene in the matter in defense of state law. (ECF No. 62.) Following discovery, Plaintiffs filed a Motion for Summary Judgment and Defendants (including the State as Intervenor) filed Cross-Motions for Summary Judgment and a Joint Motion in Limine to exclude one of Plaintiffs' experts. (ECF Nos. 73, 74–77.) Plaintiffs filed a Motion to Strike the State's memorandum in support of its summary judgment motion. (ECF No. 97.) All motions were fully briefed and argued at a hearing on December 16, 2021. (ECF No. 108.) Accordingly, this matter is now ripe for the Court's review.

## STANDARDS OF REVIEW

### I.    Rule 702 and *Daubert*

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. *See generally Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Rule

702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of expert testimony must show that the testimony satisfies these requirements. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

"Implicit in the text of Rule 702 . . . is a district court's gatekeeping responsibility to 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (emphases omitted) (quoting *Daubert*, 509 U.S. at 597). A district "court is to exclude 'subjective belief or unsupported speculation.'" *In re Bausch & Lomb, Inc. Contact Lens Sol. Prods. Liab. Litig.*, MDL No. 1785, 2009 WL 2750462, at *9 (D.S.C. Aug. 26, 2009) (emphasis omitted) (citing *Daubert*, 509 U.S. at 590).

## II.    Summary Judgment

"Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Seastrunk v. United States*, 25 F. Supp. 3d 812,

814 (D.S.C. 2014). "A material fact is one that might affect the outcome of the suit under the governing law," and a dispute is "genuine" "if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party." *Id.* (citations and quotation marks omitted). "If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party bears the burden of proof." *Rice v. M-E-C Co.*, No. 2:17-1274, 2021 WL 5822645, at *2 (D.S.C. Dec. 8, 2021) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When considering cross-motions for summary judgment, the Court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Russell v. McGrath*, 135 F. Supp. 3d 427, 430 (D.S.C. 2015) (citing *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)). In doing so, the Court must "'resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (quoting *Rossignol*, 316 F.3d at 523).

## III.    Motion to Strike

Under Rule 12(f) of the Federal Rules of Civil Procedure, the Court—either *sua sponte* or on timely motion of a party—may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike "are generally viewed with disfavor because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic." *Waste Mgmt. Holdings v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001) (citation and quotation marks omitted). "Furthermore, motions to strike pursuant to Rule 12(f) are directed only to pleadings. According to Rule 7, a document is a pleading only if

it falls within one of the following categories: complaint, answer to complaint, answer to a counterclaim, answer to a crossclaim, third-party complaint, answer to a third-party complaint, and a reply to an answer." *Charleston Waterkeeper v. Frontier Logistics, L.P.*, 488 F. Supp. 3d 240, 260 (D.S.C. 2020) (citing Fed. R. Civ. P. 7(a)).

## ANALYSIS

### I.     Defendants' *Daubert* Motion is denied as moot.

The Court first addresses Defendants' Joint Motion in Limine to Exclude the report, opinions, and testimony of Plaintiffs' expert, Dr. Charles Glenn. (*See* ECF No. 75.)

Most of Dr. Glenn's report and testimony focused on events, attitudes, and policies in other States before 1956. During his deposition, Dr. Glenn repeatedly testified that he is not qualified to opine on South Carolina history. (*E.g.*, Glenn Dep., ECF No. 75-1 at 14 & 50.) Dr. Glenn also said he has "no knowledge as to the activities of the West Committee who amended the provision of the South Carolina Constitution that is an issue in this case." (*Id.* at 53–54.) And he has "neither knowledge nor opinion about the[] motivations" of the West Committee, the South Carolina General Assembly, "or any other body that would have had a role to play in the amendment of the provision in 1972." (*Id.* at 54 & 57.) When asked whether, "even within South Carolina, different attitudes and opinions and policies were prevalent" about education, Dr. Glenn said, "I assume so, but I'm not a historian of South Carolina, so . . . you'll have to ask that question elsewhere." (*Id.* at 36.)

Defendants then asked Dr. Blease Graham, Plaintiffs' other expert, about these topics during his deposition. Upon questioning, Dr. Graham stated that the West Committee was not motivated by racial or religious animus. (Graham Dep., ECF No. 76-1 at 27–28, 32.) Notably, Plaintiffs stated in their Motion for Summary Judgment that "this

Court's focus in analyzing the history of the 1972 amendment should stay on the West Committee." (ECF No. 73-1 at 30.) Plaintiffs nevertheless argue that Dr. Glenn's account of national events is relevant because it provides "broader context" for what happened in South Carolina. (ECF No. 91 at 9.)

While the Court doubts the relevance of Dr. Glenn's opinions, the Court has considered them in full in ruling on the parties' Cross-Motions for Summary Judgment. The Court therefore denies Defendants' Joint *Daubert* Motion as moot.

## II.     Plaintiffs' Motion to Strike the State's Brief and Exhibits is denied.

Next, the Court addresses Plaintiffs' Motion to Strike the State's Memorandum in Support of its Motion for Summary Judgment and Exhibit 1 to the motion. (ECF No. 97.) For several reasons, the Court denies this motion.

First, Plaintiffs' Motion is procedurally defective under both the Local Civil Rules of the District of South Carolina and the Federal Rules of Civil Procedure. Plaintiffs failed to confer with the State prior to filing their Motion, warranting denial. *See* Local Civil Rule 7.02 (D.S.C.) (requiring "all motions," absent an enumerated exemption not applicable here, to "contain an affirmation by the movant's counsel that prior to filing the motion he . . . conferred or attempted to confer with opposing counsel and attempted in good faith to resolve the matter contained in the motion"); *see also CresCom Bank v. Terry*, 269 F. Supp. 3d 708, 715 (D.S.C. 2017) (noting the Court had "previously denied a motion . . . without prejudice for failure to comply with th[e] requirement" under Local Civil Rule 7.02); *Williams v. Clement*, No. 18-437, 2019 WL 1146682, at *6 (D.S.C. Mar. 13, 2019) ("A party's failure to comply with the Local Civil Rules is sufficient to deny his or her motion."). Additionally, Plaintiffs' Motion is not authorized by Federal Rule of Civil

Procedure 12. *E.g.*, *Charleston Waterkeeper*, 488 F. Supp. 3d at 260.[2] In other words, it "is entirely devoid of any basis in the law." *Id.* at 259.

Second, Plaintiffs' Motion fails on the merits, and this Court may properly consider the challenged materials. Notably, Plaintiffs' Complaint, Amended Complaint, Motion for Preliminary Injunction, Motion for Summary Judgment, and Responses in Opposition to Defendants' Cross-Motions for Summary Judgment are chock full of the very same matters—many of which were not cited or relied on by their experts—that they now contend are inadmissible when proffered by Defendants. Indeed, Plaintiffs concede that much of the challenged material is relevant and admissible—including "the convention journal of 1895, the minutes and reports of the West Commission, numerous articles from contemporaneous newspapers, and learned treatises." (ECF No. 73-1 at 5.) These sources, on which Plaintiffs themselves rely, are generally self-authenticating or subject to judicial notice. *See* Fed. R. Evid. 201, 902(5)–(6). And contrary to Plaintiffs' assertions, their expert cited and was cross-examined on some of the sources cited by Defendants. *See* Fed. R. Evid. 803(18). As for the remaining sources, the Court declines to adopt Plaintiffs' selective-enforcement approach.

Finally, even if this Court disregarded some or all of the State's challenged evidence, it would still grant summary judgment to Defendants because the fundamental and fatal deficiencies in Plaintiffs' case are manifested by their own expert. As a result, Plaintiffs' Motion to Strike is alternatively denied as moot.

---

[2] Plaintiffs' Motion did not identify any Federal Rule of Civil Procedure that would authorize the relief sought. (*See* ECF No. 97 at 1–9.) In their Reply, Plaintiffs point to Rules 56(e) and 37(c). (*See* ECF No. 105 at 2–3.) But "[a]rguments raised for the first time in a reply brief are normally deemed waived." *Brown v. City of Charleston*, No. 2:11-466, 2013 WL 4499138, at *5 n.3 (D.S.C. Aug. 20, 2013) (citation omitted). And neither rule applies here in any event.

III.    **The Court lacks jurisdiction over Plaintiffs' challenge to Governor McMaster's discretionary allocation of GEER funds.**

One last threshold issue remains. The Court lacks jurisdiction over Plaintiffs' claim against Governor McMaster, which is limited to his discretionary allocation of GEER funds.

First, Plaintiffs lack standing to challenge Governor McMaster's discretionary allocation of GEER funds. To prove standing, Plaintiffs "must have suffered an 'injury in fact'—an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations and quotation marks omitted). Further, "there must be a causal connection between the injury and the conduct complained of" such that the injury cannot be traced to some "independent action" of the defendant. *Id.* And "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561.

Here, Plaintiffs cannot show, and have not satisfied, these elements, because the GEER funds are left to Governor McMaster's discretion. Plaintiffs have no legally protected interest because they have no right to these funds. "The injury in fact requirement precludes those with merely generalized grievances from bringing suit to vindicate an interest common to the entire public." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156 (4th Cir. 2000).

Nor could Plaintiffs' putative injury—a speculative denial of funds—be fairly traced to the purportedly unconstitutional provision, given the Governor's discretion. "A party does not satisfy the traceability requirement when they 'can only speculate' about whether a party will pursue a certain action in a specific way." *Meyer v. McMaster*, 394 F. Supp.

3d 550, 561 (D.S.C. 2019) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013)).

Finally, Plaintiffs cannot show that any injury is "likely" to be redressed by a favorable ruling. *See Lujan*, 504 U.S. at 561. To prove redressability, Plaintiffs must show that they "personally would benefit in a tangible way from the court's intervention." *Meyer*, 394 F. Supp. 3d at 562 (citations and quotation marks omitted). That showing cannot be made when the tangible benefit "depends on the unfettered choices" of actors "whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Frank Krasner Enters., Ltd. v. Montgomery Cty.*, 401 F.3d 230, 235 (4th Cir. 2005) (citations and quotation marks omitted).

Here, sovereign immunity prohibits the Court from requiring the Governor to exercise his discretion and award GEER funding to a particular entity or for a particular purpose. *See Ex parte Young*, 209 U.S. 123, 158 (1908) ("[T]he court cannot control the exercise of the discretion of an officer."); *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 293 (4th Cir. 2001) ("[A] federal court cannot order a State official to remedy past violations of federal law by paying funds out of the State treasury, given that such relief is in practical effect indistinguishable from an award of damages against the State." (citation, quotation marks, and modifications omitted)). And Plaintiffs have not shown that if they prevail, Governor McMaster is *likely* to award them GEER funds. Although Governor McMaster has repeatedly noted that Plaintiffs' schools perform a vital service for South Carolina students and families, (*e.g.*, ECF No. 22 at 2; ECF No. 76 at 4), and Plaintiffs apparently supported his planned allocation of GEER I funds to HBCUs and the SAFE Grants Program, (*see* Am. Compl. ¶¶ 38–39), the Governor was forced to allocate, and has

already allocated, GEER I and II funds for other purposes following the South Carolina Supreme Court's decision in *Adams*. Moreover, the CRRSA prohibits the Governor from awarding GEER II funds to the Bishop of Charleston's K–12 schools. (*See supra* at 7.) In these circumstances, Plaintiffs have not established and do not have standing to assert their claim against Governor McMaster. *Cf. US Ecology, Inc. v. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000) ("Courts have been loath to find standing when redress depends largely on policy decisions yet to be made by government officials."); *Wyo. Sawmills Inc. v. U.S. Forest Serv.*, 383 F.3d 1241, 1249 (10th Cir. 2004) (stating that where a government agency "has complete discretion as to whether to offer the opportunity sought by the plaintiff," a reviewing court "do[es] not have the power to grant the only relief that would rectify the alleged injury"); *Kaplan v. Cty. of Sullivan*, 74 F.3d 398, 400 (2d Cir. 1996) (holding that the "possibility" that a county would adopt a different redistricting plan if the plaintiff prevailed was "too speculative to give [him] standing" where "no such plan ha[d] even been proposed"); *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1228 (9th Cir. 2008) ("[D]iscretionary efforts by the agencies are too uncertain to establish redressibility."); *DH2, Inc. v. SEC*, 422 F.3d 591, 597 (7th Cir. 2005) ("[T]o a significant degree, the injury [the plaintiff] complained of hinges on the decisions of independent actors whose discretion—though subject to securities laws and regulation by the SEC—is nonetheless quite broad."); *Meyer*, 394 F. Supp. 3d at 563 (finding lack of redressability where the plaintiff's "implicit belief that Tesla would move to South Carolina if the statute is invalidated is 'merely speculative,' as opposed to being 'likely,' because there is no allegation within the Complaint that Tesla would take the step that [he] desires it to take" (citations omitted)); (ECF No. 60 at 5 (stating, "[s]peculation about

potential future allocation choices by the Governor is not a sufficient interest for intervention")).

In any event, Plaintiffs' claim against the Governor is moot because the Governor has fully allocated the GEER funds. To ensure "that the Federal Judiciary confines itself to its constitutionally limited role of adjudicating actual and concrete disputes, the resolutions of which have direct consequences on the parties involved," "an actual controversy must be extant at all stages of review." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) (citation and quotation marks omitted). "If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Id.* at 72 (citation and quotation marks omitted); *see also S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015) ("When a case or controversy ceases to exist, the litigation is moot, and the court's subject matter jurisdiction ceases to exist also.").

Here, as Plaintiffs acknowledge, the deadline to allocate GEER I funds passed months ago, and all such funds have already been fully allocated. (ECF No. 95 at 2–3.) And it is undisputed that the GEER II funds have also been fully allocated. (ECF No. 104 at 3.) With no identified GEER monies left, Plaintiffs' only claim against the Governor is moot.

Because the Court lacks jurisdiction over Governor McMaster, he must be dismissed. *E.g.*, *Doyle v. Hogan*, 1 F.4th 249, 255–56 (4th Cir. 2021); *cf.* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

**IV.    Defendants are entitled to summary judgment on the merits.**

With Plaintiffs' claim narrowed to the Act 154 funds,[3] the Court turns to the merits. Mindful of the standard, the Court has reviewed each party's motion independently and resolved all factual disputes, if any, in favor of the nonmoving party. Plaintiffs agree that Section 4 does not facially discriminate based on race or religion. (*See* ECF No. 73-1 at 9 n.6.) They instead claim that Section 4 violates the Equal Protection Clause and the Free Exercise Clause because it was motivated by racial and religious discriminatory intent. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–66 (1977); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993).

"To prevail on the merits of their constitutional challenges," Plaintiffs must "prove that [Section 4] was passed with discriminatory intent and has an actual discriminatory impact." *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 302 (4th Cir. 2020). "Determining whether a statute was enacted with discriminatory intent is a factual question involving a two-step process." *Id.* at 303. First, the Plaintiffs "bear the burden of showing that racial discrimination was a 'substantial' or 'motivating' factor behind enactment of the law.'" *Id.* (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)). The Fourth Circuit has explained that "[c]hallengers need not show that discriminatory purpose was the 'sole' or even a 'primary' motive for the legislation . . . ." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (modifications omitted) (quoting *Arlington Heights*, 429 U.S. at 265–66). The central question is: "did the legislature enact a law 'because of,' and not 'in spite of,' its discriminatory effect"? *Id.* (quoting *Pers. Adm'r*

---

[3] To the extent that Plaintiffs seek damages, sovereign immunity bars that relief against the official-capacity Defendants here. *See Fauconier v. Clarke*, 966 F.3d 265, 279–80 (4th Cir. 2020).

*of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

"Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). "[T]he district court *must* afford the state legislature a 'presumption' of good faith." *Raymond*, 981 F.3d at 303 (emphasis in original) (quoting *Abbott*, 138 S. Ct. at 2324). And neither the challenger's burden nor the presumption of legislative good faith are "changed by a finding of past discrimination." *Abbott*, 138 S. Ct. at 2324. "Past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Id.* (citation, quotation marks, and modifications omitted). "The 'ultimate question remains whether a discriminatory intent has been proved in a given case.'" *Id.* at 2324–25 (quoting *Mobile v. Bolden*, 446 U.S. 55, 74 (1980)).

Answering this question involves looking to *Arlington Height*'s four factors: "(1) historical background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's legislative history; and (4) whether the law 'bears more heavily on one race [or religion] than another.'" *Raymond*, 981 F.3d at 303 (citing and quoting *Arlington Heights*, 429 U.S. at 265–69). "When considering whether discriminatory intent motivates a facially neutral law, a court must undertake a 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *McCrory*, 831 F.3d at 220 (quoting *Arlington Heights*, 429 U.S. at 266). The Court does not consider "each piece of evidence in a vacuum," but considers the "totality of the circumstances." *Id.* at 233. If Plaintiffs prove discriminatory intent, then the burden shifts to the State to show that the provision would have been adopted without that intent. *See Raymond*, 981 F.3d at 303.

Plaintiffs here fail to satisfy their burden of proving discriminatory intent, either racial or religious. Taking the last *Arlington Heights* factor first, Plaintiffs did not prove any discriminatory impact from Section 4. In denying a preliminary injunction, this Court identified the lack of proven discriminatory impact as a core problem with Plaintiffs' case, finding "no evidence that the no-aid provision . . . disproportionately affected African-American students, HBCUs, or religious schools." (ECF No. 34 at 11.) The state of the evidence has not changed on this point, as Plaintiffs did nothing to remedy this failure of proof on summary judgment. They say essentially nothing about racial impact, and they devote few short sentences to religious impact. (*See* ECF No. 73-1 at 30.) Without context, Plaintiffs note that in 1969, about 34% of South Carolina private schools were Catholic and about 26% were "some other version of Protestant." (*Id.*) Plaintiffs do not explain how these bare figures show a discriminatory impact. *Cf. Graves v. Horry-Georgetown Tech. Coll.*, 512 F. Supp. 2d 413, 415 (D.S.C. 2007) ("The nonmoving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.").

As Plaintiffs' expert Dr. Graham acknowledged, the provision disadvantages black and white low-income students alike. (Graham Dep. 117:14–16; *see also* 77:22–24 (acknowledging that Section 4 applies to all races).) Further, Dr. Graham agreed the provision applies equally to all private schools, whatever their religious affiliation (or lack thereof). (*Id.* 78:8–11.) In short, Plaintiffs did not come forward with sufficient evidence to suggest any genuine dispute of material fact on discriminatory impact. *Cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (stating that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to withstand

summary judgment). Thus, the Court finds that Section 4 did not and does not have a discriminatory impact.

Plaintiffs' failure of proof about discriminatory impact dooms their claims. This is because courts in this context have generally required plaintiffs to prove "both intentional discrimination against an identifiable" group "*and* an actual discriminatory effect on that group." *Davis v. Bandemer*, 478 U.S. 109, 127 (1986) (plurality opinion) (emphasis added), *abrogated on other grounds by Rucho v. Common Cause*, 139 S. Ct. 2484 (2019); *see also Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 489 (1997) ("The important starting point for assessing discriminatory intent under *Arlington Heights* is" whether "the impact of the official action . . . bears more heavily on one race than another." (citations and quotation marks omitted)); *Raymond*, 981 F.3d at 302 ("[T]hese Challengers had to prove that the 2018 Voter-ID Law was passed with discriminatory intent and has an actual discriminatory impact."); *Jones v. Governor of Fla.*, 15 F.4th 1062, 1067 (11th Cir. 2021) ("[D]iscriminatory intent and disproportionate impact, together, establish an Equal Protection Clause violation.").[4]

Even if Plaintiffs could get by without proving any discriminatory impact, their claim would still fail. Plaintiffs focus most of their case on the historical background of Section 4, particularly a provision in South Carolina's original 1895 Constitution that prohibited the use of public money "in aid or maintenance of any college, school, hospital, orphan house, or other institution, society or organization, of whatever kind, which is wholly or in part

---

[4] Moreover, the Fourth Circuit has said that "[w]hen discriminatory intent impermissibly motivates the passage of a law, a court may remedy the injury—the impact of the legislation—by invalidating the law." *McCrory*, 831 F.3d at 238. If there is no discriminatory impact, it is hard to see what remedy would be appropriate. In *McCrory*, unlike this case, "the record evidence provide[d] abundant support" that the challenged law had a "disproportionate impact" on African-Americans. *Id.* at 231.

under the direction or control of any church or of any religious or sectarian denomination, society or organization." S.C. Const. art. XI, § 9 (1895). To be sure, both racial and religious prejudice existed in virulent form in the late 1800s, and the Court takes this history into account. As this Court previously stated, then-prominent South Carolina politician Ben Tillman's "segregationist politics and ardent efforts to disenfranchise African-Americans were as abhorrent in the late nineteenth century as they are now." (ECF No. 34 at 10); *see also South Carolina v. Katzenbach*, 383 U.S. 301, 310 n.9 (1966) (describing Tillman's racial history during the 1895 Constitutional Convention). And "the contemporaneous anti-immigrant, anti-Catholic campaign of U.S. Congressman James G. Blaine and the American Protective Association offend all well-reasoned standards of decency, tolerance, and fairness." (ECF No. 34 at 10.)

Starting with religion, according to Plaintiffs, the 1895 provision was a so-called "Blaine Amendment" motivated by anti-Catholic animus. The Supreme Court recently recognized that certain state no-aid provisions "belong to a more checkered tradition shared with the [federal] Blaine Amendment of the 1870s[,]" which "would have added to the Federal Constitution a provision similar to the state no-aid provisions, prohibiting States from aiding 'sectarian' schools." *Espinoza*, 140 S. Ct. at 2259. "It was an open secret that 'sectarian' was code for 'Catholic,'" and "[t]he Blaine Amendment was born of bigotry and arose at a time of pervasive hostility to the Catholic Church and to Catholics in general; many of its state counterparts have a similarly shameful pedigree." *Id.* (citation, quotation marks, and modifications omitted). Plaintiffs also contend that the 1895 provision was supported by Tillman and others with avowedly racist views. But Dr. Graham, Plaintiffs' own expert, conceded that the national Blaine Amendment movement

was not a significant factor in South Carolina. (*See* ECF No. 74-2 at 18–20 (stating that "Catholics did not immigrate into South Carolina in large numbers," and connecting "the discussion about immigration and Roman Catholics to apply politically to the situation of African Americans in South Carolina" only "by analogy").) Indeed, Plaintiffs have offered no evidence that any anti-Catholic sentiment motivated the 1895 provision. The similarity in language between South Carolina's 1895 provision and Blaine Amendments in other States is not enough to make up for Plaintiffs' failure to demonstrate the existence of pervasive anti-Catholic animus in South Carolina, much less Plaintiffs' failure to establish any corresponding discriminatory intent.[5]

Plaintiffs fare no better by claiming the 1895 provision was motivated by race. This type of provision first appeared in the 1868 Constitution. *See* S.C. Const. art. X, § 5 (1868) ("No religious sect or sects shall have exclusive right to, or control of any part of the school funds of the State."). Plaintiffs' own expert, Dr. Graham, stated that the 1868 Constitution was "developed in a constitutional convention by a black majority," "popularly ratified," and "provided for counties, free schools, and extended personal freedoms and liberties to blacks as well as whites." (ECF No. 73-3 at 14.) This provision (as the State notes) was motivated by support for the State's fledgling public educational system, not prejudice. The Court finds that the evidence offered by Plaintiffs in an effort to connect racial prejudice with the 1895 provision is tenuous, as Plaintiffs point to no apparent link between racial motivations and the 1895 provision, much less its 1868 predecessor.

---

[5] Further, Plaintiffs' effort to tag South Carolina with events in other States is seemingly at odds with their own expert's testimony. When asked if he was "trying to attribute what leaders from other states thought to South Carolina . . . as evidence of what was going on in South Carolina at the time," Dr. Charles Glenn said, "No." (Glenn Dep. 46:14–18.) Dr. Glenn clarified that he was "not making any statements about how South Carolina leaders felt about Catholics." (*Id.* at 46:21–23.) Plaintiffs' effort to use Dr. Glenn's testimony as support for the notion that anti-Catholicism elsewhere proves the same discrimination was present in South Carolina is unavailing.

Even assuming the 1895 provision was connected in some way to racial or religious prejudice, Plaintiffs' claim still cannot succeed. The original 1895 provision no longer governs. Instead, the relevant provision was incorporated into the South Carolina Constitution by a vote of the people in 1972 after recommendation by the West Committee in 1969 and a supermajority of the General Assembly. Again, that provision bars the use of public money "for the direct benefit of any religious or other private educational institution." S.C. Const. art. XI, § 4.

Thus, Section 4 no longer distinguishes between religious and non-religious schools, and it no longer bars all funding to these schools. Instead, the adoption of the current version of Section 4 *expanded* funding available to all private religious schools by limiting the existing prohibition to direct funding. In other words, the amendment of Section 4 both eliminated any distinction based on religion and expanded private school funding, regardless of race or religion. Plaintiffs fail to show that the historical background, legislative history, or adoption process of *this* provision—which is neutral on its face— evinces a racial or religious motivation. *Cf. Espinoza*, 140 S. Ct. at 2261 ("A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious.").

Plaintiffs mainly argue that racial and religious prejudice from the 1895 provision tainted Section 4, while also arguing that "[t]he 'historical backdrop' of the 1972 Amendment really started in 1619, when the first slaves came to America's shores." (ECF No. 73-1 at 11.) Plaintiffs point to various historical examples of racism or anti-religious views, including the cover images of the General Assembly's legislative manual, various politicians' support for segregation, and a 1963 state law providing "segregation

25

scholarships" for white students to attend segregated private schools. (*See id.* at 21–30.)

But Plaintiffs' reliance on these other racist or anti-religious views or policies is unavailing because Plaintiffs do not connect them with Section 4's adoption. Again, even if the 1895 provision were motivated by animus, "the presumption of legislative good faith [is] not changed by a finding of past discrimination." *Abbott*, 138 S. Ct. at 2324. "Past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Id.* (citation and modifications omitted). The Court considers this historical background, including the 1895 provision, while focusing the inquiry on the intent underlying Section 4. *See McCrory*, 831 F.3d at 223. Indeed, Plaintiffs concede that "this Court's focus in analyzing the history of the 1972 amendment should stay on the West Committee." (ECF No. 73-1 at 30.) Plaintiffs do not show that Section 4 was motivated by discriminatory intent.

Contrary to Plaintiffs' suggestion that Section 4 was merely a continuation of the earlier provision, Plaintiffs' own expert Dr. Graham testified that "you could make a case that after the West Committee, the revised Constitution may be a new Constitution." (Graham Dep. 59:10–12.) He disclaimed any "straight line" between Ben Tillman and the 1895 Convention and Governor West and the 1972 provision. (*Id.* 64:19–22.) The West Committee explained that it recommended removing the prohibition on indirect aid to private schools because "there may be substantial reasons to aid the students in such institutions." West Committee Report, *supra*, at 101. As explained by Professor Underwood in his "authoritative history of the State Constitution," *Knotts v. Williams*, 462 S.E.2d 288, 290 n.1 (S.C. 1995), the 1972 provision "removes the taint of singling out religious institutions for hostile treatment, which could be just as much of a deviation from

the ideal of state neutrality toward religion as would be a provision singling out religious institutions for favorable treatment." Underwood, *supra*, at 172–73.

As it sought to allow indirect state funding of private schools, the West Committee also said that its recommendation for Section 4's language was made "in conjunction with interpretations being given by the federal judiciary to the 'establishment of religion' clause in the federal constitution." West Committee Report, *supra*, at 99. Plaintiffs argue that this explanation for the provision's failure to permit *direct* aid was a cover for religious bigotry. But Plaintiffs' argument appears to be pure speculation, and they do not suggest that the Committee's expressed concern was unreasonable. *Cf. Graves*, 512 F. Supp. 2d at 415 ("The nonmoving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." (citations omitted)). In the years before, the U.S. Supreme Court had said that "the clause against establishment of religion by law was intended to erect a wall of separation between Church and State" that "must be kept high and impregnable." *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 16, 18 (1947) (citation and quotation marks omitted). It had invalidated voluntary school-sponsored Bible reading, prayer, and a released-time program for voluntary instruction. *See Abington Sch. Dist. v. Schempp*, 374 U.S. 203 (1963); *Engel v. Vitale*, 370 U.S. 421 (1962); *Ill. ex rel. McCollum v. Bd. of Educ.*, 333 U.S. 203, 209–10 (1948). Although Plaintiffs assert that "some Justices were [themselves] influenced by residual anti-Catholicism" (ECF No. 73-1 at 32), the relevant point is that Section 4's drafters could not be said to have acted with discriminatory intent if they were simply seeking to follow federal judicial precedents—and *expand* private school funding.

Plaintiffs also emphasize that several members of the West Committee supported

segregation or other racist policies. But again, Plaintiffs' own expert undercuts their unadorned argument on this claim. According to Dr. Graham, the West Committee was not driven by racial animus or religious bigotry in proposing revisions to the South Carolina Constitution. (Graham Dep. 65:25–66:4, 118:15–21.) Instead, the Committee "was positively oriented toward a meaningful change for South Carolina." (*Id.* 66:6–8.)

In any event, extraneous "comments of a few individual legislators" are not enough to show that Section 4 was adopted with discriminatory intent. *Raymond*, 981 F.3d at 307; *cf. NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017) ("This is a good example of why floor statements by individual legislators rank among the least illuminating forms of legislative history."). That is especially true for this provision, which even after recommendation by the West Committee, still had to be proposed by a supermajority of the House and Senate, adopted by the people, and ratified by the General Assembly. This process "served as an independent intervening event" between any prejudice of individual West Committee members and Section 4's actual adoption. *Raymond*, 981 F.3d at 305. After all, following "the constitutional amendment, the people of [South] Carolina had interjected their voice into the process." *Id.* And Plaintiffs cite nothing in the record or the law that supports their effort to charge the entire voting population of South Carolina with the problematic views of a few selected leaders.

As for Plaintiffs' claim about Section 4 and segregation scholarships, those scholarships had been invalidated years before Section 4's adoption. *Brown v. S.C. State Bd. of Ed.*, 296 F. Supp. 199, 201–02 (D.S.C.), *aff'd sub nom.*, *S.C. State Bd. of Educ. v. Brown*, 393 U.S. 222 (1968). Plaintiffs do not point to any evidence connecting Section 4 with those scholarships.

Further, Plaintiffs disregard the 1970 Tuition Grants Act, enacted just after the West Committee Report was released. That act made "public funds available to provide financial aid for students attending independent institutions of higher learning." *Hartness v. Patterson*, 179 S.E.2d 907, 907 (S.C. 1971). Contemporaneous accounts say that the act had the "blessing of both blacks and whites," unlike the earlier segregation scholarships. Kent Krell, *The State* (April 28, 1970) (ECF No. 74-3). An NAACP attorney and trustee at Benedict College "said he couldn't be happier" because "all the private schools need financial help." *Id.* The South Carolina Supreme Court would invalidate the 1970 act as inconsistent with the 1895 Constitution's prohibition on direct *or* indirect funding of private religious schools. *Hartness*, 179 S.E.2d at 909. But soon after, the voters adopted a constitutional amendment—the provision at issue—that was explained as allowing indirect aid to private schools, religious or not. This history evidences a race- and religion-neutral purpose to promote educational opportunities rather than any discriminatory intent.

Finally, with respect to the remaining *Arlington Heights* factors, Plaintiffs do not suggest, much less establish, that the process leading up to Section 4's adoption provides any evidence of discriminatory intent. Nor could they. There were "no procedural irregularities in the sequence of events leading to the enactment of" the provision. *Raymond*, 981 F.3d at 305. If anything, Section 4 had more process than the norm. The West Committee recommended it after years of study, then two-thirds of the House and Senate agreed to propose it to the people, then the voters adopted it, and then the General Assembly ratified it. *See* S.C. Const. art. XVI, § 1 (1895). That the voters of South Carolina "constitutionally mandated" this provision "[a]t the very least . . . undermine[s]"

any effort to link predecessor provisions with Section 4. *Raymond*, 981 F.3d at 306.

In sum, even putting aside the failure to show any discriminatory impact, the Court finds that Plaintiffs have not met and cannot meet their burden of proving that Section 4 was motivated by discriminatory intent. Thus, Defendants are entitled to summary judgment.

## **CONCLUSION**

For the reasons set forth herein, the Court **DENIES** as moot Defendants' and Intervenor's Joint Motion in Limine (ECF No. 75), **DENIES** Plaintiffs' Motion to Strike (ECF No. 97), and **DENIES** Plaintiffs' Motion for Summary Judgment (ECF No. 73). The Court **GRANTS** Defendants' and Intervenor's Cross-Motions for Summary Judgment (ECF Nos. 74, 76, 77).

**IT IS SO ORDERED.**

/s/Bruce Howe Hendricks
United States District Judge

February 10, 2022
Charleston, South Carolina